**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JERELLE DUNN**, and **SAMUEL SEMPLE**, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> -against- <br><br> **THE CITY OF NEW YORK,** <br><br> Defendant. | Index No.:_____ <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>**Demand for Trial by Jury**</u> |

Plaintiffs **JERELLE DUNN**, and **SAMUEL SEMPLE**, on behalf of themselves and all others similarly situated, and by their attorneys at Beldock Levine and Hoffman, LLP, Rickner PLLC, and the Law Office of Christopher H. Fitzgerald, complain against Defendant the City of New York and allege, based on personal knowledge, information, belief, and the investigation of counsel, as follows:

<strong>PRELIMINARY STATEMENT</strong>

1.      The City of New York ("City") and its agency, the Department of Correction ("DOC"), has completely lost control of New York City's jails. DOC Commissioner Vincent Schiraldi recently admitted that Riker's Island has "been at a crisis level for years," adding that "anybody who thinks that things were going well a year ago or two years ago . . . they're living in a dream world."

2.      Schiraldi further admitted that Rikers is experiencing a "humanitarian crisis," confirming reports that "the inmates are in control" of entire sections of the jails and "there were times when no one was on posts so the incarcerated people are there by themselves." Schiraldi believes that these shocking conditions is caused by a lack of staffing. But this is an

oversimplification of a longstanding problem of mismanagement, poor leadership, and improper staffing, and Rikers problems cannot be accounted for by merely looking at the number of guards employed by the agency.

3.        Nonetheless, staff absenteeism is on the rise, and the antiquated ways in which the DOC staffs and manages its jails led to Schiraldi's shocking admission—that there are not enough correction officers to perform essential, often lifesaving tasks. Despite knowing this for years, the DOC has not made any meaningful attempt to hire or properly train new officers for several years, has failed to ensure that those who are currently employed show up to work, and has failed to repair the antiquated staffing system to ensure those staff members who do show up to work actually end up in the posts where they are needed. This problem has been simmering for years.

4.        Notwithstanding a 2015 consent decree in *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF), as well as the group of monitors who have been making recommendations as to how to fix this longstanding staffing problem, the City of New York, the DOC, and most recently Schiraldi have done nothing meaningful to fix it. And now, the crisis has spiraled out of control.

5.        Put simply, if the City of New York, politicians, and district attorneys insist on detaining thousands of people in jail before they have even been convicted of a crime, then the City also needs to pay to make sure there are sufficient numbers of well-trained correction officers in the posts where they are needed, ready and capable of doing the job.

6.        For decades, the City has known that the DOC facilities and the jails at Rikers Island are improperly staffed, are in disrepair, and are dangerous and inhumane. These conditions violate the most basic rights afforded by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the laws of the State of New York.

7.        The current policy—the result of years of neglect and poor management, as well as the overreliance on uniformed staff who lack effective leadership—has inevitably caused untold suffering, violating the rights of thousands of detainees. The DOC knew this would happen, and the final policymaker blatantly admitted that he knew the same. But nothing was done to stop it.

8.        Despite hundreds of lawsuits, decades of court-appointed reform, continuing federal monitoring, and extensive reporting on the Island's deteriorating conditions, the City of New York has failed to meaningfully intervene or act to create conditions that are compliant with minimal constitutional standards for pre- and post-trial detainees.

9.        While the City has announced plans to close Rikers Island entirely by 2027, it has failed in its duty to ensure the facility is fit for use, instead allowing abhorrent conditions at the multi-complex facility.[1] While politicians and policymakers debate the implementation of a decentralized jail system in the five boroughs, the City has simply allowed the Island to fall into complete disrepair and chaos.

10.        Furthermore, while the conditions at Rikers were by no means caused by the COVID-19 crisis, the  woefully unconstitutional conditions have worsened significantly since the 2020 shutdowns, compounding existing violations with new and worsening issues of overcrowding, failure to separate people known to be ill from those who are not sick, rising numbers of  staff absenteeism, crumbling infrastructure, a lack of medical care, the near evisceration of  recreation, services, and programming, decreased access to lawyers and the court system, and abysmally unsanitary conditions, where human waste and vermin are commonplace.

11.        Plaintiffs Jerelle Dunn and Samuel Semple therefore bring this punitive class action on behalf of themselves and all those detained persons who entered or were housed on Rikers

---

[1] Prior to the COVID-19 pandemic, the City announced that the closure would take place by 2026.

Island on or after April 1, 2021 (hereinafter the "Class Period"), to vindicate the rights of detainees forced to endure inhumane conditions for months and years on end.

## JURISDICTION & VENUE

12.　　　This action is brought pursuant to 42 U.S.C. § 1983 for violations of the punitive class's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States, the common laws of the State of New York, and the Constitution of the State of New York.

13.　　　An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

14.　　　Venue is properly laid in the Southern District of New York, because the acts and omissions described herein occurred in the jurisdiction of the Southern District of New York.

## PARTIES

15.　　　Plaintiff Jerelle Dunn ("Dunn") is, and was at all times relevant to this action, a resident of Bronx County in the State of New York. He entered Rikers Island on September 8, 2021 and was released on October 8, 2021.

16.　　　Plaintiff Samuel Semple ("Semple") is a resident of New York County in the State of New York. He entered Rikers Island on September 3, 2021 and was released on October 16, 2021.

17.　　　Defendant the City of New York ("City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a municipal jail system and does so through the New York City Department of Correction ("DOC"), which is responsible for the operation and maintenance of the multi-facility complexes located on Rikers Island. Defendant the City of New York assumes the risks incidental to the maintenance of Rikers Island and the employment of its staff and correction officers.

4

**THE CITY OF NEW YORK HAS A *DE FACTO* POLICY OF
IMPROPERLY STAFFING AND MISMANAGING RIKERS ISLAND**

A. **The City and the DOC have created a dangerous and inhumane environment for incarcerated individuals by failing to address staffing and mismanagement problems that they knew about for years.**

18.        In 2014, Mayor Bill DeBlasio hosted a roundtable to discuss much-needed reforms to Rikers Island, calling the multi-jail complex a "dehumanizing environment" which creates a "dynamic of conflict and violence" which was "decades in the making."[2]

19.        This round table—one of many public meetings on Rikers that would be held over the next five years—followed a Department of Justice report on the conditions of confinement for adolescent males on Rikers Island (hereinafter the "DOJ Report"). The Report, announced on August 4, 2014, concluded that "there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates."[3]

20.        Prior to the DOJ Report, there was *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF), a class action brought in the Southern District of New York on behalf of all present and future persons incarcerated on Rikers Island. The lawsuit alleged that the City engaged in a pattern and practice of excessive force, leading to a Consent Judgment which put a federal monitor in place to examine the status of uses of force on the Island.

21.        Since the Consent Judgment was entered, the federal monitor, Steve J. Martin, has produced eleven (11) reports covering the period between October 22, 2015 (beginning the first monitoring period) and December 21, 2020 (ending the eleventh monitoring period).

