**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**JERELLE DUNN, SAMUEL SEMPLE**,
**ANDRE WASHINGTON, WILLIAM**
**CLANTON**, **SAMIR SHABAN,** and
**MICHAEL PENA**, on behalf of themselves and
all others similarly situated,

     Plaintiffs,

       -against-

**THE CITY OF NEW YORK,**

     Defendant.

**Case No: 21-cv-09012 (DLC)**

# FIRST AMENDED
# CLASS ACTION COMPLAINT

June 24, 2022

**BELDOCK LEVINE & HOFFMAN LLP**
Jonathan C. Moore
David B. Rankin
Deema Azizi
Liza Batkin
Regina Powers

99 Park Avenue, PH/26th Floor
New York, New York 10016
t: 212-490-0400
  212-277-5825
e: jmoore@blhny.com
  drankin@blhny.com
  dazizi@blhny.com
  lbatkin@blhny.com
  rpowers@blhny.com

**RICKNER PLLC**
Rob Rickner
Masai I. Lord (of counsel)
Stephanie Panousieris

14 Wall Street, Suite 1603
New York, New York 10005
t: 212-300-6506
e: rob@ricknerpllc.com
  mlord@lordlawgroup.com
  stephanie@ricknerpllc.com

**THE LAW OFFICE OF**
**CHRISTOPHER H. FITZGERALD**
Christopher H. Fitzgerald

14 Wall Street, Suite 1603
New York, New York 10005
t: 212-226-2275

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................I

PRELIMINARY STATEMENT ........................................................................................ 1

JURISDICTION & VENUE ............................................................................................... 3

VIOLATIONS OF THE NAMED PLAINTIFFS' CONSTITUTIONAL RIGHTS ............. 4

    Jerelle Dunn .................................................................................................................... 4

    Samuel Semple ............................................................................................................... 6

    Andre Washington .......................................................................................................... 7

    William Clanton ............................................................................................................. 9

    Samir Shaban ............................................................................................................... 11

    Michael Peña................................................................................................................ 13

THE CITY OF NEW YORK HAS A POLICY OF DELIBERATE INDIFFERENCE TO
INHUMANE CONDITIONS OF CONFINEMENT ON RIKERS ISLAND....................... 17

    A.  Conditions are overcrowded, unsanitary, and unhabitable as the physical structures on Rikers
        Island fall apart. ........................................................................................................ 18

        i.   Lack of Sanitation .......................................................................................... 22

        ii.  Heat Conditions ............................................................................................. 24

        iii.  Structural and Physical Problems .................................................................. 25

    B.  Detained persons are denied adequate, sanitary, and regular meals. ............................... 27

    C.  Violence is rampant among both guards and detained persons, and the incarcerated population is
        constantly under threat of injury or death................................................................... 28

    D.  Emergency and preventative medical and mental health care is unavailable................... 38

    E.  Recreation and programming, including access to religious programming, has ceased altogether. 44

    F.  Access to the courts is severely limited and detained persons are missing court dates and are
        denied legal calls. ...................................................................................................... 46

THE CITY OF NEW YORK HAS A DE FACTO POLICY OF IMPROPERLY STAFFING
AND MISMANAGING RIKERS ISLAND........................................................................ 48

    A.  The Department of Correction is experiencing a staffing crisis caused by years of mismanagement
        and poor policymaking by the City. ............................................................................ 48

    B.  Rikers has a pervasive culture of violence among its staff.............................................. 59

    C.  The City has neglected Rikers Island in anticipation of closing it down. ....................... 61

THE CITY OF NEW YORK IS ACTIVELY VIOLATING MULTIPLE COURT ORDERS
AND CONSENT DECREES............................................................................................. 62

CLASS ACTION ALLEGATIONS .................................................................................. 64

**FIRST CAUSE OF ACTION**.................................................................................................. **64**

**SECOND CAUSE OF ACTION**............................................................................................... **66**

**THIRD CAUSE OF ACTION** .................................................................................................. **66**

**CONCLUSION** .......................................................................................................................... **67**

Plaintiffs **JERELLE DUNN, SAMUEL SEMPLE**, **ANDRE WASHINGTON**, **WILLIAM CLANTON**, **SAMIR SHABAN**, and **MICHAEL PENA,** on behalf of themselves and all others similarly situated, and by their attorneys at Beldock Levine and Hoffman, LLP, Rickner PLLC, and the Law Office of Christopher H. Fitzgerald, complain against Defendant the City of New York and allege, based on personal knowledge, information, belief, and the investigation of counsel, as follows:

## PRELIMINARY STATEMENT

1.          The City of New York ("City") and its agency, the Department of Correction ("DOC"), have completely lost control of New York City's jails. For decades, the City has known that their official and *de facto* policies and practices have created, perpetuated, and exacerbated unconstitutional conditions of confinement on Rikers Island. But despite years of court-ordered reform, thousands of individual lawsuits, and extensive reporting about the institutional failures behind these abhorrent conditions, the City continues to act with complete and deliberate indifference toward these blatantly unconstitutional conditions and the suffering of those forced to endure them.

2.          The conditions on Rikers Island fell well below minimum constitutional standards years before the pandemic reached New York City, and Rikers has long been known as one of the worst jails in the country. Longstanding structural and managerial issues, however, have only worsened with the City's inability to handle the effects of COVID-19, further exacerbating issues of sanitation, violence, and disorder.

3.          In 2021, then-DOC Commissioner Vincent Schiraldi called conditions the Island a "humanitarian crisis." And it is not difficult to see why. The City maintains a jail system at Rikers with longstanding issues of overcrowding; crumbling infrastructure; spoiled and nutritionally

deficient food; a lack of medical and mental health care; little to no recreation, services, and programming; decreased access to lawyers and the courts; a lack of emergency services to intervene in (let alone deescalate) violent incidents; and appallingly unsanitary conditions where human waste and vermin are commonplace. Long into this humanitarian crisis, and in violation of multiple court orders,[1] the City remains indifferent to these horrific conditions.

4.          The City's repeated failures to remedy these conditions has resulted in a universally chaotic and terrifying environment for every person housed on the Island. Conditions are so horrific that the City has announced that it will close Rikers entirely by 2027.[2] But thousands of people remain detained there right now, and the City continues to allow its facilities to rapidly deteriorate.

5.          Under such abysmal circumstances—where detained persons live in constant fear and deplorable conditions each day, in violation of their most basic rights—the very act of housing a person on the Island constitutes punishment without due process of law, and far exceeds the bounds of any lawful sentence or constitutionally permissible pre-trial detention.

6.          Plaintiffs Jerelle Dunn, Samuel Semple, Andre Washington, William Clanton, Samir Shaban, and Michael Peña, who were subjected to the abhorrent conditions at Rikers Island while detained there, now bring this class action on behalf of themselves and all those detained persons who entered or were housed on Rikers Island on or after November 2, 2018 (hereinafter the "Class Period"), to vindicate the rights of the thousands of detained persons forced to endure inhumane conditions for months and years on end.

---

[1] *See, e.g.*, *Agnew v. New York City Department of Correction*, Index No. 813431/2021E (Bronx Co. Sup. Ct. May 13, 2022), Doc. No. 126.

[2] Prior to the COVID-19 pandemic, the City announced that the closure would take place by 2026.

## JURISDICTION & VENUE

7.          This action is brought pursuant to 42 U.S.C. § 1983 for violations of the punitive class's rights under the Constitution of the United States, the common laws of the State of New York, and the Constitution of the State of New York.

8.          An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

9.          Venue is properly laid in the Southern District of New York, because the acts and omissions described herein occurred in the jurisdiction of the Southern District of New York.

## PARTIES

10.          Plaintiff Jerelle Dunn ("Dunn") is, and was at all times relevant to this action, a resident of Bronx County in the State of New York. He entered Rikers Island on September 8, 2021 and was released on October 8, 2021.

11.          Plaintiff Samuel Semple ("Semple") is a resident of New York County in the State of New York. He entered Rikers Island on September 3, 2021 and was released on October 16, 2021.

12.          Plaintiff Andre Washington ("Mr. Washington") is currently a resident of Kings County in the State of New York. He entered Rikers Island on November 10, 2021 and was released on December 23, 2021.

13.          Plaintiff William Clanton ("Mr. Clanton") is currently a resident of Suffolk County in the State of New York. He entered Rikers Island on September 25, 2020 and was released approximately one year later in or around September of 2021.

14.          Plaintiff Samir Shaban ("Mr. Shaban") is currently a resident of Hudson County in the State of New Jersey. He entered Rikers Island on March 15, 2021 and was released on November 11, 2021.

15.          Plaintiff Michael Peña ("Mr. Peña") is currently a resident of Bronx County in the

State of New York. He entered Rikers Island on May 10, 2021, charged with a technical violation of his parole, and was released on August 6, 2021.

16.          Defendant the City of New York ("City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a municipal jail system and does so through the New York City Department of Correction ("DOC"), which is responsible for the operation and maintenance of the multi-facility complexes located on Rikers Island. Defendant the City of New York assumes the risks incidental to the maintenance of Rikers Island and the employment of its staff and correction officers.

## VIOLATIONS OF THE NAMED PLAINTIFFS' CONSTITUTIONAL RIGHTS

### Jerelle Dunn

17.          Plaintiff Jerelle Dunn ("Mr. Dunn") arrived at the Otis Bantum Correctional Center ("OBCC") at Rikers on September 8, 2021. The next day, Mr. Dunn was arraigned in court and pled not guilty.

18.          Upon his return from court to OBCC, Mr. Dunn was forced to wait outside the facility for approximately eight hours in a crowded and filthy bus. On the bus, Mr. Dunn did not have access to a toilet, food, or water.

19.          Mr. Dunn and other detained persons on the bus repeatedly asked to use the bathroom but were ignored. Eventually, they had no choice but to urinate on the floor of the bus.

20.          When Mr. Dunn was finally taken to the intake area inside the facility, he was placed with approximately 30-40 men in a cell that might ordinarily hold 5-10 people. Amidst the COVID-19 pandemic, the men were not provided with masks and sat shoulder to shoulder in unsanitary conditions.  The toilet in the cell did not work, and some men urinated and defecated on the floor and walls.

21.          Crammed in a tight space, the men took turns sleeping on the dirty floor. Mr. Dunn

took his turn and, at other times, tried to sleep sitting down on a hard metal bench. Most of the time, there were no officers in what was purported to be an intake processing area.

22.        Officers would briefly visit the area to spray detained persons who they understood to be behaving in a problematic way with a chemical agent. Although the spray was meant to break up fights, innocent people in proximity were forced to breathe it in.

23.        In the officers' absence, detained persons at OBCC controlled access to the jail's food, water, and phone calls. Detained persons also controlled the phones and charged for calls.

24.        For almost a week in intake, Mr. Dunn did not receive adequate water or food. Mr. Dunn was also denied significant access to the commissary. The little food he received was cold, inedible, and/or rotten. With at least one of his meals, Mr. Dunn was given orange mayonnaise.

25.        In mid-September, Mr. Dunn was finally transferred from intake to a housing unit where conditions were not much better. For the first two days in the dorm, Mr. Dunn did not receive a mattress and was made to sleep on a filthy floor.

26.        Mr. Dunn also had to use a bug-infested shower in his housing area, and no cleaning supplies or mops were available for staff or detained persons to clean the area.

27.        Nor did the facility provide Mr. Dunn with a change of underclothes for an entire month while he was in custody. Mr. Dunn wore a towel and cleaned his clothes by hand.

28.        Due to the unsanitary conditions and inedible food, Mr. Dunn lost weight and became sick. The staff at Rikers repeatedly ignored his urgent sick calls even when he saw blood in his stool and reported an emergency.

29.        Mr. Dunn's girlfriend called 311 at least three times to request medical assistance for him. Still, it was weeks before a doctor examined Mr. Dunn. When others in Mr. Dunn's dorm tested positive for COVID-19, officers did not promptly isolate them.

30.        In addition to the lack of food, hygiene, and medical care, Mr. Dunn was surrounded by constant violence on the floor of his dorm. Except for the day Mayor Bill de Blasio visited Rikers,[3] there were no officers patrolling the floor.[4]

31.        During the entire month Mr. Dunn spent in Rikers, he did not have access to recreational time nor was he permitted to step foot outside except on the rare occasion he was taken to court. Yet Mr. Dunn was not produced to court on at least two court dates in early October and his release was delayed.

32.        While in custody, Mr. Dunn did not receive privileged legal mail that his defense attorney sent him weeks earlier.

33.        Mr. Dunn was finally released from Rikers on October 8, 2021.

**Samuel Semple**

34.        Plaintiff Samuel Semple ("Mr. Semple") is a 37-year-old man who suffers from physical and mental health conditions. He arrived at the Rikers OBCC intake area on September 3, 2021.

35.        Although he requires medical and psychiatric care, Mr. Semple was trapped for eight days in a crowded cell with approximately 40 other men. In this congregate and polluted setting, the men were not provided with masks to protect against COVID-19. The toilet in the cell leaked and flooded onto an already filthy floor.

36.        For days, Mr. Semple was not permitted to shower and was not given basic hygiene products like a toothbrush. Nor did he receive a blanket though he felt extremely cold.

---

[3] Mayor de Blasio visited Rikers on September 27, 2021. *See* Jonah Bromwich and Emma Fitzsimmons, *'The Whole Thing Upsets Me': Mayor Finally Visits Rikers*, N.Y. Times (Pub. Sept. 27, 2021, Updated Oct. 7, 2021), https://www.nytimes.com/2021/09/27/nyregion/rikers-island-de-blasio-congress.html.

[4] Only one or two officers were seated in the "bubble."

37.      In addition, Mr. Semple was not provided with adequate meals and his dietary restrictions were not met.

38.      On more than one occasion when officers used a chemical spray against detained persons, Mr. Semple was indirectly sprayed. Because he suffers from asthma and did not have his inhaler with him, Mr. Semple could not breathe and felt himself choking.

39.      On or about September 8, 2021, having been in intake for five days, Mr. Semple was not produced for his court date.

40.      On September 11, 2021, Mr. Semple was finally transferred from intake to the gym and later moved between various dorms at OBCC. In one dorm, five detained persons – one of whom had a knife – demanded Mr. Semple's cane, which he uses after a hip replacement. Mr. Semple tossed his cane to the detained persons at which point they attacked him with it causing injury.

