**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JERELLE DUNN, SAMUEL SEMPLE,
ANDRE WASHINGTON, MATTHEW
CHRISTIANSON, WILLIAM CLANTON,
SAMIR SHABAN, and MICHAEL PENA, on
behalf of themselves and all others similarly
situated,

                    Plaintiffs,

      -against-

THE CITY OF NEW YORK,

                    Defendant.

**DECLARATION OF**
**JONATHAN MOORE IN**
**SUPPORT OF MOTION FOR**
**CLASS CERTIFICATION**

**Case No: 21-CV-09012 (DLC)**

---

JONATHAN C. MOORE, an attorney duly admitted to practice before this Court, declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I am one of the attorneys for the Plaintiffs in this matter, JERELLE DUNN, SAMUEL SEMPLE, ANDRE WASHINGTON, MATTHEW CHRISTIANSON, WILLIAM CLANTON, SAMIR SHABAN, and MICHAEL PENA, and I am fully familiar with the facts and circumstances of this case. I submit this declaration and the accompanying exhibits in support of Plaintiffs' motion for class certification.

2.    This declaration sets forth the (a) the sources of evidence cited in support of plaintiffs' class claims; (b) the qualifications, experience, and ability of plaintiffs' counsel to represent the plaintiffs and the putative classes, and (c) the procedural history of this case.

### EVIDENCE SUPPORTING CLASS CLAIMS

3.    Attached as **Exhibit 1** is New York Times article titled, *Closing Rikers is a Moral Imperative*, and published on March 31, 2017, in which former Chief Judge of the New York Court of Appeals Jonathan Lippman and then City Council Speaker Melissa Mark-Viverito describe

people in custody as living in an "inhumane and violent environment" and argue that closing down Rikers is "not simply good public policy — it is a moral imperative."

4.    Attached as **Exhibit 2** is the New York State Governor's Executive Order No. 5 declaring a disaster emergency on Rikers Island.

5.    Attached **Exhibit 3** is a letter from Ross MacDonald, former chief medical officer for the City of New York's Correctional Health Services, to the City Council dated September 10, 2021, in which Dr. MacDonald beg for assistance with a "situation that has resulted in death and threatens the health and wellbeing of everyone who . . . resides in city jails." Dr. MacDonald goes on to say that the "unavailability of staff has resulted in delays in transferring patients to clinics for care, to mental health units, or to the hospital, even when 911 has been activated and EMS has arrived to transport them."

6.    Attached as **Exhibit 4** is New York City Mayor's Executive Order No. 233, dated October 12, 2022. Executive Order No. 233 extends the City of New York's state of emergency at Rikers Island, which was first declared in Emergency Executive Order No. 241 (dated September 15, 2021).

7.    Attached as **Exhibit 5** is a September 12, 2022 article authored by former DOC Commissioner Vincent Schiraldi in which he described, "A cool assessment of the numbers show a house on fire."

8.    Attached as **Exhibit 6** is a Grist article titled, *A Sinking Jail: The Environmental Disaster that is Rikers Island, describing the structural problems on Rikers Island*, which describes the crumbling infrastructure, flooding, extreme heat, poor air quality, and other structural problems on Rikers Island. None of the jail facilities on Rikers Island are fully air conditioned, and six of the ten jails on Rikers Island have no air conditioning.

9.     Below are slides from an August 4, 2022 "State of New York City Jails" presentation that the New York City Board of Correction ("BOC") showed to assistant district attorneys in the Manhattan District Attorney's Office to convey the dire conditions at Rikers Island that people face while waiting for trial. Matt Katz, *Never-Before-Seen Images Show Rikers Inmates Locked in Caged Showers, Left in Soiled Pants, More Poor Conditions*, Gothamist (Sept. 28, 2022), available at https://gothamist.com/news/rikers-images-shower-cages-poor-conditions. The photos show ailing infrastructure, fire-singed trash and doors, stagnant water, rotten food, and "makeshift laundry" at Rikers Island jails.







