# EXHIBIT 14

# Special Report of the
# *Nunez* Independent Monitor

**March 16, 2022**

**THE NUNEZ MONITORING TEAM**

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

Introduction ................................................................................................................ 1

Section I. Entrenched Culture of Dysfunction ............................................................ 3

Section II. Persistently Unsafe Conditions Caused by Deficient Staffing & Security Practices .... 7

    DOC's Staffing Challenges .................................................................................. 8

    Use of Force and Violence Data ........................................................................ 13

    Assessment of Recent Incidents in 2022 ......................................................... 15

    RNDC ................................................................................................................ 17

    Status of Efforts to Improve Basic Security Practices ....................................... 21

    Dire Conditions in Intake ................................................................................. 22

    Department's Management of Compliance and Its Consultation with Monitoring Team ........ 24

Section III. Update On Monitoring Team's Staffing Analysis ..................................... 30

    Initial Findings of Staffing Analysis .................................................................. 32

    Impact of Staffing Deficiencies on Department Operations .............................. 39

Section IV. Update on Department's Efforts to Achieve Compliance with the Second Remedial Order ...... 44

    Interim Security Plan (¶ 1(i)(a)) ..................................................................... 44

    Responding to Incidents Involving Self-Harm (¶ 1(i)(b)) ............................... 46

    Video Monitoring Unit (¶ 1(i)(d)) ................................................................. 49

    Managing People in Custody ............................................................................ 50

    Post Incident Management (¶ 1(i)(e)) ............................................................ 52

    Classification Consultant (¶ 1(i)(f)) ................................................................ 53

    Expansion of Eligibility for Candidates to Serve as Wardens and Above (¶ 1(ii)) ......... 56

    Appointment of Security Operations Manager (¶ 1(iii)) ................................... 57

Section V. Third Remedial Order Update ................................................................. 58

    Dismissal of Disciplinary Manager .................................................................. 58

    Staffing Needs for the Trials Division .............................................................. 60

    Status of Efforts to Operationalize the Requirements of the Third Remedial Order ........ 62

    Model for Additional Relief ............................................................................. 63

Section VI. Reporting & Assessment of Compliance ................................................. 63

Section VII. Recommended Actions to Accelerate Reform ....................................... 66

Conclusion ............................................................................................................... 74

## INTRODUCTION

The Monitoring Team is issuing this Special Report to advise the Court and the Parties of the continued imminent risk of harm to incarcerated individuals and staff in the New York City jails. The first few months of 2022 have revealed the jails remain unstable and unsafe for both inmates and staff. The volatility and instability in the jails is due, in no small part, to unacceptable levels of fear of harm by detainees and staff alike. Despite initial hopes that the Second Remedial Order (dkt. 398), entered in September 2021, would help the Department gain traction toward initiating reform on the most immediate issues, the Department's attempts to implement the required remedial steps have faltered and, in some instances, regressed. These failures suggest an even more discouraging picture about the prospect for material improvements to the jails' conditions. Furthermore, the Department's staffing crisis continues and the New York City Mayor's Emergency Executive Order, first issued on September 15, 2021, and still in effect (through multiple extensions) as of the filing of this report, acknowledges that, among other things, "excessive staff absenteeism among correction officers and supervising officers has contributed to a rise in unrest and disorder."[1] The Monitoring Team's staffing analysis, discussed in detail below, reveals that the Department's staff management and deployment practices are so dysfunctional that if left unaddressed, sustainable and material advancement of systemic reform will remain elusive, if not impossible, to attain.

The goal of the Consent Judgment and corresponding Remedial Orders is to ensure that the City and Department operate safe jails that meet Constitutional standards. **It is the responsibility of the City and the Department to develop and implement the reforms**

---

[1] Mayor Eric Adams, Emergency Executive Order No. 57, March 14, 2022.

**required by the Consent Judgment, which, to date, the City and Department have failed to do**. The Monitoring Team's responsibility is to provide the Court and the Parties with a neutral and accurate assessment of the current state of affairs, identify any obstacles to reform, provide compliance ratings, and provide recommendations for addressing areas where compliance has not yet been achieved. The Monitoring Team is also a resource and provides technical assistance to the Department on the development of initiatives required by the Consent Judgment and Remedial Orders. The Monitoring Team's work with the Department over the last six year has revealed a depth of dysfunction, created over decades of mismanagement, that permeates the entire system, and, in some cases, extends beyond the Department. The issues underpinning the Department's ability to reform have created a polycentric problem and represent a complicated set of dysfunctional practices unlike any jail system with which the Monitoring Team has had experience. The issues stymying reform are complex, with a number of interrelated "problem centers" for which the solution to each is dependent upon finding the solution to some, if not all, of the others. It is therefore impossible for the Department to improve the practices targeted by the Consent Judgment without first addressing four foundational issues: (1) ineffective staff management, supervision, and deployment; (2) poor security practices; (3) inadequate inmate management; and (4) limited and protracted discipline for staff misconduct.[2] Solving these four underlying problems requires a combination of deep expertise in corrections, an enduring vision, and creativity to navigate the quagmire of bureaucracy and dysfunctional practices that have developed over time. As discussed in more detail below, solving these problems cannot be

---

[2] *See* Twelfth Monitor's Report at pgs. 10 to 16 for a detailed description of the four foundational issues that are directly contributing to the Department's inability to reform its practices.

accomplished by the City and Department alone and will require the addition of some outside expertise.

The gravity of the current situation demands a comprehensive and tangible shift in the City's and Department's focus and priorities, and a corresponding shift in the work of the Monitoring Team in order to catalyze the necessary reforms as soon as possible. The Monitoring Team has concluded that simply proceeding with monitoring-as-usual (*i.e.,* bi-annual reporting on the panoply of requirements, providing recommendations and the requisite technical assistance) would only further protract the reform process and lead to the extension of oversight, rather than hastening its end. Instead, more contemporaneous in-depth reporting on a more limited set of issues, a change in focus with concrete steps and timelines, and appropriate enforcement mechanisms and external resources are necessary if the agency is ever to be reformed.

In order to support the Court's and Parties' efforts to devise the appropriate remedial scheme, this report provides a summary of the entrenched dysfunctional culture, a description of the persistently unsafe conditions caused by deficient security and staffing practices, initial findings of the Monitoring Team's staffing analysis, an update on the Department's efforts to implement the Second and Third Remedial Orders, and finally, recommendations for next steps.

