# EXHIBIT 19

```
M4QNNUNC

   UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
   ------------------------------x

   MARK NUNEZ, et al.,

               Plaintiffs,

         v.                              11 Cv. 5845 (LTS)

   CITY OF NEW YORK, et al.,

               Defendants.               Remote Conference
   ------------------------------x
                                         April 26, 2022
                                         2:00 p.m.
   Before:

                  HON. LAURA TAYLOR SWAIN,

                                         Chief Judge

                         APPEARANCES

   THE LEGAL AID SOCIETY
         Attorneys for Plaintiff Class
   BY:   MARY LYNNE WERLWAS
         KAYLA SIMPSON


   DAMIAN WILLIAMS
         United States Attorney for the
         Southern District of New York
   JEFFREY K. POWELL
   LARA K. ESHKENAZI
         Assistant United States Attorneys
```

```
                    APPEARANCES (Continued)

     New York City Law Department
BY:  KIMBERLY JOYCE
     SHERYL NEUFELD
     Assistants Corporation Counsel

STEVE J. MARTIN
     Court Monitor

ANNA E. FRIEDBERG
     Deputy Court Monitor


ALSO PRESENT:  Louis Molina, Commissioner, DOC
```

1       (The Court and parties appearing by videoconference)
2       (Case called)
3       THE COURT:  We are here today for a status conference.
4  This conference was scheduled to give the parties an
5  opportunity to address the grave urgent concerns identified by
6  the monitoring team in the March 16, 2022, special report,
7  which has since been updated by reports dated April 20 and
8  April 25.
9       The office of the United States Attorney has also
10 filed a letter expressing its concerns regarding communications
11 and action on the part of the department and the city.
12      The conference was also convened to address the status
13 of implementation regarding the monitoring team's
14 recommendations included on pages 67 to 74 of the special
15 report.
16      I thank the parties' counsel and the monitoring team
17 and particularly the commissioner of the Department of
18 Correction for attending this virtual conference today, and I
19 am now going to ask the video participants to state their
20 appearances for the record and for the benefit of those who are
21 listening.
22      I will begin with the monitoring team representatives.
23      Mr. Martin, you need to unmute yourself.
24      MR. MARTIN:  I appreciate that, your Honor.
25      My name is Steve Martin.  I am the monitor in the

|   |   |
|---|---|
| 1 | *Nunez* matter. |
| 2 | MS. FRIEDBERG:  Good afternoon, your Honor.  My name |
| 3 | is Anna Friedberg.  I am the deputy monitor of the *Nunez* |
| 4 | matter. |
| 5 | THE COURT:  Thank you. |
| 6 | And counsel for the plaintiffs. |
| 7 | MS. WERLWAS:  Good afternoon, your Honor. |
| 8 | Mary Lynne Werlwas, the Prisoners Rights Project of |
| 9 | The Legal Aid Society, counsel for the plaintiffs. |
| 10 | MS. SIMPSON:  Good afternoon, your Honor.  Kayla |
| 11 | Simpson Prisoner Rights Project of The Legal Aid Society, also |
| 12 | for the plaintiffs. |
| 13 | THE COURT:  Good afternoon. |
| 14 | And the office of the United States Attorney? |
| 15 | MR. POWELL:  Good afternoon, your Honor.  My name is |
| 16 | Jeffrey Powell.  I am representing the government. |
| 17 | Along with me is Lara Eshkenazi. |
| 18 | MS. ESHKENAZI:  Good afternoon, your Honor, Lara |
| 19 | Eshkenazi from the Southern District of New York. |
| 20 | THE COURT:  Good afternoon. |
| 21 | And for the city and the Department of Corrections? |
| 22 | MS. JOYCE:  Good afternoon, your Honor.  Kimberly |
| 23 | Joyce, from the New York City Law Department, as well as my |
| 24 | cocounsel Sheryl Neufeld, who is our chief assistant for |
| 25 | regulatory law and policy is joining me, as well as |

1    commissioner --
2              MR. MOLINA:  Louis Molina, your Honor.  I'm
3    commissioner, New York City Department of Correction.
4              MS. NEUFELD:  Good afternoon, your Honor.
5              THE COURT:  Good afternoon.
6              And, again, thank you all for being here.
7              For those who are listening in, if you are on a line
8    that has the ability to be heard, you must keep yourself muted
9    at all times.  And if we end up having interference in the
10   video feeds, just to avoid that if possible, I will ask the
11   video participants keep their video audio muted when they are
12   not themselves speaking.
13             I remind everyone that, as provided in the Court's
14   January 19, 2021 standing order filed in Docket No. 21-MC-45,
15   neither recording nor retransmission of any part of this
16   proceeding is permitted by any participant or listener,
17   including parties, counsel, the public, and the press.
18             I will be calling on each speaker during the
19   proceeding.  Each time that you speak, please identify yourself
20   by name for clarity of the record and for the benefit of those
21   who are listening in.
22             Please don't interrupt each other or me during the
23   conference.  If we interrupt each other, it's difficult to
24   create an accurate transcript.  But, having said that, I, as
25   usual, apologize in advance for breaking this rule, because I

