# Eleventh Report of the *Nunez* Independent Monitor

**Eleventh Monitoring Period**
**July 1, 2020 – December 31, 2020**

Introduction ....................................................................................................... 1
   Background ...................................................................................................... 1
   COVID-19 Impact............................................................................................ 3
   Current Status of Reform ............................................................................... 4
      •  Challenges Regarding Facility Leadership ........................................ 8
      •  Deployment of Staff and Overstaffing.............................................. 10
      •  Failure to Hold Staff Accountable in a Timely Manner ................... 14
      •  Next Steps to Address Overarching Issues Stymying Reform .......... 14
   Assessment of Compliance by the Monitoring Team ..................................... 16
      •  Monitoring Team's Methodology ...................................................... 16
      •  Organization of the Report ................................................................ 19

Use of Force Trends During the Eleventh Monitoring Period ........................... 22
   Use of Force Trends ....................................................................................... 22
   Use of Force Data ........................................................................................... 25
      •  Number of Uses of Force ................................................................... 27
      •  Use of Force Rate .............................................................................. 28
      •  Injury Sustained During Use of Force ............................................... 29
      •  Use of Force by Facility.................................................................... 30
      •  Age of Incarcerated Individuals and Use of Force ........................... 31
      •  Reasons for Using Force .................................................................... 32
   Over-Reliance on Emergency Response Teams ............................................. 38
   Incarcerated Individuals Frequently Involved in Force ................................ 51
   High Needs Individuals ("HNI") initiative ................................................... 52

Identifying & Addressing Use of Force Misconduct......................................... 61
   Identifying Use of Force-Related Misconduct .............................................. 62
      •  Rapid Reviews ................................................................................... 63
      •  Investigating Use of Force-Related Misconduct .............................. 68
   Addressing Use of Force-Related Misconduct .............................................. 75
      •  Immediate Corrective Action............................................................. 76
      •  Command Discipline ("CD")............................................................. 81
      •  Facility Referrals............................................................................... 86
      •  Personnel Determination Review ("PDR") ....................................... 87
      •  Formal Discipline.............................................................................. 89

Section by Section Analysis ............................................................................... 104
    1.   Initiatives to Enhance Safe Custody Management, Improve Staff
        Supervision, and Reduce Unnecessary Use of Force (Remedial Order § A) ..... 104
    2.   Use of Force Policy (Consent Judgment § IV) ..................................... 120
    3.   Use of Force Reporting and Tracking (Consent Judgment § V) ......... 125
    4.   Training (Consent Judgment § XIII)..................................................... 148
        Training Space & Dedicated Training Academy ................................. 149
    5.   Video Surveillance (Consent Judgment § IX) ...................................... 167
    6.   Use of Force Investigations (Consent Judgment § VII)........................ 179
    7.   Risk Management (Consent Judgment § X) ......................................... 207

8.      Staff Discipline and Accountability (Consent Judgment § VIII)....................... 221

9.      Screening & Assignment of Staff (Consent Judgment § XII) ........................... 259

10.    Arrests of Inmates (Consent Judgment § XIV).................................................. 266

11.    Implementation (Consent Judgment § XVIII) .................................................. 269

**Current Status of 18-year-olds Housed on Rikers Island ...................................................... 274**

12.    Safety and Supervision of Inmates Under the Age of 19
(Consent Judgment § XV) ............................................................................... 289

13.    Inmate Discipline (Consent Judgment § XVI)................................................... 307

**Appendix A: Definitions**……………………………………………..……....i

**Appendix B: Monitoring Team Recommendations**……………….……………… .…….......vi

**Appendix C: Training Charts** …………………………...…………………………...……vii

Status of Training Provided Since the Effective Date …………………………....…...vii

Status of Initial Training Program Development and Deployment………………..…..viii

Status of Refresher Training Program Development and Deployment………………..xiii

**Appendix D: Flowchart of Promotions Process** ……………………………………..xv

# INTRODUCTION

This is the eleventh comprehensive report[1] of the independent court-appointed Monitor ("Eleventh Monitor's Report"), Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the City of New York and the New York City Department of Correction ("the Department," or "DOC," or "Agency")[2] and the Monitoring Team to advance the reforms in the Consent Judgment during the Eleventh Monitoring Period, which covers July 1, 2020 through December 31, 2020 ("Eleventh Monitoring Period").

*Background*

The Department manages 10 facilities, eight of which are located on Rikers Island ("Facility" or "Facilities").[3] In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding Facilities in the Criminal, Supreme, and Family Courts in each borough. At the beginning of the Monitoring Period, the Department concluded its joint operation of the Horizon Juvenile Center in the Bronx with ACS. As of the end of the Monitoring Period, the Department employed approximately 9,000 active uniformed Staff and approximately 1,700 civilian employees, and managed an average daily population of approximately 4,855 incarcerated individuals.

---

[1] The Monitoring Team has filed a number of other reports and status letters with the Court.

[2] All defined terms utilized in this report are available in *Appendix A: Definitions.*

[3] There are two Facilities based in the City boroughs, Manhattan Detention Complex ("MDC") and Vernon C. Bain Center ("VCBC") in the Bronx. The eight Facilities located on Rikers Island are: Anna M. Kross Center ("AMKC"), Eric M. Taylor Center ("EMTC"), George R. Vierno Center ("GRVC"), North Infirmary Command ("NIC"), Otis Bantum Correctional Center ("OBCC"), Robert N. Davoren Center ("RNDC"), Rose M. Singer Center ("RMSC"), West Facility - Contagious Disease Unit ("WF").

