# EXHIBIT 29



**BOARD OF CORRECTION**
**CITY OF NEW YORK**

# February & March 2022 Deaths in DOC Custody Report and Recommendations[1]

# May 9, 2022

---

[1] Authored by Deputy General Counsel Melissa Cintrón Hernández and Director of Special Investigations Rahzeem Gray. Thank you to Director of Violence Prevention Bart Baily, Director of Environmental Safety Katrina Blackman, Director of Public Accountability Barbie Melendez, and Correctional Standards Review Specialist II Jermarley McFarlane for providing information for this investigation. Additional thanks to Executive Director Amanda Masters for her review and comments, and the members of the Jail Death Review subcommittee: Committee Chair Jacqueline Sherman, Interim Board Chair Julio Medina, Dr. Robert Cohen, and Dr. Steven Safyer.

## I.      INTRODUCTION & METHODOLOGY

As of the date of this report's publication, three people have died this year in New York City Department of Correction ("Department" or "DOC") custody. Sixteen people died in DOC custody in 2021. The Board of Correction ("Board" or "BOC") has a duty to investigate the circumstances leading to the death of any individual in DOC custody.[2] These investigations do not focus on criminal wrongdoing or individual fault but rather on identifying areas of improvement and lessons to be learned to prevent further tragedies. Accordingly, this report presents an overview of the three deaths that occurred in February and March 2022, plus the Board's findings and recommendations to address the dysfunction and dangerous persistent issues in the City's jails.

Many of the issues described in this report are longstanding, present in our city's jails for years and, in some cases, decades. The Board wishes to work in partnership with the Department's Commissioner, Louis Molina, and his team in finding a solution to these persistent problems. The broken and dysfunctional system Commissioner Molina inherited led to these tragedies, and we support his leadership and his efforts to properly staff DOC facilities and train uniformed officers. It is the Board's sincere hope that this report is a productive step to supporting change and furthering a collaborative approach, with the goal of improving current conditions for people in custody and staff, and preventing further deaths.

The Board staff's investigative methods included interviews with people in custody and decedents' legal teams, as well as a review of jail video footage, DOC materials, Correctional Health Services ("CHS") medical records, and relevant press coverage. On April 13, 2022, four Board members met with DOC and CHS to review this year's jail deaths. CHS flagged concerns about discussing protected health information (PHI) in the presence of DOC staff, therefore they did not delve into patients' medical history. One of the Board's recommendations will be a timely death review conference between CHS, DOC, and BOC, which comprises the exchange of clinical information.

The Board provided CHS and DOC advance copies of this report and an opportunity to comment. This report solely contains information independently collected and reviewed by Board staff, separate from DOC preliminary investigative materials. Although this report focuses on deaths in 2022, the Board is currently investigating the sixteen deaths that occurred in 2021 and aims to publish a report about our findings.

## II.     TARZ YOUNGBLOOD, 38

Tarz Youngblood was the first reported death in custody in 2022, passing away on February 27, 2022, at Elmhurst Hospital. Mr. Youngblood is survived by his domestic partner, their three children, his stepmother, his mother, his stepsister, and other relatives. Mr. Youngblood was housed in a general population unit in George R. Vierno Center's ("GRVC"). General population is a designated custody level for those who have completed classification and new admission processing, including medical and mental health screening and do not require special housing.

---

[2] Defined in §3-10(c)(2) of title 40 of the Rules of the City of New York.

In Mr. Youngblood's housing unit, people in custody are assigned cells and are locked inside or outside the cell per DOC's Lock-In/Lock-Out directive[3] and in accordance with BOC Minimum Standards.[4] Individuals are prohibited from accessing cells that are not their own and cell access is to be strictly controlled by officers. Housing units are supervised by "A" post officers and "B" post officers. "A" post officers remain within the secured housing area control room ("the "A" station colloquially known as the "bubble"). The "A" station cannot be accessed by people in custody. "B" or floor post officers interact directly with people in custody and conduct rounds (a walk-through inspection of the area). Rounds are to be conducted every thirty minutes in general population units.[5] DOC's Video Monitoring Unit is to notify on-duty facility staff of security breaches observed during real-time monitoring.[6]

