# EXHIBIT 30



**BOARD OF CORRECTION**
**CITY OF NEW YORK**

# Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody[1]

# September 12, 2022

[1] Authored by Deputy General Counsel Melissa Cintrón Hernández, in collaboration with Director of Special Investigations Rahzeem Gray and Special Investigations Coordinator Imahnni Jeffries. Former Deputy General Counsel Kate McMahon, Appeals Coordinator Joshua Acquaye, Director of Public Accountability Barbie Melendez, Director of Violence Prevention Bart Baily, and Deputy Executive Director of Oversight and Evaluation Nashla Rivas Salas were instrumental in bringing this report to production. Many thanks to Executive Director Amanda Masters, General Counsel Jasmine Georges-Yilla, and Deputy Executive Director of Research Chai Park for their insight and comments, and to the members of the Jail Death Review subcommittee of the Board of Correction: Committee Chair Jacqueline Sherman, Interim Board Chair Julio Medina, Dr. Robert Cohen, and Dr. Steven Safyer.

## I.     INTRODUCTION & METHODOLOGY

Sixteen people died in New York City Department of Correction ("Department" or "DOC") custody in 2021. They were between 24 to 64 years old and had court cases pending in five boroughs: New York County (n=3), Bronx (n=2), Kings (n=4), Queens (n=5), Richmond (n=1), plus one jailed due to a New York State Department of Parole technical parole violation. Four of the decedents had been in custody for one to five days before they died. Meanwhile, Isa Abdul Karim had been in custody the longest, at one year and nine months for a technical parole violation.

Office of the Chief Medical Examiner ("OCME") records state that six of the decedents had died by suicide, four from acute drug intoxication, two from COVID-19 complications, two from cardiovascular disease, one due to complications of meningitis, and one from complications of a nontraumatic seizure disorder.

Tomas Carlo Camacho and Anthony Scott died shortly after being granted a compassionate release after they attempted suicide while incarcerated. Had Mr. Camacho and Mr. Scott been expected to survive their suicide attempts, they would have remained in custody. Had they recovered after their compassionate releases, they likely would have been re-arrested and returned to jail. The Department and Correctional Health Services ("CHS") have a duty to provide safe care to individuals in their custody. Part of that duty is determining what jail-attributable factors played a role in these deaths and ensuring that those missteps are not repeated.

The New York City Board of Correction ("Board" or "BOC") is required, by statute, to investigate the circumstances of deaths in custody.[2] These investigations focus on identifying areas for improvement to help prevent future tragedies. There have been ten[3] fatalities in City jails since the Board's May 9, 2022 report, including two confirmed[4] deaths by suicide, two suspected suicides, two deaths due to acute fentanyl intoxication, and two suspected drug-related deaths. The Board is investigating these deaths and will publish a report with our findings.

Given the number of deaths and limited Board resources, this report focuses on the four drug-related deaths and six suicides that occurred in 2021. Although this report will not delve into details regarding the remaining six deaths, it highlights problems or issues that have been common to most deaths in DOC custody in the past.

As part of its investigation, Board staff conducted interviews with people in custody and staff, reviewed video footage in the jails, DOC records, CHS and NYC Health + Hospitals ("H+H") medical records, OCME records, press coverage, and New York State Commission of Correction ("SCOC")

---

[2] Defined in §3-10(c)(2) of title 40 of the Rules of the City of New York.
[3] As of the report date.
[4] Suicide and drug intoxication deaths are confirmed based on OCME records.

final reports on the deaths of Wilson Diaz-Guzman and Javier Velasco. The Board provided CHS and DOC with advance copies of this report and an opportunity to comment. Their written responses are appended to this report.

## II.   SUICIDES

### 1.   WILSON DIAZ-GUZMAN

| | |
|---|---|
| **Name and Age** | Wilson Diaz-Guzman, 30 |
| **Date of death** | January 22, 2021 |
| **DOC admission date** | January 17, 2021 |
| **Cause of death** | Hanging |
| **Facility at time of death** | Otis Bantum Correctional Center ("OBCC"), general population housing |
| **Bail amount, if any** | $50,000 |

The Department of Correction recorded its first 2021 death in custody on January 22, 2021. Wilson Diaz-Guzman died within 24 hours of his transfer to a new housing area and after five days in DOC custody. Correctional Health Services clinicians conduct medical and mental health evaluations of people who enter DOC custody to determine the most appropriate housing assignment based on their medical needs, separate from DOC's security screening for classification. People can be placed in general population housing,[5] under Mental Observation ("MO"),[6] or in facilities for those in need of an elevated level of medical care. These latter facilities include the Contagious Disease Unit ("CDU") in West Facility, also known as "the Sprungs", the North Infirmary Command ("NIC"),[7] the substance use or mental health units at the Anna M. Kross Center ("AMKC"), and the hospital prison wards at Elmhurst Hospital and Bellevue Hospital. CHS clinicians determine whether individuals in custody require additional medical or mental health assessment or treatment is necessary.

During his initial intake assessment on January 17, Mr. Diaz-Guzman reported that he felt hopeless or worthless and thoughts of hurting or killing himself. He was referred for an immediate mental health assessment. That assessment, conducted on January 17, was not signed by a clinician and CHS supervisor until February 17, more than a month after Mr. Diaz-Guzman died. During that assessment, he denied suicidal thoughts or any psychosis symptoms. He further reported feeling stressed due to the nature of the arrest and being separated from his family. Mr. Diaz-Guzman was placed in a general population housing unit with a referral for mental health follow-up.

---

[5] General population housing is designated by custody level for individuals who have completed classification and new admission processing, including medical and mental health screening, and do not require special housing. Non-medical special housing generally refers to restrictive housing (e.g., Punitive Segregation, Enhanced Supervision Housing, Transition Repair Unit, Secure Unit, and Separation Status).

[6] Mental observation units house those individuals whose mental condition requires a higher level of observation than those in general population or are at increased risk of suicide.

[7] Houses people in custody with acute medical conditions requiring infirmary care or have a disability that requires Americans with Disabilities Act-compliant housing. NIC also houses some general population detainees.

On January 19, Mr. Diaz-Guzman was seen by mental health staff after he reported that he made superficial scratches to his arm during the previous night because he feared for his safety due to his charges and "wanted someone to pay attention to him." At that clinical encounter, Mr. Diaz-Guzman stated that he felt safe and made a friend. He also denied suicidal ideation or experiencing auditory or visual hallucinations. Mr. Diaz-Guzman was hopeful about posting bail at his upcoming court appearance on January 22. CHS clinical staff found him to be future-oriented, goal-directed, easily engaged, and not appearing to be in acute distress. Thereafter, clinical staff diagnosed him with adjustment disorder and did not place him on suicide watch. At that point, according to SCOC's Medical Review Board, Mr. Diaz-Guzman "should have been referred to psychiatry and placed on increased supervision." The SCOC Medical Review Board has also found that there was a failure by CHS to recognize and treat Diaz-Guzman's acute suicidal ideation and that had Diaz-Guzman received proper psychiatric referrals and treatment, his death may have been prevented.[8]

On January 21, one day before his death, Mr. Diaz-Guzman complained to a nurse that he felt unsafe again.

At 5:47 pm on January 22, approximately one hour before Mr. Diaz-Guzman was pronounced dead, a DOC captain and a "B" post officer[9] entered his flooded cell, removing a mattress that had been blocking the cell door window. Statements differ on whether the flooding was due to an overflowing toilet bowl or a sprinkler break. According to statements from people in custody to DOC investigators, Mr. Diaz-Guzman tried to get the attention of correction officers so that he could get his medication but was ignored, which led him to set off the fire sprinkler in his cell. According to DOC records, officers asked Mr. Diaz-Guzman to step out of his cell, but he refused. At around 5:51 pm, DOC staff shut off the water supply. Nine minutes later, fire safety officers entered the area to take photographs of the cell. None of these events were properly recorded in the housing unit's logbooks.

Mr. Diaz-Guzman was unsupervised from 6:18 pm to 6:54 pm, when an officer touring the unit stopped by the cell, looked inside, then reported his observations over the radio.[10] Mr. Diaz-Guzman was found with a bedsheet wrapped around his neck and tied to the sprinkler. Based on BOC staff's review of footage, two officers entered the cell at 6:56 pm – two minutes after the

---

[8] Final Report of the New York State Commission of Correction: In the Matter of the Death of Wilson Diaz-Guzman, an incarcerated individual of the Otis Bantum Correctional Center, dated June 28, 2022.

[9] "B" post officers or floor officers interact directly with people in custody and are posted inside the living area. "A" post officers remain inside the "A" station, colloquially known as the "bubble." It is the housing area's secured control room and cannot be accessed by people in custody.

[10] Per DOC Directive #4517R, Inmate Count Procedures, effective June 18, 2014, correction officers are responsible for the care, custody, and control of people in custody. Officers shall remain in their assigned areas and conduct visual observations at 30-minute intervals (in general population areas).

initial discovery. One of the officers stepped out five minutes later to make a telephone call. Given the camera angle, Board staff were unable to independently verify whether the officers performed first aid. DOC records reflect that an officer performed CPR. Medical staff arrived approximately thirteen minutes after Mr. Diaz-Guzman was found with a bedsheet wrapped around his neck and moved him to the floor outside his cell to perform CPR and chest compressions. He was pronounced dead at 7:30 pm.

### 2. TOMAS CARLO CAMACHO AKA CARIO TOMAS

| Name and Age | Tomas Carlo Camacho, 48 |
|---|---|
| Date of death | March 16, 2021 (after attempting suicide[11] in custody on March 2, 2021) |
| DOC admission date | August 14, 2020 |
| Cause of death | Complications following cardiac arrest including anoxic brain injury due to or as a consequence of compression of neck |
| Facility at time of death | AMKC, mental observation housing |
| Location of death | Elmhurst Hospital |
| Bail amount, if any | $25,000 |

During his initial health screening upon entering DOC custody in August 2020, Mr. Camacho disclosed several mental health conditions, psychiatric hospitalization history, and past suicide attempts. However, he denied having any current thoughts of harming or killing himself. Clinicians prescribed Mr. Camacho medication to manage his psychiatric diagnoses, but, according to CHS records, he refused most doses after November 2020.

According to CHS records, Mr. Camacho missed at least 26 medical appointments from August 15, 2020 to March 2, 2021, and missed at least one medication appointment. Seventeen of the appointments were canceled because DOC did not produce Mr. Camacho, seven because he allegedly refused to attend, and two because CHS canceled.