---

[2] *See* "Mayor de Blasio Hosts Media Roundtable on Reform at Rikers Island Correctional Facilities," City of New York Office of the Mayor (November 20, 2014), available at https://www1.nyc.gov/office-of-the-mayor/news/932-14/transcript-mayor-de-blasio-hosts-media-roundtable-reform-rikers-island-correctional.

[3] *See* "CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island," U.S. Department of Justice (Aug. 4 2014), available at https://www.justice.gov/sites/default/files/usao-dny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf.

22.        The most recent monitor's report made clear that the DOC was not only failing to comply with the terms of the Consent Judgment, but that the conditions at Rikers were worsening significantly, reflecting a "pervasive level of disorder and chaos in the facilities."[4]

23.        The driving force behind this rapid decline is the DOC's persistent failure to screen correction officers before they are hired and train employed officers on how to keep incarcerated individuals safe and ensure that they receive the care and services to which they are constitutionally entitled. The obvious and correct solution is to stop sending people to Rikers Island. But if the City and its law enforcement apparatus refuse to decarcerate the Island, they must bear the cost of having the proper staff and officers necessary to manage the jails there.

24.        As the mayor recognized in 2014, Rikers Island was a terrible place for the guards to work, in large part because it was such a terrible and dangerous place to be incarcerated. Correction officers often worked 16-hour days, and the DOC reviewed a steady stream of complaints about working conditions both from the union and the individual officers. The Island is so horribly mismanaged that the DOC does not even have a computer system to organize staff. Instead, staff assignments are tracked by hand, on index cards.[5]

25.        The obvious consequence of these deplorable conditions was that the DOC had trouble attracting and keeping well-qualified correction officers. Over the last several years, the DOC had approximately 7,500 correction officers at Rikers Island (and hundreds more at other facilities). Even then, officers were overworked and undertrained, and attrition was dramatic. In 2017 alone, 999 officers left. Half of these officers retired, but half left before retirement age, fed

---

[4] *See* Martin, Steve J., "Eleventh Monitor's Report: July 1, 2020 – December 31, 2020," (Filed May 5, 2021), available at https://www1.nyc.gov/assets/doc/downloads/pdf/11th_Monitor_Report.pdf.

[5] *See* Vanden Heuvel, Katrina, "Opinion: Closing Rikers Island is a matter of life and death," Washington Post (October 5, 2021), available at https://www.washingtonpost.com/opinions/2021/10/05/rikers-island-death-crisis/.

up with the conditions at Rikers.[6]

26.        But despite the dramatic turnover, and the DOC and union's claimed need for new, highly qualified officers, the DOC entirely failed to take steps to ensure they could train a new class of officers. In 2016, the mayor and the union leaders agreed that the small storefront in Queens that the DOC used to train officers was insufficient, adding that a new facility should have been built 5 or 10 years earlier.[7] But this new training facility was never built. The DOC's August 6, 2021 press release admitted that "New York City has long needed a modern academy designed around best correctional training practices."[8]

27.        The inevitable combination of high attrition, the inability to properly train officers, and the antiquated staffing system for existing officers quickly created a staffing crisis. In April 2020, the correction officers unions sued to end triple shifts—shifts where officers have to work 24 hours straight. But the City did nothing to resolve the situation, even though it was obvious that officers who work for 24 hours in a row are working in a severely diminished capacity, are more likely to inflict violence, and less likely to perform necessary aspects of their jobs.

28.        The mayor responded to these reports, admitting that "[t]here should never have been 24-hour shifts. This was a dumb managerial mistake. It's not going to be allowed going from this point on, ever." But instead, it got worse. By February of 2021, news reports stated that correction officers were at the breaking point. The officers were still regularly working 24 hours

---

[6] *See* Gill, Lauren, New York Focus, and Rauven Blau, "Hundreds of New City Jail Officers for Rikers Put Detainee Advocates on Guard," The City (Jul 11, 2021), available at https://www.thecity.nyc/2021/7/11/22572991/rikers-island-getting-more-jail-guards-correction-officers.

[7] *See* Jorgensen, Jillian, "Rikers Island Will Have More Officers Than Inmates Under Proposed Budget," Observer (January 21, 2016), available at https://observer.com/2016/01/rikers-island-will-have-more-officers-than-inmates-under-proposed-budget/.

[8] *See* DOC Press Release, "City Identifies Site for New Correction Academy," New York City Department of Correction (August 6, 2021), available at https://www1.nyc.gov/site/doc/media/new_correction_academy.page.

shifts, and even sleeping in the parking lot because they were too tired to even drive home. The DOC used a legal maneuver to delay the lawsuit challenging these working conditions, allowing the agency to keep the extended shifts.[9]

29.        In March of 2021, the news reports were even more dire, as officers were working double and triple shifts, without breaks for food or water. At that point, there had not been a new class of recruits for approximately two years.[10]

30.        In May of 2021, the lack of available correction officers led to staff putting an entire facility of detainees with severe mental illness on lockdown. At least 1,200 officers called out sick that day, and another 700 were considered "medically restricted." Approximately 1,901 detainees were forced to stay in their cells, without recreation or services, for at least 13 hours. There were at least 11 similar lockdowns on the Island over the past year.

31.        In July of 2021, there were reports that hundreds of correction officers were quitting the DOC, calling it "the worst job in the world."[11] And many more were incapacitated by COVID-19, which has spread rampantly in the crowded jails. That same month, one incarcerated person even stole a logbook to document the horrific conditions.[12]

32.        Compounding this absenteeism leading to understaffing, correction officers have

---

[9] *See* Video: "I-Team: Correction Officers' Claims of Grueling 24-Hour Shifts," NBC New York (February 15, 2021), available at https://www.nbcnewyork.com/news/local/i-team-correction-officers-claims-of-grueling-24-hour-shifts/2889988/

[10] *See* Video: "Rikers Officers Claim They're Told to Work 24-Hour Shifts Without Breaks, Food Or Water," NBC New York (March 24, 2021), available at https://www.nbcnewyork.com/news/rikers-officers-claim-theyre-told-to-work-24-hour-shifts-without-breaks-food-or-water/2962998/.

[11] *See* Newman, Jack, "'This is the worst job in the world': How hundreds of NYC corrections officers have quit to join the NYPD after being forced to work back-to-back prison shifts," Daily Mail Online (July 12, 2021), available at https://www.dailymail.co.uk/news/article-9780533/Hundreds-NYC-corrections-officers-quit-worst-job-world-join-NYPD.html.