41.      During his transfer to another dorm, Mr. Semple's feet were soaked due to a flooded hallway. He was not provided with a change of socks or clothes. Mr. Semple was further injured when he was caused to slip and fall in an unmaintained bathroom.

42.      For 11 days, Mr. Semple was not permitted a phone call to his family.

43.      Unconscionably, for the 42 days Mr. Semple was at Rikers, he was denied psychiatric care and was not given essential medication. As a result, his condition was exacerbated.

44.      Mr. Semple was finally released from Rikers on October 16, 2021.

*Andre Washington*

45.      Plaintiff Andre Washington ("Mr. Washington") was originally placed in Eric M. Taylor Center ("EMTC") and spent two days in intake before moving to a housing area. He spent all but the last two or three of his days in custody in EMTC.

46.　　　　The intake area of EMTC was a small cell crowded with approximately thirty people. He described the conditions as unsanitary and dirty. People were forced to sleep on the floor. The housing unit of EMTC was crowded with upwards of forty people at the height of Covid

47.　　　　Mr. Washington had pre-existing conditions including high blood pressure and heart complications that made him more vulnerable to severe Covid-19 and increased his risk and fear of contracting the virus. Approximately fourteen of the people held in the housing cell became sick with Covid-19.

48.　　　　Mr. Washington experienced the unsanitary and dilapidated conditions of the buildings at Rikers, including floods and rats in the housing and intake areas.

49.　　　　 Mr. Washington got a job working in the intake area in order to have time away from his housing area. While working in intake, he witnessed people who are incarcerated stab one another. He also saw one person attempt suicide by hanging himself up on a pipe and had to hold the person's body while a correctional officer cut the rope that was suspending him. He had to clean feces and vomit from the floor and walls of the cells.

50.　　　　Witnessing the attempted suicide, along with other ongoing violence in the intake area, had a detrimental impact on Mr. Washington's mental health. Mr. Washington repeatedly requested mental health treatment, but he never received it.

51.　　　　Mr. Washington was also not taken to several court dates that had been scheduled to determine his bail. As a result, he was held in Rikers for forty days before bail was finally assigned and he was released.

52.　　　　During his time at Rikers, Mr. Washington was not able to receive any visitors or visit the law library and was never brought to recreation.

53.　　　　Mr. Washington occasionally received meals late and cold.

*William Clanton*

54.        Plaintiff William Clanton ("Mr. Clanton") arrived at the Vernon C. Bain Center

("VCBC") on September 25, 2020, where he was housed for approximately fourteen months

before his transfer to the Otis Bantum Correctional Center ("OBCC").

55.        Mr. Clanton was part of the group packed into intake when legislators visited the

Island to get an idea of the unfolding crisis. Cells that were made to hold up to ten people were

stuffed with 40 to 50 people at a time, with only 1–2 officers on guard in areas with 500 or more

incarcerated persons.

56.        Many persons brought in were experiencing withdraw or other acute crises, and Mr.

Clanton was personally involved in helping a number of incarcerated persons experiencing

medical emergencies, including someone who was foaming at the mouth and seizing. No DOC

staff came to assist Mr. Clanton or the ill man for at least an hour, despite the fact that the men

were held in an area directly next to the medical ward and Mr. Clanton was screaming for help,

fearing that the man was going to die in his arms.

57.        On another occasion, a second man was severely beaten by a group of gang

members, which resulted in a cut across the face, a concussion, broken ribs, and two punctured

lungs. But it took DOC staff at least 45 minutes to respond, during which time Mr. Clanton

screamed to try to keep the concussed man awake. When medical staff finally arrived, they

exhibited an extreme callousness toward the man and the seriousness of his injuries. Mr. Clanton

intervened, asking the staff why they were handling the injured man like a "piece of meat." He

was told to shut up because the issue was none of his business.

58.        During his time on VCBC, Mr. Clanton made numerous complaints about the

crowded and dangerous conditions in which he and everyone in his unit were living in the midst

of a global pandemic, including a lack of ventilation and a complete lack of sanitation services except for trash bins being emptied, and where approximately 70 percent of the correction officers either did not wear their masks properly or did not wear them at all.

59.       Anytime Mr. Clanton complained or filed a grievance, he was told by officers that there was nothing they could do without being directed to do so by a higher up. But when a superior officer was notified of the issues, the response was the same.

60.       While the officers waited for someone else to act, the conditions deteriorated quickly, and persons testing positive were placed into units with healthy individuals, who were then made to quarantine for weeks at a time. Before quarantine ended, a new admission who tested positive would be brought in, essentially trapping the occupants of the unit in quarantine indefinitely.

61.       Mr. Clanton and his cellmates were also not receiving food on any regular schedule. Breakfast (cereal and milk) would be served around 8:00 or 9:00 a.m., and when everyone would ask for another meal later in the day, guards would throw loaves of bread into the packed cells, treating the men like caged animals rather than human beings.

62.       This created a "survival of the fittest" mentality, where the larger or stronger detained persons, or those affiliated with gangs, would take the majority of the food for themselves, leaving others without anything to eat.

63.       Because he was well respected by everyone, Mr. Clanton tried on many occasions to serve as an intermediary between these gangs, the guards, and the remaining men housed in the overcrowded cells. At times, guards apologized to him that there was not more food, but said they had no control over what was available, because the meals were calculated by the max capacity of the intake unit, and the cells were well over that capacity.

64.         But the guards also made no efforts to distribute what food was available equitably; instead, they would hand everything to one person inside the cell and tell them to pass it around, which caused violent clashes as everyone struggled to survive.

65.         Mr. Clanton also suffered filthy and unsanitary surroundings, with human urine and feces everywhere throughout the crowded dorms, where the men were not allowed to use the restrooms regularly. When he complained to the deputies, he was told that only two people could fix the problem—the Mayor or the Commissioner.

66.         During his time on Rikers, Mr. Clanton was never given recreation time. When he grieved the incident, quoting both U.S. and international law requiring such recreation, his complaints were met with comments that staff was just doing what they were told.

67.         He also experienced and witnessed violence from guards, including security teams picking up the men by their pants and neck and literally throwing then into their cells. When fights between the incarcerated men broke out, guards would gratuitously spray everyone and everything, including those completely uninvolved in the violence.

68.         Mr. Clanton was released from Rikers Island in September 2021 after living in the deplorable conditions for a year.

***Samir Shaban***

69.         Plaintiff Samir Shaban ("Mr. Shaban") arrived Rikers Island in March of 2021, where he was placed in a COVID quarantine ward until mid-April. He was moved between Rikers facilities multiple times, including placement in the overcrowded OBCC intake for approximately two and a half weeks, and was eventually sent upstate from September to November 2021 as part of the group of pre-trial detained persons funneled into the state prison system due to the crisis at Rikers.

70.        Mr. Shaban was packed into an intake cell in the Sixth Building on Rikers with at least thirty people to a cell. The men were forced to urinate and defecate on themselves, while others were vomiting from withdrawal or from the disgusting conditions. After one detainee tested positive for COVID, the others were tested a week later—long after any precautionary measures could be taken.

71.        In the Fifth Building and in OBCC, incarcerated men were throwing feces onto the walls out of frustration with this inhumane treatment. As a punishment, guards refused to clean the area up, leaving human waste strewn about for days at a time, while other garbage piled around and on top of the waste around Mr. Shaban and his cellmates.

72.        Mr. Shaban was so terrified in each of the unit that he slept with his shoes on in case he needed to run or escape dangerous situations, as gang violence and control was commonplace. The guards repeatedly failed to intervene, instead handing over control voluntarily to gang leaders. When he would request help or express his fears, Mr. Shaban was ordered by DOC staff to "shut the fuck up" and told that he should not have ended up on the Island if he was so scared.

73.        During this time, Mr. Shaban also missed his virtual court date because staff could not locate his placement within the facility. When his defense attorney attempted to come in person, the visit was cancelled on the spot because the staff had not properly processed the legal visit.

74.        And when he was able to go to court, Mr. Shaban was placed onto transport buses with no air conditioning and no guards for hours at a time while DOC staff tried to coordinate the travel. On one occasion, when a fire broke out in his facility while he was out, Mr. Shaban was held on a transport bus for five hours after his scheduled return to the Island, while his bus mates

urinated on the floor because the men were not permitted to disembark the bus for any reason.

75.        These conditions were prevalent during the two and a half weeks that Mr. Shaban spend in the over-packed intake unit, where new admissions are usually kept for less than a day. When he requested medical care, he was ignored. When he complained about the conditions, he was scolded. And when he requested protection from the gang violence, he was told, in so many words, that it was his fault that he was suffering because he got himself locked up.

76.        Mr. Shaban was released from DOC custody on or about November 11, 2021.

**Michael Peña**

77.        Mr. Peña entered Rikers Island on May 10, 2021.

78.        When Mr. Peña first arrived at Rikers, he was taken to EMTC, where he saw a doctor about cuts he'd received prior to his arrest. The doctor wrote a prescription for pain medication and the daily disinfection of his cuts.

79.        After a week at EMTC, on May 17, 2021, Mr. Peña was transferred to OBCC.

80.        Despite informing correction officers and other staff about the prescription he'd received, Mr. Peña was denied any access to medical care for over a week. As a result, Mr. Peña's wounds quickly became infected, causing him extreme pain and discomfort and interfering with his ability to sleep and perform daily activities with his hand. The wounds turned green and purple and began to discharge pus and blood.

81.        On May 29, 2021, Mr. Peña was transferred to Anna M. Kross Correctional Facility ("AMKC"), where he was placed in a holding cell inside the intake area. He was not offered any clothing or bedding and was forced to sleep on the unsanitary floor of the overcrowded cell.

82.        The next day, Mr. Peña was escorted to a housing unit, but people who were incarcerated inside the unit refused to allow him entry. This occurred at the entrance to multiple

units. The escorting officer simply acceded to the persons' refusals to allow Mr. Peña into their cells and finally took Mr. Peña back to the holding cell.

83.     Mr. Peña was kept in the holding cell for the next six days in extremely unsanitary conditions. There were dried feces and human waste caked onto the toilet seat, walls, and floor of the cell as well as a large pool of liquid surrounding the toilet and across the floor that reeked of urine and feces. The toilet spilled onto the floor whenever it was flushed. Mr. Peña was forced to sleep on that floor, crowded in with approximately twenty other people. When Mr. Peña complained about these conditions to the officials and staff, he was ignored.

84.     On May 31, 2021, Mr. Peña's forearm was bit by a spider and became swollen, sore, tender, and excruciatingly painful. He told the on-duty staff and officers repeatedly that he needed medical treatment, but they ignored his requests, instead calling him demeaning names including "pus boy" and "crying ass nigger." As a result of the officers' failure to provide him with needed medical care, his spider bite became infected as well, turning a different color and discharging pus and blood.

85.     During his time in the holding cell at AMKC, Mr. Peña was given no soap, toothbrush, clean clothes, or other personal hygiene or cleaning products. He wasn't allowed to shower or make any phone calls, personal or legal. None of the people held in the cell were provided masks, despite repeated requests and the fact that this was in the middle of the Covid-19 pandemic. Trays of leftover food piled up inside of the cell, attracting flies as well as roaches and water bugs, which crawled all over the floor.

86.     Mr. Peña was mistreated, harassed, and threatened with acts of violence by correction officers, who called him derogatory terms and names, antagonized, and humiliated him, especially after he complained to them about the conditions of the holding cell. On one occasion,

14

Mr. Peña asked a captain for assistance with his worsening medical issues and the captain responded by calling him derogatory, discriminatory, and disrespectful terms in front of the entire cell, which left Mr. Peña in fear of violence from other people in his cell. This same captain regularly antagonized and provoked Mr. Peña and the other people in his cell.

87.　　　　Mr. Peña felt that his health and life were in danger.

88.　　　　On two separate occasions, Mr. Peña witnessed people attempt suicide inside the holding cell. In one instance, while a person was on the floor unconscious after attempting suicide, a captain entered the cell with a team of officers in riot gear and threatened to physically assault and use MK-9 spray against the person if he didn't become responsive.

89.　　　　In another incident, on June 3, 2021, after a person who was incarcerated fashioned a noose out of bedding, Mr. Peña witnessed the same captain yelled at that person to "shut the fuck up and do it," along with other provocative and antagonistic slurs. The captain then directed the person to block the security cameras so that he could enter the cell and assault the person without being detected. After the person covered the cameras with toilet paper, the captain continued to threaten the person. During and after this incident, Mr. Peña felt afraid for his safety.

90.　　　　Later that night, Mr. Peña saw the same person who had been threatened by the captain earlier in the day set fire to garbage in the middle of the holding cell. The flames grew very quickly and the entire cell filled with smoke. Mr. Peña saw multiple officers walk past the cell and witness the flames but continue to walk by. Ten minutes, during which people in the cell were yelling for help, passed before an officer came with a fire extinguisher. As a result of spending almost twenty-minutes engulfed in smoke, Mr. Peña struggled to breath and experienced an uncontrollable cough and tightness in his chest which required him to receive smoke inhalation exposure treatment from the medical clinic. He had to wait for almost twenty-four hours before

being seen by a doctor or member of the medical staff.

91.         After the fire, Mr. Peña was brought to another holding cell with five other people. That cell, too, was extremely unsanitary. There was dried feces and human waste on the walls and floors, where he and the others were forced to sleep. The toilet was overflowing with urine and feces. Mr. Peña again complained to the officers about these conditions, but was ignored.

92.         When Mr. Peña saw a doctor, for the first time at AMKC, on June 4, 2021, he was informed that his cuts had again become infected, and that the spider bite was as well. He was prescribed antibiotics and pain medication.

93.         That same day, Mr. Peña was brought to a housing unit, where he slept within feet of other people, despite the risk of Covid-19 transmission. The floors in the bathroom and shower area were cracked and slippery, causing people who are incarcerated to slip and fall. The showers were filled with gnats and other insects. For days, there would be no soap, toothbrushes, toilet paper, or toothpaste available in the bathroom or in commissary, depriving Mr. Peña of the ability to maintain his personal hygiene. He was not allowed to cut his hair or clip his nails the entire time he was incarcerated, causing them to grow uncomfortably long, and he was given no new clothing.