10.     Attached as **Exhibit 7** is a New York Post article titled, *Photos inside Rikers Island expose hellish, deadly conditions*, dated October 21, 2021. The article includes horrific images of the intake cells on Rikers Island and describes the lack of access to essential medication and inadequate food and water for inmates, stating that "[s]ome of the only water inmates were able to drink came from tiny sinks inside the pens and without cups, detainees used their unwashed hands to scoop up sips, or put their mouths under the faucets."

11.     Below are shocking images from the above-referenced New York Post article depicting overcrowded intake cells where dozens of men are crammed and forced to sleep on filthy, urine-soiled floors or while sitting down on hard metal benches:





12.     Below are additional slides from the City BOC's "State of New York City Jails" presentation showing people in custody sleeping on the floor of an intake cell next to feces.









13.    Below are slides from the BOC's "State of New York City Jails" presentation depicting a crowded intake cell on July 19, 2022 so crowded that at least two individuals have to lay on the floor. The second image shows the people still detained on July 21, 2022 but in uniform, lying on the floor. The third picture shows the cell on July 24, 2022 shortly before midnight.







14.     Below are slides from the BOC's "State of New York City Jails" presentation depicting a different intake cell with similarly crowded conditions on July 29, 2022 and August 3, 2022.







15.     Below are slides from the BOC's "State of New York Jails" presentation showing multiple instances of people in custody—not jail staff—carrying unresponsive individuals to the clinic.









16.     Attached as **Exhibit 8** are the meeting minutes for the Board of Correction's June

2022 meeting in which Board of Correction Member Dr. Robert Cohen testified about conditions

he witnessed in intake when he toured Rikers Island jails days before: "It's hard to say this because

I've been to a lot of jails and many, many visits, but it was really frightening." Dr. Cohen described

"filthy" intake pens "packed with screaming people—more than 100 people—some had been there

for many days" without access to medical, having to urinate on the floor, without access to the

courts, and without access to clean clothing.  It was "very, very, very upsetting."

17.     Attached as **Exhibit 9** is an article titled, *As Conditions at Rikers Reach Crisis Levels, Concerns About Heat Persist*, published in CityLimits on September 13, 2021. Citing to the New York City Board of Correction's 2020 Annual Heat Report, the article notes that 89 percent of inmate grievances to the DOC in summer 2020 were related to inoperative air conditioning units or fans and a lack of cool showers—all in the midst of record-breaking temperatures.

18.     Attached as **Exhibit 10** is a Gothamist article titled, *People Need To Go Outside: Rikers Detainees Say Loss Of Rec Time Is Intensifying Jails Crisis*, which describes the lack of access to recreation on Rikers Island and that people do not leave their housing units "for weeks or even months."

19.     Attached as **Exhibit 11** is a Daily News article (republished) titled, *Rikers detainees say brown water bring rashes and stomach sickness; another sign of inhumane NYC jail conditions, say advocates*, dated October 23, 2022, which quotes numerous advocates and detainees describing the inhumane conditions on Rikers Island.

20.     Attached as **Exhibit 12** is a New York Times article titled, *Understaffing has led to delays in dispersing food, water and medication*, dated September 15, 2021 stating "[u]nderstaffing has led to delays in dispersing food, water and medication.

21.     Attached as **Exhibit 13** is an article in the Marshall Project titled, *Dispatch From Deadly Rikers Island: "It Looks Like a Slave Ship in There"* dated October 5, 2021, describing a dead mouse cooked into a meal.

22.     Attached as **Exhibit 14** are excerpts from the *Nunez* Monitor's March 16, 2022 Special Report. The Special Report covers a myriad of issues with the jail facilities on Rikers

Island and describes the deplorable conditions at intake Rikers. The *Nunez* court-appointed monitoring team "found the conditions at one intake to be particularly distressing—a toilet was overflowing with feces and an individual was sleeping on the floor outside one of the intake pens. The Special report also describes "unacceptable levels of fear of harm" resulting from, *inter alia*, dysfunctional staff management and deployment practices at the Department of Correction. *Id.* at xx. The monitoring team emphasized that "these high rates [of violence] are *not* typical, they are *not* expected, they are *not* normal. Among other startling statistics, found that the DOC reported at least 40 incidents where detained persons left their cells or housing areas without authorization, and 60 other security breaches, in January 2022 alone.