## SECTION I. ENTRENCHED CULTURE OF DYSFUNCTION

The Department's multitude of nonfunctional systems and ineffective practices and procedures combine to form a deeply entrenched culture of dysfunction. Deficiencies in core foundational practices have been normalized and embedded in every facet of the Department's work. Indeed, recent site work (in February 2022) by the Monitoring Team reaffirmed this notion as staff seemed to have accepted their lack of control and inability to create safety within the

current environment. The Department is trapped in a state of persistent dysfunctionality, where even the first step to improve practice is undercut by the absence of elementary skills and the convolution of basic correctional practices and systems. This leaves the Department at an impasse—in a place where many of the requirements of the Consent Judgment are simply unattainable, and even the basic steps required by the Second Remedial Order are inaccessible because the basic foundation needed to improve practice simply does not exist. The current conditions—six years after the Consent Judgment went into effect—bring into stark relief that the agency has shown itself, to date, incapable of implementing the changes in practice necessary to achieve the goals of the Consent Judgment and the First and Second Remedial Orders.

Normally, those in uniformed supervisory positions would be key facilitators for transforming practice in any reform effort. Unfortunately, DOC supervisors have been unable to lead this change due to lack of expertise and skills, limitations in their numbers compared with the line staff they oversee, and illogical deployment practices which do not deploy them where they could be most effective in supervising others. Supervisors are needed to elevate staff skill in adhering to basic security practices (*e.g.* consistently locking doors), quelling disorder, reducing interpersonal conflict, and ensuring that basic services are provided, all of which are precursors to the fear and frustration among people in custody that lead to uses of force and violence. The First Remedial Order attempted to fill the void in supervision by requiring the Department to increase the number of Assistant Deputy Wardens and to ensure these supervisors were more visible and active throughout the facility in order to elevate staff practice among their subordinates. However, few, if any, additional ADWs have actually been deployed to supervise

staff on the housing units.[3] A similar theory was behind the Monitoring Team's frequent recommendations to fortify the role of Captains in managing the housing units. In theory, if supervisors have a consistent presence on the housing units, they can ensure staff are properly posted and positioned, guide and develop staff's practice, and hold staff accountable for properly executing their duties. Unfortunately, the Monitoring Team's staffing analysis revealed that a large proportion of Captains are assigned to positions that do not involve supervising the housing units, and thus are of limited value to the task of elevating staff skill.

Further exacerbating the problem, the Monitoring Team's ongoing review of key records and observation of operational practices reveals that a large proportion of the Department's uniformed supervisors either do not have the aptitude and/or willingness to properly supervise their subordinates, have limited engagement with staff on the housing units and do not provide adequate supervision. A recent incident of inadequate supervision during a use of force incident illustrates many of these issues.

- *On January 31, 2022, an incarcerated individual removed his own restraints and resisted efforts to be re-restrained. A Deputy Warden was present and witnessed staff use a prohibited hold to take the incarcerated individual down. Staff then used a chokehold on the incarcerated individual to keep him down as they restrained him. Once restrained, staff tried to lift the incarcerated individual off the ground, but the individual collapsed. Body worn camera footage captured that while the incarcerated individual was on the ground that the supervising Deputy Warden, standing over the collapsed individual stated that the individual was doing a "very good acting job right now" and then stated "you're not a very good actor just want to let you know, but I'll bring the gurney down anyway." The Deputy Warden overseeing the incident failed to act professionally, failed to supervise staff, failed to intervene on the use of a prohibited takedown and chokehold, and failed to render appropriate aid to the incarcerated individual. From start to finish this incident was a clear example of failed staff supervision.*

---

[3] Generally, only one or two ADWs are on duty each shift and they are generally assigned the post of Tour Commander (the sole point of contact for managing the tour for the entire Facility), which results in little to no direct supervision of Captains. Therefore, Captains are not actively or effectively supervised by their superiors and thus are not able to hone their skills in coaching line staff.

As discussed in more detail below, the lack of adequate supervision is what prompted the creation of a supervisory checklist as part of the Second Remedial Order, although the Monitoring Team observed while on site that it does not appear to be utilized by supervisors. There are certainly some Supervisors who have the requisite skill set and/or willingness to change, but some appear to have become resigned to the dismal state of affairs and dysfunction that permeates so much of the system. In other words, what seemed like a viable strategy toward reform turned out to be ineffective because of inaccurate assumptions regarding the core expectations for Supervisors—that they are sensibly deployed, possess a certain level of skill-mastery, and can effectively direct and regulate the conduct of their subordinates. This is a microcosm of the larger problem inhibiting reform—that a seemingly viable strategy is rendered ineffective because of the absence of key elements of basic practice.

To the extent that Supervisors themselves require sound guidance in effective strategies for improving staff practice, the Department recently demonstrated its own inability to provide this guidance by issuing an order that created an imminent risk of harm just six days ago. As way of background, in December 2021, the Department in collaboration with the Monitoring Team, developed a teletype intended to help Supervisors effectively target poor staff practices, including, among other items, properly securing doors and control stations. Unbeknownst to the Monitoring Team, last week, the Department revised this teletype and *removed* some of the very requirements that were needed to properly supervise staff on the housing units. Specifically, the revised teletype inexplicably removed requirements for supervisory tours on housing units that were unmanned or a staff member was off post. It also removed the requirements that supervisors ensure that doors were properly secured. In other words, in the revised teletype, agency leaders gave direction to supervisors that *increases* the risk of harm to people in custody

and directly *contradicted* efforts to address one of the basic safety concerns, seemingly sanctioning Supervisors abdication of responsibility for these issues. This simply defies sound correctional practice. The circumstances surrounding the revision and issuance of the teletype also raise serious concerns about the Department's strategy for interfacing with the Monitoring Team. These concerns are discussed in more detail in the "Management of Compliance" section below.

These foundational areas of dysfunction are not new and created over decades and across many administrations. This is why it is critical to reform the core foundational practices that can and must endure beyond a single administration. To date, with each new administration and/or leadership change, the Department restarts the clock of reform, and initiatives built on solid correctional practice are revised or abandoned before benefits are ever realized. This has been particularly true over the past year in which three different administrations have cycled through the agency, further destabilizing an already unstable agency. A durable pathway to reform must be developed, one that focuses squarely on the underlying causes of the current conditions, and which is mirrored by a new strategy for monitoring and enforcement that will endure across administrations.