1   may interrupt if I have questions.  And I will give the
2   attorneys an opportunity to make additional comments or ask
3   questions at the end of the conference.
4        But if anyone has any difficulty hearing me or another
5   participant at any time, please say something right away or
6   raise the electronic hand.
7        I am going to make some introductory remarks before I
8   call on the parties to speak.
9        We've previously convened on September 24 and December
10  2 of last year for emergency conferences to discuss the myriad
11  of issues identified by the monitoring team in its status
12  reports that were issued in the summer and fall of 2021.
13       In response to the ongoing cries at Rikers Island, the
14  Court approved and entered a second remedial order on September
15  28, 2021, which is at docket entry No. 398, which focused on
16  the implementation of immediate security initiatives to improve
17  the extremely dangerous conditions at the jails.
18       The Court also approve and entered a third remedial
19  order on November 2, 2021, and that is filed at docket entry
20  No. 424.  That focused on the implementation of initiatives to
21  increase timely accountability for use of force violations.
22       The monitoring team's March 16, 2022, special report
23  states that so far these measures have failed to ameliorate the
24  crisis of what the monitoring team characterizes as patently
25  unsafe conditions in the jails.  In addition to providing a

great level of detail on the foundational issues currently facing the city and the department, including the persistent levels of violence in the facilities, the March special report provided a detailed update on the department's efforts to achieve compliance with the second and third remedial orders. Although efforts to implement the requirements of the third remedial order focused on timely accountability appear to show the most promise, many of the monitoring team's updates are very disturbing in that they call out lack of progress across the spectrum of identified issues.

I have also received and reviewed the April 19, 2022, status update from the U.S. Attorney's Office and the monitor's April 20 and April 25, 2022, status reports, which reemphasize the level of gravity and urgency of the current security situation and describe the status of ongoing negotiations.

I have also received and reviewed the city's April 25, 2022, status report that is from the city and the Department of Corrections discussing the work undertaken by the commissioner and the city thus far and a proposed approach for addressing the critical state of conditions.

Today I expect to hear more about how the city and the department plan to implement the recommendations proffered by the monitoring team to improve safety, ensure humane conditions, and work toward compliance with the second and third remedial orders.

            The monitoring team has noted in its report that with each new administration and/or leadership change the department restarts the clock of reform, and initiatives built on solid correctional practice are revised or abandoned before benefits are ever realized.

            This is a matter of very serious concern to the Court. We are now six years into the effort to make Rikers a safe place for detained individuals and staff.  The fact is that a court order has been in place against the same institutional and official defendants for six years.  The parties and the Court have benefited from a wealth of information from the Court-appointed monitoring team which includes subject matter experts as to the conditions and potential steps forward.

            Restarting the clock on reform because a new administration has taken office isn't a simple answer, and it really can't be the answer when a crisis such as this has been inherited and legal standards and expectations have been put in place by court orders, especially when thousands of hours of expert analysis and advice have enabled the monitor to identify root problems and develop specific recommended approaches that are ripe for implementation.

            And so today I do expect to hear about specific steps and concrete timelines.

            I thank you all for listening.  I wanted to be as candid as possible in opening this proceeding about my

understanding of the situation and my expectations.  It is one in which every single day people are in danger, people who are detained, people who are employed.  So it is my hope and expectation that we'll come away from this conference with some specific commitments and steps and timetables.

So, with that, I will turn to the agenda which I'm grateful to the parties for collaborating on, and I will begin with the opening status report from the monitor and the deputy monitor.

MR. MARTIN:  Thank you, your Honor.  My name is Steve Martin, the monitor in the *Nunez* matter.

I'm going to be brief, plain spoken, and direct in my observations on the issues before the Court and the parties.

On March 16, 2022, my office filed the special report detailing objective evidence of a very troubled and patently unsafe confinement operation for both staff and detainees who inhabit the facilities operated by the DOC.

My office, led by my deputy monitor, assembled a treatise on the current state of affairs and, more importantly, the impediments to the reforms required by the consent judgment in three successive remedial orders.  I as the monitor stand by this treatise and warrant it to be an informed and highly credible, work product.