The provisions in the Consent Judgment and the Remedial Order include a wide range of reforms intended to dismantle the decades-long culture of violence in these Facilities and to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and individuals in custody. The Consent Judgment was entered by the Court on October 22, 2015 ("Effective Date").[4] It includes over 300 separate provisions and requires the Department to develop, refine, and implement a series of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against people in custody and reducing violence, particularly among 18-year-old individuals.[5] The Court entered a Remedial Order on August 14, 2020 to address persistent areas of Non-Compliance raised by the Monitoring Team and by Counsel for the Plaintiffs' Class and SDNY, who submitted a Non-Compliance Notice to the City pursuant to Consent Judgment § XXI. (Compliance, Termination, and Construction), ¶ 2 at the end of the Eighth Monitoring Period.[6] The Remedial Order is intended to advance reforms in four key areas: (1) implementing the Use of Force Directive; (2) addressing the backlog of investigations and improving use of force investigations going forward; (3) improving Staff discipline and accountability; and (4)

---

[4] The Effective Date of the Consent Judgment is November 1, 2015. (*see* dkt. 260)

[5] The Monitoring Team did not assess compliance with the Consent Judgment with respect to 16- and 17-year-old individuals in custody ("Adolescent Offenders") in this Monitoring Period. *See* Stipulation and Order Regarding 16- and 17-year-old Adolescent Offenders at Horizon Juvenile Center (dkt. 364).

[6] In the Non-Compliance Notice, Counsel identified nine distinct provisions that Counsel to the Plaintiffs' Class and SDNY believed the Defendants were in Non-Compliance with for which they asked the Department to address in a response: (1) Implementation of Use of Force Directive (§ IV. , ¶ 1); (2) thorough, timely and objective investigations (§ VII., ¶ 1); (3) Preliminary Reviews (§ VII., ¶ 7); (4) Full ID Investigations (§ VII., ¶ 9); (5) ID Staffing (§ VII., ¶ 11); (6) Timely, Appropriate and Meaningful Discipline (§ VIII., ¶ 1); (7) Inmates Under the Age of 19, reducing violence among Young Incarcerated Individuals (§ XV., ¶ 1); (8) Inmates Under the Age of 19, Direct Supervision (§ XV., ¶ 12); (9) Inmates Under the Age of 19, Consistent Assignment of Staff (§ XV., ¶ 17).

addressing the high level of disorder at RNDC, where most of the 18-year-olds are housed. *See* Tenth Monitor's Report at pgs. 6 to 8.

A number of provisions in the Consent Judgment have been terminated, eliminated, or placed in inactive monitoring or abeyance status[7] beginning in the Tenth Monitoring Period.[8] During the current Monitoring Period, the Monitoring Team identified a small number of *additional* provisions it recommends are terminated, eliminated, or placed in inactive-monitoring.[9] These provisions are listed in ***Appendix B: Monitoring Team Recommendations*** to this report and the basis for the recommendations are outlined in the specific compliance assessment for each provision. The Monitoring Team intends to seek input from the Parties in the next Monitoring Period on these new recommendations with the goal of developing a joint submission for Court approval.

*COVID-19 Impact*

The ongoing COVID-19 pandemic continued to impact the City and the Department's operations during this Monitoring Period. The State of New York remained under a State of Emergency order throughout the Monitoring Period, which began on March 7, 2020[10] and all non-essential staff were required to work from home. Over 900 staff continued to tele-work during this Monitoring Period. Social distancing requirements continued to impact both the

---

[7] *See* Stipulation and Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349) and Exhibit A to the Remedial Order (dkt. 350).

[8] *See* Tenth Monitor's Report with *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions.*

[9] The rationale for these recommendations is the same as those outlined in the Ninth Monitor's Report at pgs. 7 to 9.

[10] *See* Executive Order No. 202: Declaring a Disaster Emergency in the State of New York (available at https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york).

housing and staffing assignments in the jails as well as how various stakeholders worked together. Uniform Staff also continued to suffer from COVID-19 and some were on sick leave. While the population of people in custody still remains lower than at the start of the Consent Judgment, social distancing requirements meant that Staff and people in custody had to be dispersed throughout the jails across the Department to adhere to social distancing requirements. Program Counselors continued to have limited ability to interface directly with people in custody and in-person programming by community partners remained suspended. Training programs were conducted in smaller groups and so the volume of training that can be deployed at any time was significantly curtailed. For ID, the civilian investigators continued to work remotely, while uniform Staff who serve as investigators were not able to enter the jails to speak with Staff or individuals in custody as easily as before. Certain functions have also been converted to a remote platform. For instance, Pre-Trial Conferences and Trials before OATH now occur virtually. Many leadership meetings also continue to occur virtually rather than in person. While COVID-19 has presented many challenges, the Department has shown the ability to adapt in many areas to face these challenges, and the Monitoring Team has observed that certain processes and procedures that were developed to address the pandemic may actually serve as efficient and useful tools going forward.