At approximately 10:30 am on February 27, Mr. Youngblood was carried out of a cell assigned to another person, unconscious, and down the stairs to a table by people in custody, who were the first to provide emergency aid. DOC staff became aware of Mr. Youngblood's state at that moment; they proceeded to call in a medical emergency to the facility's CHS-managed clinic and perform chest compressions. Although the housing unit was staffed with both an "A" post officer and a "B"/floor post officer at the time, officers are not observed rounding the area for slightly over one hour before this incident. BOC's review of video footage showed that DOC staff did not conduct rounds every thirty minutes nor did they check the cell Mr. Youngblood was in for at least three hours before his death, the window of which was obstructed by some sort of white or grey covering.[7] The Video Monitoring Unit did not notify on-duty staff of any security breaches.

On the day of Mr. Youngblood's death, the "A" post officer assigned to the unit was classified as Medically Monitored Returned Category 3. DOC uniformed employees placed on Medically Monitored Returned Category 3 (MMR3) duty[8] are not permitted to work directly with incarcerated individuals. Medical staff arrived on the scene approximately eight minutes after people in custody brought Mr. Youngblood to the main floor. He was transported to Elmhurst Hospital, where he was pronounced dead at 11:44 am.

---

[3] Of note from DOC Directive #4009R, Lock-In/Lock-Out, effective since 08/27/14, Section III(D): "Correction officers and supervisors are advised that this directive does not in any way modify or nullify their responsibility to patrol and inspect each cell and each entire post area as it is prescribed throughout departmental policy and command level orders. All cells must be checked whether or not inmates exercise the option to lock-in or out."

[4] See §1-05 of title 40 of the Rules of the City of New York.

[5] Section III(1) of DOC Directive #4514R-C effective since 10/13/2015 states: "Correction officers responsible for the care, custody, and control of the inmates shall remain in their assigned areas and conduct visual observations at 30-minute intervals…(e.g. walking through the area and making a visual observation of each inmate when locked in their cell, observe signs of life, the cell is properly secured, etc.)."

[6] Section IV(C) of DOC Operations Order #2/19 effective since 1/18/19 on the subject of the Video Monitoring Unit (VMU) and Video Review Unit (VRU).

[7] DOC's Security Bulletin #001/13 from the Office of the Assistant Chief of Security dated 01/04/13 on the subject of Cell Window Obstruction/Officer Safety states: "AT NO TIME SHALL AN INMATE BE ALLOWED TO COVER HIS/HER CELL WINDOW OR OTHERWISE CREATE AN OBSTRUCTION OF CORRECTION STAFF TO OBSERVE THE INMATE."

[8] Section II of DOC Operations Order #56/88 effective since 8/15/88 defines three categories of MMR restrictions: "1. No physical limitations – only overtime or tour restrictions; 2. Some physical limitations – able to work a normal tour (in duration) where the job allows ample opportunity for sitting with some standing, walking, or climbing stairs. (This employee cannot be expected to do strenuous physical activity, and cannot supervise inmates alone.); 3. Serious physical/psychological limitations – abilities are more limited than those described above. These employee's abilities or disabilities must be specifically described."

### III.   GEORGE PAGAN, 48

George Pagan passed away on March 17, nine days after he arrived at Eric M. Taylor Center ("EMTC").[9] Mr. Pagan is survived by his sister and brother. He was assigned to a general population dormitory-style housing area. The unit is staffed with "A" post and "B" post officers. Mr. Pagan's visibly poor medical state was described by people in custody who resided in the same area. He regularly urinated, defecated, and vomited on himself. He was weak, barely ate, and spent his days laying on his bed or the floor. People in custody brought him food and drink. Video footage showed Mr. Pagan laying on a mattress on the floor next to his bed on March 16, less than twenty-four hours before he died.

On March 16, there was no "B" post officer in the dormitory until 2:30 pm. Based on video footage review, the "B" officer spent their shift within the "A" station control room instead of touring the housing area floor. The "A" post officer was also inside the housing area control room. On March 16 at approximately 5:32 pm, Mr. Pagan's health condition was reported by those in custody to the "A" post officer, prompting the officer to call in a medical emergency.