Mr. Camacho was placed on suicide watch once—from October 9, 2020 to October 13, 2020—during his seven-month incarceration, after he swallowed a pen "because he [was] depressed." In addition, between December 28, 2020 to February 4, 2021, Mr. Camacho was admitted to the Bellevue Hospital Prison Ward for inpatient psychiatric services. According to his hospital discharge summary, Mr. Camacho's "chronic risk of harm to self and others remain[ed] elevated due to chronic mental illness, noncompliance, and legal history. However, his risk of harm to self and others, acutely, remain[ed] low due to resolution of acute psychiatric symptoms, good response to treatment, and no suicidality."

CHS records state that Mr. Camacho denied suicidal ideation and "[did] not appear to be a danger to [him]self and others at this time" when he returned from Bellevue. He was placed in mental observation housing, as he had been prior to his admission to Bellevue. He denied suicidal ideation at his last psychiatric appointment with CHS on March 2, the day he attempted to

---

[11] OCME classified Mr. Camacho's manner of death as a suicide.

commit suicide. His treatment plan included continued psychotherapy, continued medications, and a scheduled CHS visit on March 4.

Mr. Camacho was placed in a Hart's Island Clinic[12] pen at approximately 11:35 am on March 2, following a medication reevaluation. The clinic was staffed with five officers, who were required to tour every 30 minutes but did not do so. During tours, officers must walk around the housing area, check each cell, and verify that persons in custody are breathing and alive. Indeed, between 5:28 pm and 7:12 pm, no correction officer checked on Mr. Camacho, and, at approximately 6:53 pm, Mr. Camacho stuck his head through the pen door's cuffing port/food slot, dropped to his knees, stretched his legs out, and appeared to asphyxiate.

The assigned floor officer reported that he was not present at that time because he was "rehousing" another person in custody as ordered by the area supervisor. Mr. Camacho was found with his head through the slot at 7:12 pm—more than seven hours after he was placed in that pen, awaiting an escort officer to take him back to his assigned housing area. Correction officers did not render immediate first aid. Instead, they opened the cell and waited for CHS staff to arrive. Relevantly, DOC policy—DOC Directive #4521R-A, Suicide Prevention and Intervention—requires uniformed staff to commence emergency first aid, without delay, and to continue administering aid until medical assistance arrives in situations when an individual appears to be injured or has stopped breathing.

CHS staff and EMS arrived at 7:14 pm and 7:20 pm, respectively.  Mr. Camacho was unresponsive but had a pulse. EMS departed the facility with Mr. Camacho at 8:11 pm and transported him to Elmhurst Hospital. He was granted a compassionate release the next day, on March 3, and died at Elmhurst Hospital on March 16.

Several weeks after Mr. Camacho's death, DOC issued two new Command Level Orders ("CLO") regarding the Hart's Island Clinic. The first[13] of the two orders established that mental health evaluations in the clinic "should happen within two hours and within 15 minutes for emergency referrals." That CLO also stated that mental health and nursing staff "will monitor the inmates' gross behavior and progress through the evaluation and disposition" and that "if the evaluation or disposition is delayed for more than 4 hours, nursing staff shall take action in effort to resolve the delay." Appropriate actions include inquiring about the reasons for the delay, discussing the person's movement to their unit with the tour commander, and notifying Prison Health Services operations or the administrator on duty. CHS stated that they were unaware of any discussion between CHS and DOC about this CLO or about its issuance.

---

[12] People in custody waiting to be seen by Hart's Island clinic staff are placed in pens within the clinic. This clinic is used by CHS to provide mental health services in AMKC.

[13] The CLO established policies and procedures for people in custody who were referred to Hart's Island for a mental health evaluation at the Anna M. Kross Center. (Command Level Order #02/21, Hart's Island Clinic, effective March 23, 2021)

The second order[14] established that supervisors and tour commanders must review the logbook for accuracy and that the status of any person in custody placed in the Hart's Island clinic pens will be reviewed every two hours and documented in the logbook. Lastly, the new policy specified that those awaiting an Injury Report for an accident and/or self-inflicted injury can be placed in the Hart's Island Clinic pens, with the area supervisor's review and approval.

### 3. JAVIER VELASCO

| Name and Age | Javier Velasco, 37 |
| --- | --- |
| Date of death | March 19, 2021 |
| DOC admission date | March 5, 2021 |
| Cause of death | Hanging |
| Facility at time of death | AMKC, mental observation housing |
| Bail amount, if any | $10,000/held on a warrant |

At approximately 3:05 am on March 16—three days before his death—Mr. Velasco attempted to hang himself when he tied a bed sheet around his neck and attached it to a door in the bathroom. An officer responded to the scene after he heard a loud sound coming from the bathroom. Medical staff arrived at the scene, finding Mr. Velasco ambulatory. He refused medical attention, but he disclosed a history of anxiety and depression, and reported feeling hopeless and helpless to CHS staff. However, Mr. Velasco denied being prescribed psychiatric medication. He also disclosed a history of self-harm and that he had tried to hang himself at least three times when he previously was in custody, in May 2017. Clinical staff noted that he had been goal-directed in suicidal attempts in the past and was not psychotic at the time of the assessment. Accordingly, medical staff concluded that Mr. Velasco presented "a danger to [him]self and others."

On March 16, Mr. Velasco was transferred from the Eric M. Taylor Center ("EMTC") to AMKC, and, after a mental health evaluation that morning, he was placed on suicide watch. During a suicide watch round the next day, at approximately 2:00 pm, Mr. Velasco reported to CHS staff that he "wasn't really suicidal" and that his suicide attempt was a moment of weakness because he wanted to go to Bellevue Hospital. According to CHS records, Mr. Velasco came willingly to the interview room to speak to clinical staff and was engaged in the interview. He denied suicidal ideation and hallucinations. Clinical staff found that Mr. Velasco showed no evidence of any thought disorder, his speech was clear and coherent, and he was future-oriented. He also reported eagerness to return to general population housing and work. CHS discontinued the suicide watch. In all, Mr. Velasco was under suicide watch for approximately 30 hours.

On March 18—one day before his death—clinical staff met with him and assessed his comprehensive treatment needs. According to mental health staff, he willingly engaged with them. Staff found him fully oriented, coherent, and talkative about his criminal case. Mr. Velasco reported experiencing anxiety and frustration related to his incarceration, feeling depressed and

---

[14] The stated purpose of Command Level Order #03/21, Hart's Island Clinic Pens/Logbook, effective date March 23, 2021, is to "ensure that staff members are aware and adhere to guidelines set forth regarding the utilization of the holding pens in the Hart's Island Clinic Area."

hopeless, and physical pain due to a torn ligament in his right shoulder. Thereafter, CHS referred him to a clinician, a social worker, and a substance abuse program.

Mr. Velasco was last seen outside of his cell at around 8:57 pm on March 18. A Suicide Prevention Aide (SPA)[15] was present in the area that night. SPAs must tour the housing area at irregular intervals not to exceed ten minutes between tours (minimum of six rounds per hour). Meanwhile, correction officers assigned to Mental Observation units must tour every 15 minutes when SPAs are not present in the housing units, and every 30 minutes when they are present.

The SPA assigned to Mr. Velasco's housing area retired to his cell at around 2:00 am on March 19. Thereafter, according to logbook entries made by DOC staff, officers toured the housing area every 30 minutes. However, surveillance video footage showed that the correction officers assigned to Mr. Velasco's housing area that night failed to tour every half hour when the SPA was on the floor and failed to tour every 15 minutes after the SPA had retired for the night. Although the correction officers walked up and down the area periodically, they did not check individual cells to verify that the people locked inside were alive and breathing. In addition, DOC Rules and Regulations section 2.25.010, requires captains to conduct tours at "frequent intervals," yet the last recorded captain's tour of Mr. Velasco's housing unit was at 11:05 pm on March 18.

A correction officer making a tour of the unit discovered Mr. Velasco with institutional linen affixed to an air vent tied around his neck at 5:11 am. Instead of rendering immediate aid, the correction officer walked away from Mr. Velasco's cell, towards the front of the housing area, and returned four minutes later, with other officers. An officer activated their body-worn camera at approximately 5:19 am and filmed an officer performing chest compressions and CPR. According to an SCOC report about Mr. Velasco's death, the "A" post officer on duty at the time of the incident was unfamiliar with the procedures for reporting medical emergencies, and, according to CHS records, the clinic received an emergency call at 5:20 am—nine minutes after Mr. Velasco was discovered with the linen tied around his neck. Clinical staff and FDNY EMS arrived at 5:27 am and 6:07 am, respectively. Mr. Velasco was pronounced dead at 6:15 am.

SCOC interviewed correctional and medical staff and found that staff provided conflicting accounts of who should have been responsible for calling EMS. One captain stated that the "A" post staff in the clinic or the tour commander had that responsibility. Meanwhile, a correction officer believed that only medical clinic personnel was responsible for making that notification. On the other hand, two medical staff said that the nurses called EMS, while another clinical staff

---

[15] Suicide Prevention Aides (SPA) are people in custody who are trained to monitor incarcerated individuals identified as suicide risks and to recognize the warning signs of suicidal behavior in incarcerated individuals who had not previously been identified. All detained and sentenced facilities shall maintain an Observation Aide Program unless it is a Maximum Security Housing Area (excluded because of the unique number of uniformed personnel assigned) or is granted a variance from an Order or Directive. (Directive #4017R-D on Observation Aide Program effective April 8, 2022)

member stated that they were unsure. CHS policies require medical staff, the Patient Care Coordinator ("PCC"), or charge nurse to telephone 911 as soon as it is determined that an ambulance must be summoned.[16]

Unlike the SCOC, Board staff are not afforded the opportunity to interview CHS staff as part of its investigation. CHS refers Board staff to an operational telephone hotline instead. The Board's death review investigations would benefit from being allowed to discuss deaths in custody with CHS. The Board needs significant collaboration between the agencies to fulfill our charter-mandated duty to address the crisis within the jails.

### 4. BRANDON RODRIGUEZ

| Name and Age | Brandon Rodriguez, 25 |
|---|---|
| Date of death | August 10, 2021 |
| DOC admission date | August 5, 2021 |
| Cause of death | Hanging |
| Facility at time of death | OBCC Central Punitive Segregation Unit[17] |
| Bail amount, if any | $5,000 |

Brandon Rodriguez was held in OBCC's intake area awaiting a housing assignment from August 6, at 1:30 am, to at least August 8, at 9:45 am, in violation of Department policy.[18] On the morning of August 8, he was transported to Elmhurst Hospital following a fight in the intake area, where he was treated for a closed orbital fracture. He returned to the OBCC intake that same day at 11:00 pm.