[12] *See* Fonrouge, Gabrielle, "Rikers inmate steals official log book — to complain about 'outrageous' lack of guards," New York Post (July 26, 2021), available at https://nypost.com/2021/07/26/rikers-inmate-steals-log-book-to-complain-about-lack-of-guards/.

become so angry with their situation on the Island that they have started "sick outs," where as many as 1 in 5 officers at a time were calling in sick, allegedly as a form of illegal strike, or possibly because the working conditions had actually made them sick. Either way, in the last few months, staffing problems have worsened. As of July 2021, the DOC had a total of 8,800 uniformed staff members, but 1,600 were on sick leave, 1,400 were medically monitored and unable to work, and 2,200 simply did not come to work that month.[13]

33.     In September of 2021, the mayor and DOC promised that 400 to 600 new recruits would be trained as correction officers. Only 64 showed up for training, indicating that this staffing shortage will only continue to worse, as attrition has badly outpaced hiring. Worse, in September of 2021, more than one-third of all officers on Rikers either called in sick or simply did not show, leaving the remaining officers to work double and triple shifts lasting well over 24 hours. The number of guards missing work is now almost one quarter of all uniformed staff on the Island.

34.     Recently, one officer reported that she "had not eaten or had a break from her post at a facility on Rikers Island in more than 16 hours. When a fight erupted . . . she was too tired to stop it . . . she had worked 15 24-hour shifts since the fall [and] started sleeping in her car . . . because she was too tired to drive home and often had to return in a matter of hours."[14]

35.     These staffing shortages, which continue to increase daily, as well as the mismanagement of available staff, leaves on-duty guards too exhausted to engage in their most basic duties. Tasks like distributing medication, separating detainees by classification (an important security protocol), intervening in violent interactions, deescalating tensions between

---

[13] See Kay, Jacob, "Correction officers call for better conditions at Rikers," Queens Daily Eagle (August 16, 2021), available at https://queenseagle.com/all/corrections-officers-call-for-better-conditions-on-rikers.

[14] See Ransom, Jan, "Disorder and Chaos in N.Y.C. Jails as Pandemic Recedes," The New York Times (Pub. June 19, 2021, updated Sept. 22, 2021).

guards and detainees, escorting incarcerated persons to programming, court appearances, legal visits, or the medical unit, or maintaining basic hygienic and habitable conditions for those housed on the Island, have fallen to the wayside.

**B. The City and DOC stopped repairing Rikers Island, because they planned on closing it, leaving the jails there to fall into disrepair.**

36.        A few years after the DOJ Report and the *Nunez* Consent Judgment, the City announced a $30 million comprehensive plan to close and replace Rikers. City officials claimed that the plan included "immediate steps to expand services and renovate facilities to ensure that those who work and are incarcerated in city jails have safe, humane conditions as quickly as possible."[15]

37.        While the plan made clear that the transition away from Rikers would be lengthy (at the time, the estimated year of completion was 2026), it did not provide a detailed account of how those who remained housed on Rikers Island for the remainder of its operational period would be provided with constitutional standards of care.

38.        In the months and years that followed, the Island's eight separate jail facilities have fallen into complete disrepair. The problem is so abysmal that the City  does not have the ability to execute and complete routine work orders.[16]

39.        On top of dilapidated conditions, at least one-third of the correctional staff has stopped coming in, programming and recreation time is almost nonexistent, medical care is sparse, and conditions grow more dangerous and unsanitary with each passing day.

40.        Whistleblowers and activists, along with City and State officials, have warned for

---

[15] *See* "Mayor DeBlasio Announces 'Smaller, Safe, Fairer: A Roadmap to Closing Rikers Island," City of New York Office of the Mayor (June 22, 2017), available at https://www1.nyc.gov/office-of-the-mayor/news/427-17/mayor-de-blasio-smaller-safer-fairer--roadmap-closing-rikers-island-.

[16] *See generally Benjamin v. Brann*, 75 Civ. 3073 (LAP)(S.D.N.Y.).

years that the Island was at a breaking point, long before COVID-19 reached New York. Yet

conditions have become so abhorrent in recent months that local politicians have pled with Gov.

Hochul and President Biden to intervene, even requesting that the federal government send in the

National Guard to help restore some semblance of order.

### C. The correction officers and staff at Rikers Island are undertrained, mismanaged, and unqualified.

41.         Not only are correction officers at Rikers improperly and inadequately trained, but

they are also severely mismanaged. Correction officers at Rikers Island are not  staffed at the posts

where they are actually needed, the correction officers and staff that are hired and showing up to

work are severely undertrained, mismanaged, and even unqualified.

42.         In fact, the vast majority of the inflated DOC budget does not go to services for

detainees; rather, it is spent on jail staff (mostly uniformed officers), some of whom are notoriously

unfit for the positions for which they are hired.

43.         The Eleventh Monitor's report, published in May, found three overarching issues

hindering progress on the Island, all of which related to improper staffing and poor leadership:

> First, the poor quality of Facility leadership hinders progress and must be
> addressed for the Agency to ever become successful. Second, the dysfunctional
> deployment and overstaffing of certain posts in the Facilities must be reevaluated
> to ascertain whether resources are properly assigned and whether the Staff
> assigned to each post actually meet their responsibilities consistently, without
> simply outsourcing the issue to a different group of Staff. Finally, the Department
> must have the ability to hold Staff accountable closer in time to the incident when
> they are not meeting their responsibilities and when misconduct occurs.[17]

44.         These leadership failures exist through the hiring process, training, supervision, and

discipline of DOC officers. For example, the DOC failed to conduct background checks on

---

[17] *Supra* n.4 at p. 8.

hundreds of new hires for years, leading to the employment of persons closely associated with gangs,[18] persons with violent criminal records, and at least one person who was found to be psychologically unfit for duty, but was nonetheless hired because of her friendship with union leadership.[19]

45.     A Department of Investigation ("DOI") inquiry in 2015 found that the process for hiring DOC staff was inconsistent and dangerous; historically, potential hires were not screened for gang affiliations, and at least one-third of applicants who were hired during the investigatory period should have been disqualified or subjected to further screening, either because they had criminal records, were previously rejected from employment by other law enforcement agencies, had serious psychological diagnoses that could affect their job performance, or had relatives incarcerated on the Island, creating potential security risks.

46.     Training is similarly insufficient. Recently, the DOC admitted that only about 6% of correction officers have taken a yearly refresher course in suicide prevention required of all 8,200 correction officers, and only 17% of uniformed staffers required to take a mandatory fire safety course have completed that training, according to a spokesman for the agency.[20] This lack of training is shocking given that, as early as 2014, the mayor acknowledged that there were vast problems in the training of correction officers receive regarding mental health issues.[21]

---

[18] *See,* Stack, Liam, "2 Rikers Guards Set Up Attack on Inmate, Officials Say," The New York Times (Sept. 17, 2015), available at https://www.nytimes.com/2015/09/18/nyregion/2-rikers-guards-set-up-attack-on-inmate-officials-say.html

[19] *See* Schwirtz, Michael and Michael Winerip, "Warning Signs Overlooked in Hiring for New York City Jails," The New York Times (Jan. 15, 2015), available at https://www.nytimes.com/2015/01/15/nyregion/hired-for-new-york-jails-despite-warning-signs.html.