94.         In the new housing unit, Mr. Peña did not receive his prescribed medical treatment for weeks, even after repeatedly reporting that he needed and had been prescribed medical care for his infected injuries.

95.         Mr. Peña witnessed multiple incidents of violence within AMKC, including approximately eight stabbings. He saw correction officers witness these incidents but turn a blind eye, allowing perpetrators to remain in the unit unreprimanded. In early July, for instance, Mr. Peña witnessed a person who was incarcerated stabbed multiple times while an on-duty officer watched and did nothing to assist.

16

96.       Mr. Peña had brought two bags of belongings, some of them highly valuable, to AMKC but was not allowed to bring them into the holding cell. He was assured that they would be kept safe and monitored while he was in the holding cell. However, after a few days there, a staff member located some of Mr. Peña's items in the garbage area. His other belongings, including jewelry, $124.24 worth of commissary, active legal documents, photographs and letters, were never returned to him. Though he made multiple complaints to officers, no attempt was ever made to find the remaining items.

97.       On June 7, 2021, Mr. Peña was scheduled for a parole revocation hearing. He repeatedly informed and reminded the on-duty captain and other correction officers about his hearing, but he was never taken to the hearing by staff. He later discovered that someone had falsely filled out a form stating that he had refused to appear at the hearing. As a result of his inability to attend the June parole revocation hearing, Mr. Peña was held in Rikers for another month, until his hearing was rescheduled and he was finally released on August 6, 2021.

98.       During the ninety days that Mr. Peña was incarcerated at Rikers, he was only taken out for recreation approximately three times and was denied access to the law library. Mr. Pena continues to suffer back and neck pain from lying on the floor of the cell.

## THE CITY OF NEW YORK HAS A POLICY OF DELIBERATE INDIFFERENCE TO INHUMANE CONDITIONS OF CONFINEMENT ON RIKERS ISLAND

99.       This is not a case where a single incident caused the civil rights violation, although often that is the case. Instead, there are a collection of horrible conditions that have worked in concert to make Rikers Island unbearable, unconstitutional, and inhumane. These conditions, moreover, have not occurred in isolated facilities or at isolated times. The problem is system-wide.

100.      In a case challenging numerous conditions of confinement, the Second Circuit made clear that "[e]ach of these conditions must be measured by its severity and duration, not the

resulting injury, and none of these conditions is subject to a bright-line durational or severity threshold. Moreover, the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another."[5]

101.     The numerous deplorable conditions on Rikers Island add up to create an overall environment that deprives every person incarcerated there of their basic constitutional rights.

102.     Through its deliberate indifference to the horrible conditions on the Island, and its failure to address numerous problems at Rikers despite being aware of them for many years, the City has violated the Plaintiffs' and class members' rights and caused injury.

**A.  Conditions are overcrowded, unsanitary, and unhabitable as the physical structures on Rikers Island fall apart.**

103.     Overcrowding is rampant in the Rikers jail complex, jail cells are not habitable or sanitary, and infrastructure is falling apart.

104.     In intake, rather than spending a few hours in the small cells where new detained persons are processed, dozens of people are stuffed into small cages for days and weeks at a time. Shockingly, they are expected to defecate and urinate in plastic bags within inches of one another.[6]

105.     The New York Post published images which "show as many as 26 men stuffed body to body in single cells where they were forced to relieve themselves inside plastic bags and take turns sleeping on the fetid floors."[7]

---

[5] *Darnell v. Pineiro*, 849 F.3d 17, 32 (2d Cir. 2017).

[6]  *See* Open Letter to New York City District Attorneys (October 5, 2021), https://secureservercdn.net/50.62.89.79/egs.840.myftpupload.com/wp-content/uploads/2021/10/DA-open-letter-Final.pdf.

[7] *See* Gavrielle Fonrouge, *Photos Inside Rikers Island Expose Hellish, Deadly Condition*s, N.Y. Post (Oct. 21, 2021), https://nypost.com/2021/10/21/photos-inside-rikers-island-expose-hellish-deadly-conditions/.









106.        During a five-day period in mid-September, at least 105 detained persons were inside the crowded cells long after they should have been moved, records show.[8]

107.        In April 2021, a group of detained people was brought to intake at EMTC, one of eight facilities on the Island, where they were forced to stay with 27 other people in a single holding pen for three days. At least six of the detained persons in the cell were throwing up, likely suffering from drug withdrawal, before the detained persons were moved into the permanent housing area.

108.        One of the men, Mr. Thomas Earl Braunson III, who was being held on a minor parole violation, died hours later; his death is currently under investigation. DOC staff did not clean the area in which the man had passed away, despite it being covered in feces and blood. Other detained persons in the unit were forced to clean the mess without any protective equipment.

109.        The Board of Correction's ("BOC") internal investigation of Mr. Braunson's death noted "horrible conditions" in the jail's intake area where the detained persons were held, reporting that the area has "severe staffing shortages and supplies issues . . . [including] missing sheets and blankets," that no one in the entire facility had a pillow, and that the detained persons "were not receiving recreation or meals on a regular schedule."[9]

110.        Some detained persons go two to four weeks without being offered a shower or clean clothing, and others are forced to sleep on the ground, shoulder to shoulder in these cells. Clothing and shoes, such as slippers typically used in the showers, are altogether unavailable, leaving detained persons vulnerable to slip and falls or foot infections from the shared shower spaces and general filth accumulating in the unattended facilities.

---

[8] *See id*.

[9] *See* "NYC BOC Death Reviews: Preliminary Report to Board on the death of Thomas Braunson," prepared by Dep. Gen. Counsel Kate McMahon (Apr. 23, 2021), https://s3.documentcloud.org/documents/21031127/preliminary-board-report-thomas-braunson_redacted-1.pdf.

111.        Vermin, bugs, and roaches are also widespread throughout Rikers facilities, and have been for years,[10] including in the kitchens, bathrooms, and sleeping areas.

112.        Lawmakers who toured the facility in 2021 reported shower stalls doubling as cells, garbage covering the halls, fecal matter, urine, and dead cockroaches on the floor.[11]

113.        During a visit to Rikers in February 2022, a court-appointed monitoring team "found the conditions at one intake to be particularly distressing—a toilet was overflowing with feces and an individual was sleeping on the floor outside one of the intake pens."[12]

### i. Lack of Sanitation

114.        Rikers Island is built on an old landfill, creating a number of hazardous environmental conditions from its inception.[13] The City is aware of these unsafe conditions but, with deliberate indifference, has failed to provide proper sanitation on the Island.

115.        In 2001, the District Court for the Southern District of New York issued an order (the "Environmental Order") directing the DOC to take specific actions to remedy violations of federal law in fourteen New York City jails, including those on Rikers Island.[14] The *Benjamin* class action involves years of court-ordered reform and mandatory reporting regarding the progress

---

[10] *See* Sam Ball, *Tales From Inside Rikers, The Notorious NYC Jail Set To Close*, France 24, https://www.france24.com/en/20180226-tales-inside-rikers-island-notorious-new-york-jail-prison-close

[11] *See* Graham Rayman and John Annese, *'Horror Island': NYC politicians touring Rikers witness filth, overcrowding and inmate's attempted suicide*, N.Y. Daily News (Sept. 13, 2021), https://www.nydailynews.com/new-york/nyc-crime/ny-pols-tour-rikers-island-decry-conditions-202109 14-c7tkloonubhmzidc4y3mndbtbq-story.html.

[12] *See* Special Report of the *Nunez* Independent Monitor at 23, *Nunez v. City of New York et. al.*, 11-cv-5845 (S.D.N.Y. Mar. 16, 2022), ECF No. 438.

[13] *See* Ashley Gilbertson, "This is Rikers," The Marshall Project (June 25, 2015), https://www.themarshallproject.org/2015/06/28/this-is-rikers.

[14] *See Benjamin v. Brann*, 75 cv 03073 (S.D.N.Y.).

of the environmental conditions in the City's jails. But over two decades later, conditions have worsened, and the most recent reports from the Office of Compliance Consultants ("OCC") concerning the Environmental Order paint a bleak picture of conditions on the Island.

116.    In a quarterly progress report covering the period between January and April of 2019, a year before the pandemic hit New York City, 29 housing areas failed their inspections with respect to the management of basic sanitation and housekeeping in the facilities.[15] In 25 percent of those cases, the DOC provided inadequate cleaning equipment, while only 2 percent were found to follow proper cleaning procedures.[16]

117.    During the same four-month period, there were approximately 250 incidents of vermin reported by DOC staff, including the presence of flies, ants, maggots, roaches, mice, and rats in the facilities.[17]

118.    The status report in *Benjamin* covering May–August of the following year, 2020, found that the DOC was still not "in substantial compliance with the Court's sanitation mandates" and that there was "no improvement" concerning sanitation from the prior monitoring period.[18] In nearly every facility that was checked during this period, mildew or pooling water was found on and inside the walls and floors of the bathroom areas.[19]

119.    A year later, the report covering May–August of 2021 stated that there were

---

[15] Austin-Best, Nicole N., "Report on Environmental Conditions: January–April 2019," Office of Compliance Consultants, at 5 (June 17, 2019).

[16] *Id*.

[17] *Id*. at 10.

[18] *See* Austin-Best, Nicole N., "Report on Environmental Conditions: May–August 2020," Office of Compliance Consultants, at 4–5 (Oct. 15, 2020).

[19] *Id*. at 20.

significant discrepancies between the reporting by the City's agencies and their own observations of the environmental conditions of the City's jails.[20]

120.        The 2021 report also found a "clear decline" in the City's compliance over the course of the prior year.[21] While the report indicated that there was a "widely known" issue of "significant staff shortages," during this period, the City failed to discuss with the monitor what effect those shortages were having on compliance with the Environmental Order.[22]

| Monitoring Period | January–April 2020 | May–August 2020 | September–December 2020 | January–April 2021 | May–August 2021 |
|---|---|---|---|---|---|
| Number of Inspections | 130 | 168 | 161 | 169 | 141 |
| Compliance Percentage | 62% | 76% | 78% | 69% | 61% |

121.        These reports demonstrate what those housed on Rikers have long reported—conditions are filthy, unsanitary, and uninhabitable. And they are only getting worse.

### ii. Heat Conditions

122.        Rikers Island was once described by a detainee as smelling like "sewer, mixed with fertilizer, mixed with death," conditions which significantly worsen with extreme temperatures.[23]

123.        Heat waves at Rikers have been especially prevalent in the summer months.[24] In the summer of 2020, at least 89 percent of grievances made to the DOC were related to a lack of

---

[20] *See* Austin-Best, Nicole N., "Report on Environmental Conditions: May–August 2021," Office of Compliance Consultants, at 6 (Oct. 27, 2021).

[21] *Id*. at 6–7.

[22] *Id*. at 7.

[23] *See* Raven Rakia, *A Sinking Jail: The Environmental Disaster That Is Rikers Island*, Grist (March 15, 2016), https://grist.org/justice/a-sinking-jail-the-environmental-disaster-that-is-rikers-island/.

[24] Liz Donovan, *As Conditions at Rikers Reach Crisis Levels, Concerns About Heat Persis*t, CityLimits.org (Sept. 13, 2021), https://citylimits.org/2021/09/13/as-conditions-at-rikers-reach-crisis-levels-concerns-about-heat-persist/.

operative air conditioning units or fans in the unit and a lack of access to cool showers, all in the midst of record-breaking temperatures.[25]

124.     None of the jail facilities on Rikers Island are fully air conditioned, and six of the ten jails on Rikers Island have no air conditioning.[26] Where air conditioners are present, the units regularly break, turning dorms into sweatboxes within minutes.[27]

125.     The City is aware of the heat conditions on Rikers Island and has the resources to provide temperature control in the facilities but has failed to do so.

### iii.  Structural and Physical Problems

126.     Structural deterioration is another long-standing issue on the Island, as the City has ceased any meaningful maintenance of the grounds in anticipation of closing Rikers altogether. The Island is filled with decaying and dilapidated structures never meant to provide permanent facilities, including trailers, tents, and the infamous VCBC barge, which was docked for temporary use as an "emergency fix" for the Island in 1992. Almost three decades later, VCBC remains an active housing unit for detained persons.

127.     In 2017, Mayor DeBlasio acknowledged that extensive repairs and renovations the buildings on Rikers Island were necessary, but the administration seemed to focus on closing Rikers rather than improving conditions for those currently housed there.

128.     During the City's most recent hurricane, flooding and old roofing caused the ceiling in one of the dorm areas came crashing down onto the head of a sleeping detainee. Two weeks later, the mess from the collapse remained strewn about the dorm, and the injured detainee had not

---

[25] *Id*.

[26] Raven, *supra* n.23.

[27] Donovan, *supra* n.24.

been seen by the medical staff. Detained persons were told by the few staff members present to stay away from the wreckage, but were nonetheless expected to sleep under the collapsing ceiling.

129.         The structural deterioration at Rikers contributes to the physical and mental deterioration of incarcerated people. One detainee attributed numerous suicide attempts to the "complete isolation, extreme temperatures, polluted air, [and] the stink of the landfill" that is the ever-present reality of being incarcerated at Rikers.[28] This physical and mental deterioration is exacerbated by the lack of emergency and preventative care resulting from staffing shortages.

130.         The City's deliberate indifference to structural deterioration has persisted for years, leaving past, present, and future detainees vulnerable to illness, injury, and/or death.

131.         The City's own investigation in 2015 found scores of "'raw materials to fashion weapons,' with buildings full of aging pipes, metal radiators and other items that could be broken, beaten or carved into crude blades."[29] One detainee recently discovered that a metal grate in the wall of his cell was deteriorated so significantly that he was able to easily kick it down, climb out, and stab his neighbor.

132.         Nevertheless, only minimal efforts have been made to repair the Island's structures and create habitable conditions for the detained persons; efforts which have all but disappeared in the wake of the City's plan to close Rikers.

133.         The structural deterioration at Rikers must be analyzed in combination with other conditions. Inoperable air conditioning units, flooding, clogged and broken plumping, aging materials, air pollution – these structural deficiencies leave detainees vulnerable to physical and mental illness, as well as increased levels of violence.

---

[28] Raven, *supra* n.23.

[29] *Supra* n.14.