23.     Attached as **Exhibit 15** is the New York City Board of Correction's *Borough-Based Jails Progress Report* dated December 21, 2021, which describes the extent to which intake spaces on Rikers Island are being used beyond their capacity. The Board stated that intake spaces are not designed to be used for extended stays, and that "[a] person staying overnight in intake has a choice between a stone floor or a stone bench." Nevertheless, individuals incarcerated at Rikers are forced to spend days or weeks in intake.

24.     Attached as **Exhibit 16** is an article titled, *Tales from inside Rikers, the notorious NYC jail set to close*, published on March 3, 2018 by France24, which describes the longstanding bug infestations at Rikers facilities. Vermin, bugs, and roaches are widespread throughout Rikers facilities, and have been for years, including in the kitchens, bathrooms, and sleeping areas.

25.     Attached as **Exhibit 17** is a New York Daily News article titled, *'Horror Island': NYC politicians touring Rikers witness filth, overcrowding and inmate's attempted suicide*, published on September 13, 2021. The article quotes several City politicians on the deplorable conditions they witnessed during their tour of the Island, including Assemblyman Kenny Burgos

who dubbed Rikers, "Horror Island."

26.     Attached as **Exhibit 18** is an excerpt from the *Report on Environmental Conditions: January–April 2019*, compiled and prepared by Nicole N. Austin Best of the Office of Compliance Consultants at the direction of the Court in *Benjamin v. Molina*, 75-CV-3073. The report summarizes the assigned monitor's observations and provides an update on the City's compliance, or lack thereof, with the court-ordered mandates concerning the environmental conditions on Rikers Island. The report found that in a four-month period, approximately 250 incidents of vermin were reported by DOC staff, including the presence of flies, ants, maggots, roaches, mice, and rats at Rikers facilities.

27.     Attached as **Exhibit 19** are excerpts from an April 26, 2022 Conference Transcript in *Nunez v. City of New York, et al.*, 11-cv- 5845 (LTS) (S.D.N.Y. Apr. 26, 2022), ECF No. 456. During the conference, Southern District Court Judge Swain, who oversees the court-ordered monitorship at Rikers, described Rikers as suffering from "extremely dangerous" conditions "in which every single day people are in danger." *Id*. at 6:13–9:9. DOC Commissioner Louis Molina admitted during the hearing that his agency's security practices "are deeply flawed . . . and illogical even to those with no law enforcement experience," and that "inadequate supervision at the facility level" has created dysfunction throughout the system. *Id*. at 25:16–26:11. Molina further admitted that there is "no accountability in a number of areas" pertaining to staff misconduct, and that the City and its DOC leadership "created an environment where the discipline needed to operate a law enforcement agency [i]s absent." *Id*.

28.     Attached as **Exhibit 20** is an article titled, *Man Held at Rikers Dies from Razor Wound After Guards Fail to Intervene*, published in the New York Times on August 30, 2022 describes the death of Michael Nieves: "Two correction officers and a captain failed to act for at

15

least 10 minutes when a mentally ill man slit his throat with a razor at the Rikers Island jail complex last week, with the guards looking on as the man bled." Mr. Nieves died the day after this horrific incident.

29.     Attached as **Exhibit 21** is an article from the New York Post titled, *Stabbings and slashings surge on Rikers Island*, dated May 14, 2022. Citing DOC data on stabbings and slashings at Rikers, the author describes "a bloodbath on Rikers Island." In 2021, there were 419 slashings and stabbings at Rikers — a 1,097 percent increase from 2011. In only the first four months of 2022, 191 stabbings were already recorded.