## SECTION II. PERSISTENTLY UNSAFE CONDITIONS CAUSED BY DEFICIENT STAFFING & SECURITY PRACTICES

The Department's facilities are unsafe. The use of force and violence in the jails are inextricably linked to the Department's mismanagement of staffing and its significant security failures. The Department needs immediate security upgrades and quality staff management to effectively and safely manage the incarcerated population. Instead, the Department is under significant strain. The pandemic created a crisis on top of a crisis and has exacerbated the serious

issues facing the agency. Staff are exhausted and stressed and have not been properly supported with guidance and coaching to do the difficult work that is asked of them. Incarcerated individuals are under extraordinary stress due to the surrounding chaos and violence in the jails, a disruption in basic services, and because case processing has become unreasonably protracted.[4]

An in-depth examination of the various dynamics at play within the jails is provided below. This includes a summary of the DOC's staffing challenges, aggregate use of force and violence data, a qualitative assessment of recent use of force incidents, the status of efforts to improve security practices, the continued over-reliance on intake areas, and the Department's efforts to manage compliance.

*DOC's Staffing Challenges*

The Department's staffing-related problems are directly linked to its deficient security practices and directly impact the Department's ability to achieve compliance with many of the Consent Judgment requirements. Few if any gains have been made in returning staff to work, as a significant portion either do not report to work or are on a modified status that does not allow them to work directly with incarcerated individuals. The table below reveals that approximately 30%[5] of the workforce is not coming to work and/or is not available to work with incarcerated individuals, with little change evident between August 2021 (when the Monitoring Team first issued a report regarding this crisis) and the end of January 2022.

---

[4] The current overall length of stay for an incarcerated individual is about 100 days, which is three times the national average (which is 30 days) and significantly exceeds most other large jail systems.

[5] The Department reports that some staff on MMR3 status may also be on additional status (e.g. sick, PE, FMLA, AWOL, LWOP) so there could be *some* double counting of staff on MMR3 and another status.

| Date | Significance of Date | Total # Uniform Staff | Total # and % UNAVAILABLE [6] | | Reason Unavailable | | | |
|------|---------------------|----------------------|---------------------------|---|--------------------------------|---|------|---|
| | | | | | Sick, PE, FMLA, AWOL, LWOP | | MMR3 | |
| August 24, 2021 | Filing of Monitor's First Status Report | 8,434 | 2,415 | 28.63% | 1675 | 20% | 740 | 9% |
| September 15, 2021 | Date of Mayor's First Executive Order | 8,351 | 2,796 | 33.48% | 2085 | 25% | 711 | 9% |
| December 1, 2021 | Date of DOC Vaccine Mandate | 7,798 | 2,578 | 33.06% | 1748 | 22% | 830 | 11% |
| December 31, 2021 | Peak of Staff Unavailability | 7,770 | 3,522 | 45.33% | 2864 | 37% | 658 | 8% |
| January 26, 2022 | Date that Data was Last Provided[7] | 7,674 | 2,321 | 30.24% | 1586[8] | 21% | 735 | 10% |

It is true that 1,000 staff returned to work between the end of December 2021 and the end of January 2022. But, as shown in the table above, the number of staff unavailable for work spiked to over 3,500 at the end of December 2021, and thus the decrease observed at the end of January 2022, simply returned the number of unavailable staff to August 2021 levels, a level that had already been established as a significant crisis.

The largest number of staff unavailable are out on sick leave, and the table below provides a detailed look at staff unavailable only for that reason. While the number of staff on sick leave has indeed come down from its peak on December 31, 2021, only marginal gains have been made compared to August 24, 2021, when the crisis was first reported to the Court. As of March 7, 2022, the number of staff on sick leave had only decreased by 71 staff from the August 24, 2021, level, which is 0.05% of the staff out sick on August 24, 2021. Over the last six weeks,

---

[6] *See* footnote above.

[7] Beginning on January 27, 2022, the Department stopped providing the Monitoring Team with certain routine staffing data, although it continued providing sick leave data. Following significant negotiation, on March 7, 2022, the Department committed to producing the information again.

[8] This number does not include any staff on Leave without Pay ("LWOP") as the information for this day was not available. Therefore, the number of staff unavailable on this day is likely higher than 1586.

since the Department first began to report that this situation had "improved" at the end of

January, the number of staff out sick has decreased only 0.02% (22 staff). These changes are

nowhere near the magnitude necessary to constitute "improvement."

| Date | Significance of Date | Total # Uniform Staff | Total Number of Staff on Sick Leave | |
|------|---------------------|----------------------|------|------|
| August 24, 2021 | Filing of First Monitor's Report | 8,434 | 1531 | 18.15% |
| September 15, 2021 | Date of Mayor's First Executive Order | 8,351 | 1725 | 20.66% |
| December 1, 2021 | Vaccine Mandate Date | 7,798 | 1562 | 20.03% |
| December 31, 2021 | Peak of Staff Unavailability | 7,770 | 2580 | 33.20% |
| January 26, 2022 | Last Date that Most Data was Provided | 7,674 | 1482 | 19.31% |
| March 7, 2022 | Most Recent Sick Data | ~ | 1460 | ~ |

The City and Department's approach to reducing the number of staff that are unavailable

to work with incarcerated individuals and enforcing Department policies as they relate to staff

absences is in flux with the recent change of administration, and some initiatives are different

from what was reported to the Court in fall 2021.[9] For example, at the end of January, the

Department stopped tracking absenteeism data in a centralized manner. The Department has

reported it will focus on addressing staff on sick leave and suspended about 30 staff for sick

leave abuse and one staff as AWOL in the first two months of 2022. The Department has also

revised its sick leave policy to require certain verification to occur on the *third day* out sick

rather than on the *first day*. The Department reported this change was made given that the

previous policy appeared to have the unintended consequence of keeping staff out of work longer

than necessary because of the difficulty in getting an appointment to verify their illness. A Senior

Deputy Commissioner who was focused on these issues left the Department in January 2022 and

---

[9] *See* Monitor's November 17, 2021 Status Report to the Court on Conditions (dkt. 420), and City's
October 14, 2021 Letter to Court on Conditions (dkt. 403).

it is unknown whether his responsibilities have been transferred to another individual. Finally, it is unclear what strategies, if any, the Department has currently deployed to address these staffing issues, but the data above demonstrates that the City and Department have not been able to adequately address the bloated number of staff out on sick leave.