On April 20 my office filed a status report stating that conditions remain troubled and patently unsafe.  We have

1     Thank you, your Honor, for your time and now I defer
2  to my colleague, the commissioner.
3     THE COURT:  Thank you, Ms. Joyce.
4     Mr. Commissioner.
5     MR. MOLINA:  Good afternoon, Judge Swain.  My name is
6  Louis Molina.  I am the commissioner for the New York City
7  Department of Corrections.
8     It's good to see you again.  The last time we met was
9  April 19, 2017, when I was first appointed to the department as
10 the chief internal monitor under the consent judgment.  I
11 accompanied you on a tour not only of John Jay College where
12 the department was using it for training, but we also toured
13 our then training academy on Metropolitan Avenue and we toured
14 our GMDC facility Rikers Island, when it was open.
15    Thank you for giving me a few minutes to make an
16 opening statement to the Court.  I want to first acknowledge
17 the frustration of the performance of the department since the
18 inception of the consent judgment.
19    While the record of poor performance is clear and well
20 documented by the monitor, I think it will be helpful for the
21 Court to learn about me and what I have done over the last
22 approximate three and a half months since I was appointed
23 commissioner of the New York City Department of Correction.
24    But, your Honor, before I get into what I have been
25 doing to date, let me first state up front that I am in total

agreement with the monitor's recommendations, and I intend to adopt them pursuant to further discussions regarding timelines and other details I intend to work out with the monitor for the implementation plan that will be filed with the Court for approval in the near future.

My vision, your Honor, is to create a culture of discipline and service to persons experiencing incarceration that ultimately, with the implementation of the monitor's recommendations and additional business management improvements will create an operational ecosystem of safety and rehabilitation, replicating what I was able to achieve when I was a first deputy commissioner of the Westchester County Department of Corrections, which was under federal oversight agreement with the United States and within the three years of my appointment was successfully concluded.

It is important that I begin my stating that during my transition assessment of the department and shortly after becoming commissioner, it was clear to me, as it was back in 2016, that the exact same four foundational issues that the monitor stated in its twelfth monitor's report has normalized poor practices and produced poor outcomes.

Those issues, for clarity, are the department security practices and procedures, which are deeply flawed and inconsistent with and illogical even to those with no law enforcement experience. There was inadequate supervision at

1   the facility level, and, quite frankly, this is an issue at
2   other business units.
3        Staffing practices and procedures do not allow us to
4   be effective operationally.  And while the monitor describes a
5   limited and extremely delayed accountability for staff
6   misconduct, I can tell you from what I have seen is there was
7   no accountability in a number of areas, even those not
8   connected to the consent judgment, but nonetheless impacted it
9   because the prior leaders of the department created an
10  environment where the discipline needed to operate a law
11  enforcement agency was absent.
12       I believe that what allowed these four foundational
13  areas to worsen year after year was a combination of two
14  things:  First, the prior administration's unwillingness to use
15  the full power that is inherent to the office of the
16  commissioner; and, secondly, the drive, which is unrelated to
17  the consent judgment, to advance the political argument that
18  Rikers Island needed to be closed.  And this viewpoint,
19  preimposed the borough-based jail plan, created what I think
20  was an environment of disinvestment in the department's human
21  capital and facility infrastructure as well as an intentional
22  dismantling of the department's ability to operate.
23       To make the case to this court that I as the
24  commissioner, with the support of Mayor Adams, can turn this
25  around, I share with you some of what I have done since my

1   appointment.
2           While staffing is not where I want it to be, over 1300
3   officers have returned to work, which has allowed the
4   department to shift five out of eight facilities back to
5   eight-hour tours of duty.  We have welcomed back external
6   program providers and have reopened family visitation.
7           While it's been less than four months, as of April 24,
8   assaults on uniformed staff calendar year to date have
9   decreased 22 percent, assault on nonuniformed staff has
10  decreased 37 percent, and use of force department-wide has
11  decreased 25 percent calendar year to date.
12          I recognize the frequency of these assaults and force
13  incidences are still high, but a decreasing trend is welcome,
14  and my goal is to condition to sustain these trending levels.
15  Implementing best practices, sustaining minimum standards
16  cannot exist without a timely and meaningful discipline
17  process, which quite frankly has never existed in this
18  department.
19          For all the public rhetoric of the prior
20  administrators, when caring my same initial time in office to
21  the prior two commissioners, I have closed out and administered
22  final disciplinary dispositions in 725 disciplinary cases.  The
23  prior two commissioners closed only 322 and 208 disciplinary
24  cases respectively in the same time frame.
25          If leadership at its highest level does not hold