*Current Status of Reform*

The Monitoring Team remains very concerned about the overall state of reform within the Department. While certain troubling use of force tactics have been curtailed (*e.g.,* fewer improper head strikes), the pervasive level of disorder and chaos in the Facilities is alarming. The conditions that gave rise to the Consent Judgment have not been materially ameliorated. It is frustrating and disappointing that change has not yet been realized, and so it is critical to

understand the current state of affairs and dynamics within the jails in order to determine *how* the changes that are sorely needed in the jails can be realized.

The Eleventh Monitoring Period marks five years since the Consent Judgment went into effect. It has become clear over this time that the issues and problems that plague the Agency are the result of a complex system of entrenched (and sometimes outdated) practices, often convoluted policies, and corresponding Staff culture that have developed over decades. The provisions in the Consent Judgment (and now the Remedial Order) include a variety of requirements and provisions that are expected and intended to improve the practices related to UOF, but the Department's progress has stagnated in key areas. As clearly illustrated by the current state of affairs, simply articulating the desired change (via the Consent Judgment, Remedial Order or change in policy) is not sufficient to actually *catalyze* the change in practice. This is not to say the Agency cannot be reformed; quite the contrary, it can and must be, but realizing that change requires significant, diligent, and continued efforts by all Staff and leadership within the Department.

During the last five years of monitoring, the Monitoring Team has balanced its responsibilities to assess the Department's progress with the need to provide technical assistance that helps the Department develop concrete and specific initiatives to actually *implement* the required reforms. The work needed to develop such initiatives and then actually implementing these plans cannot be underestimated, but when done properly they can result in positive and lasting change. The Department has achieved some significant milestones since November 1, 2015. The 16- and 17-year-old youth have been removed from Rikers Island. The Department has developed and deployed training to Staff on the relevant reforms. The Department has developed viable alternatives to the use of punitive segregation for young adults that, while in

need of improvement, successfully eradicated the harmful practice of long-term isolation for 18- to 21-year-olds. The ability to assess UOF incidents has also improved significantly. There is video footage for almost all incidents that occur in the Agency. Staff reports are now timely and routinely submitted for review. Facility leadership now conduct an initial assessment of all UOF incidents, and while the quality of the reviews still need improvement, they have come a long way from where they started. The investigation of UOF incidents has been overhauled and the advent of Intake Investigations means all UOF incidents now receive a timely review by ID, and the backlog of older investigations is nearly complete. The Department has also made strides in holding Staff accountable and transparency of the disciplinary process has improved, setting the stage for the Department to focus its efforts on *imposing* timely discipline. Not surprisingly, the efforts to eliminate the backlog of investigations has now resulted in a backlog of disciplinary cases that must be addressed.

Despite these accomplishments, the Department struggles to meaningfully reform the Agency. The type of change required will not occur by tinkering around the edges—a wholesale change in the way Staff approach individuals in custody is needed. It bears repeating that simply identifying and articulating what needs to change, and/or requiring the development of plans to change practice does not then magically make those changes occur—particularly when those changes must be adopted in practice by thousands of Staff Members and Supervisors across many jails. The issues plaguing the Department are systemic and deep-seated and have been passed down and accepted by all levels of Staff across the Agency. The changes that must occur require a granular focus on fundamental attitudes, correctional practices, and operations within the Agency. This requires significant technical assistance from the Monitoring Team, to assist leaders with re-framing and re-building the underlying foundation of basic correctional

management. On its own, the Agency appears to be unable to change practice without some guidance. This is particularly true where changes to policy and practice require a complete overhaul of the way things have been done historically. Staff and leadership have approached these tasks the same way for years, sometimes decades. Dismantling that culture is a slow, arduous task.

The Department has a number of both civilian and uniform leaders who have demonstrated a commitment to reform and are working hard to address the requirements of the Consent Judgement and Remedial Order. The Monitoring Team has worked with Commissioner Brann for almost the entire pendency of the Consent Judgment (and 4 years as Commissioner). She has always been honest, transparent, and forthright with the Monitoring Team about the problems plaguing the Agency and open to developing and working on solutions to address various areas of concern. The Commissioner set a clear expectation that all Staff must be open and honest with the Monitoring Team and ensured the Monitoring Team had unfettered access to the people and information needed to do its work, which allowed the Agency and the Monitoring Team to work collaboratively to develop various initiatives needed to advance the reforms.

Ultimately, the extent to which this Agency will be reformed depends on the skill and commitment level of the leadership in each jail. This work is neither glamorous nor easy and requires a strong command of what must be done, how to do it, why it is being done, and ownership of the results. These qualities among the Facilities' leadership are essential for the supervisors in each jail to provide consistent and unwavering reinforcement to Staff when modeling, guiding, training, and holding Staff accountable to do their responsibilities and duties. The Department is still in the first stage of reform in many respects—ensuring there is a foundation and understanding of appropriate practices among Facility leaders. Without a

common and accepted understanding of what must be done, the Agency will be unable to reform and the cycle of dysfunction and disorder will continue. The upcoming leadership changes at the highest level of the Department will impact the Agency for many months. Following Commissioner Brann's departure, an Acting Commissioner will be appointed in June 2021. Following that, the current mayoral administration ends in December 2021 and a new administration will assume the office in early 2022 and is expected to then appoint a new Commissioner. Although expected, there is no question that these transitions will only further disrupt the Department's work and their ability to focus on or advance the various initiatives required for progress toward the Consent Judgment's requirements. This only heightens the importance of addressing the overarching areas of concern outlined below.