During an April 13 jail death review meeting, DOC stated that the "A" post officer called in a medical emergency at 5:35 pm. CHS reported receiving the call at 6:12 pm and responding to the housing area at 6:22 pm. As of this report's publication, neither party has explained what led to this reporting discrepancy. CHS stated that they cannot speak to the discrepancy and stand by their records. If DOC's account is accurate, it took over thirty minutes for a medical team to leave the clinic and make their way to the unit. If CHS's account is accurate, the response time was around ten minutes. What is clear is that people in custody took it upon themselves to carry a weakened Mr. Pagan out of the unit and down the steps to the main floor to await medical staff at around 6:17 pm. He was transported to Elmhurst Hospital and was pronounced dead the following day at 8:33 am.

According to his legal team, Mr. Pagan was due to be discharged from DOC custody to a court-ordered drug treatment placement December 2021 during his previous incarceration. However, transportation coordination fell through and Mr. Pagan was released into the community. Prior to his incarceration on March 9, 2022, Mr. Pagan was in "very, very bad shape and probably relapsed," said his legal team. Mr. Pagan had a history of drug and alcohol addiction, as well as concerning mental health and medical history, including life-threatening medical conditions requiring regular monitoring and treatment.

When CHS deems it clinically necessary to monitor a person's possible alcohol withdrawal symptoms, nurses administer the Clinical Institute Withdrawal Assessment (CIWA), which measures ten withdrawal symptoms to indicate whether the symptoms are mild, moderate, or severe.[10]  Based on the CIWA score treatment, the patient may be observed, placed on treatment in the facility, or admitted to the hospital. CHS appropriately treats alcohol withdrawal with low detoxification with a benzodiazepine drug.

---

[9] EMTC-specific staffing issues are discussed in section V. Key Findings of this report, below.
[10] *See* Supplement to Asam News, Vol. 16, No. 1 dated January-February 2001, available here: https://www.ci2i.research.va.gov/paws/pdfs/ciwa-ar.pdf

On March 14, three days before his death, Mr. Pagan was found on the floor of his housing area and brought to the clinic. He had a fever and an elevated pulse, yet no follow-up was scheduled, and he was transported back to his housing area where, per people in custody assigned to the same unit, he was still visibly ill. Mr. Pagan did not receive his methadone medication on three occasions nor critical alcohol withdrawal medication on four occasions, including for almost 48 hours before he was transported to the clinic for emergency care on March 16. At that point, he was hallucinating and unable to walk.

BOC's review of Mr. Pagan's medical record showed that Mr. Pagan missed **nine** scheduled medical appointments for CIWA evaluation and or medication administration over a six-day period.  According to the CHS record, DOC failed to produce him in all nine instances.

## IV.   HERMAN DIAZ, 52

Herman Diaz was pronounced dead in EMTC's clinic on March 18, 2022. Mr. Diaz is survived by his five siblings. Mr. Diaz was housed in a general population dormitory-style unit. There was an "A" post officer stationed in the control unit bubble, but no "B" post officer on March 17 or March 18.[11] The "A" post officer present on March 18 was on Medically Monitored Returned Category 3 duty. MMR3 classified uniformed staff cannot interact directly with people in custody.

According to those who witnessed the incident, Mr. Diaz choked and collapsed while eating an orange. Video footage review indicated this happened at approximately 10:16 am. People in custody used the Heimlich maneuver on Mr. Diaz (a first-aid procedure to aid a person who is choking by pushing on their abdomen), turned him on his side, checked his mouth and throat, and could see his lips were turning blue. They knocked on the "A" station window to notify the officer that Mr. Diaz was choking and needed medical assistance. The "A" post officer did not render first aid, remaining inside the "A" station and reportedly called in a medical emergency to the clinic. An "A" post officer's expected role in rendering first aid when there is no "B" post officer assigned to the unit is unclear, whether it is to remain inside the control room and wait for medical response, or to enter the housing area to provide emergency aid.

DOC and CHS again diverge on the critical issue of medical response timing, here disputing whether a medical emergency was called in at all. During the April 13 jail death review meeting, DOC stated that the "A" officer called in a medical emergency twice (DOC records reflect a medical emergency called to the unit at 10:20 am; there is no mention of an additional call). CHS reported not receiving any calls. Again, neither party has explained what led to this discrepancy. CHS maintained they stand by their documentation and cannot speak to the discrepancy.