During his initial mental health assessment on August 9, at 1:45 pm, Mr. Rodriguez disclosed that he had been "jumped" in the OBCC intake pen and did not feel safe there, and he requested a transfer. Mr. Rodriguez also reported a history of mental illness for which he had been prescribed medication, but had not received medication for five to six years at the time of that assessment. A note entered by medical staff during this assessment show that Mr. Rodriguez denied suicidal ideation or experiencing hallucinations. He presented as restless, fidgety, and under increased stress, venting appropriately about his stressors, "mainly being in main intake where he was jumped [the previous day]." Staff characterized him as cooperative, coherent, alert, and willing to continue with talk therapy during his incarceration. Mr. Rodriguez was provisionally diagnosed with adjustment disorder with mixed disturbance of emotions and conduct. CHS determined he was to be housed in a general population unit with mental health follow-up.

---

[16] CHS Policy#: INT 33 on Emergency Runs – EMS and DOC

[17] Although this was not Mr. Rodriguez's official assigned housing area, it was the unit he was in at the time of his death, following the use of force incident.

[18] New admissions shall complete security and medical screening upon arrival to a new admission facility and receive a housing assignment within 24 hours of entering DOC custody. (Operations Order #22/07, Processing and Monitoring New Admissions, effective December 14, 2007) Along with Mr. Rodriguez, 40 other people were kept in intake for more than 24 hours.

Mr. Rodriguez's intake paperwork did not include a Suicide Prevention Screening Guidelines Form, suggesting it was never completed. This DOC form includes a set of questions designed to identify potential suicide risks for individuals in the first 24 to 72 hours of their incarceration.

Later that day, at 3:35 pm, while being escorted to his newly assigned housing area, Mr. Rodriguez refused to walk and, as a result, became involved in a use of force[19] incident.  The Department's Emergency Service Unit (ESU)[20] responded to the scene. Body-worn camera footage shows that Mr. Rodriguez attempted to kick an ESU officer and that correction officers then secured him against a wall multiple times, and eventually secured him on a gurney. Instead of placing Mr. Rodriguez in a secured cell, DOC staff placed him in a shower pen in the Central Punitive Segregation Unit ("CPSU")[21] intake at around 3:51 pm, because Mr. Rodriguez's cell allegedly was covered in fecal matter.

DOC records state that, due to insufficient staffing, the Department was unable to assemble an extraction team[22] to remove Mr. Rodriguez from the shower pen so that he could be examined by medical staff following the use of force incident, as required. Moreover, people in custody told DOC investigators that Mr. Rodriguez clearly was mentally ill and in need of help, and that he repeatedly yelled, from the shower pen in which he was confined, that he wanted to kill himself.

Mr. Rodriguez was last observed moving inside the shower pen at 12:13 am, on August 10. Board staff reviewed video surveillance footage which showed that the correction officer in the CPSU unit did not check each cell when conducting rounds to verify that people inside those cells were alive and breathing. Moreover, there were no correction officers in the CPSU unit between 12:03 and 12:33 am. The correction officer assigned to that area left his post and the CPSU unit entirely during that period.

When the correction officer returned to the housing area at 12:33 am, he found Mr. Rodriguez, still inside the shower pen, unresponsive, with a shirt tied around his neck and to the cuffing port. The correction officer entered the shower cell and performed chest compressions. However, a medical emergency was not called in until 12:40 am, after a captain entered the CPSU unit. CHS

---

[19] A "use of force" is any instance where staff use their hands or other parts of their body, objects, instruments, chemical agents, electronic devices, firearms, or any other physical method to restrain, subdue, or compel a person in custody to act or stop acting in a particular way. The term "use of force" does not include moving, escorting, transporting, or applying restraints to a compliant Inmate. (Directive #5006R-D, Use of Force, effective September 27, 2017)

[20] The Emergency Service Unit is charged with responding to emergency calls.

[21] This area is no longer open in OBCC. At the time of Mr. Rodriguez's death, it was the largest punitive segregation unit on Rikers Island. Individuals held in punitive segregation, also known as solitary confinement, are confined to their cells for 23 hours or more per day.

[22] A procedure whereby DOC staff forcibly restrains or removes a person from a cell area when they refuse to comply with an order. An extraction is a use of force.

arrived at 12:43 am, took over chest compressions, and used a defibrillator. FNDY EMS arrived at the CPSU unit at 1:07 am. Mr. Rodriguez was pronounced dead at 1:08 am.

### 5.  SEGUNDO GUALLPA

| Name and Age | Segundo Guallpa, 58 |
|---|---|
| Date of death | August 30, 2021 |
| DOC admission date | August 19, 2021 |
| Cause of death | Compression of Neck |
| Facility at time of death | West Facility CDU |
| Bail amount, if any | $7,500 |

Mr. Guallpa refused initial tuberculosis testing and, as a result, was housed in the Contagious Disease Unit ("CDU") at West Facility.

His initial mental health assessment was scheduled and canceled twice. On August 23, 2021, CHS administratively canceled the visit and rescheduled it due to "insufficient staffing" in the facility. According to CHS records, on August 25, CHS staff saw DOC staff and Mr. Guallpa engage in a loud discussion inside the housing area because he "apparently [was] denied" access to a telephone. CHS staff also noted that Mr. Guallpa appeared frustrated and irritated, refused CHS staff attempts to engage, waved his hands, and shook his head as he walked away from the cell door. Mental health staff noted that Mr. Guallpa did not appear to be in acute distress or psychosis at the time. Given this, the second assessment was canceled, and a third referral was submitted for a mental health assessment by CHS staff. A note entered on Mr. Guallpa's medical records on August 29 states that he was to be transferred to a general population unit. However, by August 30, he was still in West Facility and no mental health assessment had been completed.

On the evening of August 29, video surveillance footage showed Mr. Guallpa pacing inside his cell, running his hands over his head, moving his mouth, as if he were speaking to himself, and waving his arms. He paced inside his cell multiple times. His last contact with correction officers appears to be at 6:00 pm that evening, when DOC staff provided him with a tray of food through the cell door's cuffing port.

By 9:00 pm, at least three correction officers were present in the unit, however, correction officers and captains did not tour the unit consistently, let alone at least every 30 minutes, as required.  Moreover, no correction officer or captain toured the unit at all between 9:53 pm and 11:02 pm. Even when officers walked through the unit, they did not look inside the individual cells to verify that the people inside were alive and breathing.

Board staff's review of video surveillance footage revealed that Mr. Guallpa turned on the television in his cell at approximately 10:04 pm. At 1:11 am, DOC staff found Mr. Guallpa in a seated position on the floor with a ligature made from socks wrapped around his neck and the bed frame. Video surveillance footage also revealed that two officers and a captain entered Mr. Guallpa's cell and appeared to be talking and looking at Mr. Guallpa's body, rather than rendering aid.

11

Medical staff arrived at 1:16 am and Mr. Guallpa was pronounced deceased at 1:30 am. Medical records state that Mr. Guallpa's body was pulseless, stiff, cold, and pale by that point. The condition of Mr. Guallpa's body suggests that he was deceased for some time before he was found.

### 6. ANTHONY SCOTT

| Name and Age | Anthony Scott, 58 |
|---|---|
| Date of death | October 18, 2021 (after attempting suicide in custody on October 14, 2021) |
| DOC admission date | October 14, 2021 |
| Cause of death | Complications of hanging |
| Facility at time of death | Manhattan Court Facility, New Admission Holding Pen |
| Location of death | New York-Presbyterian Hospital |
| Bail amount, if any | $15,000 |

Anthony Scott was transferred from NYPD to Department custody on October 14, 2021. An article in the New York Times stated that Mr. Scott's attorney reported that Mr. Scott "was on the autism spectrum and suffered from mental illness."

Mr. Scott was placed in a new admission holding pen in the Manhattan Court Facility at approximately 12:57 pm. An Arraignment and Classification Risk Screening Form,[23] which should have been completed by DOC staff by the time he was placed in the holding pen, was not included with Mr. Scott's records. Further, a Suicide Prevention Screening Guidelines Form, which the Department's court divisions are required to complete, was not among Mr. Scott's records.

Individuals identified as being at risk of suicide or self-harm must be interviewed privately by a supervisor, and certain items such as their belts, drawstrings, neckties, and shoelaces must be confiscated and safeguarded.[24]

Three correction officers were on post in the area on the day Mr. Scott died, and his assigned pen was directly across from a correction officer's desk. Correction officers assigned to Court Divisions are required to perform routine tours of their assigned posts and observe all individuals in custody for unusual incidents, behavior, or conditions, at a minimum of every 15 minutes.[25] During these tours, staff are required to remain alert for any behavior that could indicate that an individual in custody is mentally ill or suicidal.

---

[23] This form identifies whether a person in custody has (1) any immediate medical needs; (2) whether the securing order or commitment papers request medical or mental health attention; (3) officer's observation of any obvious indication of immediate medical needs or any display of extreme nervousness or depression; (4) physical condition as stated by the person in custody; (5) whether documents indicate Suicide Watch and/or Protective Custody; (6) any reasons to consider special housing, among other personal characteristics and details.
[24] DOC Directive #4521R-A, Suicide Prevention and Intervention.
[25] *Id.*

On the afternoon when Mr. Scott died, DOC staff toured the area at 1:37 pm, 2:27 pm, and at 3:36 pm. At 3:58 pm, a correction officer provided Mr. Scott with a pen, which Mr. Scott returned at 4:05 pm. This was the last contact correction officers had with Mr. Scott.

Video surveillance footage shows that, at 4:08 pm, while a correction officer had his back to the pen, Mr. Scott removed a drawstring from his clothes and began fiddling with it. At 4:13 pm, Mr. Scott began jamming the pen's locking mechanism with what appears to be multiple strips of paper, and he continued doing so, without intervention, for the next three minutes. At 4:17 pm, while seated on the bench, Mr. Scott placed the string around his neck. At 4:21, he laid on the floor, partially out of camera view, and remained in the same position until he was found. Presumably unaware of Mr. Scott's actions, around the same time—4:22 pm—correction officers left the area completely, and no DOC staff were on post until 4:44 pm, when an officer and a captain returned to the area.