[20] *See* Marcius, Chelsia Rose, "NYC Correction Dept. failing to give staffers up-to-date training in suicide prevention, fire safety as required ," New York Daily News (Apr. 18, 2021), available at https://www.nydailynews.com/new-york/ny-correction-department-training-suicide-prevention-fire-safety-rikers-island-20210418-mqzfxnwowfhz7a6odazue2smla-story.html.

[21] *Supra* n.2.

47.        Moreover, uniformed staff is under-supervised and is rarely held accountable for wrongdoing. Higher numbers of uniformed officers, of course, is closely associated with higher rates of violent and excessive uses of force ("UOF") against detainees, and it often not a solution to disorder—especially in an era where the jail population is decreasing significantly. But because "[t]he Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base level of skill of its Staff," the problem is not necessarily an overall lack of staffing, but a failure to properly allocate funds or adequately train, supervise, and discipline the staff that is on duty.[22]

## THE LACK OF PROPER STAFFING AND SEVERE MISMANAGEMENT AT RIKERS ISLAND HAS CAUSED AN UNCONSTITUTIONAL HUMANITARIAN CRISIS

48.        Mismanagement and a lack of proper staffing has caused conditions on Rikers Island to deteriorate to the point where conditions of confinement are so inhumane that they continuously violate the constitutional rights of detainees housed on the Island.

49.        This is not a case where a single incident caused the civil rights violation, although often that is the case. Instead, there are a collection of horrible conditions that have worked in concert to make Rikers Island unbearable and unconstitutional.

### A. Violence, by both guards and by detainees, has become steadily worse.

50.        While the number of incarcerated persons on the Island has fallen significantly over the past year, those detainees that remain are feeling the devastating effects of this misallocation of funding and staffing, particularly as it relates to failures to intervene in violent encounters or guards' escalation of violence out of general frustration and impatience with abysmal conditions.

51.        The federal monitoring team on Rikers reported in May that "the conditions that

---

[22] *Supra* n.4 at pp.11–14 (finding that the "staffing issue seems to be one of roster management and deployment versus insufficient numbers of Staff.")

gave rise to the Consent Judgment have not been materially ameliorated . . . [as a] result of a complex system of entrenched (and sometimes outdated) practices, often convoluted policies, and corresponding Staff culture that have developed over decades."[23]

52.        The monitor further noted that the DOC has long-struggled with adequate and competent supervisory staff to properly implement UOF reforms mandated by the Consent Judgment. Staff and management continue to over-rely on specialized teams such as the Emergency Services Unit ("ESU"), who are more likely to implement dangerous and unnecessary UOF against detainees. The ESU teams are summoned for almost any conflict whatsoever, and de-escalation tactics are disfavored while punitive, violent responses are commonplace.

53.        Civilian employees report watching as uniformed staff stand by and merely observe the chaos, either out of sheer fear of intervening or callousness toward the state of affairs. Guards gratuitously and indiscriminately use pepper spray as a method for breaking up disputes, while detainees are subjected to almost daily violence from guards or other incarcerated persons, namely as a result of the City's failure to implement its own classification policies.

54.        The DOC's classification system—a method by which the facilities separate detainees with prior violent histories with one another or who are affiliated with rival gangs—has all but disappeared. Staff and guards are ignoring affiliations, placing persons who have been ordered separate into the same dorms or even the same cells, leading to violent outbursts and serious injuries to detainees and guards alike.

55.        The high rate of staff absenteeism is exacerbating these long-standing problems. In some spaces, there are no guards to be found, leaving detainees vulnerable to attacks, unable to call for help, and isolated in the case of a medical emergency. Detainees are answering phones and

---

[23] *Supra* n.4 at pp. 4–5.

determining who can enter and exit certain areas, while guards are giving detainees make-shift weapons, instigating violence and further contributing to disorder. One officer stated that he has ceased confiscating weapons altogether, despite stabbings on the Island doubling in the last year.

56.        At least 12 detainees have died on the Island in 2021 alone—making it the deadliest year since 2016. At least eight correction officers and four captains have been punished for failures leading to these avoidable deaths.[24]

57.        Self-injury and suicide by detainees is also on the rise. Twenty-five year-old Brandon Rodriguez hung himself on August 10; Segundo Guallpa, 57, was found dead by suicide on August 30; William Diaz-Guzman, 30, hung himself January 23; Forty-eight year-old Tomas Carlo-Camacho died by suicide on March 2; Javier Velasco on March 19; and most recently, Anthony Shabazz Scott, a fifty-eight year old man with an autism diagnosis, was taken off of life support on October 18 after attempting to hang himself in DOC custody.

58.        Uses of force by guards against detainees is also up significantly, 183% higher in 2020 than in 2016. More than half of these incidents were found to be avoidable or problematic, and around 30% were determined to be excessive or violative of the DOC's UOF policies.[25]

59.        Detainees' requests for basic services or expressions of frustration with the conditions on the Island are often met with brutality, as ESU teams are summoned for minor disputes. Officers are hyper-confrontational with detainees and often want to rely on some other staff member to handle the day-to-day issues associated with incarceration, leading to an overuse of weaponized teams and the underutilization of alternatives to physical force.[26]

_____

[24] *Supra* n.14.

[25] *Supra* n.4 at pp. 22–23.

[26] *Id*. at p. 24.

60.        For example, in the early months of a pandemic, a detainee who was using the phone to call his mother and report unsanitary conditions in his facility was ripped from the call by an ESU team after a guard called for emergency backup after a separate group of detainees voiced frustration with new isolation and lockdown protocols related to social distancing.

61.        The ESU team lined the detainees up, searched them, and told the men to return to their cells rather than continue their recreation time. The detainee whose call was cut short was the last to exit the room, and the ESU officers—for no obvious reason at all—proceeded to violently attack the man, knocking his tooth out as they slammed him to the floor and sprayed him in the eyes with a chemical agent. They then placed a hood over his head and over-tightened restraints around his wrists, causing serious injuries. The guards left the detainee bloodied in a cell, with the hood and restraints still on, then fabricated a report claiming that the man instigated the assault. The disciplinary charges against the detainee were eventually dismissed when a reviewing officer held that there were significant due process violations in the officers' reporting.

62.        Such a dismissal, unfortunately, is rare. When detainees are given disciplinary charges in response to guards' post-hoc attempts to justify unreasonable and excessive UOF, the result usually entails severe punishment of the incarcerated person who was assaulted by staff.

63.        When the disciplinary records of correction officers were finally made public with the repeal of Section 50-a of New York's civil rights statute, the data supported what detainees on the Island have been reporting for years—they are brutalized and then punished to cover up the officers' UOF. Over a twenty-month period, more than half of the UOF reported by DOC staff included false and misleading statements, omissions, and outright lies about the circumstances surrounding the UOF. When confronted with these facts, the DOC did not discipline or otherwise punish the officers for these lies; instead, they implemented a course to "improve their writing

skills and to teach them how to complete official incident reports."[27]

**B. Conditions are crowded and unsanitary.**

64.         The staffing shortages and dilapidated facilities have also caused severe overcrowding. Because there are not enough guards or staff available to cover all of the operable facilities on the Island, scores of detainees are being hauled into and indefinitely held in spaces intended for only a few persons to remain temporarily.