134.     When people incarcerated at Rikers are forced to remain in these deteriorating conditions and in crowded, unsanitary, uninhabitable cells, the overall environment created results in gross rights violations.

135.     The conditions leave detainees vulnerable to illnesses like COVID-19 and legionnaires disease. Again, these conditions reinforce each other: the crowded and unsanitary conditions lead to rampant illness, left untreated because of staffing shortages and general mismanagement of facilities and services.

136.     Crowded, unsanitary, and uninhabitable conditions are pervasive throughout all facilities and experienced in one form or another by all people incarcerated at Rikers.

**B.     Detained persons are denied adequate, sanitary, and regular meals.**

137.     On top of living in these overcrowded, filthy conditions, individuals housed on Rikers Island are not receiving their meals on a regular schedule and the City has been deliberately indifferent to this problem even as it continues. The lack of adequate, sanitary, and regular meals is experienced by essentially every person on the Island, regardless of housing placement, as staff absenteeism has hampered the regular preparation and distribution of meals.

138.     When food is finally served, sometimes hours late, it is often cold and unsubstantial. As a result, basic dietary needs are not being met, particularly for those with prescription diets due to underlying medical issues such as diabetes or heart disease.

139.     In crowded intake areas, officers simply throw loaves of bread into the cells, leaving those packed inside to fend for themselves and fight over the limited amount of available food.

140.     The DOC also orders and stocks its meals based on the maximum capacity of a given dorm or housing area. Because entire units are not being utilized due to a lack of available staff, detained persons are being forced into a few dormitories, far beyond capacity, but meals remain limited to the number of persons who *should* be housed in one area.

141.        Incarcerated persons are thus forced to split meals and utilize commissary to meet their necessarily calorie intake, and gangs have taken it upon themselves to distribute food inequitably, leaving some detained persons without anything to eat at all. Even clean water has become a scare resource: "Some of the only water inmates were able to drink came from tiny sinks inside the pens and without cups, detainees used their unwashed hands to scoop up sips, or put their mouths under the faucets."[30]

142.        In some cases, persons on prescription diets have received meals completely contrary to that prescription, forcing them to choose between not eating or eating something that will likely make them sick, while those without prescription diets may still get sick due to rotting food. And when the DOC's food (or lack thereof) causes such sickness, emergency and preventative medical care is essentially nonexistent.[31]

143.        Because the City has not acted to remedy dysfunction in the DOC's food distribution system, and because the DOC's staffing crisis is far from resolved, essentially every person incarcerated on Rikers has experienced this denial of adequate nutrition and access to sanitary meals, in violation of their constitutional rights and against all basic human decency.

### C.   Violence is rampant among both guards and detained persons, and the incarcerated population is constantly under threat of injury or death.

144.        The City has been deliberately indifferent to the culture of violence prevalent on Rikers Island, and the resulting fear that people there experience on a daily basis.

145.        In some intake and housing areas, there are no guards to be found, leaving detained

---

[30] *See* Fonrouge, *supra* n.7.

[31] *See* Correctional Health Services, CHS Access Report: November 2021 (February 7, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/Correctional-Health-Authority-Reports/CHS-Access-Report-CY21Q4.pdf.

persons vulnerable to gang violence. Moreover, the DOC's classification system (a method by which the facilities separate detained persons with prior violent histories with one another or who are affiliated with rival gangs) has all but disappeared. Staff and guards are ignoring these affiliations and placing persons who have been ordered separate into the same dorms or even the same cells, leading to violent outbursts and serious injuries to detained persons and guards alike.

146.     In some cases, guards have turned a blind eye to "fight nights" where detained persons are pitted against each other and guards watch them fight. Other times, staff gratuitously and indiscriminately uses pepper spray as a shortcut for breaking up disputes.[32]

147.     Incarcerated persons are manning the guards' stations, answering phones, and determining who can enter and exit certain areas, while guards are utilizing mace indiscriminately and giving detained persons make-shift weapons, instigating violence and further contributing to disorder. Civilian employees report watching as uniformed staff stand by and merely observe the chaos, either out of sheer fear of intervening or callousness toward the state of affairs.

148.     These conditions have led to a reasonable, universal fear amongst the incarcerated population that they are under a real and constant threat of violence, whether it be excessive force by guards or violence at the hands of their fellow detained persons. This fear is exacerbated by the fact that DOC staff is unlikely to intervene in violent encounters, and that injured persons will not be afforded a timely, adequate medical response if they become the victim of such violence.

149.     Southern District Court Judge Swain, who oversees the court-ordered monitorship at Rikers, has described Rikers as suffering from "extremely dangerous" conditions "in which

---

[32] Jan Ransom, "A Look Inside Rikers: 'Fight Night' and Gang Rule, Captured on Video," The New York Times (Jan. 12, 2022), https://www.nytimes.com/2022/01/12/nyregion/rikers-jail-videos.html.

every single day people are in danger."[33] A special report filed by the monitoring team in March 2022 described "unacceptable levels of fear of harm" resulting from dysfunctional staff management and deployment practices at the Department of Correction.[34]

150.        The pervasiveness of this violence—which is predicated on a long-standing culture of brutality by DOC staff—means that every person detained on Rikers, even those who have not yet experienced this violence themselves, nonetheless live in constant fear that they may be next.

151.        As early as 2014, the U.S. Attorney for the Southern District of New York reported on this "pervasive"  and "deep-seated culture of violence" across Rikers Island, noting that "DOC staff routinely utilize[s] force not as a last resort, but instead as a means" of "control" and to "punish disorderly or disrespectful behavior."[35]

152.         In November 2017, the *Nunez* Monitor made similar observations concerning the entrenched culture of "staff actions and behaviors that too often engender, nurture, and encourage confrontation" rather than deescalate and end conflict between incarcerated individuals.[36] The Report attributed this "tendency to engage in [a] pattern of hyper-confrontation" to "unprofessional conduct" driven by the "inexperience of Staff."[37]

153.        A report published by the New York State Commission of Correction in February of 2018 ("COC Report") found that, in 2017, the rate of violence on Rikers was significantly higher

---

[33] *See* Transcript of Remote Conference at 6:17, *Nunez v. City of New York, et al.*, 11-cv- 5845 (LTS) (S.D.N.Y. Apr. 26, 2022), ECF No. 456.

[34] *See* Special Report of the *Nunez* Independent Monitor at 4, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Mar. 16, 2022), ECF No. 438.

[35] *Id.* at 3.

[36] *See* Fourth Report of the *Nunez* Independent Monitor at *10, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Oct. 10, 2017), ECF No. 305.

[37] *See id.* at *11.

than county jails throughout New York State.[38] Despite having less than half the combined population of these county jails, the number of group or gang assaults and assaults among incarcerated individuals on Rikers was more than double than in the county jails, while the number of assaults involving staff was more than <u>ten</u> times higher than the rest of the state.[39]

154.        But despite being "plagued by managerial failures" and "significant structural problems," the COC Report said, the DOC "demonstrated both an unwillingness and inability to take necessary actions to remedy identified violations [] concerning facility safety and security."[40]

155.        The problem only worsened the following year. In 2018, the New York City Comptroller's Office found that, despite a declining detainee population, rates of violent incidents and uses of force continued to increase.[41] There were approximately 1,354 fights or assaults per 1,000 average daily population in 2018, compared with only 441 ten years earlier in 2008.[42]

156.        Then-Comptroller Stringer stated in a press release that "the DOC is spending more money with more staff to guard fewer people, yet rates of violence and assault continue to rise which is troubling both for our detained population and for correction officers."[43]

157.        By 2019, use of force by DOC officers had jumped nearly 30 percent from 2018,

---

[38] New York State Commission of Correction, *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* (Feb. 2018), https://scoc.ny.gov/pdfdocs/Problematic-Jails-Report-2-2018.pdf.

[39] *Id*. at 29-30.

[40] *Id.* at 3.

[41] *See* NYC Comptroller, Press Release, *Despite a Decline in Incarceration, Correction Spending, Violence, and Use of Force Continued to Rise in FY 2018* (Jan. 22, 2019), https://comptroller.nyc.gov/newsroom/comptroller-stringer-despite-a-decline-in-incarceration-correction-spending-violence-and-use-of-force-continued-to-rise-in-fy-2018/.

[42] *See id.*

[43] *See id.*

up to 6,670 from 5,175 in 2018.[44] Violence among incarcerated people also skyrocketed, from 55.8 incidents for every 1,000 people in 2018, to 69.5 in 2019, a 24.5 percent increase.[45] The rate of serious injury to individuals at Rikers as a result of violent incidents rose nearly 24 percent.[46]

158.         In 2020, uses of force by guards against detained persons rose 183 percent from 2016.[47] More than half of these incidents were found to be avoidable or problematic, and around 30 percent were determined to be excessive or violative of the DOC's use of force policies.[48]

159.         Requests for basic services by detained persons are often met with brutality, as staff increasingly over relies on specialized teams such as the ESU—an enforcement unit well-known to respond to the population indiscriminately with punitive and dangerous tactics.[49]

160.         For example, in the early months of a pandemic, a group of detained persons voiced frustration with new isolation and lockdown protocols related to social distancing. In response to these vocal complaints, an ESU team lined the men up, searched them, and told them to return to their cells. For no clear reason, ESU proceeded to violently attack one detainee, knocking his tooth out as they slammed him to the floor and sprayed him in the eyes with a chemical agent. They then placed a hood over his head and over-tightened restraints around his wrists before leaving him left

---

[44] Erin Durkin, *New Stats Show Surge in Violence at Rikers Island*, Politico (Sept. 17, 2019), https://www.politico.com/states/new-york/albany/story/2019/09/17/new-stats-show-surge-in-violence-at-rikers-island-1193798.

[45] *See id*; *see also* Julia Marsh, *Violence Spikes at Rikers Island Despite Jail Population Decline*, N.Y. Post (Sept. 17, 2019), https://nypost.com/2019/09/17/violence-spikes-at-rikers-island-despite-jail-population-decline/.

[46] *See id.*

[47] *See* Eleventh Report of the *Nunez* Independent Monitor at *26, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) at *26 (S.D.N.Y. May 11, 2021), ECF No. 368.

[48] *See id.* at *27.

[49] *See id.* at *50-51 (S.D.N.Y. May 11, 2021).

bloodied in a cell, with the hood and restraints still on. The officers went on to fabricate a report claiming that the man instigated the assault.

161.        In 2021, the rate at which guards used force against detained persons was 200 percent higher than the rate in 2016 that gave rise to the *Nunez* consent decree.[50] There were a total of 419 slashings and stabbings on the Island that year, up 1,097 percent from 2011, despite a steadily declining incarcerated population.[51]

162.        For example, in the early months of a pandemic, a group of detained persons voiced frustration with new isolation and lockdown protocols related to social distancing. In response to these vocal complaints, an ESU team lined the men up, searched them, and told them to return to their cells. For no clear reason, ESU proceeded to violently attack one detainee, knocking his tooth out as they slammed him to the floor and sprayed him in the eyes with a chemical agent. They then placed a hood over his head and over-tightened restraints around his wrists before leaving him left bloodied in a cell, with the hood and restraints still on. The officers went on to fabricate a report claiming that the man instigated the assault.

163.        In 2021, the rate at which guards used force against detained persons was 200 percent higher than the rate in 2016 that gave rise to the *Nunez* consent decree.[52] There were a total of 419 slashings and stabbings on the Island that year, up 1,097 percent from 2011, despite a

---

[50] *See* Special Report of the *Nunez* Independent Monitor at *17, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Mar. 16, 2022), ECF No. 438.

[51] Griffin Kelly, "Stabbings and slashings surge on Rikers Island," New York Post (May 14, 2022), https://nypost.com/2022/05/14/rikers-island-sees-surge-of-stabbings-and-slashings/ (citing figures shared during a public DOC meeting).

[52] *See* Special Report of the *Nunez* Independent Monitor, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF), Dkt. No. 438 at *17 (S.D.N.Y. Mar. 16, 2022).

steadily declining incarcerated population.[53]

164.     The year of 2021 also saw a 22.5 percent increase from the prior year in violent incidents among individuals in custody.[54] More than 1,900 detained persons suffered lacerations, concussions, or broken bones, and at least 450 of those were so severely injured that they were hospitalized.[55] Given the pervasive failures of DOC staff to take injured people for prompt (or any) medical treatment, the actual rate of hospitalizations is likely much higher, evidencing the City's *de facto* policy of underreporting serious injuries.[56]

165.     On September 28, 2021, Governor Hochul issued an Executive Order declaring that Rikers Island was in a state of emergency because "conditions in the facilities have led to an unsafe, life-threatening environment for both the inmates and the staff."[57] Nine subsequent Executive Orders extended the State of Emergency, which remains in place today.[58]

166.     By the end of April 2022, a shocking 191 stabbing incidents had already occurred on the Island, putting that number on track to reach 575 total stabbings over the course of the year, a 37 percent increase from 2021.[59]

---

[53] *See* Kelly, *supra* n.51.

[54] Office of the Mayor, "Mayor's Management Report: September 2021," The City of New York (Sept. 2021), https://www1.nyc.gov/assets/operations/downloads/pdf/mmr2021/2021_mmr.pdf.

[55] Jan Ransom and William K. Rashbaum, *How Brutal Beatings on Rikers Island Were Hidden from Public View*, N.Y. Times (March 2, 2022), https://www.nytimes.com/2022/03/02/nyregion/nyc-jail-beating-rikers.html.

[56] NYC Board of Correction, "Serious Injury Reports in NYC Jails January 2019," (Jan. 2019) https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2019.01.07%20-%20BOC%20 Serious %20Injury%20Report%20-%20Final.pdf.

[57] N.Y. Exec. Order No. 5, https://www.governor.ny.gov/executive-order/no-5-declaration-disaster-emergency-counties-bronx-kings-new-york-richmond-and.

[58] N.Y. Exec. Order No. 5.9, https://www.governor.ny.gov/sites/default/files/2022-06/EO_5.9.pdf.

[59] *See* Kelly, *supra* n.51 (referencing statement from Board of Correction member).