30.     Attached as **Exhibit 22** is a New York Times article titled, *A Look Inside Rikers: 'Fight Night' and Gang Rule, Captured on Video* and published on January 12, 2022, describing "Fight Nights" at Rikers Island, where gang members orchestrate fights between detained persons while guards watch. Where guards do intervene, they gratuitously and indiscriminately use pepper spray as a shortcut for breaking up disputes.

31.     Attached as **Exhibit 23** is a 2019 Press Release from the New York City Comptroller. The Comptroller's Office found that, despite a declining detainee population at Rikers, rates of violent incidents and uses of force continued to increase. The Comptroller's Office reported that there were approximately 1,354 fights or assaults per 1,000 average daily population in 2018, compared with only 441 ten years earlier in 2008.

32.     Attached as **Exhibit 24** is an article published in Politico titled, *New stats show surge in violence at Rikers Island*, dated the September 17, 2019. Citing to statistics from the 2019 Mayor's Management Report, the author notes that violence and use of force by DOC officers had jumped nearly 30 percent from 2018 to 2019.

33.     Attached as **Exhibit 25** is an article from the New York Post titled, *Violence spikes*

*at Rikers Island despite jail population decline*, published on September 17, 2019. The article notes a 24.5 percent increase in inmate-on-inmate violence from 2018 to 2019 according to the annual Mayor's Management Report.

34.     Attached as **Exhibit 26** are excerpts from the Eleventh Report of the *Nunez* Independent Monitor, filed in May 2021, in which the monitoring team expresses "concern[] about the overall state of reform with the Department [of Correction]," finding that those conditions that gave rise to the Consent Judgment "have not been materially ameliorated." *Id.* at ECF 8–9. The Eleventh Report also shows that uses of force by guards against detained persons rose 183 percent from 2016 to 2020. *Id*. at ECF 26.

35.     Attached as **Exhibit 27** is a New York Times page tracking all deaths on Rikers Island in 2022, *Tracking the Deaths in New York City's Jail System in 2022*, most recently updated two days ago, when Erick Tavira became the seventeenth person in DOC custody to die in 2022. As of the date of filing Plaintiffs' motion for class certification, seventeen people have died this year while in custody at Rikers Island.

36.     Attached as **Exhibit 28** is a New York Times report on the deaths at Rikers Island in 2021 and reporting that "[m]ost of the deaths might have been prevented by basic oversight." At least 16 people died in custody at Rikers Island in 2021, most of whom were awaiting trial.

37.     Attached as **Exhibit 29** is a New York City Board of Correction Report on February & March 2022 on Deaths in DOC Custody. One of the Board's key findings is that "DOC and CHS do not seem to have an acceptably functioning system for providing emergency care to persons in life-threatening situations."

38.     Attached as **Exhibit 30** is the Board of Correction's *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody*.

According to the report, seven of the sixteen people who died in 2021 while in custody at Rikers Island died by suicide and "uniformed staff failed to provide timely first aid, if at all, in at least five of the deaths" and noted staff's failures in supervising individuals in custody and producing them to medical appointments.

39.    Attached as **Exhibit 31** is the New York City Board of Correction's Report and Recommendations on the November 2019 Attempted Suicide of Mr. Nicholas Feliciano dated October 18, 2021, which reports, "On November 27, 2019, 18-year-old Nicholas Feliciano hanged himself with institutional clothing in an intake pen at the George R. Vernon Center on Rikers Island. According to the Board of Correction's review of this incident, he was hanging for 7 minutes and 51 seconds in plain view of Correction Officers, other people in custody, and members of FDNY emergency medical services before DOC staff cut him down."

40.    Attached as **Exhibit 32** is an excerpt (pages 1-17) of the *Report on Environmental Conditions: January–April 2022*, compiled and prepared by Nicole N. Austin Best of the Office of Compliance Consultants at the direction of the Court in *Benjamin v. Molina*, 75-CV-3073. The report summarizes the assigned monitor's observations and provides an update on the City's compliance, or lack thereof, with the court-ordered mandates concerning the environmental conditions on Rikers Island. The excerpt includes a brief summary of the report.