The Department's staffing issues are perplexing and are driven by deeply ingrained patterns of mismanagement and dysfunction. In relation to the size of the incarcerated population it manages, the Department has more staff resources than any other correctional system with which the Monitoring Team has had experience. The Department's budget for fiscal year 2021 was $1.25 billion. This included over $153 million for uniform staff overtime—some of which may be unavoidable, but overall is indicative of the pervasive mismanagement of the Department's key resource. A significant portion of the budget is allocated to staff wages and benefits with 86% of the 2020 budget going to these line items.[10] The total average spending per incarcerated individual per year skyrocketed to an all-time high of $556,539 in fiscal year 2021,[11] a per capita cost that is simply unparalleled. A national comparison of the per capita costs of incarceration completed by the Vera Institute[12] last year, when the Department's spending per incarcerated individuals was $438,000 ($118,000 *less* than the current cost), found not only that the Department spends more per incarcerated individual than any city in the nation,

---

[10] Vera Institute of Justice, "A Look Inside the New York City Correction Budget," May 2021, https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

[11] New York City Comptroller's Office (Budget Bureau), "NYC Department of Correction FYS 2011-21 OPERATING EXPENDITURES, JAIL POPULATION, COST PER INCARCERATED PERSON, STAFFING RATIOS, PERFORMANCE MEASURE OUTCOMES, AND OVERTIME," December 2021, https://comptroller.nyc.gov/wp-content/uploads/documents/DOC_Presentation_FY_2021.pdf.

[12] Vera Institute of Justice, "A Look Inside the New York City Correction Budget," May 2021, https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

but that it was at least three times higher than the next highest city and over 350% higher than the cost per incarcerated individual in Los Angeles, California and Cook County, Illinois.



Source: The Vera Institute of Justice analyzed corrections budget data from the 50 largest cities in the United States and used their average daily jail population (ADP) to calculate the cost of incarceration per person. For more complete information on jail budgets, see Vera Institute of Justice, *What Jails Cost: A Look at Spending in America's Large Cities* (New York: Vera Institute of Justice, 2021), https://perma.cc/S2VF-V3WE.

Despite the bloated size of its workforce and its extraordinary budget, the agency has not seen an appreciable improvement in the appalling conditions of confinement that are at the heart of the Consent Judgment. Since 2018, the Department has been on the New York City Comptroller's "watch list," which leads to closer scrutiny of agencies whose spending increases rapidly year to year with only meager measurable results.[13] While the Comptroller

---

[13] New York City Comptroller (Bureau of Budget), "FY 2022 Agency Watch List - Department of Correction," March 2021, https://comptroller.nyc.gov/reports/agency-watch-list/fy-2022/department-of-correction-fy2022/.

acknowledged that "the [Department's] budget has begun to contract [from 2017 to present, but] the pace is far slower than declines in the jail population, leading to higher per-person costs." This cost data is shared to demonstrate that the issues facing the agency cannot be attributed to insufficient resources (although additional resources are needed in a few areas, such as the Trials Division, as discussed below), but rather raises the question of why, given the agency's outsized budget, it has consistently failed to improve conditions. Finally, the Department's current staffing practices also call in to question whether the Department is adequately managing its resources.

### _Use of Force and Violence Data_

The Department's poor practices regarding the use of force and its level of violence caused concern for the Monitoring Team at the inception of the Consent Judgment, and the Monitoring Team's level of alarm has only increased over time as these rates continued to climb. Use of force incidents are rife with examples of inadequate staff practice. An incident that occurred just last month illustrates the multitude of issues driving the current state of affairs and the adverse impact on both staff and incarcerated individuals.

> _At OBCC, staff were rehousing an incarcerated individual when the individual was suddenly slashed by another incarcerated individual without provocation. An officer initially placed himself in front of the victim, but then the officer moved away from the victim, allowing yet another incarcerated individual to stab the victim. Another officer then used OC spray to break up the incident. After the staff escorted the victim out of the area, an incarcerated individual appears to remove personal items from the victim's bag (no staff appeared to be present). The victim sustained a 2.5cm deep laceration that crossed from his ear to the top of his head, and a 2cm laceration to the eyebrow. Reports from counsel to the incarcerated individual claim he ultimately required emergency brain surgery to address the injury. During the incident, all security cameras were blocked or partially covered with tissue and toothpaste. The unit logbook contained many concerning entries from officers prior to the incident. One entry claimed that there was not an_

13

*officer on post until after the incident occurred. Further, throughout the day prior, multiple entries stated that multiple cell doors were unsecured, all cameras were covered, and the staff phone was inoperable. In two entries, the writer reported feeling "unsafe" and notified their supervisor. Despite these logbook entries, within 10 minutes of the incident occurring, a logbook entry indicated a Captain conducted an unannounced tour and stated, "no incidents [were] reported."*

In 2016, the Department's average use of force rate was 4.02, and given that the many protections and practices required by *Nunez* had not yet been implemented, this represented a de facto baseline. A decrease in the use of force rate over time was expected as reforms took hold. Unfortunately, the exact opposite has occurred. The average use of force rate has increased each year, and in 2021, the rate (12.23) was the highest it has ever been, approximately 200% higher than the rate in 2016 (4.02) that gave rise to the Consent Judgment.[14] Similarly, data on fights among people in custody, especially the number of stabbings and slashings that have occurred, reveal that the jails have become more dangerous over time. More specifically, despite an average daily population that is 40% lower than in 2016, there were *more* fights among people in custody in 2021 (6,007 in 2016 versus 6,264 in 2021). The beginning of 2022 has started out no better; the 48 stabbing/slashings that occurred in January 2022 ranked as the second highest monthly total since the Consent Judgement took effect.

An unfortunate and dangerous side effect of these high rates of use of force and violence is that they have become normalized and have seemingly lost their power to instill a sense of urgency among those with the power to make change. **The Monitoring Team must emphasize that these high rates are *not* typical, they are *not* expected, they are *not* normal.** Quite the

---

[14] The monthly use of force rate has fluctuated throughout the life of the Consent Judgment and so the Monitoring Team cautions against assessing progress via changes over a month or two. The Department must *sustain* substantial reductions in the rate of use of force to demonstrate progress in staff practice.

contrary: they are abnormal, they in no way conform to generally accepted practices in the field, and thus they must catalyze an urgency that befits the gravity of the situation. As shown in the chart below, the rate of violence in the City's jails is seven to eight times higher than those observed in other correctional systems.[15]



### *Assessment of Recent Incidents in 2022*

In addition to the very troubling quantitative data, the Monitoring Team's review of incidents from January 2022 revealed that poor staff practices continue. Staff's inability or lack of willingness to utilize basic security practices leads directly to violence among people in custody and to uses of force that were completely preventable.