1    persons accountable, then the same mediocre attitude when it
2    comes to accountability trickles down to all supervisory ranks
3    and does nothing but normalize exhausted mediocrity.  Slashings
4    have been increasing since the calendar year 2021 because
5    facility and tactical search operations for too long were just
6    not being done.
7             In response to the violence, I initiated increased
8    facility search operations for contraband weapons and
9    reinstituted tactical search operations.  In calendar year to
10   date department-wide, 2,297 contraband weapons have been
11   seized.  12 out of the 20 tactical search operations alone were
12   conduct at RNDC and recovered 685 contraband weapons.  And the
13   department has stopped the practice of housing individuals
14   solely by their gang affiliation and broke up and rebalanced
15   gang housing that was the past practice of the department.
16            I have also changed the department's policy that
17   previously prevented credible messengers access to department
18   facilities.  With the change, they now have the opportunity to
19   engage with our troubled young adults in an effort to cease the
20   ongoing violence.
21            Lastly, as I have alluded to before, leadership
22   matters.  And I want to respectfully remind this Court that it
23   was I who recommended back in 2016 as the department's chief
24   internal monitor in my Q3 2016 use of force orders report,
25   dated December 5, 2016, I recommended then, in writing, in my

first 100 days as then the chief internal monitor, and I quote, "If the department continues to manage operations under the current structure, it is likely that our current rate of force would either remain the same or increase."

I would not have thought back then that the department would have reached the state that it did in calendar year 2021, having over 8,000 use of force incidents.

I went on to recommend a change in leadership that would allow the then commissioner to externally hire executive staff to perform operational functions. And I can assure you this position did not endear me to my colleagues and was not an easy recommendation for me to put in writing.

But given the prior administration's unwillingness to seriously consider the idea, it had to be officially documented in my auditor's report. I knew then, like I know now, that it was what was needed to be done, but the prior administration lacked the will to do it, and this placed the department in the state that it is in today.

The difference between today, your Honor, and calendar year 2016 is that now I am the commissioner. And I can assure this Court that I will exercise my power as commissioner to the maximum to address the ongoing issues in this agency. I have shown in the short time that I as commissioner am willing to do so. From taking immediate action to issues raised by the monitor to ensuring that all discipline cases are handled not

only as expeditiously as possible, but departing upward when I do not agree with the OATH judges and believe that termination is warranted for the offense and the good order of the department, to also terminating nonuniformed staff that, either through their inability or willingness to be bystanders, allowed through their collective inaction the department to continue to deteriorate while talking a good game publicly and taking no action despite being in executive positions of authority.

Your Honor, that is not me. And I am asking that I be given the time to work with the monitor, as I did with the monitor in Westchester County, which allowed Westchester County DOC to be released from federal oversight agreement.

The monitor has stated in his most recent status report and I quote, "An option that may offer a viable pathway for the city and the department to retain management of the city's jails is to immediately begin taking concrete steps to actually implement the monitor's team's recommendations and for the city and the department to immediately and aggressively remove all barriers to the implementation of initiatives that are necessary to bring safety and stability to the jails."

Your Honor, that is exactly what I am doing and intend to continue to do through my powers as the commissioner. These barriers will be removed.

In closing, I add that I truly believe that the

1  monitor and I are aligned.  We may debate processes and
2  implementation strategies, but what I think of what he did as
3  young lawyer fighting internally against the state of Texas
4  prison system starting back in 1972, your Honor, that was me in
5  2016 when I first entered the New York City Department of
6  Corrections as a chief internal monitor.
7  　　　　I am fortunate that with a new mayor I was given the
8  honor to be appointed commissioner and lead the heroic
9  Department of Corrections staff, the majority of whom came to
10 work during the height of pandemic and continue to do so today.
11 　　　　The women and men of our department that stayed in the
12 fight deserve to be recognized, and I am here as their
13 commissioner fighting for them too.  They deserve to be treated
14 with dignity and respect, and every day I fight for them
15 because they too deserve to work in a place that values them as
16 people.
17 　　　　Your Honor, let the monitor and I implement the reform
18 that has been long overdue.  I assure this Court you will see
19 change.
20 　　　　I hope I'm not speaking out of turn, Mr. Martin, when
21 I state matter of fact that we have not crossed a point of no
22 return.  You and I together can get this done.
23 　　　　Thank you, your Honor, for giving me a few minutes
24 just to make an opening statement.  I am available for
25 questions if you have any.