There are three overarching issues that have stymied progress. First, the poor quality of Facility leadership hinders progress and must be addressed for the Agency to ever become successful. Second, the dysfunctional deployment and overstaffing of certain posts in the Facilities must be reevaluated to ascertain whether resources are properly assigned and whether the Staff assigned to each post actually meet their responsibilities consistently, without simply outsourcing the issue to a different group of Staff. Finally, the Department must have the ability to hold Staff accountable closer in time to the incident when they are not meeting their responsibilities and when misconduct occurs. The contours of each of these problems is discussed below, followed by recommendations to address each issue.

- **Challenges Regarding Facility Leadership**

The Department has long struggled with adequate supervision of its Staff in the effort to properly implement the UOF directive. Unfortunately, over the past five years, the Wardens and Deputy Wardens have not been successful in dismantling the culture that gave rise to the

Consent Judgment. While conceptually sound strategies to address identified problems have been developed throughout the life of the Consent Judgment, these initiatives often take a long time to be implemented, and some never get off the ground at all. For example, despite refined guidance to limit the circumstances for when and how an Emergency Response Team may be activated to assist with managing an event on a housing unit, Staff and leadership alike continue to over-rely on these teams to address even the most routine issues on the housing unit (*e.g.,* complaints from incarcerated individuals that they have not received commissary, etc.). This is but one example of a recurring pattern at the Department: the strategies are grounded in a nuanced understanding of the problem and require Facilities to apply a practical course of action. However, time and again, implementation falters. The implementation failures come from multiple, interrelated dynamics including:

- leadership with limited ability to inspire, encourage, and motivate Staff to embrace the new practices that are at the heart of the reform effort. The Monitoring Team's observation of Facility practices and various leadership meetings suggest that Facility Leadership has not embraced, and in some cases has not quite grasped, what is needed for the task at hand. While the current corps of Facility leaders each have various strengths, they do not seem to be capable of dismantling the dysfunctional/abusive culture at the Facilities and replacing it with one built on dignity, respect, and problem-solving.

- a lack of buy-in from Facility leaders at the concept phase, coupled with a sense that the Consent Judgment reforms are to be addressed by the civilian leadership (*e.g.*, ID, NCU, leadership in Headquarters, etc.). Facility leaders rarely emerge as champions of an idea or new practice and often seem to be myopic due to a lack of experience in other

jurisdictions. They simply do not know of other ways to solve problems besides "how we've always done it."

- near constant turnover among Facility leaders. Implementation stalls while new leaders are brought up to speed. Staff also know that Facility leadership turn over quickly, they observe Supervisors who are not modeling new practices, and are not exposed to leaders who expect or motivate change over the long haul. Staff who may have been intrigued by new practices then lose interest, lose faith, or move on to something else.

These dynamics, circulating from and around Facility leadership, are a major factor undercutting the success of the reform. The Monitoring Team believes that the current pipeline for Facility Leadership is insufficient and inadequate to inspire, guide and support line Staff in reforming practices. The Monitoring Team therefore recommends that the City and Department expand the corps of individuals who may serve in this role, as discussed in more detail in the "Next Steps" section below.

- **Deployment of Staff and Overstaffing**

The Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base level of skill of its Staff. All of this has a direct impact on the Department's ability to reduce the level of violence and ensure the safety and well-being of Staff and incarcerated individuals. The size of the Department's complement of Staff,[11] particularly the number assigned to the jails, is highly unusual and is one of the richest staffing ratios among the systems with which the Monitoring

---

[11] Uniformed Staff hold one of six ranks: Correction Officers (COs) are supervised by Captains, who are supervised by Assistant Deputy Wardens (ADWs), who are supervised by Deputy Wardens (DWs), who ultimately report to the Warden. The Wardens report to Bureau Chiefs who ultimately report to the Chief of Department.

Team has had experience. This is true even with the unusually high number of Staff who have
not reported to work due to chronic illness, COVID-19, and other reasons.

The Department has an unusually high number of Staff who are not available to work
because they are on medically monitored restrictions, sick leave, maternity leave, military leave,
Family Medical Leave Act, etc. As of March 27, 2021, approximately 2,040 Staff[12] were not
available to work. In the Monitoring Team's experience, this is an extraordinarily large number
of Staff that are unavailable to work.[13]

Notwithstanding the abnormally high absenteeism, the Department *still* has an
extraordinarily large number of Staff to operate the jails. The chart below identifies the number
of *available* uniform Staff as of March 27, 2021. Of particular note, there are 5,520 uniform Staff
available to work in the Facilities while the monthly ADP of incarcerated individuals is 5,629.

| Number of Available Uniform Staff<br>*as of March 27, 2021* | | | | | | |
|---|---|---|---|---|---|---|
| | CO | Captain | ADW | DW | DWIC or above | Total |
| Available Staff Assigned to the Facilities | 5,042 | 398 | 62 | 15 | 6 | 5,520 |
| Uniform Staff with routine contact with incarcerated individuals, but not in Facilities (*e.g.*, ESU and Transportation Division) | 350 | 29 | 2 | 0 | 0 | 380 |
| Uniform Staff with positions with very limited or no contact with incarcerated individuals (*e.g.*, Academy, Headquarters, Investigation Division, Security Operations, CIB) | 732 | 137 | 12 | 1 | 0 | 882 |
| **Total Available Staff** | **6,124** | **564** | **76** | **16** | **6** | **6,782** |

[12] This includes approximately 1,825 COs, 186 Captains, 18 ADWs, and 12 Deputy Wardens and above.