In the absence of a medical response, at approximately 10:20 the "A" officer opened the unit's entrance gate to allow people in custody to carry Mr. Diaz to the clinic. Along the way to the clinic, officers opened doors and gates to allow them passage to the clinic. None of the officers rendered first aid to Mr. Diaz. Mr. Diaz was pronounced dead at 10:58 am.

---

[11] More EMTC-specific staffing issues are discussed in section V. Key Findings of this report, below.

## V.   KEY FINDINGS

1. **"B" post officers**: "B" posts were unstaffed in Mr. Pagan's and Mr. Diaz's units on the dates of their medical emergencies. In Mr. Pagan's case, the "B" post was unstaffed until 2:30 pm. Even after their arrival, the "B" post officer remained inside the "A" station, not on the housing unit floor. In Mr. Diaz's case, the "A" officer was classified as MMR3. Officers are trained in CPR and first aid. In all three instances described in this report, people in custody were the first to render aid to the best of their ability and notify officers of what was happening, highlighting supervision deficiencies. Maintaining housing areas open without floor officers is a dangerous practice that puts the safety and lives of people in custody at risk.

2. **Medically Monitored Returned Category 3 (MMR3)**: both Mr. Youngblood's and Mr. Diaz's housing units were staffed with an MMR3-restricted "A" post officer. This was critical in Mr. Diaz's case, as there was no "B" post officer present and the "A" officer was restricted from interacting directly with people in custody – there was **no staff** assigned to the housing area that could provide **immediate** first aid when Mr. Diaz began choking.

3. **EMTC**: EMTC closed in March 2020 and reopened that same month due to the pandemic; the reopening plan initially only included processing new admissions in intake and opening two housing units to place new admissions waiting to be rehoused. However, due to OBCC intake overcrowding, that facility closed its main intake area and EMTC became the only new admission intake for the entirety of Rikers Island's male population. All new admissions remain in COVID-19 quarantine at EMTC for at least ten days after their initial intake. There were twenty-seven open housing units in EMTC the week Mr. Pagan died. EMTC 9U, Mr. Pagan's housing unit, was closed on March 30, 2022. The following illustrates some of the EMTC staffing trends as observed by BOC staff in April 2022:

| April 4, 2022 | 16 open units; 8 had floor officers |
|---|---|
| April 12, 2022 | 3 units visited by BOC staff had no floor officers on the 7:00 am to 3:00 pm officer tour schedule (7x3 tour) |
| April 13, 2022 | 21 open units; at the start of the 7x3 tour, 21 units had no floor officers. By mid-tour, unstaffed posts reduced to 11 and by 2 pm, they reduced to 10. |
| April 20, 2022 | 19 open units; 13 had no floor officers |

4. **Insufficient rounds**: in the case of Mr. Youngblood, there was a "B" officer present, but they failed to round and check individual cells every thirty minutes as required by DOC policy governing procedure in general population housing. The cell window was obstructed, further impeding adequate supervision. Based on footage review, no officer laid eyes on Mr. Youngblood for approximately three hours before his death while he was in a cell, and people in custody were free to wander in and out of cells during that time. In Mr. Pagan's case, a "B" officer was only present after 2:30 pm on March 16.  The "B"

officer did not conduct rounds, remaining within the "A" station. DOC staff's failure to regularly check on the status of every person every thirty minutes (particularly at night) is a chronic and life-threatening issue.

5. **Medical emergency response**: DOC and CHS do not seem to have an acceptably functioning system for providing emergency care to persons in life-threatening situations. There are discrepancies between DOC and CHS on what time a medical emergency was called in (Pagan) and whether a medical emergency was called in at all (Diaz). If DOC's account is correct, it took over thirty minutes for a medical team to make their way to the unit to collect Mr. Pagan and no one responded to the unit to aid Mr. Diaz. In both instances, people in custody physically carried Mr. Pagan and Mr. Diaz closer to the clinic. Prompt emergency medical response is vital in preventing further tragedies. It can mean the difference between life and death.