One minute after they returned to their post, the correction officer saw Mr. Scott on the floor, and DOC staff tried to enter the pen, but were unable to do so because the locking mechanism was jammed. Thereafter, DOC staff tried to cut the ligature through the bars of the holding pen by attaching a 911 knife (a specially designed rescue tool for safe and fast cutting) to a mop handle; their efforts were unsuccessful.

FDNY paramedics were notified by DOC staff at 4:52 pm and arrived at 5:04 pm.  Two minutes after arriving, FDNY personnel opened the cell using a crowbar or a similar instrument. They removed the ligature from Mr. Scott's neck, initiated chest compressions, inserted an IV, and intubated him before departing the facility at 5:32 pm. Mr. Scott was transported to New York-Presbyterian Hospital, where he arrived in cardiac arrest, and was placed on a mechanical ventilator. While he was still in the hospital, Mr. Scott was released on his own recognizance on October 15 and was pronounced dead on October 18, 2021.
DOC suspended three correction officers following Mr. Scott's suicide.

Mr. Scott was in a new admission holding pen for nearly four hours by the time he was discovered with a ligature around his neck. Relevantly, DOC Operations Order #22/07 on Processing and Monitoring New Admissions states:

> All new admission, adult male detainees shall be transferred to a new admission facility within four (4) hours.  All special cases (i.e., special housing – AMKC, City-sentenced males – EMTC, male adolescents – RNDC, females – RMSC and parole violators – corresponding borough's new admission facility) shall be transferred to appropriate Rikers Island facilities or as directed by New Admission Movement Control Unit (NAMCU) Supervisor, within four (4) hours.

## III.    ACUTE DRUG INTOXICATION

### 1. THOMAS BRAUNSON

| Name and Age | Thomas Braunson, 35 |
|---|---|
| Date of death | April 19, 2021 |
| DOC admission date | April 16, 2021 |
| Cause of death | Acute intoxication due to the combined effects of fentanyl, heroin, and phencyclidine |
| Facility at time of death | EMTC, general population housing |
| Bail amount, if any | Held on a warrant |

The circumstances around Mr. Braunson's death highlight the devastating consequences of inadequate touring and supervision by correctional staff. Mr. Braunson was housed in a dormitory-style unit in EMTC—an open room with rows of beds and no assigned lockable cells. At approximately 9:00 pm on April 18, video surveillance footage show Mr. Braunson ingest a substance from a bucket at least twice and show him provide a substance to another person in custody, who proceeded to sniff it. That night and the morning of Mr. Braunson's death, video surveillance footage show that DOC staff were off-post at times and did not tour every 30 minutes.

Based on OCME's Investigation Report and video surveillance footage reviewed by Board staff, it was clear that Mr. Braunson and at least one other person in custody kept and used drugs in what would have been plain sight of DOC staff, had staff been on post.

The correction officer assigned to the unit toured the housing area at 5:00 am, 5:07 am, and 5:24 am. However, during those tours, DOC staff simply walked up and down the room with a flashlight and did not check each bed to ensure that the people in custody were alive and breathing. [26] Nevertheless, logbook entries made every 30 minutes by multiple officers and one captain indicated that general supervision of the unit was done and that there was nothing to report. Moreover, a review of video surveillance from the units reveals that between 5:26 am and 8:10 am on April 19, the assigned floor officer did not consistently conduct rounds.

At approximately 5:50 am, a fight broke out between people in custody, but the correction officer on post in the dorm did not intervene, and, instead, waved his arms. Meanwhile, people in custody intervened, in an apparent attempt to disrupt the fight, and a probe team[27] eventually responded to the unit. According to OCME's investigation report, Mr. Braunson was last seen alive at 6:30 am, at which time he told other people in custody that "he [had] consumed a large

---

[26] Active supervision applies to all non-cell housing areas at all times, and includes but is not limited to: (a) direct and uninterrupted communication with each inmate; (b) tour at 30-minute intervals; (c) ability of the officer on post to immediately respond to emergency situations; and (d) if a facility housing area houses 20 or more inmates, the continuous presence of an assigned correction officer within that housing area to ensure optimal safety and security are provided. (Directive #4514R-C, Housing Area Logbooks, effective October 13, 2015)

[27] Operations Order #01/15, Facility Probe Teams, effective March 11, 2015, states that the probe team is solely responsible for the immediate and coordinated response to all emergency alarms sounded within a facility.

amount of heroin," purportedly because he did not want to get caught with contraband by the probe team. Among Mr. Braunson's belongings, OCME investigators recovered two small empty rubber bags, which likely were drug paraphernalia, and a clear plastic bag that contained a grainy beige substance—likely heroin—hidden in his groin area.

People in custody were the first to notice that Mr. Braunson was unresponsive and raised the alarm, alerting the floor officer at around 8:22 am. Video surveillance footage show that correction officers walked back and forth between the "A" station and Mr. Braunson's bed, from 8:22 am until 8:32 am, at which time medical staff arrived and began rendering aid. During that ten-minute period, uniformed staff never performed chest compressions or CPR.

### 2. JOSE MEJIA

| Name and Age | Jose Mejia, 34 |
|---|---|
| Date of death | June 10, 2021 |
| DOC admission date | May 14, 2021 |
| Cause of death | Acute methadone intoxication |
| Facility at time of death | George R. Vierno Center ("GRVC"), general population housing |
| Bail amount, if any | Held on a warrant |

Mr. Mejia was diagnosed with multiple mental health disorders and severe cocaine use disorder, and he tested positive for cocaine when he was first admitted to DOC custody. Throughout his incarceration, he disclosed a significant substance use history of K2, opioids, cannabis, alcohol, and cocaine.

On May 15, at 12:54 pm, CHS referred Mr. Mejia for an immediate mental health evaluation after he reported that he had tried to kill himself in the past but denied that he currently had thoughts of hurting or killing himself. Mr. Mejia also had a history of inpatient psychiatric admissions, and was assessed by mental health staff on May 15, at 7:18 pm, after which he was prescribed psychiatric medication and placed in general population housing, with mental health follow-up by a clinician/psychiatrist.

On May 15, he was referred to A Road Not Taken ("ARNT"), a substance abuse program operating in AMKC and in the Rose M. Singer Center ("RMSC"). ARNT is not a Medication-Assisted Treatment program. On May 19, he reported: "low-level anxiety related to lack of access to cocaine use, after daily use of $100," but, by June 8, his referral to ARNT still appeared as an open order.  Moreover, he was not prescribed methadone at any point during his incarceration.

Video footage revealed that, on the morning of Mr. Mejia's death, he ingested substances from two different cups which another person in custody had given him. A search of Mr. Mejia's property after his death yielded three disposable medication cups containing approximately 30 pills in total. At around 11:14 am, approximately an hour after he ingested the contents of the first cup, Mr. Mejia sluggishly walked around the dayroom—the unit's shared common area— stopping frequently to place his hand on his head. People in custody told Board staff that Mr.

Mejia "seemed high." A DOC civilian staff member who spoke with Board staff confirmed that Mr. Mejia did not look well while sitting at a table in the dayroom that day.

Video surveillance footage reveal that, over the next forty minutes, Mr. Mejia struggled to climb stairs or stand upright, he leaned over, and held his head. At approximately 11:56 am, a floor officer saw and spoke with an apparently sluggish Mr. Mejia on a staircase, yet left without raising the alarm about Mr. Mejia's state or condition.[28] Around the same time, clinical staff exited the housing area, having visited the housing area to offer vaccines, according to DOC records.

Thereafter, people in custody helped Mr. Mejia navigate the stairs and sit. Later, at approximately 12:11 pm, they escorted him to his cell. People in custody told Board staff that one of the officers had instructed them to take Mr. Mejia to his cell to lie down rather than sending him to the clinic. Two officers were present in the housing unit at the time.

Between 12:23 pm and 3:43 pm, multiple people in custody and correction officers looked through Mr. Mejia's cell window. In one instance, an officer opened the door and allowed a person in custody to enter Mr. Mejia's cell. A person in custody told DOC investigators that he checked on Mr. Mejia at approximately 3:00 pm, and, at that point, Mr. Mejia "felt cold to the touch." At approximately 3:38 pm, a person in custody entered Mr. Mejia's unsecured cell for at least two minutes, and multiple people entered and gathered around the cell after him. A DOC uniformed staff member told Board staff that none of the unit's cell doors locked.

At 3:43 pm, a correction officer entered Mr. Mejia's cell then quickly stepped out, presumably to call in the medical emergency.  Clinic staff received the notification at 3:45 pm.

It is unclear whether DOC staff performed chest compressions or CPR upon finding Mr. Mejia. At that point, he was on his bed, unresponsive, without a pulse, and with no visible signs of trauma. Clinical staff arrived at 3:53 pm and Mr. Mejia was pronounced dead at 4:39 pm.

### 3. ESIAS JOHNSON

| Name and Age | Esias Johnson, 24 |
|---|---|
| Date of death | September 7, 2021 |
| DOC admission date | August 7, 2021 |
| Cause of death | Acute methadone intoxication |
| Facility at time of death | AMKC, mental observation housing |
| Bail amount, if any | $1/remanded |

According to CHS medical records, Mr. Johnson was diagnosed with multiple substance use-related disorders and tested positive for amphetamines and methamphetamines at his initial medical

---

[28] DOC Directive #4021, Constant Supervision, effective February 2, 2021, sets guidelines for identifying individuals at risk and in need of constant supervision due to (a) self-harm, risk of self-harm, suicide attempt, or threat of; (b) recent substance use or abuse, either stated or witnessed; (c) medical status; (d) mental health status; or (e) security concerns. Said directive requires officer to conduct tours and observe individuals in their custody for unusual incidents, behavior, or conditions.

evaluation. Mr. Johnson disclosed to clinical staff that he was enrolled in a drug treatment program at the time of his arrest.

On August 8, during new admissions processing, CHS referred him for a mental health consultation after he placed the cord connected to the blood pressure machine around his neck, fashioned a knot, and stated that he would kill himself. The referral noted that Mr. Johnson had been hospitalized just four days earlier due to suicidal ideation. Mr. Johnson further stated that he had attempted to "overdose of [sic] drugs" in the past.

He was placed on suicide watch on August 8, but was taken off suicide watch three days later, "given his excitement about his future and no evidence of active suicidality," according to CHS records. In addition, he was referred to ARNT, a drug treatment program at AMKC, however, by September 1, this was still an open referral, and it is unclear whether Mr. Johnson was ever enrolled in the program, let alone participated. Mr. Johnson was also referred to a methadone treatment program known as Key Extended Entry Program ("KEEP"). However, based on CHS records, DOC did not produce him to his initial KEEP counseling appointment on September 1. CHS staff signed a second KEEP referral on September 3, but KEEP intake staff did not see Mr. Johnson before his death on September 7.