65.         The intake process, for example, has been completely upended in recent months. Rather than spending a few hours in the small cells where new detainees are processed, dozens of people are smashed into tiny holding cells for days and weeks at a time. They are expected to defecate in buckets and urinate in bags, all within inches of one another.

66.         The New York Post published images which "show as many as 26 men stuffed body to body in single cells where they were forced to relieve themselves inside plastic bags and take turns sleeping on the fetid floors."[28]

---

[27] *See* Ransom, Jan, "In N.Y.C. Jail System, Guards Often Lie About Excessive Force," The New York Times (Pub. April 24, 2021, updated Sept. 22, 2021), available at https://www.nytimes.com/2021/04/24/nyregion/rikers-guards-lie-nyc-jails.html.

[28] *See* Fonrouge, Gavrielle, "Photos inside Rikers Island expose hellish, deadly conditions," New York Post (October 21, 2021), available at https://nypost.com/2021/10/21/photos-inside-rikers-island-expose-hellish-deadly-conditions/.



67.     During a five-day period in mid-September, at least 105 detainees were inside the

crowded cells long after they should have been moved, records show.[29]

---

[29] *Id.*







68.       In April of 2021, a group of detainees was brought to intake at EMTC, one of eight

facilities on the Island, where they were forced to stay with 27 other people in a single holding pen

for three days. At least 6 of the detainees in the cell were throwing up, likely suffering from drug

withdrawal, before the detainees were moved into the permanent housing area.

69.       One of the men, Mr. Thomas Earl Braunson III, who was being held on a minor

parole violation, died hours later; his death is currently under investigation. DOC staff did not

clean the area in which the man had passed away, despite it being covered in feces and blood.

Other detainees in the unit were forced to clean the mess without any protective equipment.

70.       The Board of Correction's ("BOC") internal investigation of Mr. Braunson's death

noted "horrible conditions" in the jail's intake area where the detainees were held, reporting that

the area has "severe staffing shortages and supplies issues . . . [including] missing sheets and

blankets," that no one in the entire facility had a pillow, and that the detainees "were not receiving

recreation or meals on a regular schedule."[30]

71.        Some detainees go two to four weeks without being offered a shower or clean clothing, and others are forced to sleep on the ground, shoulder to shoulder in these cells. Clothing and shoes, such as slippers typically used in the showers, are altogether unavailable, leaving detainees vulnerable to slip and falls or foot infections from the shared shower spaces and general filth accumulating in the unattended facilities.

72.        In late March of 2020, detainees called for a strike from work and meals in protest of these horrible conditions, including overcrowding and a lack of Personal Protective Equipment ("PPE"). The protest resulted in a short-lived influx of supplies sent in by the City to quell dissent and avoid public attention but supplies quickly depleted and were not replaced.

73.        Heat waves and a lack of water also became prevalent in the summer months of both 2020 and 2021. Lawmakers who toured the facility reported overflowing toilets, crowded intake areas, and detainees forced to sleep standing up inside of shower stalls.

74.        Additionally, while quarantine procedures are technically in place, protocols are not being followed. A two-week quarantine can last up to two months due to new persons being admitted to a specific unit, mixing vaccinated persons with unvaccinated persons and continually restarting the clock on the two-week isolation. Those who are particularly vulnerable to the virus are held inside quarters with those who were brought in from the outside with visible symptoms.

75.        As a result of the detainees knowing that if a new prisoner comes into their dorm, their quarantine will re-start, there has been a widespread practice of the original prisoners in a

---

[30] *See* NYC BOC Death Reviews: Preliminary Report to Board on the death of Thomas Braunson, prepared by Dep. Gen. Counsel Kate McMahon (Apr. 23, 2021), available at https://s3.documentcloud.org/documents/21031127/preliminary-board-report-thomas-braunson_redacted-1.pdf.

dorm, telling guards that if they place a new person in the dorm, that person will be injured so they have to leave, and the quarantine does not restart. This practice is referred to as jumping in, and the DOC employees are knowingly placing new detainees in this apparent and obviously dangerous situation which predictably causes them injury.

76.        Vermin, including squirrels, rats, and mice are also widespread throughout the facilities—including in the kitchens, bathrooms, and sleeping areas.

77.        Food is served cold, and basic dietary needs are not being met, particularly for those with prescription diets due to underlying medical issues such as diabetes or heart disease.

78.        When detainees complain of these conditions or request that their basic needs be met, they are often met with violence and punishment, including lockdowns in units and cells that are literally falling to pieces, further exacerbating the frustration and dehumanization experienced by persons incarcerated on the Island.

**C.  Physical structures are deteriorating.**

79.        Structural deterioration is another long-standing issue on the Island, as the City has ceased any meaningful maintenance of the grounds in anticipation of closing Rikers altogether. In 2017, Mayor DeBlasio acknowledged that extensive repairs and renovations the buildings on Rikers Island were necessary, but the administration seemed to focus on closing Rikers rather than improving conditions for those currently housed there.

80.        In the summer of 2020, at least 89% of grievances made to the DOC were related to a lack of operative air conditioning units or fans in the unit and a lack of access to cool showers, all in the midst of record-breaking temperatures. Where air conditioners are present, the units

regularly break, turning dorms into sweatboxes within minutes.[31]

81.        Rikers Island was built atop a landfill, creating a number of hazardous environmental conditions from its inception. It was once described by a detainee as smelling like "sewer, mixed with fertilizer, mixed with death," conditions which significantly worsen with extreme temperatures.[32]

82.        Most recently, plumbing is clogged and unavailable, doors between units do not lock, and decrepit, aging materials provide make-shift weapons to whomever can collect them.

83.        The Island is filled with decaying and dilapidated structures never meant to provide permanent facilities, including trailers, tents, and the infamous Vernon C. Bain Center ("VCBC") barge, which was docked for temporary use as an "emergency fix" for the Island in 1992. Almost three decades later, VCBC remains an active housing unit for detainees.

84.        During the City's most recent hurricane, flooding and old roofing caused the ceiling in one of the dorm areas came crashing down onto the head of a sleeping detainee. Two weeks later, the mess from the collapse remained strewn about the dorm, and the injured detainee had not yet been seen by the medical staff. Detainees were told by the few staff members present to stay away from the wreckage, but were nonetheless expected to sleep under the collapsing ceiling.

85.        The City has long been on notice of these conditions; their own investigation in 2015 found scores of "'raw materials to fashion weapons,' with buildings full of aging pipes, metal radiators and other items that could be broken, beaten or carved into crude blades."[33] One detainee

---

[31] *See* Donovan, Liz, "As Conditions at Rikers Reach Crisis Levels, Concerns About Heat Persist," Citylimits.org (Sept. 13, 2021), available at https://citylimits.org/2021/09/13/as-conditions-at-rikers-reach-crisis-levels-concerns-about-heat-persist/.