167.         Comparatively, the rate of staff assaults and fights in DOC facilities is seven to eight times higher on the Island than in the rest of New York State or Los Angeles County,[60] and the *Nunez* monitoring team has taken pains to "emphasize that these high rates [of violence] are *not* typical, they are *not* expected, they are *not* normal" (emphases in original).[61] The Monitor has insisted that these numbers are "abnormal" and "in no way conform to generally accepted practices in the [corrections] field." [62]   The sheer number of these incidents, the Monitor opined, should "catalyze an urgency that befits the gravity of the situation."[63]

168.         Moreover, the severity of violent incidents on the Island are frequently downplayed and misrepresented in official DOC reports, creating an inaccurate record of the actual prevalence of injuries and staff assaults on Rikers, and preventing oversight agencies or the federal monitor from accurately assessing the pervasiveness of violence on the Island.

169.         For example, in August of 2021, a man in intake was beaten so badly by another detainee that he was paralyzed from the neck down, but no report of the incident was ever filed.[64]

170.         In December 2021, a 25-year-old man was slammed to the floor and kicked in the head by another incarcerated person, causing him to spend six weeks in a coma and relearn how to walk and talk. The report of his injury stated that he had suffered from a fractured eye socket

---

[60] *See* Special Report of the *Nunez* Independent Monitor, *Nunez*, 11-cv-5845, ECF No. 438 at *4 (S.D.N.Y. Mar. 16, 2022).

[61] *See id.* at *17 (S.D.N.Y. Mar. 16, 2022).

[62] *See id.* at 18.

[63] *See id*.

[64] *See* Jan Ransom and William K. Rashbaum, "How Brutal Beatings on Rikers Island Were Hidden from Public View," N.Y. Times (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/nyregion/nyc-jail-beating-rikers.html.

and swelling of the head and had not required hospitalization.[65]

171.        In April 2022, a 47-year-old man got into a fight with a detainee and suffered a head injury so severe that he had to undergo emergency surgery and is now partially paralyzed, while DOC records say he suffered only a laceration on the left side of his head.[66]

172.        Common security breaches include failing to secure doors, failing to supervise detained persons, allowing detained persons to congregate, going off-post, using restraints improperly, or failing to intervene in escalating tensions.[67]

173.        In one case, a detainee passed through an unsecured door and thew scalding water on another individual, causing second-degree burns. The *Nunez* Monitor, in a report from August 24, 2021, found that this incident was "predicated on multiple security breaches."[68]

174.        In January 2022, the DOC reported at least forty incidents where detained persons left their cells or housing units without authorization, and approximately sixty cases of security breaches resulted in incidents of force and violence among detained persons.[69]

175.        Moreover, when the disciplinary records of correction officers were finally made public with the repeal of Section 50-a of New York's civil rights statute in 2021, the data supported what detained persons on the Island have been reporting for years—that they are brutalized and then punished to cover up the officers' misconduct.

---

[65] *See id.*

[66] *See* Jan Ransom, "As Pressure Builds Over Rikers Crisis, a Drumbeat of Death and Disorder," N.Y. Times (May 23, 2022), https://www.nytimes.com/2022/05/23/nyregion/rikers-island-death-crisis.html.

[67] Letter to Court Regarding Present Conditions, *Nunez*, No. 11 cv 5845 at ECF No. 378 at 2 (S.D.N.Y. Aug. 24, 2021).

[68] *See id.*

[69] *See* Special Report of the *Nunez* Independent Monitor, *Nunez*, No. 11-cv-5845 at ECF No. 438 at *18-19 (S.D.N.Y. Mar. 16, 2022).

176.     Over a twenty-month period, more than half of the uses of force reported by DOC staff included false and misleading statements, omissions, and outright lies about the circumstances surrounding the incident. When confronted with these facts, the DOC did not discipline or otherwise punish the officers for these lies; instead, they implemented a course to "improve their writing skills and to teach them how to complete official incident reports."[70]

177.     While detained persons are often punished after they are victimized by guards, correction officers are rarely held accountable for excessive uses of force or other misconduct. And the City has a substantial backlog of disciplinary actions pending against its officers, which can take over a year from the time of the incident to resolve.[71]

178.     In fact, at a public hearing on April 26 of this year, Commissioner Molina conceded that a "timely and meaningful discipline process . . . quite frankly has never existed in this department," demonstrating how mismanagement and poor oversight, including a lack of discipline, contributes to rampant and increasingly dangerous violence on the Island.[72]

179.     One report found that the City's inability to manage large numbers of staff productively has a direct impact on the ability to effectively reduce levels of violence and ensure safety. *Nunez* Monitor Steve J. Martin stated that the "state of seriously compromised safety has spiraled to a point at which, on a daily basis, there is a manifest risk of serious harm to both detainees and staff, which in turn generates high levels of fear among both groups."[73]

---

[70] *See* Jan Ransom, *In N.Y.C. Jail System, Guards Often Lie About Excessive Force*, N.Y. Times (Pub. Apr. 24, 2021, Updated Sept. 22, 2021), https://www.nytimes.com/2021/04/24/nyregion/rikers-guards-lie-nyc-jails.html.

[71] *See* Eleventh Report of the *Nunez* Independent Monitor, *Nunez*, No. 11-cv-5845 at ECF No. 368 at *14 (S.D.N.Y. May 11, 2021).

[72] *See* Transcript of Remote Conference, *Nunez*, 11 cv 5845 at 27:16 (Apr. 26, 2022).

[73] *See* Letter on Present Conditions, *Nunez*, 11 cv 5845 at ECF 378 at *4 (S.D.N.Y. Aug. 24, 2021).

180.     This universal and reasonable fear is fueled by this pervasive violence as well as every other issue identified in this complaint—from the deteriorating physical conditions of the facilities to the lack of emergency and medical care. Under the law, the City must provide essential services and protect those within their custody. But in reality, those detained are Rikers are forced to fend for themselves.

### D.   Emergency and preventative medical and mental health care is unavailable.

181.     A pervasive fear of violence among detained persons is exacerbated by the DOC's proven failure to adequately respond to injuries that result from violent encounters. In a letter dated September 10, 2021, Dr. Ross MacDonald, the Chief Medical Officer of Correctional Health Services ("CHS"), stated that the "[u]navailability of staff has resulted in delays in transferring patients to clinics for care, to mental health units, or to the hospital, even when 911 has been activated and EMS has arrived to transport them."[74] As a result, tasks like distributing medication and transferring patients to clinics for care have fallen to the wayside.[75]

182.     Limitations on accessing mental and medical healthcare begin at intake: when a detained person is brought to Rikers Island, days may pass until they are given a preliminary medical screening, which should occur promptly upon their arrival. During that time, individuals are frequently deprived of medications that they require for the treatment of ongoing conditions.

183.     In 2022 alone, nine people have died in custody on Rikers Island.[76] In 2021, that

---

[74] Ross   MacDonald,   M.D.   Letter   to   Keith   Powers   (Sept.   10,   2021), https://www.ny1.com/content/dam/News/static/nyc/pdfs/RM-city-council-letter-9-10-21.pdf.

[75] *See id.*

[76] *See* Jonah E. Bromwich and Jan Ransom, *3 N.Y.C. Detainees Die in Less Than a Week, Bringing Year's Total to 9*, N.Y. Times (June 22, 2022), https://www.nytimes.com/2022/06/22/nyregion/rikers-inmate-deaths.html.

number was sixteen.[77] Dr. MacDonald attributed the deaths to a collapse in basic jail operations, including the delays in medical care, which he said were caused by the unavailability of correction officers.[78]

184.     Jeanette Merrill, a spokesperson for CHS, has also expressed that "[t]he department's staffing shortages are affecting health operations, including the availability of escorts to bring patients to the clinic and of DOC personnel to staff the clinics."[79]

185.     A Board of Corrections report into the DOC's responsibility for the death of persons in their custody found similar deficiencies in access to emergency medical care: <u>"DOC and CHS do not seem to have an acceptably functioning system for providing emergency care to persons in life-threatening situations."</u>[80] (emphasis added).

186.     The report identified significant delays in responsive emergency care for persons experiencing fatal medical emergencies.[81] In two cases, only one officer was stationed in the control unit bubble, despite DOC policy requiring two officers.[82] And in at least three cases resulting in death, detained persons were the first to provide aid and notify DOC staff of the

---

[77] *See* Michael Wilson and Chelsea Marcius, *16 Men Died in New York City Jails Last Year. Who Were They?*, N.Y. Times (Pub. Jan. 28, 2022, Updated Jan. 31, 2022), https://www.nytimes.com/2022/01/28/nyregion/rikers-island-prisoner-deaths.html#:~:text=At%20least %20 2016%20people%20died,mainland%20by%20the%20East%20River.

[78] *See* Gloria Pazmino, *Rikers Island Detainees Expose Lack of Medical Care While in Custody*, NY1 (Sep. 21, 2021), https://www.ny1.com/nyc/all-boroughs/public-safety/2021/09/22/rikers-island-detainees-expose-lack-of-medical-care-while-in-custody.

[79] *Supra* n.34.

[80] City of New York Board of Corrections, "February & March 2022 Deaths in DOC Custody Report and Recommendations," (May 9, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports /BOC-Reports/deaths-report-and-chs-response-202202-202203.pdf.

[81] *See id.*

[82] *See id.* at 6.

medical emergencies.[83]

187.      According to former Commissioner Schiraldi, inadequate staff is the sole reason for missed medical appointments.[84] New York City Comptroller Brad Lander also told the City Council that when he toured DOC facilities in September 2021, medical providers told him they were not seeing 90 percent of the people on their call list each day.[85]

188.      The DOC does not even deny they lack the man-power necessary to provide constitutionally-adequate medical care. In a filing in *Agnew, et al. v. New York City Department of Correction*, Index No. 813431/2021E, the DOC admitted that:

> Respondent [the DOC] does not dispute the applicability of the mandates, and has freely acknowledged deficiencies in its ability to escort individuals in custody to clinic appointments, primarily due to lack of staff in the jails. … There is no real dispute between the parties as to the following facts: DOC is required to provide access to medical care for individuals in its custody, and the inability to consistently do so is due to serious staff shortages related to the pandemic.

189.      Memorandum of Law at 2.

190.      The City's deliberate indifference to these issues has interfered with timely and adequate medical care for years. In November 2018, 21 percent of incarcerated people who needed specialty medical services were not produced to on-Island specialty clinics.[86] That number

---

[83] *See id.*

[84] *See id.* at 98:10–12.

[85] *See* Transcript of New York City Council Hearing of September 15 at 86:20–21, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5117031&GUID=C0114C55-A2DB-430F-84B3-3A451359F9AF&Options=&Search=.

[86] *See* Correctional Health Services, "CHS Access Report: November 2018," (January 29, 2019), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/CHS_Access_Report_Nov_2018_v2.pdf.

increased to 30–33 percent in November 2019 and 2020[8788], and leapt to a shocking 53 percent in November 2021.[89] Medical care is even denied by staff as a form of punishment, or because gang members, who have taken control in the jails,[90] obstruct access for persons seeking care.[91]

191.     On May 13, 2022, Bronx Supreme Court Judge Taylor found the DOC in contempt of a December 2021 court order directing the DOC to provide access to sick call and not prohibit or delay access to health services.[92] But that December, 1,061 medical appointments were missed because of a lack of officer escorts.

192.     One detainee was forced to wait over two months before receiving medical attention for scabies—an itchy condition caused by mites that is very easy to transfer to other people—despite repeated requests to see a doctor for weeks. Another man was made to wait for six weeks for treatment after his fingers were badly jammed; by the time he was seen by the medical staff, his fingers were permanently twisted.[93] These significant delays functionally amount

---

[8787] *See* Correctional Health Services, "CHS Access Report: November 2019," (February 25, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/chs-access-report-q4cy19.pdf.

[88] *See* Correctional Health Services, "CHS Access Report: November 2020," (August 31, 2021), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/chs-access-report-cy20q4.pdf.

[89] *See* Correctional Health Services, "CHS Access Report: November 2021," (February 7, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/Correctional-Health-Authority-Reports/CHS-Access-Report-CY21Q4.pdf.

[90] Ransom, Jan, *A Look Inside Rikers: 'Fight Night' and Gang Rule, Captured on Video*, N.Y. Times (January 12, 2022), https://www.nytimes.com/2022/01/12/nyregion/rikers-jail-videos.html.

[91] Ransom, Jan, *Judge Faults Medical Care for Detainees in Latest Sign of Rikers Crisis*, The New York Times (May 17, 2022), https://www.nytimes.com/2022/05/17/nyregion/nyc-correction-department-rikers.html.

[92] *See Agnew et al v. New York City Dep't of Corr.*, Index No. 813431/2021E (Sup. Ct. Bronx Co. 2021), Doc. No. 126.

[93] *See* Rachel Sherman, *Rikers Staffing Crisis Limits Access to Medical Care*, The City (Aug. 26, 2021), https://www.thecity.nyc/health/2021/8/26/22643199/rikers-staffing-crisis-medical-care.

to a complete denial of emergency medical care.

193.         These problems are exacerbated by the virulent Delta variant of COVID-19, whose spread throughout the jail has been enabled by overcrowding in holding cells. As of September 2021, Covid-19 rates outpaced the spread of the disease in the rest of the city. People experiencing flu-like symptoms typically have to wait up to a week to be seen by a doctor—too long to isolate cases and staunch the spread of the virus. One person who died in custody contracted Covid-19 in a crowded intake cell where he was held for ten days after his arrest.[94]

194.         Productions to mental health appointments are similarly dismal. Between November 2018 and November 2021, 19 to 35 percent of mental health appointments were missed because staff failed to produce detained persons to their mental health services.[95] George Anderson, a mental health administrator for CHS, said that "with such long wait times for medical care—sometimes weeks, where it was once days—there is now greater incentive for detained persons to self-harm in order to be seen."[96]

195.         Self-harm in the city's jails is, in fact, on the rise. In March of 2021, "148 people harmed themselves, including 12 seriously."[97] Despite this, the small group of staffers available is not properly trained in suicide prevention.[98]

---

[94] *See* Gloria Pazmino, *Rikers Island Detainees Expose Lack of Medical Care While in Custody*, NY1 (Sep. 21, 2021), https://www.ny1.com/nyc/all-boroughs/public-safety/2021/09/22/rikers-island-detainees-expose-lack-of-medical-care-while-in-custody.

[95] *See* nn.46–49, *supra*.