41.    Attached as **Exhibit 33** is an excerpt (pages 1-20) from the *Report on Environmental Conditions: May–August 2020*, compiled and prepared by Nicole N. Austin Best of the Office of Compliance Consultants at the direction of the Court in *Benjamin v. Molina*, 75-CV-3073. The report summarizes the assigned monitor's observations and provides an update on the City's compliance, or lack thereof, with the court-ordered mandates concerning the environmental conditions on Rikers Island. The excerpt includes a brief summary of the report.

42.     Attached as **Exhibit 34** is an excerpt (pages 1-27) from the *Report on Environmental Conditions: May–August 2021*, compiled and prepared by Nicole N. Austin Best of the Office of Compliance Consultants at the direction of the Court in *Benjamin v. Molina*, 75-CV-3073. The report summarizes the assigned monitor's observations and provides an update on the City's compliance, or lack thereof, with the court-ordered mandates concerning the environmental conditions on Rikers Island. The excerpt includes a brief summary of the report.

43.     Attached as **Exhibit 35** is an excerpt from the August 4, 2014 report, prepared by the United States Department of Justice, titled *CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island*, which summarizes the federal agency's observations and findings concerning the conditions of confinement for adolescent males on Rikers Island. The report found that the DOC engages in "a pattern and practice of conduct on Rikers Island that violates the constitutional rights of adolescent inmates." The report includes a "Summary of Findings," *id.* at 4, that lists numerous factual determinations about alarming uses of force and other serious problems at Rikers Island.

44.     Attached as **Exhibit 36** is the City's official, publicly available transcript of a November 20, 2014 roundtable discussion held by the Office of the Mayor concerning necessary reforms to Rikers Island. During the discussion, former Mayor de Blasio noted that Rikers Island is a "dehumanizing environment" that is "unfair to the inmates" who are forced to live there.

45.     Attached as **Exhibit 37** is an excerpt of *Report of the Independent Commission on New York City Criminal Justice and Incarceration* released in April of 2017. This commission, chaired by former New York State Chief Judge Lippman and comprised of 27 members in a wide variety of fields, including law, business, philanthropy, academia, and social services unanimously concluded that Rikers Island should be closed. In the report, the Hon. Lippman declares that "we

must close the jail complex on Rikers Island. Period." The report finds that "New York City, the leader in so many ways, is currently in the 19th century in terms of jails."

46.     Attached as **Exhibit 38** is the City's official June 22, 2017 announcement of the "Smaller, Safer, Fairer" initiative, which included plans to "close Rikers Island safely and house the population off-Island" in a series of borough-based jail complexes. The announcement included the launch of the "Close Rikers" campaign, which remains available at nyc.gov/CloseRikers.

47.     Attached as **Exhibit 39** is a February 21, 2015 New York Times article written by Michael Winerip titled *Even as Many Eyes Watch, Brutality at Rikers Island Persists*. The article tells the story of Mr. Jose Guadalupe, a "seriously mentally ill" man who was beaten unconscious by guards while housed on Rikers Island. The article describes how, despite years of attention focused on reforming Rikers Island, the City has failed to meaningfully reduce brutality by DOC staff against the incarcerated population.

48.     Attached as **Exhibit 40** is a July 11, 2021 article from The City, written by Lauren Gill, New York Focus, and Reauven Blau, titled *Hundreds of New City Jail Officers for Rikers Put Detainee Advocates on Guard*. The article states that the DOC employs "five correction officers for every three incarcerated people—a ratio seven times higher than the national average," yet the City continues to reserve additional resources to hire hundreds more officers, rather than pay to reform and reorganize the staff it already has.

49.     Attached as **Exhibit 41** is a July 26, 2021 New York Post article written by Gabrielle Fonrouge titled *Rikers inmate steals official log book—to complain about "outrageous" lack of guards*. The article describes a desperate man's attempt to blow the whistle on conditions during a period where "at least 150 officers were working triple shifts, approximately 50 posts

were left unmanned."