In January 2022, the Department reported at least 40 incidents in which incarcerated individuals exited unauthorized from cells, pens, housing units or other areas and approximately

---

[15] Personal communication, Dr. James Austin, March 7, 2022.

60 instances of security breaches resulting in incidents of force and violence among people in custody—all in a single *month*. Security breaches included basic errors such as unsecured doors, leaving incarcerated individuals unsupervised, allowing individuals to congregate in vestibules, officers going off post, A-station breaches, improper use of restraints, and failing to intervene as tensions escalated. Despite these clear staff failures, there have been only two suspensions of staff for use of force-related misconduct in January and February 2022 (a concerning decline, especially given the levels of misconduct identified).

Three incidents involving incarcerated individuals exiting areas unauthorized occurred during a 5-day period in early January at three separate facilities that illustrate the pervasiveness of these problems. While commonplace in the New York City jails, these incidents would be considered *major events* in any other jail system.

- *On 1/3/22 at EMTC, incarcerated individuals had complained of not receiving required meals for two days. Approximately 25-30 individuals barricaded themselves, prompting approximately 15 ESU and Probe Team staff to enter the housing unit. Their entry was nonetheless delayed due to not having the correct key to open the housing unit door. Chemical agents (including OC grenades) were deployed, after which medical services were delayed due to staff shortages.*

- *On 1/5/22 at GRVC, approximately 30 incarcerated individuals were involved in a disturbance when staff failed to secure doors, including a pantry door. This allowed some of the individuals to gain entry to an adjacent housing unit. Various assaults ensued. Approximately 30 ESU and Probe Team staff responded, dispersing OC grenades and chemical agents. Several detained individuals sustained injuries and medical attention was once again delayed.*

- *On 1/8/22 at RNDC, approximately 30 incarcerated individuals entered a corridor unauthorized and 28 staff deployed chemical agents, OC grenades and hands-on force to secure the individuals. Once secured, the group of individuals were returned to their housing units, where a Captain advised that the unit's doors could not be secured. A number of incarcerated individuals sustained Class A injuries, but medical attention was once again delayed. Reportedly one individual required sutures, but a 16-hour delay to receive medical attention meant the sutures could not be applied. Another individual who was rear-cuffed, kneeling and facing a dayroom wall was gratuitously struck in the head by an officer who used enough force to knock the individual prone to the floor.*

16

*RNDC*

The Monitoring Team continues to closely scrutinize the operations of RNDC, where the majority of 18-year-olds and all young adults are living and, unfortunately, where a large portion of violence, disorder, poor practice, and avoidable uses of force continues to occur. The condition of this facility has been of grave concern since the inception of the Consent Judgment and has only increased as, time after time, strategies to quell violence, increase programming and incentives, properly manage young adults' behavior, and improve staff practice have failed or been abandoned with the revolving door of agency and facility leaders. While the discussion below focuses on RNDC, the problems are not confined to this one facility but rather occur throughout the facilities managed by the Department.

A review of Department records and assessments of RNDC incidents from *a single month*—January 2022—revealed a large number of troubling events triggered by staff's failure to adhere to basic security practices.

- Incarcerated individuals took an officer's OC cannister and assaulted him, causing a scalp contusion, concussion with loss of consciousness, nasal deviation, and knee strain.

- On four separate occasions, groups of between 6 and 38 incarcerated individuals exited their housing areas unauthorized, and some were able to gain entry to other housing units that had been left unsecured.

- On January 2, 2022, an individual was stabbed after a staff member walked off their post. The housing area lights were also off, which is against protocol. These staffing and security breaches created the opportunity for the stabbing to occur. After the incident, the perpetrator was observed without flex cuffs during multiple escorts and was placed in intake for over 24 hours. In intake, he was placed in the wrong pen, and then placed in a

pen with another individual. It took two days to transfer the perpetrator, and at one point, he was brought back to his original dorm where he was left unsecured and able to interact with other incarcerated individuals. The perpetrator was not body scanned until after he went to the clinic, giving him time to hide or dispose of the weapon. None of the four expectations of the Department's Post-Incident Management protocol were met: the perpetrator was not properly isolated from others after the incident; the potential to exchange or abandon contraband was not properly limited because the individuals were not body scanned as soon as possible; and the individuals were not properly transferred to more secure locations consistent with the protocol.

- Multiple incidents were identified where staff members were off post, leading to serious violence among the incarcerated individuals. If staff members are off post, it is axiomatic that timely interventions in acts of violence are impossible. It also gives rise to questions of how much violence goes unreported given the frequency of unmanned posts. A few examples of incidents that occurred in late January while staff were off post and/or unmanned are below:

  o *Incarcerated individuals were sitting at and crowding an empty B-post desk. Several individuals then got up and entered a cell with an unsecured door, chased another individual out of that cell, and violently assaulted him. Video confirmed that the individuals were armed with weapons. The incarcerated individuals then dragged the victim toward the B-post area, and violently continued their assault near the housing unit's door. After a prolonged period of time, an officer exits the A station and sprays OC through the door to move the assailants away from the victim. A Command Discipline was issued for the officer who was off post. The officer said he was off post because the incarcerated individuals threatened him with a weapon, so he was scared for his safety and notified his supervisor.*

  o *Two individuals were fighting near the B-post/ "No Go" zone and no staff were present. Video captured multiple unsecured cell doors and other cameras were partially obstructed. As the individuals fought, two staff members can be seen exiting the A station. When staff enter the housing area, they briefly leave the*

vestibule door unsecured. Once in the housing area, they separated the
individuals and ordered others to remove the camera obstructions. A Command
Discipline was issued for the officer who was off post.

o   The B-post in one housing unit was unmanned and several nearby doors were
    unsecured, allowing individuals from that unit to exit the unit and move freely
    through corridors and stairways in an effort to get to housing unit across the way.
    Several of the individuals were also able to obtain broomsticks and hot water
    tanks. These individuals from the first housing unit kicked open the door to the
    other housing unit, but staff from that unit deployed OC to force the individuals to
    retreat.