[13] This figure suggests that an evaluation of the City and Department's policies and procedures regarding medical leave must be scrutinized.

11

Across the thousands of incidents that the Monitoring Team has reviewed, all too often, problems are precipitated, exacerbated, and catalyzed by the number of Staff who are present at the scene. A critical area of focus for the Department is to reform practices resulting in an excessive show of force that becomes counterproductive and likely catalyzes the need to use force in the first place. Even as Facility leadership and Staff claim that there is an insufficient number of Staff in the Facilities, time and again, the Monitoring Team observes more Staff than reasonably necessary responding to incidents. The image below is one example of many in which an extraordinary number of superfluous Staff respond to an event.[14]



The Monitoring Team has found that the dominant staffing models within the Facilities appear to promote the idea that the addition of *more Staff* will solve all problems. This creates a dynamic in which Facility leadership believes more Staff are always needed, when, in fact, it appears that Staff simply need to be deployed more effectively and need to apply a different skill

---

[14] This was an incident in which two incarcerated individuals in a secure day space recreation area were refusing to cuff-up. A Response Team arrived and immediately used OC spray on the two individuals who were standing passively facing the five-member Response Team (during the course of the incident five additional applications of OC were applied). The two individuals were quickly subdued. Separately, one Response Team member repeatedly used hard impact body and head strikes to an individual cornered in the back of the day space. After the individuals were restrained, the small day space was flooded by no less than 10 to 12 officers creating such a crowded milieu, that officers could be seen tripping over one another. That such a cadre of additional officers were not only available, but deployed to respond to this incident, raises a number of important questions regarding staffing management.

set to resolve tensions. More often than not, Staff and Supervisors default to requests for additional Staff to address issues that can and should be addressed by the Staff on the unit and their Supervisors. In most cases, it appears the Staff and Supervisors on the unit are simply unwilling or unable to accept and execute their core responsibilities, such as to provide basic services and resolve interpersonal conflict, and instead seek more Staff to address the problem. The Monitoring Team's observation of Facility operations reveal an unusually large number of Staff working in the Facilities despite some markers that could suggest understaffing (*e.g.*, high use of overtime; high rates of violence and use of force; problems with dependable service delivery including commissary, barbershop, recreation; difficulty releasing Staff who need to attend training), each of which leads to additional problems. These include environments that undervalue de-escalation and problem-solving and overuse physical intervention; frustration among people in custody that leads to negative behaviors; Staff calling out for their regularly assigned shift because they do not want to be held over for an additional shift; fatigue, impatience and morale problems among Staff who are working extra shifts; and an inadequately trained workforce.

The staffing issue seems to be one of roster management and deployment versus insufficient numbers of Staff. The way Staff are assigned to various posts does not appear to be efficient. It appears that more Staff than necessary are assigned to certain posts and overall Staff assignment is not aligned with the values that undergird the reform effort, such as de-escalation and reliable service provision on the housing units. These opposing perceptions about the number and deployment of Staff required for Facility safety and effective service delivery must be resolved given their close and direct connection to the Department's problems with use of

13

force. Accordingly, the Monitoring Team recommends a system-wide staffing analysis is undertaken, as described in more detail below.

- **Failure to Hold Staff Accountable in a Timely Manner**

The system is incredibly behind on addressing use of force violations. As of the filing of this report, almost 1,500 formal disciplinary cases are pending. Further, the accountability that is imposed is often far after, and often years, after the violation initially occurred, which undermines the effectiveness of the discipline. While the significant backlog of disciplinary cases demonstrates the Department has improved in identifying misconduct, this improvement is undermined by the fact that Staff accountability is simply not occurring in a timely fashion.

It is notable and disturbing that under a best-case scenario (which is assuming that the system is functioning properly, which it rarely is), that the current process to impose discipline can take over one year to achieve from the time of the incident (this includes the completion of the investigation, prosecution of the case and ultimate imposition of discipline). Such a system can only be described as inherently dysfunctional and ineffective. The disciplinary process must be improved as discussed in depth in the Formal Discipline section of the Identifying and Addressing Use of Force Misconduct section of this report. It will take a concerted and well-coordinated effort among the City, Department, OATH and all other relevant parties involved to develop a system that provides for timely accountability. These issues must be addressed for the goals of the Consent Judgment to be achieved.