6. **Special medical housing**: in the case of Mr. Pagan, witnesses observed his health visibly deteriorating during his time in custody. He had an extensive medical and mental health history, as well as a drug and alcohol abuse history that required close monitoring for withdrawal symptoms. Per DOC Directive 3801: "The decision to house an inmate or remove an inmate from an infirmary or other medical or mental health housing area is strictly a clinical decision that can only be made by a health care provider." There are multiple DOC facilities designated to provide elevated levels of medical care, such as North Infirmary Command, the Contagious Disease Unit, and Bellevue Hospital Prison Ward. NIC houses those with acute medical conditions that require infirmary care or those who have a disability that requires housing compliant with the Americans with Disabilities Act, as well as some general population units. It also houses people in custody with HIV and AIDS-related conditions. Bellevue houses male persons in custody in need of psychiatric or medical treatment. The Contagious Disease Unit is available for patients with contagious diseases. In addition, Anna M. Kross Center (another facility within Rikers Island) has a Methadone Detoxification Unit, including double detoxification units for people withdrawing from two chemical substances, and a mental health center. Mr. Pagan was not placed in any of these facilities during his nine-day incarceration.

7. **Missed medical appointments and medication**: CHS medical records show that Mr. Pagan missed nine clinical appointments across six days. He did not receive multiple Clinical Institute Withdrawal Assessments, did not receive methadone medication on three occasions, and did not receive alcohol withdrawal medication on four occasions. There was also no follow-up scheduled by the clinic after a medical emergency three days before his death and the scheduled CIWA clinical evaluations were not provided. During these two days, Mr. Pagan's condition deteriorated dramatically. The current system for treating alcohol and opiate withdrawal requires frequent clinical observation of patients being treated or at risk for withdrawal in the facility clinic by nursing staff. Patients must be brought by DOC staff to the clinic. Initially issued on September 15, 2021, and still in effect,[12] Mayoral Emergency Executive Order No. 241 declared a state of emergency within DOC facilities and suspended several Board minimum standards based on DOC's

---

[12] As of the date this report was published, the latest extension is Emergency Executive Order No. 84 dated April 28, 2022.

staffing shortages affecting health operations and availability of clinic escorts. For the past year, DOC has not been able to transport patients to required clinical evaluations, and, in this instance, CHS was unable to assure Mr. Pagan received critical medications.

## VI.   RECOMMENDATIONS

**To CHS and DOC, jointly**

1. CHS, DOC, and BOC should hold timely death review conferences to discuss the circumstances around each death, what operational or clinical problems can be identified, and how both agencies can work collaboratively to prevent further incidents. This *must* include the exchange of clinical information. Issues regarding confidentiality and protected health information (PHI) must be addressed and resolved between each agency's legal department. Death, whether in a jail, at home, or in a hospital, is a **clinical** event that cannot be adequately reviewed without clinical information being provided to DOC.

2. CHS and DOC should develop a process for flagging and tracking patients with **serious** medical concurrent conditions including those suffering from withdrawal syndromes requiring medication. Failures to transport these patients should be reported to the assigned Captain, and deficiencies remedied. If CHS deems the medical condition critical enough to require immediate intervention, and there is a failure to transport, the problem should be elevated beyond the Captain to the attention of the Deputy Warden or Warden.  Failures to provide CIWA evaluation, provide ordered benzodiazepine medications for alcohol/benzodiazepine detoxification, and failure to provide ordered Medication-Assisted Treatment (including methadone detoxification) should be reported quarterly by CHS to DOC and the Board with explanation (patient refused, patient not transported, medication not available, etc.)

3. CHS and DOC should identify what led to these medical emergency call discrepancies and develop necessary fail-safe protocols to prevent future miscommunication. Any joint review and development of an action plan to improve both agency's role in responding to medical emergencies must examine operational problems such as 1) failure to staff housing areas with correctional officers; 2) failure to have an "A" officer emergency backup system; and 3) failure to have a functional system for DOC line staff to directly contact the medical clinic.

4. In the absence of placing medically fragile people in housing areas with direct nursing and medical observation such as North Infirmary Command, CDU, or Bellevue upon intake, CHS and DOC should explore expanding the clinical observation space currently available on Rikers Island.

5. To avoid delays or miscommunication between the "A" post officer and medical staff in the clinic, CHS and DOC should set up a dedicated direct phone line for medical emergencies that does not rely on information being relayed through multiple staff to reach the medical response team.  Currently, the "A" post officer contacts the clinic officer, who then notifies the medical team. CHS and DOC should actively track response time to identify undue delays and take corrective action. The direct line phone number should be posted in a visible area within the "A" station.