On September 1, Mr. Johnson reported to medical staff that he had been using "110 mg methadone daily for the past week (from another patient)" and that he nodded off in the housing area after he took methadone. CHS records indicate that he drank liquid from a water bottle that he said was methadone and expressed concerns about withdrawal since his supply was no longer available. He was scheduled to begin low-dose methadone treatment on September 2, and was advised to avoid extra methadone use for his safety. Records show that Mr. Johnson was administered methadone six times—once a day from September 1 through September 6—and that he had missed six medical visits. He missed two because DOC did not produce him for those medical visits, three because he allegedly refused to be produced, and one because CHS canceled that visit.

Mr. Johnson was housed in a mental observation dormitory-style unit in AMKC. He was scheduled to go to the clinic on August 6, the day before his death, but CHS records indicate that per DOC, Mr. Johnson refused to be seen. Multiple people in custody told DOC investigators that Mr. Johnson was not feeling well and that, for two days—including on the night before his death—he had asked DOC staff to take him to the clinic, but they ignored his pleas. A person in custody reported that a correction officer simply walked away after Mr. Johnson complained to that officer.

Video surveillance footage reviewed by Board staff show that, on September 7, 2021, at approximately 12:12 am, Mr. Johnson got up from his bed and went into the bathroom, where he remained until 1:03 am, at which time he returned to bed. There were no correction officers

in the housing unit at the time, and the nearest correction officer was the "A" station officer in the bubble. At approximately 1:46 am, a correction officer entered the housing unit and took a seat at the "B" post, but that officer did not tour the dormitory. At 2:59 am, the correction officer walked among the beds while using a flashlight, but no officers conducted rounds to ensure all people in custody were alive and breathing every 15 minutes, as required by DOC policies in mental observation units. Multiple officers came and went throughout the night, but they remained seated at the "B" post table.

In addition, there was a suicide watch officer on post that night to monitor three individuals, not Mr. Johnson. People under suicide watch are subject to constant supervision, as defined in DOC Directive #4521R-A, on Suicide Prevention and Intervention. Constant supervision requires maintaining uninterrupted personal visual observation without the aid of surveillance devices and the officer must permanently occupy an established post near the person under supervision. However, the suicide watch officer on post that night also was not conducting rounds or verifying whether the three individuals under his charge were alive and breathing.

At approximately 5:07 am, some people in custody woke up for breakfast, but Mr. Johnson did not move. Based on Board staff's review of video footage, the only movement detected from when he initially laid down at 1:03 am, was at 5:56 am, when he moved his head slightly several times. It wasn't until 9:11 am that an officer walked toward Mr. Johnson's bed and began tapping him. Multiple people in custody assisted in trying to awaken him, and no officers attempted CPR or chest compressions, despite DOC policies that require them to do so. CHS records state that they received an emergency call at 9:15 am. Medical staff were the first to perform life-saving techniques at 9:25 am, and they administered Narcan. However, Mr. Johnson was pronounced dead at 9:43 am.

After Mr. Johnson's death, a search of the housing area revealed two plastic bags on a windowsill by a bed that did not belong to Mr. Johnson. One bag contained 30 Gabapentin pills (approved by the FDA for the treatment of epilepsy and sometimes used as part of depression treatment), two hydrochloride pills (narcotic), ten Mirtazapine pills (antidepressant), and one Ibuprofen. The other bag contained six Prazosin pills (blood pressure medication), sixteen Buspirone pills (anxiety medication), three Citalopram pills (antidepressant), fourteen Aripiprazole pills (depression medication), and a multi-vitamin. Several burned homemade cigarette butts also were recovered in the housing area. Field tests on those remnants were inconclusive.

The New York Daily News reported that Mr. Johnson was scheduled to appear in court on August 20, and that DOC failed to produce him for that appearance. Mr. Johnson's parents attributed his death to DOC's failure to produce him for court, as Mr. Johnson was held on $1 bail for a misdemeanor charge.  He had been told that he could not leave DOC custody without going before a judge. DOC records confirmed that there was a court hearing originally scheduled for

August 20 then rescheduled to September 8, but DOC records did not state why the appearance was rescheduled.

### 4.  WILLIAM BROWN

| Name and age | William Brown, 55 |
|---|---|
| Date of death | December 14, 2021 |
| DOC admission date | November 14, 2021 |
| Cause of death | Acute Mdmb-4en-pinaca (synthetic cannabinoid) intoxication |
| Facility at time of death | AMKC, general population housing |
| Bail amount, if any | $10,000 |

CHS records indicate that Mr. Brown's initial mental health assessment was canceled and rescheduled at least four times. On November 18, 2021, CHS canceled the appointment because CHS staff determined that it was unsafe for them to enter the CDU, where Mr. Brown was housed at the time.  According to CHS records, several individuals in the unit shouted aggressively at DOC staff from their cells, a few cell door slots were open, and there was a lot of water on the floor. On November 22, CHS canceled the mental health assessment again, because there was insufficient staffing in the CDU. CHS canceled two other appointments without a note as to why.

During a mental health review on November 14—Mr. Brown's first day in custody—clinical staff noted that he had current mental health and emotional problems, described as schizoaffective disorder. Mr. Johnson stated that he was taking Haloperidol. Due to the multiple canceled mental health evaluations, Mr. Brown did not receive psychiatric medication until 12 days after his admission to EMTC, on November 26.

Mr. Brown was assigned to a general population dormitory-style housing area in AMKC. Board staff reviewed video surveillance footage, which shows that Mr. Johnson and other people in custody had been smoking in the dormitory and dayroom since at least 5:18 pm, on December 14. In addition, the "B" post correction officer did not tour either the dormitory or dayroom every 30 minutes, despite making entries in the logbook stating otherwise. Instead, the "B" post correction officer remained seated, and mostly stationary, at the "B" post table, which was located directly across from the "A" station. At approximately 6:10 pm, the "B" post officer left the post. The post remained empty and there were no correction officers in the housing area until 10:33 pm.

At approximately 10:19 pm, Mr. Brown entered the dayroom, where people in custody were smoking what was described as a cigarette. Mr. Brown also smoked from the cigarette and, within four minutes, he began to slouch in his seat. At the same time, two people in custody helped another individual who appeared to be vomiting.

Mr. Brown fell from his seat at 10:28 pm. People in custody tried to help one another, as multiple people slouched over and vomited. At approximately 10:33 pm, the "B" post officer arrived in the housing area. Instead of rendering aid immediately or calling in an emergency, the correction

officer stood by for four minutes, and watched as people in custody shook and patted Mr. Brown, trying to wake him. At 10:37 pm, the "B" post officer left the housing area, entered the "A" station, and returned a minute later. Again, the officer simply stood by until 10:42 pm, when she began performing chest compressions, but she stopped after a minute. By that time, another correction officer had arrived in the housing unit, but that officer did not administer life-saving techniques. The "B" post officer resumed chest compressions at 10:46 pm, at which time medical staff arrived. CHS records reflected they received the medical emergency call at 10:43 pm. Medical staff performed CPR and administered Narcan, but Mr. Brown was pronounced dead at 10:46 pm.

A search conducted after Mr. Brown's death uncovered three unidentified pills, numerous rolled papers with unknown substances inside and one end burnt, and a mop string with one end burnt used as a wick. According to OCME records, there was evidence of small residual partially-smoked cigarette butts in the dayroom. The three pills identified were potentially Mirtazapine (antidepressant), Diphenhydramine hydrochloride (antihistamine), and Buspirone hydrochloride (anxiety medication).

## IV.    OTHER CATEGORIES

| Name and age | Date of death | Facility at time of death | Cause of death per OCME report | Length of stay |
|---|---|---|---|---|
| Richard Blake, 45 | 4/30/2021 | OBCC, general population | Hypertensive and atherosclerotic cardiovascular disease | 1.5 months |
| Robert Jackson, 42 | 6/30/2021 | AMKC, general population | Hypertensive and atherosclerotic cardiovascular disease | 8 months |
| Isa Abdul Karim, 41 | 9/19/2021 | NIC | Pulmonary emboli due to right lower extremity deep vein thrombosis complicating COVID-19 in person with decreased mobility due to degenerative spine disease | 1 month |
| Stephan Khadu, 34 | 9/22/2021 | Vernon C. Bain Center ("VCBC"), general population | Complications of lymphocytic meningitis (probable viral etiology) | 1 year and 9 months |
| Victor Mercado, 64 | 10/15/2021 | Elmhurst Hospital Prison Ward | COVID-19 with complications (contributing hypertensive and atherosclerotic cardiovascular disease) | 3 months |
| Malcolm Boatwright, 28 | 12/10/2021 | AMKC, mental observation | Complications of nontraumatic seizure disorder of undetermined etiology | 1 month |

## V.    KEY FINDINGS

### 1.  Insufficient rounding and supervision

The pervasive issue of insufficient rounding and supervision by correctional staff was present in at least eight of the ten deaths reviewed in this investigation. During the seven hours **Tomas Carlo Camacho** was in the Hart's Island Clinic pen after his medical appointment, correction officers did not check on him for about two hours before he was found unresponsive. DOC policy requires officers to round every 30 minutes. Due to this lack of supervision, Mr. Camacho was able to put his head through the cuffing port and asphyxiate without any intervention. Correction officers did not find him until at least twenty minutes after his suicide attempt.

Whether in a dormitory or assigned cell housing, proper supervision is especially lacking at night, as demonstrated in the deaths of **Javier Velasco**, **Thomas Braunson**, **Segundo Guallpa**, and **Esias Johnson**. In all four instances, correction officers did not tour consistently overnight and when they did conduct walk-throughs, they did not verify that people in custody under their supervision were alive and breathing. SCOC noted that the "A" post officer assigned to Mr. Velasco's housing unit on the day of his death did not know how to call in a medical emergency, signaling a potential training deficiency.

**Anthony Scott** was placed in a pen directly across from a correction officer's desk. Despite this, Mr. Scott fashioned a ligature from his clothing and jammed the holding pen's locking mechanism with paper, while an officer was present but had his back to the pen. He then wrapped the ligature around his neck and tied it to a fixture within the pen when correction officers left the area unattended.