[32] *See* Rakia, Raven, "A sinking jail: The environmental disaster that is Rikers Island," Grist (March 15, 2016), available at https://grist.org/justice/a-sinking-jail-the-environmental-disaster-that-is-rikers-island/.

[33] *Supra* n.14.

recently discovered that a metal grate in the wall of his cell was deteriorated so significantly that he was able to easily kick it down, climb out, and stab his neighbor.

86.         Nevertheless, only minimal efforts have been made to repair the Island's structures and create habitable conditions for the detainees; efforts which have all but disappeared in the wake of the City's plan to close Rikers. Any attempt at rebuilding or repairing broken and crumbling infrastructure within the jail system was further deprioritized in as COVID conditions and staff absenteeism created further turmoil on the Island.

### D.  Recreation and programming has ceased altogether.

87.         Detainees on the Island are no longer receiving adequate (if any) recreation time or programming, despite both constitutional and statutory mandates requiring government officials to provide these services to detainees during their incarceration. Detainees, whether pre- or post-trial, retain a constitutional right to many of the same services, such as adequate education, skills programming, recreation outside of their cells, and daily access to the outdoors.

88.         But these things have all but come to a standstill in recent months. Detainees are spending hours—even days—locked in cells or housing units without access to the outdoors or other forms of recreation time. Staff and outside contractors who lead skills, art, education, and other classes are no longer coming to the Island because of the chaos.

### E.  Emergency and preventative medical care is unavailable.

89.         Detainees have routinely faced significant delays in receiving appropriate medical services, even after 911 has been called or EMS have arrived. These delays functionally amount to a complete denial of emergency medical care.

90.         One detainee was forced to wait over two months before receiving medical attention for scabies, despite repeated requests to see a doctor for weeks. Another man was made to wait for six weeks for treatment after his fingers were badly jammed; by the time he was seen

by the medical staff, his fingers were permanently twisted.[34]

91.        The multitude of problems with healthcare on the Island begins at intake: when detainees arrive, it can take days until they are given a preliminary medical screening. During that time, detainees are deprived of medications that they require for the treatment of ongoing medical conditions. The deprivation of such medication can cause serious harm and, in some cases, death.

92.        Even when detainees have managed to schedule medical appointments, many are unable to attend them because there are not enough correctional officers to escort them through the facility to the medical unit. Where escorts are not available, individuals in detention are simply unable to access routine as well as emergency health services. As a result, thousands of medical visits have been missed in recent months, a significant rise from last year. New York City Councilmember Brad Lander told the City Council that when he toured DOC facilities, medical providers told him they were not seeing 90% of the people on their call list every day.[35]

93.        These inadequacies in the provision of medical care have been directly attributed to the problem of improper staffing and absenteeism. According to Commissioner Vincent Schiraldi, inadequate staff was the sole reason for missed medical appointments.[36] Jeanette Merrill, a spokesperson for Correctional Health Services ("CHS"), said that the shortage of staff coming to the Island forced the DOC to prioritize high risk patients, so "the number of patients awaiting less critical care has grown."[37]

---

[34] *See* Sherman, Rachel, "Rikers Staffing Crisis Limits Access to Medical Care," The City (Aug. 26, 2021), available at https://www.thecity.nyc/health/2021/8/26/22643199/rikers-staffing-crisis-medical-care.

[35] *See* Transcript of New York City Council Hearing of September 15 at 86:20–21, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5117031&GUID=C0114C55-A2DB-430F-84B3-3A451359F9AF&Options=&Search=.

[36] *Id.* at 98:10–12.

[37] *Supra* n.34.

94.	Delays in accessing medical care have heightened the risk of serious, lasting physical injury as well as self-harm. George Anderson, a mental health administrator for CHS, said that "with such long wait times for medical care—sometimes weeks, where it was once days— there is now greater incentive for detainees to self-harm in order to be seen."[38]

95.	These problems are exacerbated by the virulent Delta variant of COVID-19, whose spread throughout the jail has been enabled by overcrowding in holding cells. As of September, Covid-19 rates were outpacing the spread of the disease in the rest of the city. People experiencing flu-like symptoms typically have to wait up to a week to be seen by a doctor, too long to isolate cases and staunch the spread of the virus. One person who died in custody contracted Covid-19 in a crowded intake cell where he was held for ten days after his arrest.[39]

96.	Over the past year, 14 people have died in custody. These deaths have been described as "jail-attributable" by Ross MacDonald, Chief Medical Officer of CHS, meaning that that jail conditions meaningfully contributed to each death.[40]

97.	MacDonald cited "breakdowns in basic functions such as failing to provide correctional staff to supervise some housing areas or observe incarcerated people placed on suicide watch" as contributing factors to these deaths. Ross MacDonald further stated in his letter that "we have witnessed a collapse in basic jail operations, such that today I do not believe the City is capable of safely managing the custody of those it is charged with incarcerating in its jails…"

---

[38] *Id.*

[39] *See* Pazmino, Gloria, "Rikers Island Detainees Expose Lack of Medical Care While in Custody," NY1 (Sep. 21, 2021), available at https://www.ny1.com/nyc/all-boroughs/public-safety/2021/09/22/rikers-island-detainees-expose-lack-of-medical-care-while-in-custody.

[40] *See* Letter from Ross MacDonald to Keith Powers dated September 10, 2021, available at https://www.ny1.com/ content/dam/News/static/nyc/pdfs/RM-city-council-letter-9-10-21.pdf.

98.        The DOC does not even deny that lack of staffing has severely limited access to required medical care. In a filing in *Agnew, et al. v. New York City Department of Correction*, Index No. 813431/2021E, the DOC admitted that:

> Respondent [the DOC] does not dispute the applicability of the mandates, and has freely acknowledged deficiencies in its ability to escort individuals in custody to clinic appointments, primarily due to lack of staff in the jails. … There is no real dispute between the parties as to the following facts: DOC is required to provide access to medical care for individuals in its custody, and the inability to consistently do so is due to serious staff shortages related to the pandemic.

Memorandum of Law at 2.

**F. Access to the courts is severely limited and detainees are missing court dates.**

99.        In certain circumstances, bail is set on individuals accused of crimes to "to secure [there] court attendance." Criminal Procedure Law §510.30(2)(a).

100.        The DOC is not transporting prisoners to court reliably in violations of their rights. Over the course of the last year and a half, however, detainees who are already being held for extensive periods of time due to court closures are subjected to even longer waiting periods because DOC staff is failing to escort them to their virtual and in person court appearances.

101.        One man, Esias Johnson, who was being held on the Island on a $1 bail for misdemeanor offenses, missed three court dates because no one was available to transfer him. DOC staff's failure to facilitate Johnson's court appearance caused him to languish on the Island far longer than he should have. He died in September after missing his August 20 court appearance.