[96] *Id.*

[97] *See* Jan Ransom, *Disorder and Chaos in N.Y.C. Jails as Pandemic Recedes*, N.Y. Times (Pub. June 19, 2021, Updated Oct. 18, 2021), https://www.nytimes.com/2021 /06/19/nyregion/rikers-island-chaos-suicides.html.

[98] *Id.*

196.     Because of the severe absenteeism, officers are not around to prevent incarcerated individuals from self-harming, oftentimes finding someone well after they are severely injured or have died.[99] Other times, the few officers who are available are in the midst of triple shifts, raising questions about their ability and capacity to properly surveil at-risk populations or intervene in mental health crises.[100]

197.     Since December 2020, at least seven people detained in the DOC's custody have committed suicide, including Brandon Rodriguez; Segundo Guallpa; Wilson Diaz Guzman; Tomas Carlo-Camacho; Javier Velasco; Anthony Scott, and Dashawn Carter.

198.     The unavailability of emergency and preventative care, as well as these increased incidents of self-harm and suicide are emblematic of the larger problem all detained persons on Rikers Island experience: Constant stress and fear that takes a significant toll on incarcerated peoples' mental and physical health, grinding away their will to live. Those detained know that, if they are attacked or become ill, or need assistance with an ongoing condition or acute crisis, they are unlikely to receive the help that they need.

199.     At the same time, the City's unmanageable staffing practices and continued indifference have severely limited access to necessary services known to improve overall wellbeing, including counseling, education, recreation, programming, and religious services. In sum, "[e]very person they send to jail is at great risk of harm or death."[101]

---

[99] *Id.* (providing various instances in which inmates were found hanging in their cells, including one inmate who had been left hanging for 15 minutes).

[100] *See* Jonah E. Bromwich and Jan Ransom, *An 'Absolute Emergency' at Rikers Island as Violence Increases*, N.Y. Times (Oct. 11, 2021), https://www.nytimes.com/2021 /08/24/nyregion/rikers-island-emergency-chaos.html.

[101] *See id.*

E.   **Recreation and programming, including access to religious programming, has ceased altogether.**

200.         People detained at Rikers are locked in cells or housing units for hours—or even days—without access to the outdoors or other forms of recreation time. Entire housing units have been shut down, causing "people in custody [to go] weeks or even months without leaving their housing units."[102] Other essential services and programming, including religious observance, have all but come to a standstill.

201.         These stretches of time without recreation and sunlight affect the mental health of those that are isolated, forcing them to undergo a "torturous experience" beyond that of constitutional detention.[103]

202.         Detained persons, whether pre- or post-trial, retain a constitutional right to certain basic services, such as adequate education, skills programming, religious services, recreation outside of their cells, and daily access to the outdoors.

203.         Nearly 50 years ago, the Second Circuit ruled that the City's attempts to limit access to recreation in its jails was unconstitutional. *See Rhem v. Malcolm*, 507 F.2d 333, 339 (2d Cir. 1974). Thus, City and DOC have long known that keeping detained people indoors, without the ability to exercise outside, is illegal.

204.         And yet, for years, DOC has fallen short of its responsibility to provide adequate recreation and programming to those housed at Rikers. When Mayor de Blasio took office,

---

[102] Jake Offenhartz, '*People Need To Go Outside': Rikers Detainees Say Loss Of Rec Time Is Intensifying Jails Crisis*, Gothamist (Dec. 13, 2021), https://gothamist.com/news/people-need-to-go-outside-rikers-detainees-say-loss-of-rec-time-is-intensifying-jails-crisis.

[103] *See id.* ("'When you're able to get outside and look at the sky, maybe see the sun, maybe feel the breeze, it makes you feel like okay . . . Being locked in 24/7, you don't get those thoughts or feelings. You can't have those dreams. It takes everything away from you.'") (quoting an activist who was previously incarcerated on Rikers Island).

individuals detained in city jails had access to less than one hour per day of programming.[104]

205.     Despite Mayor de Blasio's promise that the City would work on increased recreation and programming, detained persons on the Island are not receiving adequate (if any) of these services, despite constitutional and statutory mandates requiring them.

206.     In May 2021, BOC Chair Jennifer Jones Austin relayed the Board's observations that recreation, programming, and other services were unavailable due to staffing problems:

> Board members and board staff have observed people spending significant lengths of time in intake. We've also monitored housing areas in the jails and have seen that they are being locked down due to insufficient staffing. A lockdown impacts nearly all of the minimum standards, including access to medical and mental health, time out of cell, recreation, visiting, televisiting, phone calls, showers, and more. We also understand that even when a jail is not locked down, critical services such as recreation, law library, grievance, and more are limited by the acute staffing shortage.[105]

207.     In a recent class action lawsuit challenging human rights violations at the George R. Vierno Correctional Facility ("GRVC") on Rikers Island, the City admitted that "DOC staffing challenges have disrupted the timely provision of [showers, recreation, and 'lock out' times]" and, as a result, incarcerated persons were "provided the opportunity to shower only approximately once a week, have had limited recreational opportunities, and have had periods of time where they have not been able to leave their cells."[106]

208.     Furthermore, staff and outside contractors who lead skills, art, education, and other classes are no longer coming to the Island because of the inhumane conditions and chaos.

---

[104] *See* New York City Office of the Mayor, "A Roadmap to Closing Rikers Island" (June 2017), https://s3.documentcloud.org/documents/3871392/De-Blasio-s-Plan-to-Close-Rikers-Island.pdf.

[105] New York City Board of Correction Public Meeting (May 11, 2021), https://www.youtube.com/watch?t=6228&v=DM4Q92NWz7w&feature=youtu.be

[106] *See* Mem. of Law in Opp. to Pls.' Second Motion for a Temp. Restraining Order and Prelim. Inj. at 13, *Arce et al. v. City of New York*, Index No. 809252/2021E (N.Y. Sup. Ct. Sept. 7, 2021), Doc. No. 54.

**F.     Access to the courts is severely limited and detained persons are missing court dates and are denied legal calls.**

209.        In certain circumstances, bail is set on individuals accused of crimes to "to secure [there] court attendance." Criminal Procedure Law §510.30(2)(a). Often referred to as pre-trial detainees, these persons are presumed innocent, and must attend court in order to defend themselves against pending charges.

210.        But the DOC is not reliably transporting persons in their custody to their scheduled court appearances, in violation of their right to access the courts. Over the course of the last year and a half, detained persons who have already been held for extensive periods of time due to COVID-related court closures are subjected to even longer waiting periods because DOC staff is failing to escort them to their virtual and in person court appearances.

211.        According to a Bronx Defenders Services report analyzing data from November 2021, people on Rikers Island were twice as likely to miss a court date than people who were released on their own recognizance or out on bail. Being denied bail actually doubled the chance of appearing in court, despite the fact that missing court is one of the primary reasons people are given bail in the first place.

212.        One man, Esias Johnson, who was held on the Island on a $1 bail for misdemeanor offenses, missed three court dates because no one was available to transfer him. The DOC's failure to facilitate Johnson's court appearances caused him to languish on the Island far longer than he should have. He died in September after missing his August 20 court appearance.

213.        The Bronx District Attorney recently noted a severe drop off in detained persons who were indicted on charges timely appearing for their arraignments, worsening an already back-logged court docket that is struggling to catch up from months-long closures.

214.        For example, in Queens, only 34 out of 52 people with scheduled court proceedings

on one September day 2021 made it to the borough's criminal court.[107]

215.        Persons awaiting trial also have a Sixth Amendment right to an unimpeded criminal defense, including regular contact with their attorney(s). Those who have been convicted, but remain on the Island, also retain a constitutional right to access the courts, including uninterrupted access to legal mail and calls, as well as access to a law library.

216.        But legal calls and visits are also unavailable or severely limited. Attorneys cannot get ahold of staff to set up visits or calls, or when they do call at a scheduled time, attorneys are met with unanswered phones, or told that their client was not brought down to the legal call area. Often, staff wrongly reports that the client "refused" the call, when, in actuality, they were never even informed that a call with their attorney was scheduled.

217.        Law offices have been inundated with calls from persons held on Rikers Island who want to report the conditions of their confinement, but regular jail calls are recorded and are thus not conducive to privileged conversations. In some instances, guards stand near detained persons while they speak on privileged calls, disincentivizing reporting of these issues. Staff has even started turning off the phone system altogether after an incident occurs, preventing those in custody from calling the City's 311 service, their loved ones, or their attorneys to report what happened.

218.        For those trying to reach their defense attorneys while awaiting trial, these waits substantially interfere with the detained person's right to communicate with counsel and support their own criminal defense. Criminal court typically requires an appearance every 2 to 6 weeks, but those housed on Rikers are missing approximately one third of their court dates, evidencing the widespread and pervasive denial of access to the courts for those detained on the Island.

---

[107] *See* Reuven Blau, J*ustice Delayed: City Jail Staff Shortage Keeps Detainees From Getting to Court*, The City (Sept. 14, 2021), https://www.thecity.nyc/2021/9/14/22674823/nyc-rikers-jail-staff-shortage-keeps-detainees-from-court.

219.        Worse still, going to court is the only real way to permanently leave Rikers Island, as a criminal defendant may only enter plea, be granted bail reduction, or proceed to trial by attending court. Thus, the City and DOC's widespread failure to provide timely and regular access to the court system is essentially denying detained persons a way off the Island, and forces them to endure the abhorrent conditions on the Island for even longer than necessary.

**THE CITY OF NEW YORK HAS A DE FACTO POLICY OF
IMPROPERLY STAFFING AND MISMANAGING RIKERS ISLAND**

A.  **The Department of Correction is experiencing a staffing crisis caused by years of mismanagement and poor policymaking by the City.**

220.        Current DOC Commissioner Louis Molina recently admitted that his agency's security practices "are deeply flawed . . . and illogical even to those with no law enforcement experience," and that "inadequate supervision at the facility level" has created dysfunction throughout the system.[108]

221.        The current staffing practices—the result of years of mismanagement, antiquated tracking systems, increasing absenteeism, and an overreliance on uniformed officers who lack effective leadership—serve as a stark example of the City's indifference and resistance to reform.

222.        In reality, the DOC employs more than sufficient staff,[109] but cannot effectively manage or control them.[110]

223.        The antiquated ways in which the City manages its correctional staff are well

---

[108] Conference Transcript at 25, *Nunez*, 11 cv 5845 (S.D.N.Y. April 26, 2022).

[109] *See* Lauren Gill et al., *Hundreds of New City Jail Officers for Rikers Put Detainee Advocates on Guard*, The City (Jul. 11, 2021), https://www.thecity.nyc/2021/7/11/22572991/rikers-island-getting-more-jail-guards-correction-officers (reporting that the DOC employs a number of guards per detainee at a rate seven times higher than the national average).

[110] Jan Ransom and Pallaro, Bianca, *Behind the Violence at Rikers, Decades of Mismanagement and Dysfunction*, N.Y. Times (Dec. 31, 2021), https://www.nytimes.com/ 2021/12/31/nyregion/rikers-island-correction-officers.html.

documented by the court-appointed federal monitor assigned to Rikers Island.[111] The Board of Correction and the *Nunez* monitor have urged DOC to create a modern system to deploy staff, as DOC "does not utilize roster management software to manage daily staff assignments, which is particularly concerning given the size of the agency and the individual facilities and the number of modifications required." [112]

224.        As a result, "[d]aily shift schedules are modified by hand-written notes and [are] manually manipulated. Facility rosters are disorganized, are constantly adjusted and are difficult to decipher."[113] This outdated and inefficient system makes it "extremely difficult, if not impossible, to clearly track where all scheduled staff [are] assigned."[114]

225.        Commissioner Molina has criticized his agencies policies directly, stating that "[s]taffing practices and procedures do not allow [the DOC] to be effective operationally." Molina observed that there is "no accountability in a number of areas" pertaining to staff misconduct, and that the City and its DOC leadership have "created an environment where the discipline needed to operate a law enforcement agency [i]s absent."[115] The City has known about these issues for years, but has not reworked its policies to encourage existing staff to attend work regularly or perform their roles effectively, or hold accountable those who do not.

226.        Notwithstanding the 2015 consent decree in *Nunez.*, 11 Civ. 5845, or its group of court-appointed monitors who have made dozens of solution-oriented recommendations

---

[111] Consent Judgment, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Oct. 21, 2015), ECF No. 249.

[112] Special Report of the *Nunez* Independent Monitor at ¶12, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Mar. 16, 2022), ECF No. 438.

[113] *Id*.

[114] *Id*.

[115] Conference Transcript at 26, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Apr. 26, 2022), ECF No. 456.

concerning these issues (particularly concerning the deeply ingrained culture of violence promulgated by DOC officers), the City, DOC, and most recently Commissioner Molina, have failed to adequately screen, train, supervise, or discipline their officers for misconduct; have failed to ensure that their employees show up to work (or are at least disciplined for excessive absences); and have failed to repair the broken staffing system to ensure that those who attend their shifts end up assigned to posts where they are most needed.

227.       The City has known about these issues for years but has not reworked its policies to encourage existing staff to attend work regularly or perform their roles effectively, or hold accountable those who do not.

228.       Put simply, if the City of New York, its politicians, police, and the City's district attorneys insist on detaining thousands of people pretrial or on parole holds (some for extraordinary amounts of time), then the City must also ensure that there are enough well-trained correction officers in the posts where they are needed, ready and capable of doing their job.

229.       Part of the cause of the abhorrent conditions on Rikers Island is the City's poor leadership and persistent failures to adequately screen correction officers before they are hired; to properly train employed officers on how to keep incarcerated individuals safe and ensure that they receive the care and services to which they are constitutionally entitled; and to effectively manage, supervise, and discipline officers after their initial employment with the agency.

230.       With staff absenteeism on the rise since at least 2018, the City's pervasive failures to train and supervise staff are laid bare. DOC employees on the Island are ill equipped to handle the sheer numbers of detained persons or the deteriorating physical conditions.