50.     Attached as **Exhibit 42** is a May 13, 2022 Yahoo News article by Thomas Tracy describing the tragic suicide of Edward Roman, a DOC corrections officer whose fatal jump from the Verrazano Bridge was attributed by many to the stressful and inhumane conditions on Rikers.

51.     Attached as **Exhibit 43** is the April 24, 2021 New York Times article by Jan Ransom reporting that "more than half of the roughly 270 [DOC] correction officers disciplined over a 20-month period lied to investigators or filed incomplete or inaccurate reports."

52.     Attached as **Exhibit 44** is an excerpt of the Fourth Report of the *Nunez* Independent Monitor, filed October 10, 2017, in which the Monitor found in one-third of audited cases, the DOC brought no disciplinary charges when staff failed to report unnecessary uses of force by other staff, outright failed to report uses of force at all, lied to justify force, and failed to report chokeholds and blows to the head.

53.     Attached as **Exhibit 45** is a letter to the *Nunez* court dated August 24, 2021, ECF No. 378, in which Monitor Steve J. Martin stated that the "state of seriously compromised safety has spiraled to a point at which, on a daily basis, there is a manifest risk of serious harm to both detainees and staff, which in turn generates high levels of fear among both groups." The letter further states that "multiple security breaches" were causing violence to persist between incarcerated individuals on the Island.

54.     Attached as **Exhibit 46** is an excerpt of the introduction to the June 30, 2022 Status Report of the *Nunez* Independent Monitor, reporting that Rikers Island jails "remain dangerous and unsafe, and the conditions are volatile."

55.     Attached as **Exhibit 47** is a copy of the May 13, 2022 Decision and Order in *Agnew et al v. New York City Dep't of Corr.*, Index No. 813431/2021E (Sup. Ct. Bronx Co. 2021), in

which the Hon. Judge Taylor of the Bronx Supreme Court found the City of New York in contempt of court for failing to provide access to sick call for persons on Rikers Island.

56.     Attached as **Exhibit 48** is the October 17, 2022 extension of Mayor Eric Adams's Emergency Executive Order No. 238, originally executed on September 2, 2021, which declares that "excessive absenteeism" of DOC Staff on Rikers Island "continue[s] to contribute to a rise in unrest and disorder," creating issues with "maintenance and delivery of sanitary conditions" as well as "access to basic services."

57.     Attached as **Exhibit 49** is an excerpt from the September 2022 Mayor's Management Report, in which each City agency reports new statistical data related to the duties and obligations of that agency. The excerpt contains the Department of Correction agency report. The City incarcerates thousands of individuals on a daily basis on Rikers Island. According to the 2022 Mayor's Management Report, the average daily inmate population on Rikers Island was 5,559 in 2022; 4,921 in 2021; 5,841 in 2020; 7,938 in 2019; and 8,896 in 2018. In the same report, the Mayor reported that the average length of stay for incarcerated individuals on the Island (in days) was 120 in 2022; 87 in 2021; 90 in 2020; 75 in 2019; and 66 in 2018.

58.     Attached as **Exhibit 50** is the original pleading filed by the City of New York against the Corrections Officers' Benevolent Association ("COBA") on September 20, 2021 in the New York County Supreme Court, in which the City accuses COBA of orchestrating an "unlawful campaign of mass absenteeism."

59.     Attached as **Exhibit 51** is a July 2022 interview of DOC Commissioner Molina describing in which he describes why slashings and stabbings have sharply risen: "[T]actical and facility search operations for contraband weapons were not done for over two years in this department. In addition to that, there was no infrastructure investment within the department

because the construction budget was always underfunded. When the decision was made to close Rikers Island and move to a borough-based jail facility, really the infrastructure on Rikers Island was just neglected." Commissioner Molina said the administration was "dealing with over a decade of neglect." He goes on to say that "timely and meaningful discipline" of DOC staff "quite frankly has never existed in th[e] [DOC]."