o   Another incident occurred on a housing unit that was unmanned due to
    insufficient staffing as both officers assigned to a unit were reassigned. The cell
    doors on the unit were not secured. A fight began in the housing area hallway and
    escalated when multiple individuals pushed the victim into an unsecured cell. The
    victim sustained a 9cm laceration to his cheek, a 3cm laceration near his eye, a
    2cm laceration on his shoulder and a 1.5cm laceration on his bicep. He also had
    multiple abrasions on his neck and hand. Staff did not arrive on the housing unit
    until 25 minutes later and during this window, multiple individuals entered the
    unlocked cell and appeared to leave with commissary items. When staff finally
    arrived to lock in the unit, no cell doors were ever secured. No corrective action
    or discipline was taken against any officer or supervisor.

o   While staff were off post, an individual was slashed in the face. The incident was
    not captured on security cameras, as the cameras were obstructed. At one point,
    staff even arrived to wipe the obstructed cameras, but the staff did not discover
    the victim within his cell. For at least an hour and a half prior to the incident, no
    staff appeared on post on the floor. Multiple individuals were observed going in
    and out of cells without assistance or authorization from an officer. Before the
    victim was discovered, staff came to the housing unit on three separate occasions
    without noticing him. The first staff appearance was to wipe the obstructed
    cameras. The second staff appearance was to facilitate providing meals (which
    were not conducted in accordance with DOC policies or procedures). The third
    staff appearance was to gather individuals for recreation time. The victim was
    discovered on the fourth staff appearance, when a Captain arrived to do a tour of
    the area and opened his cell door. The victim exited his cell with multiple face
    lacerations and is observed wiping blood with a towel. The housing unit was not
    secured for approximately four and a half hours after the victim was discovered,
    during which time individuals roamed freely amongst the cells and housing unit.
    According to the post-incident management policy, the housing unit should have

> been placed under lockdown immediately after the victim was discovered. No
> perpetrator was ever identified.

In addition to these dangerous incidents precipitated by staff's blatant security failures, NCU conducted an assessment of staff resources at RNDC using a one-day snapshot from January 2022 to illustrate why the Department was demonstrating so little progress with the consistent staffing requirements of the Consent Judgment and Remedial Order for this facility.[16] As an initial matter, NCU found a number of discrepancies in the various sources of information (*e.g.*, facility records, HR records, and the Office of Administration) relating to the status of the officers and the number of officers actually assigned to RNDC. This is consistent with the Monitoring Team's staffing analysis which found that the Department cannot accurately identify where staff are assigned or their status at any given time.

For its analysis, NCU's best estimate was that 929 officers were assigned to RNDC. Of these, nearly *half* (n=454, or 49%) were unavailable to be assigned directly to a post engaged with incarcerated persons because they were either out on indefinite sick leave (out for 30 days or more), on restricted or modified duty, out for family medical leave, assigned on temporary duty to another command, or out on military leave. At best, only half of the facility's workforce was available for coverage and, on any given tour, that number is then further reduced by those who call in sick, attend training, take scheduled vacation, etc. NCU's findings confirmed a key element of the Monitoring Team's staffing analysis—that a significant proportion of the workforce has been deemed "unavailable to work." Thus, without considerable and targeted improvements in the efficiency, oversight and management of these job statuses, the Department

---

[16] § XV (Safety and Supervision of Inmates Under the Age of 19) ¶ 17 of the Consent Judgment and § D (18-Year-Old Incarcerated Individuals at RNDC), ¶ 1.

will continue to be unable to stabilize its workforce, properly staff its facilities and achieve many of the requirements of the Consent Judgment and Remedial Orders.

To its credit, in late February 2022, the Department developed some targeted action steps to curtail the violence that has plagued RNDC. The steps require concurrent efforts from the Department's Programs Division, the Office of the Chief of Security, Custody Management and Facility Leadership, and include actions to redistribute Security Risk Group ("SRG")-affiliated people so that affiliates of any one SRG are not concentrated in individual housing units; to restrict the facility's ability to re-house people autonomously; conducting security sweeps; increasing the number of staff assigned to certain housing units; redeploying some of the uniformed staff assigned to non-custodial posts; increasing programming designed to reduce violence delivered by both internal and external providers; increasing supervision by Captains; and ensuring that those who commit violence are held accountable via the infraction process. These are all steps in the right direction to improve the level of safety at RNDC. Their successful implementation will require a new level of tenacity and creativity to overcome the many barriers that have historically thwarted similar strategies. The Monitoring Team intends to closely monitor these initiatives and is prepared to offer any type of support or assistance to increase the likelihood of success.

*Status of Efforts to Improve Basic Security Practices*

The effort to reduce the use of force and quell disorder must begin with a focus on basic security practices, as the Monitoring Team has emphasized repeatedly, most recently in its Twelfth Report and numerous Court filings last fall and winter. An interim security plan was developed pursuant to the Second Remedial Order which included reasonable and sensible initiatives to address security-related practices. However, to date, the Department has failed to

meaningfully implement solutions to any of the immediate problems such as unsecured doors, post abandonment, poor key control, outdated post orders, escorted movement with restraints when required, incarcerated individuals congregating around secure ingress/egress doors, poorly managed vestibules, and poorly secured OC spray.

Separately, the Monitoring Team has also provided the Department with written feedback to promote the development of a long-term robust security strategy, including improved search practices (February 2021), Emergency Response Team practices (June 2021), and to address the use of chemical grenades and the Pepperball System (August 2021). While the Department began some initial work to address its search procedures, the initiative was halted in spring 2021 and has not been reinvigorated. With respect to Emergency Response Teams, the Monitoring Team met with Department leadership in June 2021 and appeared to achieve consensus that these practices needed immediate focus; however, the Department took no subsequent action. The Department recently reported its intention to address all three sets of feedback once a leadership team is put in place in 2022.

The Monitoring Team fully appreciates that the current dearth of security expertise limits the agency's ability to adequately address these issues, which only reinforces the immediacy of the need to address the Monitoring Team's recommendations regarding the Security Operations Manager and expanded criteria for selecting Wardens. These recommendations were made nearly six and ten months ago, respectively, but have yet to be addressed by the agency. This issue illustrates the poly-centric nature of the Department's issues—that the solution to one problem depends heavily on the solution of another.