- **Next Steps to Address Overarching Issues Stymying Reform**

The Monitoring Team *strongly* recommends the following actions to address these fundamental issues regarding the Facilities' management:

*Recommendation 1*: The Department must expand the criteria for who may serve on Facility leadership teams, so the Department is not limited to selecting individuals from the uniform ranks. Currently, the only individuals who may serve as Wardens and Deputy Wardens are those currently in the uniformed ranks. This creates a narrow field without many choices, selects from those with DOC-only experience, perpetuates DOC's culture, and excludes well-qualified candidates who have served in similar positions in other jurisdictions. Therefore, the Monitoring Team recommends that the Department broaden the criteria of candidates who may serve in these roles, which will allow for the selection of individuals based on their breadth of experience and demonstrated effectiveness as leaders. Only then, with the right people at the top of the Facility hierarchy, will the vision for elevating the quality of supervision further down the chain of command and the essential improvements to Staff practice become possible. The City has committed to consulting with the Monitoring Team before the end of the Twelfth Monitoring Period (June 30, 2021) on the various options that may be available to address this recommendation and develop a path forward.

*Recommendation 2*: A neutral and independent staffing analysis must be conducted by an individual, external to the Department and the City, with significant experience in conducting staffing analyses for correctional facilities. The Monitoring Team intends to facilitate this assessment, which must provide individual staffing plans for each jail. The evaluation must be consistent with the practices required to achieve the reforms envisioned by the Consent Judgment (as well as other requirements mandated by City and State law). The breadth of work to be completed is complex and time consuming and therefore is expected to require 6-8 months to complete. The Monitoring Team anticipates this project will begin in the Summer of 2021.

*Recommendation 3*: The City, the Department, and OATH must work with the Monitoring Team during the next Monitoring Period to devise various creative solutions to significantly shorten the time required to impose discipline following use of force-related misconduct (as discussed in more detail in the Considerations for Improving Disciplinary Process part of the Identifying and Addressing Use of Force Misconduct section of this report). This is a complex task that needs to be prioritized with appropriate resources from the Department, City, and OATH, and is essential to the Department's ability to improve performance in this area.

These foundational and systemic changes are necessary to catalyze the much-needed reforms in the Agency and ultimately achieve compliance with the aims of the Consent Judgment.

*Assessment of Compliance by the Monitoring Team*

- **Monitoring Team's Methodology**

The task of monitoring the Consent Judgment, and now the Remedial Order, is complicated given the hundreds of provisions, the interrelationship of the various requirements, and the size and complexity of the Agency. Over the past five years, the Monitoring Team's methodology has become more advanced as the Monitoring Team has gained further expertise in the Department operations and sources of information have been discovered and developed. Furthermore, the Parties have requested that the Monitoring Team consider whether additional indicators of progress could be developed in certain areas. For these reasons, the Monitoring Team's methodology is briefly reviewed here.

Over the past five years, the Monitoring Team has cultivated a strong and collaborative working relationship with the Department and the Department remains receptive to working with

the Monitoring Team. The Monitoring Team continues to provide significant technical assistance to support implementation of the various *Nunez* requirements.

The Monitoring Team's approach to assessing compliance includes a myriad of considerations. The Monitoring Team currently reviews all initial reports (*e.g.,* CODs) and Intake Investigations (formerly Preliminary Reviews) of all use of force incidents that occur in the Department, along with a variety of data regarding training, staffing, Facility operations and the implementation of specific procedures regarding Facility safety. This allows the Monitoring Team to understand the nature of the force being used throughout the Department at the incident level, as well as the variety of influences that lead to and flow from the use of force. The Monitoring Team's approach also identifies systemic trends and patterns. It is important to note that an assessment of an individual use of force requires a qualitative assessment of the specific facts of the case that inherently has some subjectivity, among which even experts may not always agree.

Every Monitor's Report to date has included a wide variety of both qualitative and quantitative data to measure and evaluate the Department's performance and progress. Multiple measures are required in each key area (*e.g.*, implementing the UOF directive, quality of investigations, meaningfulness of accountability, Facility safety, etc.) because no one metric adequately represents the multi-faceted nature of these requirements. While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a single, one-dimensional, quantitative metric would not only be challenging, but is also not advisable. Data—whether qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has been made or Substantial Compliance has been achieved. For instance, proper implementation of

17

the Department's Use of Force Directive relies on a series of closely related and interdependent requirements (*e.g.*, adequate policy, training, Staff practice and supervision in the moment and after the fact, adequate assessment of the incident and accountability for poor performance and reinforcement for positive conduct) working in tandem to ultimately change Staff behavior. As such, there is no single number that would determine whether the UOF Directive has been implemented properly. The Monitoring Team therefore applies a combination of the quantity, the quality, the context, and the standard of practice to assess compliance with each of the Consent Judgment's and Remedial Order's requirements.

Two cautions are needed about the use of quantitative metrics. First, the use of numerical data suggests that there is a line in the sand that specifies a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at which Staff are held accountable.[15] The Monitoring Team's multi-faceted strategy for assessing compliance requires an assessment of all inter-related issues, because each of the main Consent Judgment and Remedial Order requirements is more than simply the sum of its parts. This is why the experience and subject matter expertise of the Monitoring Team is so critical, for the ability to not only contextualize the information, but also to compare the Department's performance to their decades-long, deep experience with the operation of other jail systems.