**To CHS**

1. New admissions with serious medical problems, including patients who are being treated with medication for alcohol and benzodiazepine withdrawal should be housed in medically supervised areas.

2. CHS should maintain a liaison to follow up with DOC about missed medical appointments due to a lack of DOC escorts to ensure those who have an urgent need for medication or treatment are seen urgently in the clinic.

3. Given the high volume of drug contraband seized within the jails, CHS should track the volume of non-fatal drug overdoses they treat. For these same reasons, CHS should set up sessions or programs for people in custody on the short and long-term effects of drug use, and the dangers of K2, fentanyl, and other drugs routinely seized by DOC in the jails.

**To DOC**

1. Given the current staffing crisis and lack of "B" post officers, DOC should revise Operations Order #5/17, Emergency Health Care Log, to clarify the CPR and first aid responsibilities of the "A" post officer in the absence of a "B" post officer.

2. Given that "B" posts are consistently unstaffed, officers assigned to the "A" station must be available to provide persons in custody emergency first aid support. MMR3 officers are not able to fulfill this critical function.

3. DOC's Operations Order on the Utilization of Medically Monitored Personnel was last revised on August 15, 1988. Based on DOC's own admission that the prevalence of MMR3-restricted officers presents a staffing challenge[13] and the Nunez Independent Monitor's latest MMR3 data,[14] this policy should be revised to reflect current staffing practices and needs.

4. DOC should articulate staffing policies to ensure that critical posts in housing areas, such as floor officer posts, are staffed department-wide *before* assigning uniform staff members to non-essential posts. This was also a recommendation in the Nunez Independent Monitor's Special Report.[15]

5. DOC should transition out of the practice of keeping paper logbooks and develop an electronic log system. The electronic system should capture information triggered at the individual cell level. Until such a system is implemented, Tour Commanders should articulate an action plan to regularly audit logbooks against Genetec video footage and Watch Tour data at unpredictable times to ensure that rounds are taking place as required and to detect incorrect entries. This was also a recommendation included in the Board's June 23, 2020 report on the death of Layleen Cubilette-Polanco.[16]

6. DOC should revise its Video Monitoring Unit (VMU) and Video Review Unit (VRU) Operations Order to clarify and enumerate examples of security breaches that require notification to facility staff.

---

[13] *See* DOC Fact Sheet: Staffing Efforts to Improve Conditions (2019-2021), available here: https://www1.nyc.gov/site/doc/media/staffing-efforts.page

[14] *See* Special Report of the Nunez Independent Monitor, filed March 16, 2022, at pg. 12. On January 26, 2022, of 7,674 total uniform staff, 735 were unavailable due to MMR3. On August 24, 2021, of 8,434 total uniform staff, 740 were unavailable due to MMR3.

[15] *Id* at pgs. 36 and 72.

[16] *See* The Death of Layleen Xtravaganza Cubilette-Polanco 1991-2019 at pg. 15.

## VII.  CONCLUSION

There are common elements in all three deaths, which result in the Department of Correction's failure to provide minimally adequate coverage and supervision within housing areas in the city's jails. This report further highlights the consequent inadequate medical follow-up, failures to transport patients to medical appointments, and failure to provide patients with essential medications.  We are extremely concerned about the unresolved DOC and CHS positions on when medical emergencies that resulted in death were initiated. CHS and DOC must assess internal operational and clinical failures and commit to 1) openly reviewing the results with their partner agencies; 2) developing a realistic action plan; and 3) implementing it with the best interests of people in custody and staff in mind.

DOC Commissioner Louis Molina testified before the New York City Council's Committee on Criminal Justice on March 23, 2022: "When someone dies in custody, it is a **public health issue** (emphasis added), and we need to make sure all parts of our public health system and city at large are supporting these individuals in their time of need."[17] The Board wholeheartedly agrees and these recommendations are geared toward just that. It is our hope that DOC and CHS can learn from our review of these tragic deaths and that the agencies will implement our recommendations to address systemic issues and prevent future deaths.

---

[17] Available here: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=935673&GUID=BB3876CA-D3BE-4D90-9225-04CD0B1B5E4B&Options=info|&Search= ; timecode 00:50:00.