**Jose Mejia** visibly struggled to move and stand upright within view of correction officers, yet there was no intervention.[29] A uniformed DOC staff member stated that the cell doors in that unit did not lock, an operational issue that went unaddressed prior to Mr. Mejia's death. On the issue of unsecured cell doors, DOC records reflect: "The Facility's Management Team acknowledges that keeping housing area cell doors unlocked for prolong [sic] periods of time is a constant issue. A memo to be read for 21 consecutive roll calls will be reissued, as well [as] continued disciplinary actions for Staff members found in violation of such."

---

[29]   Active supervision applies to cell housing areas during all lock out periods when inmates are allowed to freely move about the confines of the housing area (0500 x 2100 hours) and those inmates who remain in their cells during lock out hours. It includes but is not limited to: (a) direct and uninterrupted communication with each inmate; (b) tour at 30-minute intervals; (c) ability of the officer on post to immediately respond to emergency situations; and (d) if a facility housing area houses 20 or more inmates, the continuous presence of an assigned correction officer within that housing area to ensure optimal safety and security are provided. (Directive #4514R-C, Housing Area Logbooks, effective October 13, 2015)

Finally, in the case of **William Brown**, a "B" post remained empty from at least 6:10 pm to 10:33 pm. During this unsupervised period, people in custody smoked, were in the dayroom past 9:00 pm against DOC policy, and ultimately became sick. DOC failed to adequately maintain the care, custody, and control of these housing areas by not actively supervising those in their custody according to their own policies, leading to tragic results.

### 2. Contraband

The importance of consistent and thorough contraband searches is evident in the drug-related deaths described in this report. The Department utilizes various methods to recover contraband, such as Tactical Search Operations ("TSO"), special searches, scheduled or unscheduled institutional searches, K9 searches, and Emergency Service Unit ("ESU") searches. The prevalence of drugs, often laced with fentanyl, combined with deficient supervision and reduced staffing, threatens the lives of those in custody on a daily basis. According to reporting from The City, banned drugs were seized within the jails more than 2,600 times between April 2020 and May 2021, more than double the seizures from April 2018 and May 2019, when the census was higher.[30] In-person visitation was canceled through most of 2020 and 2021 due to COVID-19 concerns, therefore contraband could not have entered DOC facilities through that avenue at the time of this sharp increase in contraband seizures.

Directive #4508R-E, Control of and Search for Contraband, tasks each Commanding Officer to develop scheduled searches of cells and common areas "on a regular and frequent basis." Said directive also establishes that all civilian and uniformed personnel, regardless of title or rank, shall be subject to search and inspection, including all carried possessions. However, it does not indicate under what circumstances or how personnel will be searched. Directive #4597R-C, Use of Body Scanners and Separation Status Housing, establishes procedures for the use of body scanners.[31] DOC directs male individuals to be scanned upon admission to custody and scans are offered daily to individuals in Separation Status. Female individuals are not scanned. Additionally, male individuals may be scanned (1) after a slashing, stabbing, or other serious incidents indicating possession of contraband, (2) during a facility search, (3) when leaving or returning to the facility, (4) after a visit (particularly if the individual has a history of contraband possession), and (5) when other means of search provide a reason to believe that an individual possesses contraband. There is no mention of civilian or uniformed staff being subject to body scans.

**Thomas Braunson** and another individual consumed drugs that were stored inside a bucket in an open dormitory, in view of video surveillance cameras. Post-mortem, heroin was discovered on

---

[30] Joseph G. & Blau R. (2022, Feb. 9). *When Visitors Were Banned From Rikers Island, Even More Drugs Showed Up.* The City. https://www.thecity.nyc/2022/2/9/22926241/when-visitors-were-banned-from-rikers-island-even-more-drugs-showed-up

[31] Limited-use system that utilizes a low dose of ionizing radiation to conduct full body scans capable of detecting objects placed on, attached to, or secreted within a person's body.

his person. **William Brown** died and other people in his housing area became sick and vomited after openly smoking a cigarette that now is known to have been a synthetic cannabinoid.

**Jose Mejia** was not prescribed methadone during his incarceration yet died of acute methadone intoxication after ingesting a substance from two cups given to him by others in custody. A search of his belongings uncovered approximately 30 pills. **Esias Johnson** admitted to CHS staff that he consumed methadone provided to him by others in his housing area, and ultimately died of methadone intoxication.

Searches and seizures are vital not only for the recovery of drugs and weapons. A search of **Javier Velasco's** belongings after his suicide revealed three braided ropes in his cell in a mental observation unit.

### 3. Naloxone

Naloxone, also known as brand name "Narcan", is a nasal spray designed to help reverse the effects of a known or suspected opioid overdose. Known in-jail drug seizures and usage resulted in four deaths in 2021, one confirmed death[32] and four suspected overdoses in 2022, and an unknown number of non-fatal overdoses. CHS and DOC apparently do not actively track overdoses that do not result in death, but it is clear that they could be tracked. CHS documents every clinical encounter in electronic medical records. The Department similarly identifies each of these incidents and contacts CHS for help. A departmental directive for correction officers to use naloxone when an overdose is suspected, became effective on June 30, 2022, long after these incidents.[33]

CHS first proposed a pilot to train people in custody on how to use naloxone in September 2021 and received DOC approval in November. According to CHS staff, since officially launching the program on December 3, 2021, CHS trained at least 1,000 incarcerated individuals (as of mid-May this year). Naloxone is available in all "A" stations for people in custody who request it, whether they are trained in its usage or not. Per CHS, as of June 10 of this year, five (trained) people in custody encountered an emergency and were successful in retrieving naloxone kits and administering the life-saving drug to individuals who appeared to be overdosing, and those people in custody survived.

Naloxone is an easy-to-use nasal spray that does not cause adverse effects if used on someone who is not overdosing, and untrained incarcerated individuals have access to it. Now that the directive is in effect, DOC efforts to inform and train its staff on the importance of this potentially

---

[32] The death of Tarz Youngblood is reviewed in the Board's May 9, 2022 report on the first three deaths in custody of 2022. After the issuance of the report, OCME concluded that Mr. Youngblood died from acute intoxication due to the combined effects of fentanyl and heroin.

[33] Operations Order #02/22, Naloxone (Narcan), with the purpose of defining a policy and guidelines/procedures regarding administering Naloxone (Narcan) in DOC units, commands, and facilities.

lifesaving measure must immediately reach those areas where suspected overdoses are currently happening. In July, BOC investigative staff spoke with correction officers who have not yet been trained and incorrectly believe that people in custody cannot request naloxone. Likewise, Board staff have witnessed people in custody in AMKC fetch naloxone from the "A" station and rush to administer it to someone suffering from a suspected overdose. It is unclear when all DOC staff will complete this vital training.

### 4. Logbook deficiencies

Instances of false or insufficient logbook entries were identified in at least four of the deaths reviewed in this report. Per DOC Directive #4514R-C, Housing Area Logbooks, effective October 13, 2015: "Logbook entries must be made without undue delay and must be recorded legibly, accurately, and concisely, in chronological order using military time." Despite multiple incidents occurring within the unit on the day of **Wilson Diaz-Guzman's** suicide, including a flooded cell and the arrival of fire safety staff, the "B" post logbook did not reflect any of these events.

Logbook entries in the units housing **Javier Velasco**, **Thomas Braunson**, and **William Brown** indicated that tours were conducted regularly, however, areas were not toured for stretches of time exceeding DOC policy (every 30 minutes in general population and every 15 minutes in mental observation units). This practice was of particular concern in the circumstances of Mr. Brown's death, because the officer was not in the unit yet wrote entries about making tours every 30 minutes that did not take place.

### 5. Lack of emergency first aid by officers

In case of an emergency requiring CPR or first aid, uniform staff members have a responsibility to render such aid until the arrival of medical personnel (Operations Order #05/17, Emergency Health Care Log). Staff members trained in CPR and currently certified in its administration can administer CPR. Personnel who are not certified shall limit their resuscitation efforts to rescue breathing, along with the use of the appropriate personal protective equipment. DOC's Correction Academy conducts recertification training in CPR, first aid, and the use of automated external defibrillators for staff already in service. Yet uniformed staff failed to provide timely first aid, if at all, in at least five of the deaths described above.

**Thomas Braunson** was found unresponsive on his bed, yet correction officers did not perform CPR or chest compressions, instead walking back and forth for at least ten minutes until clinic staff arrived. The same occurred in **Esias Johnson's** case, where other incarcerated individuals tried to rouse Mr. Johnson yet no DOC staff performed first aid.

The correction officer assigned to **William Brown's** housing area stood by for at least nine minutes while multiple individuals vomited, and Mr. Brown became unresponsive, before performing chest compressions. When two officers and a captain entered **Segundo Guallpa's** cell once he was discovered unresponsive, they stood by his bedside instead of performing first aid.

Likewise, when officers found **Tomas Carlo Camacho** unresponsive in his cell, they did not render any sort of aid while awaiting CHS's arrival.

### 6.   Missed visits and medication/lack of escorts

The cancelation of medical appointments due to a reported lack of DOC escorts is the subject of ongoing litigation. On August 11, 2022, the Department was ordered to pay $100.00 for each missed escort to the infirmary from December 11, 2021 through January 2022. The Court concluded that DOC failed to comply with its duties to provide people in custody with access to care and provide sufficient security for the movement of persons to and from health services.[34]

This issue was also evident in at least four of the reviewed deaths. **Tomas Carlo Camacho** missed 26 medical appointments from August 15, 2020 to March 2, 2021. At least 17 of those were missed because DOC did not produce him.

In the case of **William Brown**, three medical appointments were canceled by CHS, in two instances because of insufficient staffing levels in the facility and due to safety concerns. Further, at least seven appointments were canceled because he was not produced by DOC, four of which were because he was reportedly in court. CHS and DOC should improve coordination to prevent scheduling services and treatment when it is known the person will be in court or otherwise engaged. This will avoid undue delays in receiving critical medical care.

**Segundo Guallpa** did not receive an initial mental health assessment before he died by suicide. His scheduled assessments were canceled twice.

The matter of **Esias Johnson** highlights the importance of recording refusals, whether it be for legal visits, lock-out, or in this case, medical appointments. Records reflect that Mr. Johnson refused to be seen by the clinic the day before his passing, despite statements from people in custody that he was complaining about not feeling well and that he stated that he wished to go to the clinic. According to a new 2022 DOC policy, service refusals by people in custody and interactions with people in custody should be recorded via body-worn cameras. The Board believes this is a good first step toward ensuring people who wish to be seen by medical staff are not recorded as "refusals," and cautions that the way the body-worn camera footage is reviewed will be critical to successful supervision of staff.