102.        The Bronx District Attorney recently noted a severe drop off in detained persons who were indicted on charges timely appearing for their arraignments, worsening an already back-logged court docket that is struggling to catch up from months-long closures.

103.        In Queens, only 34 out of 52 people with scheduled court proceedings on one September day made it to the borough's criminal court. Back on the Island, DOC buses sat idle,

packed with detainees who were not permitted to disembark off the bus because staff was simply too overwhelmed to escort them to the appropriate facilities.[41]

104.        Legal calls and visits are similarly unavailable or severely limited. Attorneys cannot get ahold of staff to set up visits or calls, or when they do call at a scheduled time, attorneys are met with unanswered phones, or told that their client was not brought down to the legal call area.

105.        Often times, it can take weeks before a new call or visit can be arranged, interfering with the detainees' right to communicate with counsel and support their own criminal defenses.

106.        Persons awaiting trial have a Sixth Amendment right to an unimpeded criminal defense, including regular contact with their attorney(s). Those who have been convicted, but remain on the Island, also retain a constitutional right to access the courts, including uninterrupted access to legal mail and calls, as well as a law library.

### G. The City is actively violating multiple court orders.

107.        In addition to the multitude of requirements imposed by the original *Nunez* consent judgment, most of which continue to be ignored by City officials, U.S. District Judge Laura Taylor Swain recently entered a sweeping order to help alleviate some of the concerns about worsening conditions on the Island.[42] There have been no signs of such implementation thus far.

108.        In late September 2021, Judge Mitchell J. Danzinger of the Supreme Court, Bronx County, issued a preliminary injunction related to the inhumane conditions in a specific unit inside the George R. Vierno Correctional Facility ("GRVC") on Rikers Island called the Enhanced Supervision Housing ("ESH"). [43] The unit holds detainees who the DOC believes pose a threat to

---

[41] *See* Blau, Reuven, "Justice Delayed: City Jail Staff Shortage Keeps Detainees From Getting to Court," The City (Sept. 14, 2021), available at https://www.thecity.nyc/2021/9/14/22674823/nyc-rikers-jail-staff-shortage-keeps-detainees-from-court.

[42] *See Nunez*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y.) at Dkt No. 398.

[43] *See Acre et al v. City of New York, et al*, Index No. 809252/2021 (Sup. Ct. Bronx Co. 2021).

themselves or others; there are approximately 115 persons housed there.

109.        The comprehensive preliminary injunction directed the DOC to provide basic standards of living—access to showers and personal care items, bedding, clean blankets, recreational periods, access to attorneys and the courts, and three hot meals a day. The City continues to violate the injunctive order.

110.        At least one other lawsuit was recently brought by local defender organizations on behalf of those detainees still trapped on the Island, specifically complaining of the lack of medical care accessible to those who need it.[44] While no order has yet been entered by the court, the mandamus action, also in the Bronx Supreme Court, seeks similar relief commanding the DOC to provide the care they legally owe to all those in their case on the Island.

## VIOLATIONS OF THE NAMED PLAINTIFFS' CONSTITUTIONAL RIGHTS

*Jerelle Dunn*

111.        Plaintiff Jerelle Dunn ("Mr. Dunn") arrived at the Otis Bantum Correctional Center ("OBCC") at Rikers on September 8, 2021.

112.        The next day, Mr. Dunn was arraigned in court and pled not guilty.

113.        Upon his return from court to OBCC, Mr. Dunn was forced to wait outside the facility for approximately eight hours in a crowded and filthy bus. On the bus, Mr. Dunn did not have access to a toilet, food, or water.

114.        Mr. Dunn and other detainees on the bus repeatedly asked to use the bathroom but were ignored. Eventually, they had no choice but to urinate on the floor of the bus.

115.        When Mr. Dunn was finally taken to the intake area inside the facility, he was placed with approximately 30-40 men in a cell that might ordinarily hold 5-10 people. Amidst the

---

[44] *See Agnew et al v. New York City Dep't of Corr.*, Index No. 813431/2021E (Sup. Ct. Bronx Co. 2021).

COVID-19 pandemic, the men were not provided with masks and sat shoulder to shoulder in unsanitary conditions.

116.        The toilet in the cell did not work, and some men urinated and defecated on the floor and walls.

117.        Crammed in a tight space, the men took turns sleeping on the dirty floor. Mr. Dunn took his turn and, at other times, tried to sleep sitting down on a hard metal bench.

118.        Most of the time, there were no officers in what was purported to be an intake processing area.

119.        Officers would briefly visit the area to spray detainees who they understood to be behaving in a problematic way with a chemical agent. Although the spray was meant to break up fights, innocent people in proximity were forced to breathe it in.

120.        In the officers' absence, detainees at OBCC controlled access to the jail's food, water, and phone calls.

121.        For almost a week in intake, Mr. Dunn did not receive adequate water or food.

122.        Mr. Dunn was also denied significant access to the commissary.

123.        The little food he received was cold, inedible, and/or rotten. With at least one of his meals, Mr. Dunn was given orange mayonnaise.

124.        Detainees also controlled the phones and charged for phone calls.

125.        In mid-September, Mr. Dunn was finally transferred from intake to a housing unit where conditions were not much better.

126.        For the first two days in the dorm, Mr. Dunn did not receive a mattress and was made to sleep on a filthy floor.

127.        Mr. Dunn also had to use a bug-infested shower in his housing area.

128.        No cleaning supplies or mops were available for staff or detainees to clean the area.

129.        Nor did the facility provide Mr. Dunn with a change of underclothes for an entire month while he was in custody. Mr. Dunn wore a towel and cleaned his clothes by hand.

130.        Due to the unsanitary conditions and inedible food, Mr. Dunn lost weight and became sick.

131.        The staff at Rikers repeatedly ignored his urgent sick calls even when he saw blood in his stool and reported an emergency.

132.        Mr. Dunn's girlfriend called 311 at least three times to request medical assistance for him. Still, it was weeks before a doctor examined Mr. Dunn.

133.        When others in Mr. Dunn's dorm tested positive for COVID-19, officers did not immediately isolate them.

134.        In addition to the lack of food, hygiene, and medical care, Mr. Dunn was surrounded by constant violence on the floor of his dorm. Except for the day Mayor Bill de Blasio visited Rikers,[45] there were no officers patrolling the floor.[46]

135.        During the entire month Mr. Dunn spent in Rikers, he did not have access to recreational time nor was he permitted to step foot outside except on the rare occasion he was taken to court.

136.        Yet Mr. Dunn was not produced to court on at least two court dates in early October and his release was delayed.