231.       In May 2021, the federal monitor appointed in *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845, published his eleventh report, which found three overarching issues

hindering much-needed progress on Rikers Island—all of which related to poor leadership and improper staffing:

> First, the poor quality of Facility leadership hinders progress and must be addressed for the Agency to ever become successful. Second, the dysfunctional deployment and overstaffing of certain posts in the Facilities must be reevaluated to ascertain whether resources are properly assigned and whether the Staff assigned to each post actually meet their responsibilities consistently, without simply outsourcing the issue to a different group of Staff. Finally, the Department must have the ability to hold Staff accountable closer in time to the incident when they are not meeting their responsibilities and when misconduct occurs.[17]

232.    A Department of Investigation ("DOI") inquiry in 2015 also found that the process for hiring DOC staff was inconsistent and dangerous; historically, potential hires were not screened for gang affiliations, and at least one-third of applicants who were hired during the investigatory period should have been disqualified or subjected to further screening, either because they had criminal records, were previously rejected from employment by other law enforcement agencies, had serious psychological diagnoses that could affect their job performance, or had relatives detained on the Island, creating potential security risks.[116]

233.    These practices quickly led to the employment of persons closely associated with gangs,[117] persons with violent criminal records, and at least one person who was found to be psychologically unfit for duty, but was nonetheless hired because of her friendship with union

---

[116] *See* Mark G. Peters, Commissioner, "New York City Department of Investigation Report on the Recruiting and Hiring Process for New York City Correction Officers," (Jan. 2015), https://www1.nyc.gov/assets/doi/press-releases/2015/jan/pr01rikers_aiu_011515.pdf.

[117] *See* Liam Stack, *2 Rikers Guards Set Up Attack on Inmate, Officials Say*, N.Y. Times (Sept. 17, 2015), https://www.nytimes.com/2015/09/18/nyregion/2-rikers-guards-set-up-attack-on-inmate-officials say.html.

leadership.[118]

234.	More recently, DOC officers were caught coordinating with gangs to bring drugs and other contraband into the City's jails in exchange for cash payments, fueling violence and substance abuse on the Island,[119] and at least six correction officers were charged with federal crimes in January 2022 for their alleged connections to the criminal enterprise, which DOI Commissioner Margaret M. Garett identified as part of a pattern of "contraband-smuggling conspiracies [that] have long plagued City jail facilities."[120]

235.	Exacerbating these hiring and oversight deficiencies is an overall lack of effective training. In 2016, former Mayor Bill de Blasio and corrections union leaders agreed that the small storefront in Queens used by the DOC to train its officers was insufficient to accomplish the agency's training goals, adding that a new facility should have been built 5 or 10 years earlier.[121]

236.	On August 6, 2021, the DOC—who had not addressed the issue of a new training facility in the five years following de Blasio's statement that the project was *already* 5 to 10 years behind—issued a press release wherein it admitted that "New York City has long needed a modern

---

[118] *See* Michael Schwirtz and Michael Winerip, *Warning Signs Overlooked in Hiring for New York City Jails*, N.Y. Times (Jan. 15, 2015), https://www.nytimes.com/2015/01/15/nyregion/hired-for-new-york-jails-despite-warning-signs.html.

[119] *See* Associated Press, *Rikers guards accused of smuggling contraband to gang members*, ABC News 10 (Apr. 6, 2022), https://www.news10.com/news/ny-news/rikers-guards-accused-of-smuggling-contraband-to-gang-members/.

[120] Press Release, "Six New York City Correction Officers and 15 Others Charged with Conspiring to Accept Bribes and Smuggle Contraband into Rikers Island Facilities" U.S. Attorney's Office for the Eastern District of New York (Jan. 14 2020), https://www.justice.gov/usao-edny/pr/six-new-york-city-correction-officers-and-15-others-charged-conspiring-accept-bribes.

[121] *See* Jillian Jorgensen, *Rikers Island Will Have More Officers Than Inmates Under Proposed Budget*, Observer (January 21, 2016), https://observer.com/2016/01/rikers-island-will-have-more-officers-than-inmates-under-proposed-budget/.

academy designed around best correctional training practices."[122]

237.        Almost a year later, the City has not even started construction on a new academy, and the expected completion of the academy is not until 2027— the same year the City expects to close Rikers. In the meantime, Rikers remains open, staff remain inadequately trained, and avoidable incidents occur every day on the Island as a result.

238.        The DOC itself can identify enormous gaps in its training: Only about 6 percent of correction officers have taken a yearly refresher course in suicide prevention (which is required of all 8,200 officers), and only 17 percent of uniformed staff which is required to take a mandatory fire safety course have completed the training, according to a spokesman for the agency.[123]

239.        This lack of training is shocking given that, as early as 2014, the former mayor acknowledged that the City has serious problems with training related to the mental health of detained persons within its care.

240.        These improperly and inadequately trained officers are also severely mismanaged. The DOC allocates approximately 86 percent of its $2.6 billion budget to staffing[124]—more than its budget for programming and all other services for incarcerated individuals—despite the fact that the ratio of correction officers to incarcerated people in New York City is significantly higher than jails in the rest of the country:[125]

---

[122] *See* Press Release, "City Identifies Site for New Correction Academy," New York City Department of Correction (Aug. 6, 2021), https://www1.nyc.gov/site/doc/media/new_correction _academy.page.

[123] *See* Chelsia Rose Marcius, *NYC Correction Dept. failing to give staffers up-to-date training in suicide prevention, fire safety as required*, N.Y. Daily News (Apr. 18, 2021), https://www.nydailynews.com/new-york/ny-correction-department-training-suicide-prevention-fire-safety-rikers-island-20210418-mqzfxnwowfhz7a6odazue2smla-story.html.

[124] *See* VERA Institute, "A Look Inside the New York City Correction Budget" (May 2021) at 4, https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

[125] *Id.* at 5.



**Figure 4: Ratio of incarcerated people to corrections staff, NYC vs. United States**

1. In 2020, the incarcerated person-to-corrections officer ratio was 3:5 in New York City.[17]
2. In 2012, the incarcerated person-to-corrections officer ratio was 7:5 in New York City.
3. By comparison, in 2018, the national average for the incarcerated person-to-corrections officer ratio was 21:5.[18]
4. In 2020, the DOC's uniformed staff headcount was 9,237.[19]

241.     Notwithstanding these massive resources, DOC staff are not effectively managed and those in charge do not properly allocate the funds that are available in the DOC's budget. In fact, the DOC's staff management system is so outdated that staffing assignments are tracked by hand, on index cards.[126] Inevitably, this antiquated system leads to staffing problems, such as assigning someone to a post where a uniformed officer is not needed, or understaffing other posts where officers are needed, forcing some to work multiple back-to-back shifts.

242.     Overall, "[t]he Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base level of skill of its Staff."[127]

243.     This poor leadership and mismanagement, coupled with the deplorable conditions on Rikers Island, have made it difficult for the DOC to  attract and ultimately keep well-qualified

---

[126] *See* Katrina Vanden Heuvel, *Opinion: Closing Rikers Island is a matter of life and death*, Washington Post (Oct. 5, 2021), https:// death-crisis/.www.washingtonpost.com/opinions/2021/10/05/rikers-island-death-crisis/.

[127] *See* n.115, *supra*.

correction officers on the Island.

244.        For example, over the last several years, the DOC employed approximately 7,500 correction officers on Rikers Island (and hundreds more at other facilities). According to COBA President Benny Boscio Jr., the DOC lost 1,400 officers between 2019 and 2021,[128] in part due to the miserable workplace conditions.

245.        But hiring more uniformed officers is frequently associated with higher rates of violent and excessive uses of force against detained persons, and is often not a solution to disorder, especially in an era where the jail population is decreasing significantly.[129]

246.        Put simply, there are more than enough DOC staff on the City's payroll, but there is no way to make sure that they are placed where they are needed within each facility—a problem further complicated by rising absenteeism, which highlights these deep deficiencies in the DOC's staffing policies and practices.

247.        The overarching issue is one of corruption, poor leadership, and bad management. As Sarah Townsend, investigator for staff misconduct in the City's jails, recently stated:

> You see corruption in a lot of different places on Rikers Island. When I say corruption, I mean from both the union, which basically runs the place if you have a willing partner in the commissioner and mayor which you do now. But I also saw corruption with a lot of the officers and captains.[130]

---

[128] *See* VERA Institute, "A Look Inside the New York City Correction Budget" (May 2021) at 6, available at https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

[129] *See* Steve J. Martin, "Eleventh Monitor's Report: July 1, 2020–December 31, 2020," at 11–14 (May 5, 2021) (finding that the "staffing issue seems to be one of roster management and deployment versus insufficient numbers of Staff"), https://www1.nyc.gov/assets/doc/downloads/pdf/11th_Monitor _Report.pdf.

[130] *See* JB Nicholas, F*ormer Rikers Watchdog: 'This Whole Fucking Thing Is A Racket*,' Hellgate NYC (May 3, 2022), https://www.hellgatenyc.com/nycs-former-jails-investigator-identifies-top-problem-on-rikers-corruption/.

248.        Ms. Townsend also stated that two of the biggest difficulties she faced in her role as an investigator were "the union and the structure of discipline in general."[131]

249.        The union's heavy influence on the City's operations is well known. In April 2020, COBA, filed a lawsuit against the City alleging that its member officers were working triple shifts—where officers must work for 24 hours straight. But the City did nothing to resolve the situation, even though it was obvious that officers who work for 24 hours in a row are working in a severely diminished capacity, are more likely to inflict violence, and less likely to perform necessary aspects of their jobs.

250.        The former mayor responded to these reports by admitting that "[t]here should never have been 24-hour shifts. This was a dumb managerial mistake. It's not going to be allowed going from this point on, ever." But instead, it got worse.

251.        By February of 2021, correction officers were at a breaking point. The officers were still regularly working 24 hours shifts, and were even sleeping in the parking lot because they were too tired to drive home. The DOC used a legal maneuver to delay the lawsuit challenging these working conditions, allowing the agency to keep the extended shifts.[132]

252.        In March of 2021, the news reports were even more dire, as officers were working double and triple shifts, without breaks for food or water. At that point, there had not been a new class of recruits for approximately two years.[133]

---

[131] *Id.*

[132] *See* "I-Team: Correction Officers' Claims of Grueling 24-Hour Shifts," NBC N.Y. (Feb. 15, 2021), https://www.nbcnewyork.com/news/local/i-team-correction-officers-claims-of-grueling-24-hour-shifts/2889988/

[133] *See* "Rikers Officers Claim They're Told to Work 24-Hour Shifts Without Breaks, Food Or Water," NBC N.Y. (Mar. 24, 2021), https://www.nbcnewyork.com/news/rikers-officers-claim-theyre-told-to-work-24-hour-shifts-without-breaks-food-or-water/2962998/.

253.        In May of 2021, the lack of available, qualified officers led staff to put an entire

facility of detained persons with severe mental illness on lockdown. At least 1,200 officers called

out sick that day, and another 700 were considered "medically restricted."  Approximately 1,901

detained persons were forced to stay in their cells, without recreation or services, for at least 13

hours. There were at least 11 similar lockdowns on the Island over the past year.

254.        In June 2021, one officer reported that she "had not eaten or had a break from her

post at a facility on Rikers Island in more than 16 hours. When a fight erupted . . . she was too tired

to stop it . . . she had worked 15 24-hour shifts since the fall [and] started sleeping in her car . . .

because she was too tired to drive home and often had to return in a matter of hours."[134]

255.        Currently, nearly one-third of COs are either not showing up to work or not

available to work with incarcerated people. And on some days, almost half of the staff is missing.

In May 2022, an incarcerated individual even stole a logbook to help document the utter lack of

guards on the Island.[135] The same month, DOC correction officer committed suicide, which the

union's president attributed to the officer's job at the DOC.[136]

256.        Correction officers have become so angry with their situation on the Island that they

have also started organizing "sick outs," where as many as 1 in 5 officers at a time were calling in

sick, allegedly as a form of illegal strike, or possibly because the working conditions had actually

made them sick. Either way, staffing problems have worsened. In July 2021, the DOC had a total

---

[134] *See* Ransom, *supra* n.97.

[135] *See* Gabrielle Fonrouge, *Rikers inmate steals official log book—to complain about 'outrageous' lack of guards*, N.Y. Post (Jul. 26, 2021), https://nypost.com/2021/07/26/rikers-inmate-steals-log-book-to-complain-about-lack-of-guards/.

[136] Thomas Tracy, *NYC Correction Officer Jumps From Verrazzano Bridge, Dies By Suicide*, N.Y. Daily News (May 13, 2022), https://www.yahoo.com/news/amphtml/nyc-correction-officer-jumps-verrazano-181800489.html.

of 8,800 uniformed staff members, but 1,600 were on sick leave, 1,400 were medically monitored and unable to work, and 2,200 simply did not come to work that month.[137]

257.     In July of 2021, there were reports that hundreds of correction officers were quitting the DOC altogether, calling it "the worst job in the world."[138] Many more officers were incapacitated by COVID-19, which has spread rampantly in the crowded jails.

258.     As abhorrent as these working conditions have become, it is the detained persons who suffer the most from the City's systemic failures. The obvious and only just solution is to stop sending people to Rikers Island and release or relocate those who are housed there. But the City and its law enforcement apparatus refuse to decarcerate the Island, so they must bear the cost of having properly trained staff, as well as the cost of adequately managing that staff and the facilities themselves, and compensate the thousands of detained persons who have suffered as a result of these managerial failings.

259.     The staffing crisis at Rikers and the mismanagement of available employees leaves on-duty guards too exhausted to engage in their most basic duties. Tasks like distributing medication, separating detained persons by classification (an important security protocol), intervening in violent interactions, deescalating tensions between guards and detained persons, escorting incarcerated persons to programming, court appearances, legal visits, or the medical unit, or maintaining basic hygienic and habitable conditions for those housed on the Island, have all fallen by the wayside.

---

[137] *See* Jack Kay, *Correction officers call for better conditions at Rikers*, Queens Daily Eagle (Aug. 16, 2021), https://queenseagle.com/all/corrections-officers-call-for-better-conditions-on-rikers.

[138] *See* Jack Newman, '*This is the worst job in the world': How hundreds of NYC correction officers have quit to join the NYPD after being forced to work back-to-back prison shift*s, Daily Mail Online (Jul. 12, 2021),      https://www.dailymail.co.uk/news/article-9780533/Hundreds-NYC-corrections-officers-quit-worst-job-world-join-NYPD.html.