60.    Attached as **Exhibit 52** is a copy of the Court's Order in Agnew v. DOC, Index No. 813431/2021E (N.Y. Sup. Ct. Oct. 29, 2021) directing the DOC to pay $100 for each missed escort to the infirmary after the City was found in contempt.

61.    Attached as **Exhibit 53** are the meeting minutes for the Board of Correction's May 11, 2021 meeting, during which attendees discussed how staffing shortages and the steadily increasing jail population also result in delays moving people out of intake.

62.    Attached as **Exhibit 54** is the home page of the New York City OpenData Website with a list of "Daily Inmates in Custody." The list is updated daily and was updated on the date of filing of this motion (October 24, 2022). The home page describes the various data points that are provided by the NYC OpenData site including fields that identify "each inmate record," "the admitted date and time," and the "discharged date and time."

63.    Attached as **Exhibit 55** is a Spectrum News New York 1 article by Gloria Pazmino entitled *Rikers Island Detainees Expose Lack of Medical Care While in Custody*, which discusses the extensive delays in delivering medical care on Rikers Island.

**ADEQUACY OF CLASS COUNSEL**

64.    The named plaintiffs in this case are represented by attorneys from the law firm of Beldock Levine & Hoffman LLP, Rickner PLLC, and The Law Office of Christopher H. Fitzgerald.

65.    Beldock Levine & Hoffman LLP ("BLH"), founded in 1964, has a diversified civil

and class action practice.  The firm has handled government misconduct and constitutional litigation for over forty-five years. The firm was responsible for the ground-breaking class action, *Floyd v. City of New York*, which successfully overturned the NYPD's decade-long unconstitutional stop-and-frisk policy.

66.     Beldock Levine & Hoffman, LLP ("BLH") attorneys have litigated a number of class action lawsuits against the City of New York, including, but not limited to: *El Sayed v City of New York*, No. 18-cv-10566 (SDNY) (injunctive claims, including a revised Patrol Guide policy, resolved on June 11, 2021); *Syed v City of New York*, No. 16-cv-04789 (S.D.N.Y. 2016) (class certified on February 15, 2019); *McLennon v City of New York*, No. 14-cv-6320 (E.D.N.Y. 2014) (injunctive claims resolved on March 3, 2020); *Floyd v City of New York*, No. 08-cv-1034 (S.D.N.Y.) (currently in remedial stage); *Daniels v City of New York*, 198 FRD 409, 418 (S.D.N.Y. 2001); and *MacNamara v City of New York*, 275 FRD 125, 154 (S.D.N.Y. 2011).

67.     I, Jonathan C. Moore, have been a partner at BLH since July of 2006.  I graduated from DePaul University College of Law, magna cum laude, in 1977.  From 1977-78, I served as a Lecturer at the Wayne State University College of Law in Detroit, Michigan.  From 1978 to 1979, I was a staff attorney with the Better Government Association in Chicago, Illinois.  From 1979 to 1983, I was a partner in the firm of Haas, Moore, Schmiedel & Taylor in Chicago, Illinois.  From 1983 to 1985 I was *of counsel* to the New York firm of Rabinowitz, Boudin, Standard, Krinsky & Lieberman.  From 1985 to 1995 I was a solo practitioner in New York, New York.  From 1995 to 1998 I was a principal and partner in the law firm of Moore & Williams, LLP, in New York. In 1999 I returned to solo practice, which I maintained until March 1, 2003, when I formed the firm of Moore & Goodman, LLP.  For the last 45 years I have been engaged in civil rights and constitutional law litigation in the federal and state courts.