*Dire Conditions in Intake*

The Department's overreliance on the use of intake continues to create a dangerous and chaotic environment for incarcerated individuals. Last summer, the conditions of the facilities' intake units further imploded. Some incarcerated individuals remained in intake for days, if not weeks, in horrifying conditions. These chaotic conditions directly resulted in harm to incarcerated individuals. The Monitoring Team's February 2022 site visit found the conditions at one intake to be particularly distressing – a toilet was overflowing with feces and an individual was sleeping on the floor outside one of the intake pens. If staff were aware of these problems prior to the Monitoring Team's visit, they did nothing to correct the situations. In addition to poorly supervised spaces and unsanitary conditions in these units, the risk of violence to individuals in intake is also a continuing cause for concern. Two disturbing incidents of unreported misconduct were identified as a result of heightened scrutiny from the Monitoring Team.

- *In August 2021, an incarcerated individual held in an intake cell was beaten by another detainee and suffered significant injuries—he is paralyzed from the neck down and had multiple broken ribs and a collapsed lung which necessitated a ventilator. This assault was not reported and so it was not investigated through the normal channels; instead, Monitoring Team's inquiries brought this otherwise unreported assault to light. The facility did not report the assault and no injury report was generated. The Department of Investigations reports it is now investigating the incident.*

- *In January 2022, during an audit requested by the Monitoring Team and conducted by NCU, an individual held in intake at a Facility for at least 5 days was observed engaging in sexual misconduct with individuals in intake on multiple occasions. None of the misconduct was detected by facility intake staff and came to light only as a result of NCU's audit.*

The problem with the overuse of intake is linked to a number of other issues that are subject to Remedial Order requirements. First, one of the underlying causes of the chaos in intake units is the facilities' routine practice of transporting individuals to intake following a use of force. This problem is meant to be addressed, among other things, by the development of a

revised de-escalation protocol (per the First Remedial Order, § A, ¶ 3), the implementation Post-Incident Management protocol (per the Second Remedial Order, ¶ 1(i)(e)), and improved housing practices (per the Second Remedial Order, ¶ 1(i)(f)). The Department has reported, and the Monitoring Team's site work confirmed, that many individuals are left in intake because the facility is unable to house the individuals on a housing unit. One of the reasons that facilities report rehousing to be difficult is that SRG-affiliated residents of various housing units often refuse to allow an individual to be housed there, at which point the individual is returned to the intake unit to await a different housing assignment. The concentration of SRG-affiliated individuals in certain housing units is discussed in more detail in the Classification section, below. The problems plaguing intake illustrate yet another poly-centric issue.

*Department's Management of Compliance and Its Consultation with Monitoring Team*

Transparency, proactive coordination, and cooperation between the Department and the Monitoring Team are necessary to advance the reforms and for the Monitoring Team to do its work. It is for this reason that to perform his duties, the Monitor (and his team) is provided access to, among other things, non-privileged documents and information, and the right to conduct confidential interviews of staff members outside the presence of other staff members pursuant to Consent Judgment § XX, ¶ 8 of the Consent Judgment. The Department must also encourage all staff members to cooperate fully with the Monitor and his staff (Consent Judgment § XX, ¶ 13). These requirements support a transparent and candid relationship between the Department and the Monitoring Team and is intended to advance reforms as efficiently as possible. The Consent Judgment and Remedial Orders also require the Department to consult with the Monitoring Team, and in some cases obtain approval from the Monitor, on a significant number of requirements in the Consent Judgment and Remedial Orders, which requires

coordination and document sharing. Further, access to the relevant information and open, transparent communication both facilitate compliance—and, ultimately, the end of external oversight. This is why the Monitoring Team has long advocated for communicating directly with facility operators and staff in key Divisions as it helps those individuals to better understand *Nunez's* requirements and creates ownership and accountability in the reforms.[17]

The work of the Nunez Compliance Unit ("NCU") is a bright spot in the otherwise dismal state of affairs and must be acknowledged and commended. NCU is led by a smart, dedicated, reform-minded individual who, despite the many challenges in this Department, has managed a team that has supported the development of critical and reliable information about the Department's efforts to implement the various requirements of the Consent Judgment and Remedial Orders, which is referenced in this report and prior Monitor reports. The work of NCU is an important step to advancing reforms as it provides the Department the ability to internally identify the current state of affairs, which, in turn, allows the Department to address obstacles and barriers to compliance and ultimately support the pathway to end external oversight.

Since the New Year, the Department has altered its management of its compliance efforts *with the Monitoring Team* to essentially eliminate the proactive and collaborative approach that previously existed, reduced its level of cooperation, and limited its information-sharing and access in ways which inhibit the work of the Monitoring Team. Nearly all of the Monitoring Team's communications are now managed by the Department's Legal Division (with relevant

---

[17] *See* Tenth Monitor's Report at pgs. 216: "Significant involvement and buy-in from all Divisions of the Department is needed to successfully implement the enumerated reforms of the Consent Judgment. The Monitoring Team continues to strongly encourage ownership and focus by uniform staff in advancing the Nunez requirements, which has been lacking." *See also* Fourth Monitor's Report at pg. 202, Fifth Monitor's Report at pg. 139, Sixth Monitor's Report at pg. 148, Seventh Monitor's Report at pgs. 188-189, Eighth Monitor's Report at pg. 215, and Ninth Monitor's Report at. Pgs. 245-246.

information shared by NCU). The Department's approach to filter most information through the Legal Division inhibits the Monitoring Team's access to information and hinders its efforts to provide factually accurate information to the Parties and the Court and to facilitate improvement. Further, while the Department previously *proactively* identified initiatives underway to seek input and/or collaborate, that no longer occurs as it should. Below are a few examples of the issues the Monitoring Team has encountered in the last few months:

- *Refusal to Provide Staffing Data*: The Department recently refused to provide staffing data related to staff absenteeism, which had *previously* been shared on a routine basis, under the erroneous position that the Monitoring Team was not entitled to the information. The Monitoring Team expended significant time and effort to obtain this data which clearly, under the terms of the Consent Judgment and the Second Remedial Order, must be provided. After over a month of discussions, the City and Department acknowledged that the Monitoring Team is entitled to the information and reported that the data will now be produced beginning in late March.