Second, there are infinite options for quantifying the many aspects of the Departments' approach and results. Just because something can be quantified, does not mean it is useful for

---

[15] Notably, neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation nor Remedial Order, include metrics or qualitative measures related to the concerning practices identified or potential corrective measures.

understanding or assessing progress. The trick is to identify those metrics that actually provide insight into the Department's processes and outcomes and that are useful to the task of problem solving. If not anchored to a commitment to advance and improve the way the Department is doing something or the results it is trying to achieve, the development of metrics becomes a burdensome and bureaucratic task that distracts from the qualitative assessments needed to understand and more importantly, improve, the processes and outcomes that underpin the requirements of the Consent Judgment and Remedial Order. Poorly conceptualized metrics create an unnecessary focus on "counting" instead of solving the actual problem at hand. In short, while there are certain *ad hoc* requirements that are amenable to the development of additional metrics, overall, the Monitoring Team strongly discourages a strategy that relies on a single metric against which progress is measured.

The Monitoring Team is committed to being as transparent as possible and will continue to explore the development of additional metrics to the extent that they are feasible, that they meaningfully contribute to the task of problem-solving and that do not unnecessarily divert the overall focus of the Monitoring Team's work. This commitment to develop additional metrics comes with a parallel obligation to ensure that these data are interpreted within the proper context. To the extent additional metrics are identified and developed, they will be included in future reports.

- **Organization of the Report**

The following sections of this report summarize the Department's efforts to achieve the goals of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of UOF trends. This data is presented to anchor the report in the context of the conditions that created the need for external oversight and to illustrate emerging trends. Next, the report

19

evaluates the Department's mechanisms for identifying and responding to UOF-related misconduct. This is done in a single section because the two actions are intrinsically intertwined, and while the Consent Judgment includes individual requirements across many different topics that touch on these areas, discussing them holistically emphasizes their interdependence. Finally, the report assesses compliance with each of the Consent Judgment sections in turn.[16] As for the assessment of compliance with the Remedial Order, Section A of the Remedial Order is addressed in its own standalone section while the assessments of compliance with Sections B, C and D of the Remedial Order are interpolated with the related sections of the Consent Judgment (*e.g.,* Section B of the Remedial Order is addressed with the Use of Force Investigations section in this report).

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[17] (b) Partial Compliance,[18] and (c) Non-Compliance.[19] It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain

---

[16] A small group of Consent Judgment provisions are not addressed in their original section because their substance is more similar to another area of the Consent Judgment (*e.g.*, § V, ¶¶ 18 and 20 related to use of force reports are addressed in the Risk Management section of this report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Incarcerated Individuals is addressed in the Use of Force Investigations section of this report).

[17] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[18] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[19] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-Compliance shall not constitute Substantial Compliance."[20] The Monitoring Team did not assess compliance for every provision in the Consent Judgment or the Remedial Order in this report because the Monitoring Team was simply not in a position to rate the provision (the reasons for which are described in the specific provision) or the requirement had not come due.[21] Further, any provisions that have been placed in an "inactive monitoring" status or held in "abeyance" are not included in this report.[22]

---

[20] § XX (Monitoring), ¶ 18.

[21] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

[22] *See* Tenth Monitor's Report *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions.*

# USE OF FORCE TRENDS DURING THE ELEVENTH MONITORING PERIOD

This section assesses the Department's use of force by utilizing quantitative and qualitative data extracted from the Department's use of force data and the Monitoring Team's independent review of incident reports, video footage, and investigations. Annual trends for the past five years permit general comparisons, which allow the Monitoring Team to draw conclusions about the Department's progress toward the goals of the Consent Judgment. This section addresses the following: (1) overarching use of force trends, (2) use of force data, (3) the Department's overreliance on Emergency Response Teams,[23] and (4) incarcerated individuals frequently involved in force.

## Use of Force Trends

As discussed in the Introduction of this report, an assessment of UOF must examine a variety of factors and considerations to evaluate the current state of affairs. The data presented in this section clearly demonstrates that physical force is currently used much more frequently than at the time the Consent Judgment went into effect. In fact, the average UOF rate in 2020 was 183% higher than the average UOF rate in 2016. The sheer volume of force is concerning given the underlying dynamics between Staff and people in custody are negatively impacted by these incidents and the system is significantly burdened and overloaded by the required ancillary procedures following each use of force (*e.g.*, Staff reports, investigations, etc.). As noted in the Introduction, the Monitoring Team continually searches for and develops new measures that

---

[23] There are at least three types of Emergency Response Teams: (1) Probe Teams, which consist of Facility-based Staff; (2) the Emergency Services Unit ("ESU") which is a separate and dedicated unit outside of the Facility; and (3) the Special Search Team ("SST"), a separate and dedicated unit associated with the Special Operations Division that conducts searches.

contribute to the understanding of the problems facing the Department. Some of these are discussed below.

Further compounding concerns about the frequency of force is that the Department has found that just over half of the incidents (1,623 of 3,076; 53%) that occurred during this Monitoring Period had either procedural errors or involved avoidable and/or problematic force.[24] At least 29% of incidents (904 of 3,076) that occurred during this Monitoring Period could have been avoided[25] and/or involved excessive or unnecessary force, and/or involved violations of the Use of Force Directive or Chemical Agents Directive. Furthermore, an additional 23% of incidents (719 of 3,076) involved a variety of procedural errors that ran the gamut from failure to don equipment properly (including the failure to wear personal protective equipment), to the failure to secure cell doors and control rooms or "bubbles", and/or the failure to apply restraints correctly. Although these 719 incidents with only procedural errors did not always include UOF violations, the poor operational practices contributed to the environment characterized by disorder, chaos and subsequent UOF in the Facilities. The high number of uses of force—the majority of which are problematic in some way—creates a vicious cycle of chaos and disorder within the Facilities. UOF incidents cause basic operations and service delivery within the Facility to be interrupted, which leads to anger and frustration among people in custody, which then erupts into subsequent incidents in which force is utilized.