**Patricia Yang, DrPH**
*Senior Vice President*
55 Water Street, 18th Floor
New York, New York. 10004
Patricia.Yang@nychhc.org
347-774-7000

May 6, 2022

New York City Board of Correction
2 Lafayette, Fl. 12, Room 1221
New York, NY  10007

Dear Members*, New York City Board of Correction,

New York City Health + Hospitals / Correctional Health Service (CHS) has reviewed the Board of Correction (BOC) report, "*February & March 2022 Deaths in DOC Custody: Report and Recommendations*" and provides this response to be included with your final report.

**Case Reviews:**

George Pagan:

The Board writes in paragraph 1, *"He regularly urinated, defecated, and vomited on himself. He was weak, barely ate, and spent his days laying on his bed or the floor."*

**Response: The report should cite the evidence and temporal frame upon which the Board bases its assertion. The patient was not experiencing, nor did he report to CHS, incontinence and vomiting.**

Herman Diaz:

The Board writes in paragraph 4, *"In the absence of a medical response, at approximately 10:20 the 'A' officer opened the unit's entrance gate to allow people in custody to carry Mr. Diaz to the clinic."*

**Response: The report should not include the phrase, "in the absence of a medical response." CHS has no record of being notified of a medical emergency.**

**Key Findings:**

Finding #5: *Medical emergency response: DOC and CHS do not seem to have an acceptably functioning system for providing emergency care to persons in life-threatening situations…*

**Response: CHS operates an emergency response system that functions acceptably and appropriately, and the Board has not provided evidence to the contrary.**

Finding #6: *Special medical housing: in the case of Mr. Pagan, witnesses observed his health visibly deteriorating during his time in custody was not placed in any of these facilities during his nine-day incarceration.*

**Response: The patient's clinical condition did not require priority placement in any of the specialized medical units named by the Board.  Nor was his presumed cause of death foreseeable based on his need for withdrawal treatment.  Notwithstanding, it should be noted that the Board's finding disregards facility and operational realities which range from physical plant limitations to the considerations of clinical imperatives of other patients and of public health.**

Finding #7: *Missed medical appointments and medication: For the past year, DOC has not been able to transport patients to required clinical evaluations, and, in this instance, CHS was unable to assure that patients received critical medications.*

**Response: CHS was fully aware that the patient was not produced to clinic and the matter was appropriately escalated.**

**Recommendations to CHS and DOC, jointly:**

CHS and DOC Recommendation #1: *CHS, DOC, and BOC should hold timely death review conferences… to discuss the circumstances around each death, what operational or clinical problems can be identified, and how both agencies can work collaboratively to prevent further incidents. This must include the exchange of clinical information being provided to DOC.*

**Response: In 2016, CHS established the Joint Assessment and Review (JAR) process wherein CHS and DOC timely and jointly review negative outcomes for patients and identify solutions to prevent future recurrences.  Clinical care is appropriately reviewed by the health authority and neither should nor can be reviewed by the non-clinical, security agency, DOC; or by the BOC which, by its own admission, is not a clinical body.  Instead, the JAR focuses on systemic remedies which, as in all three cases in this report, tend to be operational and environmental in nature.  As for the recommendation for timely death reviews by BOC, DOC, and CHS, it is the BOC that has the authority to convene such reviews.**

CHS and DOC Recommendation #2: *CHS and DOC should develop a process for flagging and tracking patients... the problem should be elevated beyond the Captain to the attention of the Deputy Warden or Warden.  Failure to provide…quarterly by CHS to DOC and the Board…*

**Response: All patients whom CHS requests be produced to clinic on a daily, tour-by-tour basis should be considered priority and in need of clinical services on that day.  Adherence to these requests is the most appropriate preventive measure, and CHS has systems in place for flagging and escalating non-production.  CHS rejects the suggestion that it should divert resources from providing care to producing yet another detailed quarterly report to the Board. The demand to exquisitely collect data as to why care was not delivered inherently conflicts with CHS' imperative to get that work done. Yet another report provided to the Board months after the fact will not result in any meaningful change to the situation at hand and will instead distract from the efforts of our staff to get that care delivered every day. The Board is also extrapolating from a single case to request a specific reporting on our most consistently completed services, with medication completion rates for methadone administration ranging from 96-98% last week for more than 460 patients prescribed methadone. Finally, the Board's focus on even the single case in this report is misguided since the cause of death was not foreseeable based on his need for withdrawal treatment.**