### 7.   Suicide watch designation deficiencies

**Javier Velasco** attempted to commit suicide just three days before his death, but a correction officer intervened immediately and cut the ligature around Mr. Velasco's neck before he could inflict any harm on himself. He was subsequently placed under suicide watch, yet it was

---

[34] NY St Cts Elec Filing [NYSCEF] Doc No. 147, judgment/order, in *Matter of Joseph Agnew et al v. New York City Department of Correction*, Sup Ct, Bronx County, Index No. 813431/2021E

discontinued 30 hours later. SCOC's final report on the death of Mr. Velasco found that the "decision to remove Velasco from suicide watch was premature given the seriousness of his attempt, without having received a follow-up psychiatric consultation, and not having established his history of prior suicide attempts by hanging."[35]

SCOC further concluded that CHS "failed to recognize Velasco's acute suicidal ideation and refer him for psychiatric hospitalization after a serious suicide attempt and then removed suicide watch measures prematurely without proper psychiatric consultation." The SCOC Medical Review Board stated that Mr. Velasco's death was preventable had his suicidal ideation been properly identified and treated.

### 8. Insufficient staffing

Insufficient staffing remains a persistent problem for the Department, particularly lack of staffing in housing areas and crucial assignments such as the "B" post (the correction officers present within the housing area itself, among people in custody, tasked with rounds and active supervision). The circumstances around three of these deaths highlight how lack of staffing impacted many other services and operations. **Brandon Rodriguez** was improperly placed in an intake shower pen instead of a cell following a use of force incident. Department records show that DOC was unable to assemble an extraction team to remove Mr. Rodriguez from the shower pen due to insufficient staffing.

One of **Segundo Guallpa's** initial mental health assessment appointments was canceled by CHS due to "insufficient staffing level in the facility." As a result, Mr. Guallpa did not receive a mental health evaluation before he committed suicide.

Lastly, the floor officer tasked with supervising the Hart's Island clinic where **Tomas Carlo Camacho** committed suicide told DOC investigators that he was not present at the time because he was rehousing another person in custody. Insufficient staffing can result in officers abandoning their assigned posts to fulfill other tasks elsewhere.

### 9. Intake

There were several housing and placement issues from the moment **Brandon Rodriguez** came into DOC custody. He and 40 other individuals were in intake pens in OBCC for more than 24 hours, in contravention of DOC policy.[36] Mr. Rodriguez reported being "jumped" and not feeling safe in the intake pen. He was involved in a use of force incident on the way to a housing area. He was subsequently taken to a shower pen in Central Punitive Segregation Unit's intake. Instead of being placed in a cell, he remained in that shower pen for approximately eight and a half hours

---

[35] Final Report of the New York State Commission of Correction: In the Matter of the Death of Javier Velasco, an incarcerated individual of the Anna M. Kross Center, June 28, 2022.

[36] See footnote #17 for relevant policy.

before he committed suicide. His intake paperwork did not include a completed Suicide Prevention Screening Guidelines form, specifically designed to gauge an individual's suicide risk.

**Anthony Scott** was in DOC custody for approximately four hours at the Manhattan Detention Center, yet no Arraignment and Classification Risk Screening Form or Suicide Prevention Screening Guidelines Form were included in his paperwork. These forms, when used, may identify problems such as suicidal ideation, allowing the confiscation of the drawstrings he ultimately used to create a ligature.

### 10. Medical and mental health

Board staff's review of CHS medical records revealed several issues with appointment scheduling, unfulfilled referrals, and lack of follow-up. **Wilson Diaz-Guzman** was evaluated by mental health staff on January 17, 2021, yet the assessment was signed by a clinician and supervisor until a month later, February 17. Mr. Diaz-Guzman died on January 22.

As discussed in item seven of this section, according to SCOC, **Javier Velasco** was prematurely removed from suicide watch.

**Esias Johnson** admitted to CHS staff that he was taking methadone provided to him by someone else in the housing area, yet it is unclear if CHS raised the alarm to DOC about these statements so the Department could arrange a search of the area to uncover contraband.

Both Mr. Johnson and **Jose Mejia** were referred to an AMKC-based drug treatment program, yet just days before each of their deaths, it does not appear either of them was enrolled or participating in the program. Further, Mr. Johnson was referred to a methadone treatment program but missed his initial counseling session because DOC did not produce him to his appointment.

**William Brown's** medical records show that, although CHS was aware that Mr. Johnson was diagnosed with schizoaffective disorder and was taking Haloperidol, he did not receive any psychiatric medication until 12 days after his admission to EMTC given delays in his mental health evaluation. Lastly, Mr. Brown had a condition characterized by a persistent slow heart rate (less than 50 beats per minute) which is a potentially life-threatening problem in people with other conditions such as hypertension, diabetes, or hyperlipidemia. CHS did not complete an evaluation for this condition by obtaining an EKG during his current admission, despite a significantly low pulse identified at four different medical assessments.

### 11. Medical emergency response

There was a severe discrepancy among DOC and CHS on clinic staff response in the case of **Robert Jackson** that must be addressed. People in custody were the first to notice that Mr. Jackson was unwell, pulling him out of his cell and alerting officers. According to DOC records, a medical

27

emergency was activated by DOC staff at approximately 8:00 pm. By 8:30 pm, medical staff had not responded, so DOC staff activated a second medical emergency. By 9:00 pm, medical staff had not arrived, therefore a third medical emergency was activated. According to CHS, their records indicate that the first emergency call was received at 9:08 pm. Correctional staff performed CPR and chest compressions as they awaited the medical staff, who ultimately arrived at 9:24 pm.

## VI.    RECOMMENDATIONS

**To CHS and DOC, jointly**

1. CHS, DOC, and BOC should hold timely death review conferences to discuss the circumstances around each death, what operational or clinical problems can be identified, and how both agencies can work collaboratively to prevent further incidents. This must include the exchange of clinical information. Issues regarding confidentiality and protected health information (PHI) must be addressed and resolved between each agency's legal department. Death, whether in a jail, at home, or in a hospital, is a clinical event that cannot be adequately reviewed without clinical information being provided to DOC and a joint mortality review conference between DOC and CHS.[37]

2. To avoid delays or miscommunication between correctional staff in the housing unit and medical staff in the clinic, CHS and DOC should set up a dedicated direct phone line for medical emergencies that does not rely on information being relayed through multiple staff to reach the medical response team. Currently, the "A" post officer contacts the clinic officer, who then notifies the medical team. CHS and DOC should actively track response time to identify undue delays and take corrective action. The direct line phone number should be posted in a visible area within the "A" station.[38]

3. CHS and DOC should implement immediate measures to actively track suspected non-fatal overdoses in all housing areas. Said tracking system should incorporate information on whether Narcan was administered and by whom, as well as real-time updates on the person's status and whereabouts.

4. DOC and CHS must immediately dispatch naloxone kits to intake, court holding pens, corridors, de-escalation units, law libraries, mess halls, gyms, and all other areas in close proximity to incarcerated individuals.

5. CHS and DOC should inform and train staff on who is responsible for calling EMS in the event of an emergency. This information should be conspicuously posted in the "A" station and clinics, in plain view of staff from both agencies.

6. If DOC is unable to assemble the staff necessary to remove a person in crisis from an area to administer medical assistance, like in the case of Brandon Rodriguez, DOC and CHS must coordinate for medical staff to attend to the person in-unit.

---

[37] As recommended in *February & March 2022 Deaths in DOC Custody Report and Recommendations*, p. 8.
[38] *Id*.

7. DOC should confer with and notify CHS when issuing a directive, Operations Order, Command Level Order, or any DOC order that impact CHS's staff or operations.

## To CHS

1. CHS should maintain a liaison to follow up with DOC about missed medical appointments due to a lack of DOC escorts to ensure those who have an urgent need for medication or treatment are seen urgently in the clinic.[39]

2. Given the high volume of drug contraband seized within the jails, CHS should track the volume of non-fatal drug overdoses they treat. For these same reasons, CHS should set up sessions or programs for people in custody on the short and long-term effects of drug use, and the dangers of K2, fentanyl, and other drugs routinely seized by DOC in the jails.[40]

3. CHS should develop an action plan to ensure that medical information from prior City incarcerations is quickly integrated upon subsequent intakes, including known histories of suicidal behavior and psychiatric medication regimens.[41]

4. CHS should improve appointment scheduling practices to prevent scheduling treatment and services when it is known the person will be in court or otherwise engaged. This will avoid undue delays in receiving critical medical care.

5. CHS must conduct quality assurance reviews of delayed clinical entries.

6. CHS must conduct medical and mental health rounds in intake/receiving room areas and in designated de-escalation areas.

7. CHS must conduct a quality assurance review of clinical determinations removing individuals from suicide watch or Mental Observation, particularly when the removal happens within less than 72 hours of a documented suicide attempt.

8. When patients report the use or presence of contraband in the facilities, CHS should communicate such intel to DOC without compromising patient confidentiality.

## To DOC

1. DOC should transition out of the practice of keeping paper logbooks and develop an electronic log system. The electronic system should capture information triggered at the individual cell level. Until such a system is implemented, Tour Commanders should articulate an action plan to regularly audit logbooks against Genetec video footage and Watch Tour data at unpredictable times to ensure that rounds are taking place as required and to detect incorrect entries.[42]

---

[39] As recommended in *February & March 2022 Deaths in DOC Custody Report and Recommendations* at pg. 9.
[40] *Id.*
[41] As recommended in *A Report and Recommendations on the November 2019 Attempted Suicide of Mr. Nicholas Feliciano* at pg. 15.
[42] As recommended in *February & March 2022 Deaths in DOC Custody Report and Recommendations* at pg. 9 and *The Death of Layleen Xtravaganza Cubilette-Polanco 1991-2019* at pg. 15.