137.        While in custody, Mr. Dunn did not receive privileged legal mail that his defense

---

[45] Mayor de Blasio visited Rikers on September 27, 2021. *See* Bromwich, Jonah and Fitzsimmons, Emma, "'The Whole Thing Upsets Me': Mayor Finally Visits Rikers," The New York Times (Pub. Sept. 27, 2021, Updated Oct. 7, 2021), available at: https://www.nytimes.com/2021/09/27/nyregion/rikers-island-de-blasio-congress.html.

[46] Only one or two officers were seated in the "bubble."

attorney sent him weeks earlier.

138.    Mr. Dunn was finally released from Rikers on October 8, 2021.

***Samuel Semple***

139.    Plaintiff Samuel Semple ("Mr. Semple") is a 37-year-old man who suffers from physical and mental health conditions.

140.    Mr. Semple arrived at the Rikers OBCC intake area on September 3, 2021.

141.    Although he requires medical and psychiatric care, Mr. Semple was trapped for eight days in a crowded cell with approximately 40 other men.

142.    In this congregate and polluted setting, the men were not provided with masks to protect against COVID-19.

143.    The toilet in the cell leaked and flooded onto an already filthy floor.

144.    For days, Mr. Semple was not permitted to shower and was not given basic hygiene products like a toothbrush.  Nor did he receive a blanket though he felt extremely cold.

145.    In addition, Mr. Semple was not provided with adequate meals and his dietary restrictions were not met.

146.    On more than one occasion when officers used a chemical spray against detainees, Mr. Semple was indirectly sprayed. Because he suffers from asthma and did not have his inhaler with him, Mr. Semple could not breathe and felt himself choking.

147.    On or about September 8, 2021, having been in intake for five days, Mr. Semple was not produced for his court date.

148.    On September 11, 2021, Mr. Semple was finally transferred from intake to the gym and later moved between various dorms at OBCC.

149.    In one dorm, five detainees – one of whom had a knife – demanded Mr. Semple's cane, which he uses after a hip replacement.

150.        Mr. Semple tossed his cane to the detainees at which point they attacked him with it causing injury.

151.        During his transfer to another dorm, Mr. Semple's feet were soaked due to a flooded hallway.  He was not provided with a change of socks or clothes.

152.        Mr. Semple was further injured when he was caused to slip and fall in an unmaintained bathroom.

153.        For 11 days, Mr. Semple was not permitted a phone call to his family.

154.        Unconscionably, for the 42 days Mr. Semple was at Rikers, he was denied psychiatric care and was not given essential medication. As a result, his condition was exacerbated.

155.        Mr. Semple was finally released from Rikers on October 16, 2021.

## CLASS ACTION ALLEGATIONS

156.        Pursuant to Fed. R. Civ. P. 23(a) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a class of plaintiffs consisting of individuals who were in DOC custody on Rikers Island from April 1, 2021 until the present and going forward into the future, and were subjected to the above-described conduct, including those who:

    a. Suffered from inmate-on-inmate violence;

    b. Suffered from assaults by DOC employees;

    c. Were denied sanitary cells;

    d. Were denied medical visits;

    e. Were denied access to medical facilities and personnel;

    f. Were denied access to the courts;

    g. Were denied access to legal calls;

    h. Were denied recreation;

i. Were denied regular and sanitary meals.

157.        As well as all the people in DOC custody who were subjected to all or many of these conditions at once.

## JURY DEMAND

158.        Plaintiffs demands a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983
### (Monell Liability)
### *The City of New York*

159.        Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

160.        The City of New York had and had a *de facto* policy of improperly staffing Rikers Island, failing to properly hire and train qualified correction officers, failing to properly manage correction officers and staff at Rikers Island, and failing to keep Rikers Island's facilities in proper working order.

161.        The City of New York, including final policy makers at the DOC, and the mayor himself, have been aware of the problems detailed in this Complaint since at least 2014, and likely much longer. Throughout 2020, these same final policymakers knew the situations was deteriorating. But they did nothing.

162.        The direct and inevitable result of the City of New York's policies are the multiple deprivations of the detainees' and Plaintiffs' constitutional rights. The driving force behind every horrible condition at Rikers Island is a combination of the failure to properly staff the jails, the failure to train the people working there, and the failure to keep the jails in proper working order.

Put simply, the City of New York let Rikers Island fall apart, causing the suffering and constitutional violations we see now. Detainees and plaintiffs were thus deprived of the minimal civilized measure of life's necessities and were subjected to unreasonable health and safety risks.

163.        These conditions violate the most basic rights afforded by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

## SECOND CAUSE OF ACTION

### State Law
### (Constitutional Violations and Tort)
### *The City of New York*

164.        Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

165.Such conduct breached the protections guaranteed to plaintiff by the New York State Constitution, including but not limited to, Article 1, §§ 1 and 6.

166.Employees of the City of New York and the DOC created and allowed to continue horrific conditions that deprived detainees and the Plaintiffs of the minimal civilized measure of life's necessities and subjected them to unreasonable health and safety risks.

## THIRD CAUSE OF ACTION

### State Law
### (Negligence)
### *The City of New York*

167.        Plaintiffs incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

168.        In assuming physical custody of plaintiffs the City undertook a duty of care to, *inter alia*, safeguard them from harm.

169.        The City violation of their duty of care to plaintiffs was a direct and proximate

cause and a substantial factor in bringing about their damages as outlined above, and, as a result, defendant is liable to plaintiff.

**WHEREFORE**, Plaintiffs request that this Court:

    a.  Issue an Order certifying this action as a class action with Plaintiffs as class representatives;

    b.  Require Defendants to pay compensatory and punitive damages in fair, just, and reasonable amounts to be determined at trial;

    c.  Award attorney's fees and costs, as well as pre- and post-judgment interest; and

    d.  Grant such other and further relief as this court may deem appropriate and equitable.

Dated:  November 2, 2021
         New York, New York

**BELDOCK LEVINE & HOFFMAN LLP**

By: _____
    Jonathan C. Moore
    David B. Rankin
    Deema Azizi
    Regina Powers
    Liza Batkin (law graduate – not yet admitted)

99 Park Avenue, PH/26th Floor
New York, New York 10016
    t: 212-490-0400
      212-277-5825
    e: jmoore@blhny.com
      drankin@blhny.com
      dazizi@blhny.com
      rpowers@blhny.com

**RICKNER PLLC**

By:
_____/s/_____
Rob Rickner
Masai I. Lord (of counsel)
Stephanie Panousieris (*pro hac vice*)

14 Wall Street, Suite 1603
New York, New York 10005
t: (212) 300-6506
e:  rob@ricknerpllc.com
    mlord@lordlawgroup.com
    stephanie@ricknerpllc.com

**THE LAW OFFICE OF
CHRISTOPHER H. FITZGERALD**

By:_____/s/_____
Christopher H. Fitzgerald

233 Broadway, Suite 2348

New York , NY 10279
t: (212)226-2275
e: CFitzgerald@CHFLegal.com
*Attorneys for Plaintiffs*

TO:

THE CITY OF NEW YORK
New York City Law Department
100 Church Street
New York, New York 10007