**B.    Rikers has a pervasive culture of violence among its staff.**

260.        In 2013, a class action was brought in the Southern District of New York on behalf of all present and future persons incarcerated on Rikers Island. *See, generally*, *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF). The lawsuit alleged that the City, through its correction officers on Rikers Island, engaged in a pattern and practice of excessive force. The lawsuit sought declaratory and injunctive relief on behalf of those effected by this *de facto* policy.

261.        In 2014, while the *Nunez* litigation was ongoing, former Mayor Bill DeBlasio hosted a roundtable to discuss much-needed reforms to Rikers Island, calling the multi-jail complex a "dehumanizing environment" which creates a "dynamic of conflict and violence" which was "decades in the making."[139]

262.        This round table—one of many public meetings on Rikers that would be held over the next five years—followed a Department of Justice report on the conditions of confinement for adolescent males on Rikers Island (herein after the "DOJ Report"). The DOJ Report, announced on August 4, 2014, concluded that "there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates" and the "investigation suggests that the systemic deficiencies identified in [the] report may exist in equal measure" for adult detained persons housed in separate facilities on the Island.[140]

263.        On October 21, 2015, the District Court entered a Consent Judgment in Nunez "to correct the violations of federal rights as alleged" by the Plaintiff class in that case. The Consent

---

[139] *See* Office of the Mayor, "Mayor de Blasio Hosts Media Roundtable on Reform at Rikers Island Correctional Facilities," The City of N.Y. (Nov. 20, 2014), https://www1.nyc.gov/office-of-the-mayor/news/932-14/transcript-mayor-de-blasio-hosts-media-roundtable-reform-rikers-island-correctional.

[140] *See* U.S. Dep't of Justice, "CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island," (Aug. 4 2014), https://www.justice.gov/sites/default/files/usao-dny/legacy/2015/03/25/SDNYpercent20Rikers percent20Report.pdf.

Judgment provided for a federal monitor to report on the DOC's compliance with the agreed-upon reforms for Rikers Island.

264.        Since the Consent Judgment was entered nearly seven years ago, federal monitor Steve J. Martin has produced at least twelve reports covering the period between October 22, 2015 (beginning the first monitoring period) and June 30, 2021 (ending the twelfth monitoring period); at least four Remedial Reports; and at least seventeen supplementary status reports, recommendations, and action plans associated with conditions on the Island,[141] all of which make clear that the City has not only failed to comply with the terms of the Consent Judgment, but that conditions on Rikers have worsened significantly since the Consent Judgment was entered, reflecting a "pervasive level of disorder and chaos in the facilities" that extends far beyond the staff violence against adolescent males for which the monitor was first required.[142]

265.        The extent of officer-inflicted violence on the incarcerated population is reflected in the experiences of the punitive class members. As staff absenteeism worsens, the guards who remain on the Island are quick to use violent interventions that often escalate, rather than deescalate, incidents between detained persons or simple misunderstandings or arguments between staff and those held on Rikers Island.

266.        With fewer a guards posted in positions that deal directly with the incarcerated population, a small argument or incident often results in harsh responses from DOC staff. The indiscriminate use of pepper spray has become synonymous with the agency's Emergency Services Unit ("ESU"), who are well known by detained persons to use retaliatory and brutal

---

[141] *Id*.

[142] *See* Steve J. Martin, "Eleventh Monitor's Report: July 1, 2020–December 31, 2020" (May 5, 2021), https://www1.nyc.gov/assets/doc/downloads/pdf/11th_Monitor_Report.pdf.

excessive force rather than the minimum force necessary to maintain order and protect the incarcerated population.

**C.   The City has neglected Rikers Island in anticipation of closing it down.**

267.        Less than two years after the *Nunez* Consent Judgment, the City announced a $30 million comprehensive plan to close and replace Rikers.[143] City officials claimed that the plan included "immediate steps to expand services and renovate facilities to ensure that those who work and are incarcerated in city jails have safe, humane conditions as quickly as possible."[144]

268.        While the plan made clear that the transition away from Rikers would be lengthy (at the time, the estimated year of completion was 2026), it did not provide a detailed account of how those who remained housed on Rikers Island for the remainder of its operational period would be provided with constitutional standards of care. And in 2015, Mayor de Blasio admitted that he underestimated how dysfunctional Rikers is and how much was required to fix it.[145]

269.        In the months and years that followed the decision to close Rikers, the Island's eight separate jail facilities have fallen into complete disrepair. The problem is so abysmal that the City does not even have the ability to execute and complete routine work orders.[146]

---

[143] *See* Office of the Mayor, "Mayor de Blasio Announces 'Smaller, Safer, Fairer: A Roadmap to Closing Rikers Island,'" The City of N.Y. (Jun. 22, 2017), https://www1.nyc.gov/office-of-the-mayor/news/427-17/mayor-de-blasio-smaller-safer-fairer--roadmap-closing-rikers-island-

[144] *See id.*

[145] *See* Michael Winerip, *Even as Many Eyes Watch, Brutality at Rikers Island Persists*, N.Y. Times (Feb. 21, 2015) https://www.nytimes.com/2015/02/22/nyregion/even-as-many-eyes-watch-brutality-at-rikers-island-persists.html.

[146] *See* Nicole N. Austin, "Report on Environmental Conditions: *Benjamin v. Brann*, 75 Civ. 3073 (LAP) Progress Report May-August 2021," Office of Compliance Consultants (October 27, 2021) at 30 ("As with the prior monitoring period, a review of the PHS and EHO inspection reports for the current monitoring period indicate numerous references to the lighting not being maintained, and where work orders have been submitted the conditions have remained unabated, necessitating the submission of additional work orders.")

270.          The deteriorating physical conditions lead directly to violence because cell and dormitory doors often do not lock, allowing incarcerated people to be attacked at night and allowing others access to restricted areas of the facilities, diverting staff away from their posts.

271.          Whistleblowers and activists, along with City and State officials, have warned for years that the Island was at a breaking point, long before COVID-19 reached New York. Yet Rikers has so greatly deteriorated that local politicians have pled with Gov. Hochul and President Biden to intervene, even requesting that the federal government send in the National Guard to help restore some semblance of order. Zachary Carter, former NYC Corporation Counsel and former US Attorney for New York's Eastern District, supported the idea of a federal receivership.[147]

## THE CITY OF NEW YORK IS ACTIVELY VIOLATING MULTIPLE COURT ORDERS AND CONSENT DECREES

272.          In addition to the multitude of requirements imposed by the original *Nunez* consent judgment, most of which continue to be ignored by City officials, District Court Judge Swain recently entered a sweeping order to help alleviate some of the concerns about worsening conditions on the Island.[148] There have been no signs of such implementation thus far.

273.          The City has violated multiple other court orders. For example, the City has not complied with the Environmental Order in *Benjamin* directing the DOC to remedy violations of federal law at Rikers.[149]

274.           In late September 2021, Judge Mitchell J. Danzinger of the Supreme Court, Bronx

---

[147] *See* Stephen Handelman, *Reformers Call for Federal Takeover of New Yorks Rikers Jail*, Center on Media Crime and Justice at John Jay College (May 20, 2022), https://thecrimereport.org/2022/05/20/reformers-call-for-federal-takeover-of-new-yorks-rikers-jail/.

[148] *See Nunez*, 11 cv 5845 at ECF No. 398.

[149] *See Benjamin*, 75 cv 03073.

County, issued a preliminary injunction related to the inhumane conditions in a specific unit inside GRVC called the Enhanced Supervision Housing ("ESH"). [150] The unit holds approximately 115 detained persons who the DOC believes pose a threat to themselves or others.

275.    The comprehensive preliminary injunction directed the DOC to provide basic standards of living—access to showers and personal care items, bedding, clean blankets, recreational periods, access to attorneys and the courts, and three hot meals a day. The City continues to violate the injunctive order.

276.    At least one other lawsuit was recently brought by local defender organizations on behalf of those detained persons still trapped on the Island, specifically complaining of the lack of medical care accessible to those who need it.[151] The defendants were ordered to provide medical visits to everyone who needed it, but the City violated those orders and was held in contempt.[152]

277.    Either the City has let Rikers Island deteriorate so badly that it cannot comply with court orders, or the City is making a deliberate choice not to correct the problems, choosing contempt of court rather than taking the steps it needs to take.

278.    Either way, these contempt rulings, taken with the numerous admissions by DOC officials and politicians, make the situation undeniable. The City has simply failed, repeatedly and deliberately, to detain people in such a way that conditions meet bare minimum standards required both by the constitution and by simple human decency.

---

[150] *See Acre*, Index No. 809252/2021.

[151] *Id.*

[152] *See* Graham Raymon, *Bronx judge finds city in contempt for missed medical visits on Rikers Island*, N.Y. Daily News (Apr. 18, 2021), https://www.nydailynews.com/new-york/ny-rikers-contempt-order-judge-missed-medical-appointees-20220517-l5furejuw5eo3nshwmgfqyonqa story.html

## CLASS ACTION ALLEGATIONS

279.        Pursuant to Fed. R. Civ. P. 23(a) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a class of plaintiffs consisting of individuals who were in DOC custody on Rikers Island from November 2, 2018 until the present and going forward into the future, and were subjected to the above-described unconstitutional conditions of confinement, including those who:

 a. are held in overcrowded, unsanitary, and uninhabitable conditions while the jail structures crumble around them;

 b. are denied access to adequate, sanitary, and regular meals;

 c. suffer from violence and/or live in near-constant fear of violence from guards or other incarcerated people;

 d. are denied access to preventative and emergency medical and mental health care;

 e. are denied access to programming, recreation, and religious services; or

 f. are denied timely access to the courts or their lawyers while in custody.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 (*Monell* Liability)
### *Against the City of New York*

280.        Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

281.        The inhumane conditions that Defendants maintains at Rikers Island do not meet the constitutional minimum conditions of confinement. The City of New York has a policy, practice, and custom of incarcerating people in unconstitutional conditions of confinement at Rikers, which has been occurring for years.

282.        The City has a policy, practice, and custom of deliberate indifference to the deplorable conditions of confinement of people incarcerated on Rikers Island.

283.        Conditions include unsanitary living conditions, overcrowding, threat of violence,

lack of medical and mental healthcare, lack of programming, recreation, and religious services, and lack of access to the courts and legal counsel.

284.     Each condition separately amounts to an unconstitutional condition of confinement, and these deplorable conditions taken together add up to amount to an even more severe unconstitutional condition of confinement.

285.     The City of New York has and had a *de facto* policy of improperly staffing Rikers Island, failing to properly hire and train qualified correction officers, failing to properly manage correction officers and staff at Rikers Island, and failing to keep Rikers Island's facilities in proper working order. The City's policy of failing to train correction officers in preventing and responding to violence, self-harm, and structural hazards on the Island was done with deliberate indifference to the constitutional rights of people incarcerated at Rikers.

286.     The City of New York, including final policy makers at the DOC, and the mayor himself, have been aware of the problems detailed in this Complaint for many years. Since at least 2018, these same final policymakers knew the situations was deteriorating. But they did nothing.

287.     The direct and inevitable result of the City of New York's policies are the multiple deprivations of the incarcerated persons' and Plaintiffs' constitutional rights. Some driving forces behind the horrible conditions at Rikers are the failure to properly staff the jails, the failure to train the people working there, the failure to discipline and hold staff accountable for misconduct, and the failure to keep the jails in proper working order.

288.     Put simply, the City of New York allowed Rikers Island to fall apart, causing the suffering and constitutional violations we see now. Incarcerated persons and Plaintiffs were thus deprived of the minimal civilized measure of life's necessities and were subjected to unreasonable health and safety risks.

289.      The conditions of confinement on Rikers Island violate the most basic rights afforded by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

## SECOND CAUSE OF ACTION

### State Law (Constitutional Violations)
### *Against the City of New York*

290.      Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

291.      Such conduct breached the protections guaranteed to plaintiff by the New York State Constitution, including, but not limited to, Article 1, §§ 1 and 6.

292.      Employees of the City of New York and the DOC created and allowed to continue horrific conditions that deprived incarcerated persons and the Plaintiffs of the minimal civilized measure of life's necessities and subjected them to unreasonable health and safety risks.

## THIRD CAUSE OF ACTION

### State Law (Negligence)
### *Against the City of New York*

293.      Plaintiffs incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

294.      In assuming physical custody of Plaintiffs, the City undertook a duty of care to, *inter alia*, safeguard them from an unreasonable risk of damage to Plaintiffs' and the Class members' health and physical and mental soundness.

295.      The City's violation of their duty of care to plaintiffs was a direct and proximate cause and a substantial factor in bringing about their damages as outlined above, and, as a result, defendant is liable to plaintiff.

## CONCLUSION

**WHEREFORE**, Plaintiffs request that this Court:

    a.  Issue an Order certifying this action as a class action with Plaintiffs as class representatives;

    b.  Require Defendants to pay compensatory and punitive damages in fair, just, and reasonable amounts to be determined at trial;

    c.  Award attorney's fees and costs, as well as pre- and post-judgment interest; and

    d.  Grant such other and further relief as this court may deem appropriate and equitable.

Dated:  New York, New York
        June 24, 2022

**BELDOCK LEVINE & HOFFMAN LLP**

By: _/s/_____

    Jonathan C. Moore
    David B. Rankin
    Deema Azizi
    Liza Batkin
    Regina Powers

99 Park Avenue, PH/26th Floor
New York, New York 10016
    t: 212-490-0400
       212-277-5825
    e:  jmoore@blhny.com
       drankin@blhny.com
       dazizi@blhny.com
       lbatkin@blhny.com
       rpowers@blhny.com

**RICKNER PLLC**

By:
_____/s/_____
Rob Rickner
Masai I. Lord (of counsel)
Stephanie Panousieris

14 Wall Street, Suite 1603
New York, New York 10005
t: (212) 300-6506
e:  rob@ricknerpllc.com
   mlord@lordlawgroup.com
   stephanie@ricknerpllc.com

**THE LAW OFFICE OF
CHRISTOPHER H. FITZGERALD**

By:_____/s/_____
Christopher H. Fitzgerald

14 Wall Street, Suite 1603
New York, NY 10005
t: (212) 226-2275
e: CFitzgerald@CHFLegal.com
*Attorneys for Plaintiffs*

TO:

THE CITY OF NEW YORK
New York City Law Department
100 Church Street
New York, New York 10007
*Attorneys for Defendant*