68.     I was also class counsel in *Burley, et al. v. City of New York, et al.*, 03-CV-735 (S.D.N.Y.) (Pauley, J.) (challenging excessive detention of demonstrators arrested for minor offenses during the 2002 World Economic Forum) and, together with William H. Moore, I represented a class of African American and Latino men who were subjected to racial profiling by the Street Crime Unit of the NYPD in their successful settlement against the City of New York in *Daniels v. New York*, 99 CV 1695 (SAS) (S.D.N.Y.). I have additionally represented plaintiffs on First Amendment and police misconduct claims in *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979); 446 U.S. 754 (1980) (sustained §§1983 and 1985(3), and *Bivens* claims against federal and state law enforcement officials for wrongful death of members of the Black Panther Party); *Carlson v. Green*, 446 U.S. 14 (1980) (established Eighth Amendment *Bivens* claim for federal prisoners for inadequate medical care; principal author of brief in Supreme Court); *King v. Conde* and *Gentile, et al., v. The County of Suffolk*, 121 F.R.D. 180 (E.D.N.Y.1988) (most widely cited decision in this Circuit and in other Circuits establishing presumptive discoverability of police officer personnel files in §1983 action); *Bartholomew v. The City of New York, et al.*, 00 Civ 3076 (WHP) (S.D.N.Y.) (settled First and Fourth Amendment challenge to City's policy of detaining individuals arrested at demonstrations for processing through the system rather than releasing them with a Desk Appearance Ticket); *Mandal, et al. v. The City of New York, et al.*, No. 02-CV-1234 (S.D.N.Y.) (WHP) (liability verdict in 2006 on First and Fourteenth Amendment challenge to City's policy of denying individuals arrested at demonstrations consideration for release with a Desk Appearance Ticket or summons); *Circulo de la Hispanidad v. The City of Long Beach, et al.*, 00-CV-1463 (jury verdict on §1983 action alleging violations of First Amendment rights).

69.     Rob Rickner of Rickner PLLC has extensive experience litigating civil rights cases, class actions, and mass torts. Mr. Rickner has represented over one hundred plaintiffs with 42

U.S.C. § 1983 civil rights claims in federal and state court, including numerous cases against the City of New York, as well as over a dozen wrongful conviction cases that have resulted in multi-million-dollar settlements. Mr. Rickner is presently co-class counsel in two other class actions, *Sierra et al. v. City of New York et al.*, 20-CV-10291 (S.D.N.Y.) and *Welch et al. v. City of New York*, Index No. 153648/2021 (Sup. Ct. NY Co.). Before opening his civil rights practice, Mr. Rickner managed the *World Trade Center Disaster Site Litigation*, No. 21-MC-100 (S.D.N.Y.), litigation on behalf of the Port Authority, as well as helped defend many other mass torts and pattern, and commercial litigation.

70.     Christopher H. Fitzgerald is the principal attorney at the Law Office of Christopher H. Fitzgerald and has over ten years of experience litigating police misconduct and prisoner abuse actions in New York's state and federal courts. Since 2017, he has served as counsel to the Leadership Council on Civil and Human Rights, one of the amici curiae on the landmark class actions *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (AT), *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT), and *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT). Mr. Fitzgerald also serves in a pro bono capacity on the National Lawyers Guild's Floyd/BLM Litigation Task force, training the Task Force's civil rights fellows and summer associates in the fundamentals of §1983 litigation.

71.     Class counsel have and will continue diligently and vigorously to pursue all rights and interests of plaintiffs and the putative class members.

## PROCEDURAL HISTORY

72.     On November 2, 2021, Plaintiffs Dunn and Semple initiated this action by filing a class action complaint.[1] Dkt. 1. On January 28, 2022, Defendant City answered the complaint. Dkt.

---

[1] Due to a signature error, the Complaint was re-filed on November 3, 2021. *See* Dkt. 8.

18. On June 27, 2022, Plaintiffs filed the First Amended Complaint, which added four additional plaintiffs: Washington, Clanton, Shaban, and Peña. Dkt. No. 27. The First Amended Complaint also extended the Class Period to begin on November 2, 2018. *Id.* On October 3, 2022, Defendant City filed its answer to the First Amended Complaint. Dkt. No. 37.

73.     The parties held the first mediation session on October 14, 2022, and mediation is currently ongoing.


Dated: New York, New York
       October 24, 2022

_____

Jonathan C. Moore, Esq.