- *Interference with Communications with DOC Staff*: In late January an Interim Deputy Commissioner of ID was appointed, but the Monitoring Team was not advised of this appointment until the Monitoring Team inquired about the leadership for ID, a division with significant *Nunez* responsibilities. Two members of the Monitoring Team sought to have an introductory phone conversation with the Interim Deputy Commissioner upon learning of her appointment. The Department initially attempted to delay providing the Monitoring Team with her contact information and then claimed that a member of the Department's leadership team must be present on the call. The Monitor advised the Department that the ability to speak with DOC staff confidentially and outside the

presence of other DOC staff was permitted under the terms of the Consent Judgment (discussed above) and necessary for the Monitor to have candid and transparent conversations, so the presence of a member of the DOC executive team on the call would be inappropriate and unacceptable.[18]

- *Refusal to Provide Briefing on Safety & Security Initiatives*: In mid-February, the Monitoring Team requested a briefing on any safety and security initiatives underway given the lack of information provided proactively by the Department. The Department advised that there was no time to provide such a briefing to the Monitoring Team, but, a few weeks later (in early March), the Department shared a memo regarding certain security initiatives underway at RNDC. Over a month later, as of the filing of this report, a detailed briefing on any safety and security initiatives underway in the Department has not been provided to the Monitoring Team.

- *Refusal to Consult & Advise on Orders Posing an Imminent Risk of Harm:* Yesterday, the day before filing this report, the Monitoring Team discovered that a week ago, on March 9, the Department had materially altered instructions for supervisory tours. The original version of this order had been developed in consultation with the Monitoring Team, as discussed in the "Entrenched Culture of Dysfunction" section, above. The Monitoring Team was not consulted (as it should have been) on the revisions, was not advised (as it should have been) that the order was promulgated, and was not advised (as it should have been) when agency leaders themselves recognized that the revised teletype ran afoul of *Nunez* requirements, created an imminent risk of harm, and needed to be rescinded. In

---

[18] The introductory call was subsequently scheduled with the Monitor, Deputy Monitor and interim Deputy Commissioner of ID.

fact, it appears a decision was made ***not*** to inform the Monitoring Team that a problem had been detected. Department leadership have since reported that it intended to "quickly" address the issue by rescinding the order, drafting revisions to the order, and *then* it would consult and advise the Monitoring Team. However, the veracity of these claims are suspect, at best. The order was not rescinded in the five days after it was identified by Department leadership and it was only rescinded yesterday after the Monitoring Team expressed significant concerns about the imminent risk of harm the revised policy presented. Further, revisions to the order have not been provided nor was any information provided to suggest revisions are under development.

It is unclear whether there is a concerted effort to minimize the information being shared with the Monitoring Team or whether the individuals responsible for coordinating with the Monitoring Team are not privy to the relevant information. Either way, the lack of open and transparent communication and information is deeply troubling. The Department's current approach to working with the Monitoring Team is counterproductive and circumvents obligations to consult with the Monitor and to ensure that new practices or tools do not run afoul of *Nunez* requirements. This type of faulty, untenable approach—of avoiding consultation and hiding the discovery of problems—seriously compromises the Monitoring Team's confidence in the information it is provided. It is critical for the Monitoring Team to have current and reliable information in order to accurately assess the current state of affairs.

Prior to this sea change, the City and Department were able to balance the ability to contemporaneously share information, manage its other responsibilities, and maintain a collaborative relationship with the Monitoring Team so it is clearly not only possible, but feasible for the Department to maintain a transparent, collaborative, and cooperative relationship

with the Monitoring Team. The Monitoring Team has attempted to improve relations with the Department and shared its concerns and frustrations about these issues with Department leadership on numerous occasions. The Monitoring Team has also met with the City's new Corporation Counsel and her team about the ways in which the Department's approach to working with the Monitoring Team is impeding our work. In an effort to mitigate these issues, the Monitoring Team also encouraged the Department to reinforce the Department's obligations to maintain an open and transparent relationship with the Monitoring Team in hopes this would alleviate some of these issues. The Department advised the Monitoring Team that Staff were already aware of their obligations.

Despite these efforts, little to no progress has been made, and the Monitoring Team is incredibly disappointed to report that it has lost confidence that it has access to all of the relevant and reliable information necessary to perform its duties. The Monitoring Team believes we have exhausted our ability to address this issue and that clear and direct orders from the Court are necessary to ensure the Monitoring Team obtains the information needed to perform our responsibilities under the Consent Judgment and Remedial Orders. Accordingly, the Monitoring Team respectfully requests that the Court direct the Department to return to fully proactive and transparent communication practices with the Monitoring Team. Specifically, the Department must:

1. Timely provide all information requested by the Monitoring Team necessary to fulfill its duties.

2. Engage in proactive consultation when new practices or staff guidance are being contemplated that relate to requirements of the Consent Judgment and Remedial Orders.

3. Provide the Monitoring Team with unencumbered, direct access to Department staff at all levels.

4. Proactively inform the Monitoring Team when problems have been detected that impact the Department's compliance with Consent Judgment and Remedial Orders, including any issues that may result in the risk of harm to people in custody.

## SECTION III. UPDATE ON MONITORING TEAM'S STAFFING ANALYSIS

The Monitoring Team has long identified significant problems with the Department's efforts to manage its workforce responsibly, deploy its workforce appropriately, and supervise its workforce capably. These problems are mutually reinforcing in myriad ways as described throughout this report and every Monitor's Report to date.[19] The poor condition and capacity of the Department's workforce is the core reason why the efforts to integrate the responsibilities and requirements of the Consent Judgment (and Remedial Orders) into staff practice have failed time after time.

A recent incident provides a vivid example of staff dysfunction within the Department on several levels and the resulting major use of unnecessary and excessive force by staff. The badly mismanaged incident was avoidable, precipitated, and exacerbated by staff-related ineptitude and over-confrontational behavior all too common in the Department.

- *On January 30, 2022, at EMTC, a detainee in a dorm housing unit went into medical distress convulsing on his bed. Detainees immediately attempted to attend to him while others went to summon help. As there was no officer in the housing unit, detainees appealed to the A-Station officer to summon medical assistance. The detainees became increasingly agitated during the almost ten minutes when there was no response from staff to attend to the medical emergency, at one point throwing a trash container against the A-Station window in an apparent attempt to prompt the officer to respond to the*

---

[19] *See* Seventh Monitor's Report at pg. 24-25, Eighth Monitor's Report at pg. 7, Ninth Monitor's Report at pg. 23, Tenth Monitor's Report at pgs. 25-29, Eleventh Monitor's Report pg. 10-14, and Twelfth Monitor's Report at pgs. 33-35.