---

[24] Although the Department's effort to identify *all* violations is not always accurate or complete, these findings are generally consistent with the Monitoring Team's assessment of incidents and certainly illustrates the pervasive problems occurring throughout the Agency. These findings are from the Rapid Reviews and the Intake Investigations.

[25] Given the overall concerns regarding Staff's misuse of force and the frequency of pain and/or injury, any incident that could have been avoided contributes to a risk for Staff-on-inmate violence and unsafe conditions.

The Monitoring Team's careful review of thousands of written reports and hours of videotaped footage reveals certain commonalities among the factors that contribute to Staff's decision to use physical force across the Department. These include:

- Poor supervision and inadequate support for Staff on the housing units (discussed in more detail in the Introduction to this Report);

- Poor operational practices (*e.g.*, failing to secure doors, failing to adhere to lock-in times) that create opportunities for disorder and often lead to a use of force;

- Failure to adequately provide for and/or address requests for basic services (*e.g.* access to commissary or recreation time) which results in incarcerated individuals expressing frustration. This then often results in extreme responses by housing unit Staff and/or Supervisors to address these requests for basic services by seeking an external Emergency Response Team (who often respond with an excessive number of Staff, discussed in more detail in the Introduction and below) when the issue could have been addressed by those Staff on the unit or their Supervisors;

- The presence of an abundance of Staff appear to diffuse Staff's sense of responsibility and leads them to believe that "someone else will handle the problem"—creating the classic 'bystander effect' in which Staff do not uphold standards of conduct nor call out the improper or misuse of force when they see it;

- Staff's hyper-confrontational demeanor, which often precipitates the need for force, including their mannerisms and conduct during searches, and their typical responses to rising tensions. These behaviors significantly increase the likelihood that situations will escalate to the point that physical force becomes necessary; and

- Poorly executed physical restraints (*e.g.,* painful escort techniques, improper use of OC spray, force that is disproportionate to the actual threat), in addition to violating the Use of Force Directive, are antithetical to the reform effort and further deteriorate the culture when Supervisors fail to intervene.

This combination—(1) situations that if managed properly would have avoided a use of force altogether and (2) the failure to properly temper the force to only what is necessary and proportional—continues the Department's trajectory in the opposite direction of what is required by the Consent Judgment. In particular, these practices violate the core principles of the Use of Force Directive: that the force used shall always be the minimum amount necessary and proportional to the resistance or threat encountered; the use of excessive and unnecessary force is expressly prohibited; the Department has a zero-tolerance policy for excessive and unnecessary force; and the best and safest way to manage potential use of force situations is to prevent or resolve them without physical force. In fact, many of the incidents reviewed by the Monitoring Team include conduct that is expressly prohibited by the UOF Directive (*e.g.*, the use of force to punish, discipline, assault, or retaliate against an Inmate and the use of racial, ethnic, or homophobic slurs towards Inmates; *see* Consent Judgment § IV., ¶ 3(c)).

<u>Use of Force Data</u>

The Tenth Monitor's Report found that the *number of uses of force* dropped significantly at the end of the Monitoring Period, but because fewer people were in custody, the *use of force rate* was higher. This pattern of lower numbers but higher rates continued during the current Monitoring Period —for the Department as a whole, across all age groups, and for many of the Facilities—as shown in the graphs and charts below. These data continue to tell the story of a Department that has thus far been unable to implement reform strategies at the scale and fidelity

needed to produce a significant and sustained reduction of the rate at which physical force is used to respond to people in custody.

As repeated in every Monitor's Report to date, a well-executed, well-timed use of force that is proportional to the observed threat protects both Staff and incarcerated individuals from serious harm. That said, given capable Staff and effective leadership, many risky situations can be avoided altogether or successfully managed without force of any kind. An important bit of progress is the Department's recognition that some uses of force are indeed avoidable, meaning that if the precursors had been handled differently, the need to use force could have been averted. During the Eleventh Monitoring period, the Department's Rapid Reviews and/or investigators found that at least 647 of the 3,076 (21%) uses of force were "avoidable".[26] Thus, one of the keys to achieving the goals of the Consent Judgment is to equip Staff with the skills, mindset, and motivation to address these precursors more constructively, driving down the number of situations in which force is necessary. Moreover, even when physical force is a reasonable response to an observed threat, Staff and their Supervisors and leadership must ensure that the type and amount of force used does not exceed what is necessary for Staff to restore safe conditions.

Finally, even necessary, proportional uses of force are enormously taxing on the system. Each use of force and associated follow-up prevents Staff from focusing on their primary duty—maintaining safety and facilitating services for those in custody—which, when neglected, becomes a vicious cycle of continued interruptions in service delivery and inattention to basic

---

[26] While a Rapid Review was completed for every UOF in this Monitoring Period, ID's investigations of 658 incidents that occurred in this Monitoring were still pending as of the end of the Monitoring Period. It is possible that ID's investigations will identify additional uses of force that were likely avoidable.