CHS and DOC Recommendation #3: *CHS and DOC should identify what led to these medical emergency call discrepancies and develop necessary fail-safe protocols to prevent future miscommunication...*

**Response: CHS' emergency response system functions appropriately and the Board has not provided evidence to the contrary.**

CHS and DOC Recommendation #4: *In the absence of placing medically fragile people in housing areas with direct nursing and medical observation such as North Infirmary Command or Bellevue upon intake, CHS and DOC should explore expanding the clinical observation space currently available on Rikers Island.*

**Response: The Board's statement that there is an "absence of placing medically fragile people in housing…" is inaccurate:  CHS appropriately prioritizes placement of its clinically vulnerable patients in available specialized medical housing.  Additionally, in line with  CHS' advocacy to expand the number of therapeutic environments, CHS and DOC are continuously exploring such options. The reopening of EMTC, at CHS' recommendation, as a central intake for COVID-19 control and cohorting of new admissions was an enormous effort in responding to clinical and public health needs under the stresses of the pandemic. The Board's recommendation should take into consideration such realities as physical plant limitations, DOC staffing constraints, and a growing census.**

CHS and DOC Recommendation #5: *To avoid delays or miscommunication between the "A" post officer and medical staff in the clinic, CHS and DOC should set up a dedicated direct phone line for medical emergencies that does not rely on information being relayed through multiple staff to reach the medical response team...*

**Response: CHS routinely tracks and evaluates its emergency response times and welcomes suggestions for DOC streamlining of its notification of medical emergencies to its own staff and to CHS.**

## Recommendations to CHS:

CHS Recommendation #1: *New admissions with serious medical problems...should be housed in medically supervised areas.*

**Response: CHS maintains a threshold for placement in therapeutic  housing  that is protective for patients while necessarily working within the constraining realities of the jail.  Patients who are not housed in specialized medical areas but whose circumstances may require attention, are monitored in a variety of ways ranging from encounters in clinic to observation by DOC staff.  The Board's recommendation seems to misunderstand that a large number of persons admitted to NYC jails have serious medical problems and not all those with chronic conditions can be housed in therapeutic settings with the current footprint. Current realities also dictate that further cohorting within the designated new admission facility would require rolling admission to several new housing areas designated for this purpose, which defeats the value of COVID cohorting and would further divert staffing from routine operations of the jail - the imperative for patient safety.**

CHS Recommendation #2: *CHS should maintain  a liaison to follow up with DOC about missed medical appointments due to a lack of DOC escorts to ensure those who have an urgent need for medication or treatment are seen immediately by the clinic.*

**Response: CHS has facility-based and central personnel who work in partnership with and serve as liaisons to appropriate counterparts in DOC to address various aspects of the health operation.**

CHS Recommendation #4: *Given the high volume of drug contraband seized within the jails, CHS should track the volume of non-fatal drug overdoses they treat. For these same reasons, CHS should set up sessions or programs for people in custody on the short and long-term effects of drug use, and the dangers of K2, fentanyl, and other drugs routinely seized by DOC in the jails.*

**Response: As CHS has previously indicated to the Board, CHS periodically reviews data on non-fatal overdoses as needed for the provision of care. As the Board is also aware, CHS continues to be a national leader in the treatment of substance use disorders in jail and we will continue to use every evidence-based strategy to mitigate the harms of unregulated drug supply in the NYC jails, including a recent CHS initiative to train and make available to people in custody in their housing areas, naloxone.**

We look forward to your issuing, and including our response in, a final report.

Sincerely,

Patricia Yang, DrPH
Senior Vice President

*BOC: Jackie Sherman, Chair, BOC Committee on Jail Death Reviews
        Bobby Cohen, Member, BOC
        Julio Medina, Member, BOC
        Steven Safyer, Member, BOC
        Amanda Masters, Executive Director, BOC

Cc:     Louis Molina, Commissioner, NYC Dept. of Corrections
        Bill Heinzen, Special Counsel at NYC Mayor's Office