2. DOC should reevaluate and strengthen its mental health and CPR training for staff as several officers with such training failed to intervene in multiple instances described in this report.[43]

3. DOC should revise its Video Monitoring Unit (VMU) and Video Review Unit (VRU) Operations Order to clarify and enumerate examples of security breaches that require notification to facility staff.[44]

4. DOC must increase its naloxone training efforts and aim to finish training all uniformed staff within the next month.

5. As recommended by Dr. James Austin in his Declaration in Support of Plaintiff's Motions for Preliminary Injunction and Provisional Class Certification before the United States District Court of the Southern District of California filed on May 2, 2022 regarding San Diego jail facilities, the Department should require all individuals, including medical staff, custody staff, and contractors, to undergo body scanning before entry. Per Dr. Austin, "when body scan technology is used properly on all individuals entering a jail, it is nearly impossible for contraband to enter a correctional facility on or in a person's body."[45]

6. DOC must actively recruit and incentivize people in custody to apply to SPA positions by tailoring its directives and security criteria evaluation to allow for the largest eligibility pool possible. DOC must particularly ensure 24/7 SPA availability in intake areas, de-escalation units, restrictive housing units, and units with a higher census. BOC staff have previously found that the number of SPAs diminished over the years because selection criteria discouraged people from taking the exam and housing area staff did not allow people to attend the testing sessions if they had an "M"[46] designation, despite the directive specifying that individuals shall not be automatically denied participation in the program solely based on their classification as Brad H.

7. The Department's committee tasked with the review of existing Incarcerated Individual Wages must significantly raise wages for SPAs, currently set at $1.45 per hour.[47] There is precedent for raising wages for important jobs. Notably, at the height of the pandemic in 2020, DOC raised wages for critical job assignments in enhanced sanitation details and Hart's Island to encourage more participation. DOC must increase SPA wages beyond the arbitrary limits of their existing directive to attend to the crisis precipitated by the increase in suicides, suicidal ideation, and self-harm.

---

[43] As recommended in *A Report and Recommendations on the November 2019 Attempted Suicide of Mr. Nicholas Feliciano* at pg. 16.

[44] As recommended in February & March 2022 Deaths in DOC Custody Report and Recommendations at pg. 9.

[45] Dunsmore v. San Diego County Sheriff's Dep't, Civil No. 11-0083 IEG (WVG) (S.D. Cal. Mar. 1, 2011)

[46] Designation given to all people in custody who are Brad H. class members. The class includes all persons in DOC custody for 24 hours or more who receive mental health treatment (seen by mental health at least three times) during their incarceration.

[47] Directive #4014R-B, Incentive Pay Plan for Incarcerated Individuals, effective October 12, 2021. Job assignments categorized as low are paid $0.55 per hour, those categorized as medium are paid $1.00 per hour, and those categorized as high are paid $1.45 per hour. DOC adopted the Board's previous recommendation to reclassify SPA positions from medium to high.

8.  DOC should raise Incarcerated Individual Wages across all job classifications to boost interest from a larger pool of incarcerated individuals and reduce idleness, which may lead to self-harm or violence.

9.  DOC must increase the number of job assignments for people in custody available among jail programs, jail maintenance, and jail operations. DOC should develop a targeted plan to encourage City-sentenced individuals to apply for these positions, particularly SPA assignments.

10. DOC must enforce compliance with its Operations Order on body-worn cameras, which specifies that all interactions with people in custody, unless prohibited,[48] must be recorded. This footage must always be accessible to the Board.

11. DOC must regularly audit intake paperwork completed by both Rikers-based and Court Division staff to ensure complete and timely record-keeping.

---

[48] Prohibitions on the activation of body-worn cameras are: (1) personal or administrative duties; (2) in places where a reasonable expectation of privacy exists; and (3) during Tactical Search Operations, random and strips searches unless the individuals' resistance during the search reasonably causes an officer to believe that a Use of Force or Assault on Staff is about to occur or occurs. (Operations Order #01/22 on Body Worn Camera effective May 13, 2022)

**NYC Health + Hospitals/Correctional Health Services**
**Response to Recommendations Contained in the NYC Board of Correction's**
**"***Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody***"**

## Recommendations to CHS and DOC, jointly:

CHS and DOC Recommendation #1: *CHS, DOC, and BOC should hold timely death review conferences to discuss the circumstances around each death, what operational or clinical problems can be identified, and how both agencies can work collaboratively to prevent further incidents. This must include the exchange of clinical information. Issues regarding confidentiality and protected health information (PHI) must be addressed and resolved between each agency's legal department. Death, whether in a jail, at home, or in a hospital, is a clinical event that cannot be adequately reviewed without clinical information being provided to DOC and a joint mortality review conference between DOC and CHS.*[36]

Response: **In 2016, CHS established the Joint Assessment and Review (JAR) process wherein CHS and DOC timely and jointly review negative outcomes for patients and identify solutions to prevent future recurrences. Clinical care is appropriately reviewed by the health authority and neither should nor can be reviewed by the non-clinical, security agency, DOC; or by the BOC which, by its own admission, is not a clinical body. Instead, the JAR focuses on systemic remedies which, as in all three cases in this report, tend to be operational and environmental in nature. As for the recommendation for timely death reviews by BOC, DOC, and CHS, it is the BOC that has the authority to convene such reviews.**

CHS and DOC Recommendation #2: *To avoid delays or miscommunication between correctional staff in the housing unit and medical staff in the clinic, CHS and DOC should set up a dedicated direct phone line for medical emergencies that does not rely on information being relayed through multiple staff to reach the medical response team. Currently, the "A" post officer contacts the clinic officer, who then notifies the medical team. CHS and DOC should actively track response time to identify undue delays and take corrective action. The direct line phone number should be posted in a visible area within the "A" station.*[37]

Response: **CHS routinely tracks and evaluates its emergency response times and welcomes suggestions for DOC streamlining of its notification of medical emergencies to its own staff and to CHS.**

CHS and DOC Recommendation #3: *CHS and DOC should implement immediate measures to actively track suspected non-fatal overdoses in all housing areas. Said tracking system should incorporate information on whether Narcan was administered and by whom, as well as real-time updates on the person's status and whereabouts.*

Response: **The Board's request relative to clinical tracking of "suspected non-fatal overdoses" is neither realistic nor useful.  Such analyses would not meaningfully inform our clinical practice nor be necessarily able to be captured in part because it can vary in its clinical presentation.**

**CHS will continue to conduct individual clinical reviews in order to identify suspected overdoses and to allocate our limited resources to patient care services including our targeted outreach, education, and intervention work.**

CHS and DOC Recommendation #4: *DOC and CHS must immediately dispatch naloxone kits to intake, court holding pens, corridors, de-escalation units, law libraries, mess halls, gyms, and all other areas in close proximity to incarcerated individuals.*

Response: **Since it began its own initiative in January 2022, CHS has trained patients to use naloxone and distributed naloxone kits to all housing areas, naloxone kits. CHS continues to seek other ways to reduce harm and risk, including continuing to pursue other areas where kits can be maintained.**

CHS and DOC Recommendation #5: *CHS and DOC should inform and train staff on who is responsible for calling EMS in the event of an emergency. This information should be conspicuously posted in the "A" station and clinics, in plain view of staff from both agencies.*

Response: **CHS trains staff to ensure EMS is called in the event of an emergency if not already activated by DOC.**

CHS and DOC Recommendation #6: *If DOC is unable to assemble the staff necessary to remove a person in crisis from an area to administer medical assistance, like in the case of Brandon Rodriguez, DOC and CHS must coordinate for medical staff to attend to the person in-unit.*

Response: **CHS responds to referrals as clinically appropriate.  If DOC is not able to remove a person in crisis from an area, DOC must constantly monitor the patient(s) and provide the necessary officers to safely escort the various clinical response teams to the emergency and to ensure that the unit is secure for clinical staff to enter and perform their work.**

## Recommendations to CHS:

CHS Recommendation #1: *CHS should maintain a liaison to follow up with DOC about missed medical appointments due to a lack of DOC escorts to ensure those who have an urgent need for medication or treatment are seen urgently in the clinic.*[38]

Response: **CHS has processes and personnel in place to review clinical risk of individuals who are not receiving treatment and has developed escalation procedures for those who**

require urgent evaluation.  Escalation pathways include the use of facility-based and central personnel who work in partnership with and serve as liaisons to appropriate counterparts in DOC to address various aspects of the health operation.

CHS Recommendation #2: *Given the high volume of drug contraband seized within the jails, CHS should track the volume of non-fatal drug overdoses they treat. For these same reasons, CHS should set up sessions or programs for people in custody on the short and long-term effects of drug use, and the dangers of K2, fentanyl, and other drugs routinely seized by DOC in the jails.*[39]

Response: **Please see CHS' response to CHS and DOC Recommendation #3.**

CHS Recommendation #3: *CHS should develop an action plan to ensure that medical information from prior City incarcerations is quickly integrated upon subsequent intakes, including known histories of suicidal behavior and psychiatric medication regimens.*[40]

Response: **CHS has workflows and structures in place to maximize identification of relevant clinical information from past incarcerations, including self-harm and medication treatment. All providers are expected to integrate this into their decision making.  As noted previously, the Board seems to have misunderstood and inaccurately represented how information was integrated by CHS into its clinical interventions.**

CHS Recommendation #4: *CHS should improve appointment scheduling practices to prevent scheduling treatment and services when it is known the person will be in court or otherwise engaged. This will avoid undue delays in receiving critical medical care.*

Response: **An individual's next court date is listed in our medical record and staff are expected to utilize information when scheduling appointments. All missed visits are rescheduled in a manner that is appropriate to clinical need, and all individuals in custody can directly communicate to CHS via the Health Triage line.  It is unclear what the Board is referring to when using the term "or otherwise engaged."**

CHS Recommendation #5: *CHS must conduct quality assurance review delayed clinical entries.*

Response: **CHS agrees and will continue to conduct quality assurance reviews of delayed clinical entries.**

CHS Recommendation #6: *CHS must conduct medical and mental health rounds in intake/receiving room areas and in designated de-escalation areas.*

Response**: It is CHS' understanding that DOC is already required to monitor individuals in intake areas and should utilize existing escalation protocols for any clinical needs that arise during these times.**

CHS Recommendation #7: *CHS must conduct a quality assurance review of clinical determinations removing individuals from suicide watch or Mental Observation, particularly when the removal happens within less than 72 hours of a documented suicide attempt.*

Response: **CHS discontinued 2,172 suicide watches in 2021.  As noted above, CHS disagrees with the Board's opinion that the removal of suicide watch in these two cases above was inappropriate or that the deaths were foreseeable, given the information available to the evaluating clinician at those times.  However, we do have existing structures and protocols in place to ensure that a proper risk assessment is performed for all self-injuries and for those being removed from watch.**

CHS Recommendation #8: *When patients report the use or presence of contraband in the facilities, CHS should communicate such intel to DOC without compromising patient confidentiality.*

Response: **See response to finding 10. CHS staff are instructed to report when there is suspected diversion or clinically relevant substance use.**