# EXHIBIT 31



**NEW YORK CITY**

**BOARD OF CORRECTION**

# A Report and Recommendations on the November 2019 Attempted Suicide of Mr. Nicholas Feliciano[1]

# October 18, 2021

[1] Authored by Kate McMahon, Deputy General Counsel. Thank you to the following BOC staff and former staff who provided information for this investigation: Bart Baily (Correctional Standards Review Specialist (CSRS II), Dilcio Acosta (CSRS II), Barbie Melendez (CSRS II), V Ezeji (CSRS II), Michele Ovesey (Former General Counsel), and Sherie Tripp (Dir. Of Monitoring). Additional thanks to Bill Heinzen (General Counsel) and Margaret Egan (Executive Director) for their review and comments, and to the members of the Prison Death Review Board subcommittee, Jackie Sherman (Committee Chair), Jennifer Jones Austin (Board Chair), Dr. Robert Cohen, and Dr. Steven Safyer.

## A. Introduction

On November 27, 2019, 18-year-old Nicholas Feliciano hanged himself with institutional clothing in an intake pen at the George R. Vernon Center on Rikers Island. According to the Board of Correction's review of this incident, he was hanging for 7 minutes and 51 seconds in plain view of Correction Officers, other people in custody, and members of FDNY emergency medical services before DOC staff cut him down. As a result of prolonged oxygen deprivation, he suffered significant brain damage and remains in a rehabilitation facility unable to live independently nearly two years later.

The Board of Correction ("Board" or "BOC") has a duty to investigate all in-custody deaths. These investigations are distinct from those conducted by other City and State agencies in that BOC investigations do not focus on criminal wrong-doing or individual fault, but rather identifying where lessons can be learned to prevent future tragedies. Although Mr. Feliciano's suicide attempt was not fatal, the circumstances of this incident are disturbing and starkly illustrate persistent issues in the City's jails that the Board elected to investigate and report on it in the same manner as a death in custody. Accordingly, this report presents the Board's findings in connection with Mr. Feliciano's attempted suicide, and makes specific recommendations to the Department and NYC Health + Hospitals/Correctional Health Services (CHS) to prevent similar incidents in the future. The Board provided advance copies of this report to both the Department of Correction and Correctional Health Services and gave them the opportunity to comment.  CHS prepared a response to the Findings and Recommendations, which is attached as an exhibit to this report.

While the facts at issue in this report occurred in November 2019, this report comes as the City jails are experiencing a substantial increase in self-harm incidents amid the COVID-19 pandemic and extraordinary rates of staff absenteeism.[2] Following four and a half years of no completed suicides in the jails, Ryan Wilson died by suicide on November 22, 2020 at the now-shuttered Manhattan Detention Center after reportedly hanging where staff and people in custody could see him for upwards of 14 minutes before officers intervened.[3] Since Mr. Wilson's death 10 months ago, there have been five more completed suicides in the City jails, including Brandon Rodriguez's August 10, 2021 suicide in an intake shower pen where he, like Mr. Feliciano, had been placed following an incident and left alone for several hours.  Of 29 ligature-related incidents in August 2021 (including suicide attempts and self-injurious behavior) reviewed by Board staff, 62% (n=18) took place in one of the jail's intake areas, which have been plagued by overcrowding, long delays, and unsanitary conditions since the jail population returned to pre-pandemic levels this spring.  It is therefore the Board's hope that this report be considered in the context of the ongoing intake crisis and alarming rise in self-harm incidents unfolding across the jails right now.

## B. Methodology

---

[2] https://www.thecity.nyc/2021/9/7/22659614/self-harm-suicide-rikers-island-new-york-city-jails-rising "Between July and September 2020, the self-injury rate nearly doubled that of the previous quarter. According to the latest available data, covering April to June of this year, city jails recorded 539 incidents of incarcerated people hurting themselves, pushing the rate up to 95 such incidents per every thousand detainees — the highest in the last five years. Meanwhile, the number of detainees is growing while staffing shortages have driven city jails into a near constant crisis mode."

[3] In April 2021, the Manhattan District Attorney charged a Captain in that case with criminally negligent homicide, alleging that she repeatedly told other staff and people in custody that Mr. Wilson was "faking" while he was hanging.

The factual summary outlined in Part C is informed by the Board's review of Board Staff interviews following the incident; DOC records, including Mr. Feliciano's files from three City incarcerations and incident reports; Genetec surveillance footage and Securus telephone recordings; Health + Hospitals records; media reports; and information from the family's counsel. On August 26, 2021, Board staff met with DOC, CHS, and City Hall to review the factual findings. The Department had no factual objections to the Board's account, and CHS raised one factual objection regarding the mental health care provider at Horizon Juvenile Center that has been incorporated below.

## C. Factual Summary

### I.   Childhood and Background[4]

Nicholas Feliciano was born on May 7, 2001.  He was placed in foster care at age two due to neglect. When he was five years old, his grandmother and grandfather legally adopted him, and he lived with them and his uncle (just two years his senior) in Brooklyn and then Kew Gardens, Queens.

His grandmother told *The New York Times* that Mr. Feliciano was diagnosed with attention deficit hyperactivity disorder (ADHD), and later with clinical depression. He was placed on medication, including the antipsychotic Risperdal,[5] and received a variety of services over the years, including weekly psychotherapy sessions. She reported that Mr. Feliciano first tried to kill himself at age 15, when, after a fight with a classmate at a high school for students with disabilities, he ran outside and stood in front of a speeding truck until a security guard pulled him out of harm's way. When he was 16, the Nassau County Police Department identified him as a missing juvenile and asked the public for help locating him.[6]

### II.   February 2018 Arrest

On February 22, 2018, when Mr. Feliciano was 16 years old, officers from the 102nd precinct in Queens arrested him for second degree robbery after he and another boy were accused of assaulting and robbing a stranger the previous afternoon. At this time, New York was one of only two states that automatically treated 16 and 17-year-olds as adults in the criminal justice system. On February 23, 2018, Mr. Feliciano was arraigned in Queens County Criminal Court, and the judge set bail at $5000. He was then placed in Department of Correction (DOC) custody and sent to Rikers Island.

---

[4] Unless otherwise indicated, the information contained in this section is based on Mr. Feliciano's self-reported history to Mental Health Intake Staff on 2/26/18 at Rikers Island, as well as information his grandmother provided to the press. *See* Jan Ransom and Edgar Sandoval, "They Saw Him Hanging and Did Nothing': A Teen's Agony in Rikers," *The New York Times* (December 12, 2019), https://www.nytimes.com/2019/12/12/nyregion/feliciano-rikers-suicide.html?smid=nytcore-ios-share,

[5] Risperdal is the brand name for Risperidone, an antipsychotic used to, among other things, reduce behavior problems, aggression, or ADHD.  This paper defaults to the term Risperdal for consistency. https://childmind.org/article/what-parents-should-know-about-risperdal/

[6] Paige McAtee, "Feliciano was last seen crossing Union Turnpike on Friday afternoon, police say," *New Hyde Park, NY Patch* (August 18, 2017), article updated on August 19, 2017 to say he had been located, https://patch.com/new-york/newhydepark/missing-teen-last-seen-new-hyde-park

# III.  2/23/18 – 6/7/18: First DOC Incarceration, Rikers Island

In February 2018, the Robert N. Davoren Center (RNDC) on Rikers Island housed all the 16 and 17-year-old boys in DOC custody. Upon admission, Mr. Feliciano went through various intake procedures, including a suicide risk screening and a medical and mental health evaluation by Correctional Health Services (CHS). While the suicide risk screening did not find him at risk of suicide, CHS medical intake records note that Mr. Feliciano had a history of psychiatric disorder; that he was noncompliant with medications; and that he reported to staff that he suffered from ADHD and took the antipsychotic Risperdal to control his behavior. He also reported to staff that he had previously received in-patient psychiatric treatment at Jamaica Hospital and Wycoff Hospital.  He expressed anxiety about getting into fights in jail and not being able to sleep. CHS cleared him for General Population housing with a referral for follow-up with a Mental Health clinician.  CHS staff did not place him on any mental health medication at this time.

A week after Mr. Feliciano arrived, on March 2, 2018, DOC staff first referred him to Mental Health services for "showing radical changes in behavior; expressing a desire to commit suicide and/or attempting suicide; planning to inflict bodily harm, attempting or actually carrying out the act; continually refusing to lock-out during lock-out periods; [and] being depressed." He met with Mental Health, but DOC failed to produce him for five different follow-up mental health appointments scheduled over the next week and a half. On March 23, he punched a glass window panel in his housing area, injuring his right hand.

In April and May 2018, Mr. Feliciano was involved in a series of troubling incidents.  These included three fights with others in custody, one resulting in injuries to his nose and jaw that required x-rays; seven occasions when he was subjected to Officer force, including being sprayed with a chemical agent seven times over a six-week period; and nine departmental infractions, including spitting at an officer while in an intake area holding pen following a fight, for which he was later arrested and criminally charged. As a result of his behavior, on April 11, DOC transferred him from General Population housing to the Transitional Restorative Unit (TRU). The Department defines TRU as a "special unit... for housing young adults who exhibit and incite aggressive and/or negative behavior that significantly threatens the safety of staff and other young adults or the security of the facility. The unit's objective is to provide support that addresses the thinking and behavior that present obstacles to young adults living safely in General Population housing (GP)."[7] During this same period, Mr. Feliciano developed a pattern of punching his cell door (once requiring x-rays) and banging his head against the wall. DOC referred Mr. Feliciano to Mental Health another three times in April and May following such behavior.

On May 3, he was arraigned at Queens County Criminal Court on a new burglary charge. When he returned to Rikers, he made a Use of Force allegation claiming that an officer at court had choked him and another officer had punched him in the stomach multiple times. He was seen by Medical staff, who noted bruising on his rib cage, cuts on his wrist, arm, and neck, and swelling to his hand.  The following day, after a clinical interview, a CHS clinician ordered that Mr. Feliciano be placed in a

---

[7] DOC Directive 4494R-A, "Transitional Restorative Unit," eff. 1/22/21.

Mental Observation (MO) dorm and on constant suicide watch.[8] The clinician also completed a "Notification for Evaluation for Civil Commitment," alerting DOC staff that Mr. Feliciano may require psychiatric civil commitment on account of posing a danger to himself or others.

He was transferred into MO housing at Rikers for the first time on May 5, 2018. Two days later, on May 7—his 17th birthday—he was discharged from suicide watch and cleared for return to TRU. Upset about the prospect of being transferred out of MO housing, he acted out and a probe team came and removed him to the clinic in restraints on a gurney. The next day, on May 8, CHS placed him back on suicide watch but still transferred him out of the MO unit to TRU; however, he only remained in TRU for an hour before a probe team was called again and he was transferred back to MO housing. On May 10, two and a half months into his incarceration, CHS started him on medication for the first time (specifically, the antidepressant Remeron and the antipsychotic Risperdal.)

On May 14, after almost 10 days, a CHS psychiatrist took him off suicide watch but ordered that he remain in the MO dorm. The psychiatrist also discontinued CHS's May 4 request for an evaluation for civil commitment.

On May 24 and 25, Mr. Feliciano harmed himself again by stabbing pencils and plasticware into his arm. CHS determined to place him back on suicide watch as a protective measure on May 25. That evening, officers called a probe team to the MO housing unit to respond to him; the probe team discharged chemical spray and placed him in restraints. Later that night, the Department transferred him back to TRU even though he was still on suicide watch.

At his court date on May 29, Mr. Feliciano expected to be released from jail to a program, however, the judge sent him back to jail. When he returned to the facility, he attempted to harm himself again with a sharp plastic object to his arm. The next day, on May 30, CHS reevaluated Mr. Feliciano's psychiatric medication "on an urgent basis" following a clinical interview in which he presented as angry and agitated and said he had not received his Risperdal the past two days. CHS staff gave him a stat dose of Risperdal and doubled his prescription dose. In addition to his existing assessments (including "adjustment disorders with anxiety"), CHS also assessed him for "other specified disruptive impulse-control, and conduct disorder." He was then transferred out of TRU and back into MO housing, where he remained on suicide watch until June 4.

On June 6, 2018, Mr. Feliciano pled guilty on the two open robbery cases, and his bail was lifted. He had a remaining $1 bail hold stemming from the April 10 incident in which he was arrested for spitting on an officer, which was paid by the next day. On June 7, a CHS clinical supervisor formally discontinued its request to have Mr. Feliciano placed in involuntary civil commitment (though it's not clear from the records reviewed by BOC when that most recent request was made.) That same day, Mr. Feliciano was released from DOC custody to await sentencing.

At the time of his release from RNDC, he had spent a total of 20 days on one-to-one suicide watch and 27 days in Mental Observation housing.

---

8 The Department's Directive on Suicide Prevention (DOC Directive #4521) defines suicide watch (also known as "constant supervision") as "The uninterrupted personal visual observation of inmates (without the aid of any electrical or mechanical surveillance devices) and continuous and direct supervision by permanently occupying an established posting in close proximity to the inmate under supervision."

# IV.   11/20/18 – 1/23/19: Second DOC Incarceration, Horizon Juvenile Center

Five months later, on November 7, 2018, the Queens County Criminal Court issued a bench warrant for Mr. Feliciano, presumably for failure to return to court. He was rearrested and taken back into DOC custody on November 20, this time to the Horizon Juvenile Center in the Bronx, since 16 and 17-year-olds were no longer permitted on Rikers Island pursuant to New York State's newly-enacted Raise the Age ("RTA") legislation now prohibiting adolescents from being held there.[9] At that time, while RTA was being phased in, Horizon Juvenile Center was jointly operated by DOC and the Administration for Child Services ("ACS"), and medical care at Horizon was provided not by CHS but by the Floating Hospital and the Bellevue Hospital Juvenile Justice Mental Health Project.

On November 20, Mr. Feliciano went through a series of ACS screenings, during which he reported a history of depression, ADHD, and past psychiatric hospitalization, and told staff he took Risperdal (antipsychotic), Buspirone (antianxiety), and Remeron (antidepressant).

On November 23, a mental health assessment found that "he meets [Serious Mental Illness] criteria based on functional impairment which is severe and persistent. Of note, he was housed in MO housing for the entire time he was at Rikers Island earlier this year. Specifically he is severely impaired in the area of self-direction/self-control." Within days of this assessment, Medical treated him several times for punching walls and glass when frustrated.

Mr. Feliciano was already familiar with some of the others in custody at Horizon from his time on Rikers Island. On December 3, he got into a fight with eight other boys, including the person who had injured his nose at Rikers. Mr. Feliciano and the others received infractions for fighting. A psychiatrist from Bellevue Juvenile Justice Mental Health Service started him on Vyvanse (for ADHD) and Kapvay (a sedative sometimes used to treat hyperactivity.)

Two days later, on December 5, officers conducted a contraband search in the housing area and found two sharpened pieces of metal in Mr. Feliciano's cell. He received another infraction. On December 8, officers observed Mr. Feliciano "making a manipulative gesture," shorthand often found in DOC records to describe an event where DOC staff believe that a person is self-harming or pretending to self-harm as a means of provoking an officer response. DOC records indicate that Mr. Feliciano refused orders to stop, and so officers used force. On the same day, medical staff made a mental health referral and filed a report with the New York State Justice Center ("JC") and Office of Children and Family Services ("OCFS") saying that an officer had grabbed Mr. Feliciano's neck after Mr. Feliciano swung at him, and that Mr. Feliciano had cut himself with an object because he was upset about being sentenced the day before. The medical records indicated that Mr. Feliciano would be transferred to the Second Chance Housing Unit with constant supervision (1:1 suicide watch) and full-restrictions in place.

Mr. Feliciano received four more infractions in December 2018, including on December 13, when another sharpened piece of metal was discovered hidden in his cell; on December 17, when he was involved in another fight with five others; on December 24, when he and his friend Mr. Martinez touched a female officer inappropriately (for which they were later arrested and charged); and on December 28, when he spat and charged at a rival.  During this time period, he was seen by Medical

---

[9] https://legislation.nysenate.gov/pdf/bills/2017/s2009c#page=210

several times for scratches on his chest and for punching a steel light. The treating psychiatrist declined to start him on the antipsychotic Risperdal he had previously taken at Rikers, which he was requesting, and instead increased the dosage of his other medications.

On December 29, Mr. Feliciano was transferred into the Second Chance Housing Unit (SCHU). At the time, SCHU was defined as a "housing unit designed for adolescents and young adults who exhibit behavioral challenges requiring individualized interventions prior to reintegration into general population."[10] Mr. Feliciano's self-injurious behavior escalated while housed in SCHU. On December 30, ACS made another mental health referral and filed a report with OCFS and JC noting that Mr. Feliciano was cutting himself with an unknown object and had "12 self-injured slashes." He continued this cutting behavior for several days, prompting several referrals, and on January 3 a crisis intervention team responded and took him to Lincoln Hospital after he was found with glass in his hand. He reported that he was upset because he missed his grandmother. On January 5, staff referred him to the Bellevue Forensic Psychiatric Emergency Room for suicidal behavior, specifically statements that he "will bang his head and keep trying to kill himself until he is on the news."

On January 6, he locked himself in the bathroom and began to bang his head against the wall. Officers, along with Mr. Feliciano's friend Mr. Martinez, were eventually able to open the door and pull him out while he resisted with kicks and punches. A DOC probe team arrived and held him face down on the floor. The probe team then escorted him to the Intake area, where he again began banging his head against the wall and climbed on top of a chair. Officers used control holds to restrain him, causing some swelling on his forehead, for which he refused treatment. Medical staff initiated a transfer to Bellevue Hospital for a mental health evaluation, however the transfer was canceled once staff reported that he had calmed down. The following day, on January 7, he was treated at the clinic for headaches from banging his head, and was prescribed ibuprofen.

Later that evening, on January 7, 2019, he began cutting himself, writing "RIP" in his blood on the housing area plexiglass. He was taken back to the clinic, where medical staff treated his wounds and noted that he was distressed. At 12:45 AM on January 8, CHS called EMS to take him to the hospital for a mental health evaluation. While in the clinic awaiting EMS, around 1:15 AM, Mr. Feliciano began cutting his arm again with sharpened metal pieces, and broke into a fire cabinet and began spraying the fire extinguisher and inhaling the fumes. Five probe team officers then surrounded him, took him down to the floor, and placed him in restraints. Near the entrance to the Intake, he refused to walk any further, so six officers forcibly placed him on a gurney to subdue him while he cried. Mr. Feliciano went to Bellevue Hospital and received stitches in his arm; he had other cuts to his legs, neck, and chest. He returned from the hospital later that day. On January 8, a psychiatrist prescribed him Risperdal. Medical records noted "Mr. Feliciano is at chronically elevated risk for violence and suicide."

On January 11, 2019, Mr. Feliciano was adjudicated a Youthful Offender in accordance with the Raise the Age Law, and was sentenced on both of his robbery cases to a term of 16 months to four years. Following this sentence, he continued to harm himself by punching walls, cutting, and threatening suicide, for which he was prescribed additional doses of medication. On January 23, after being on suicide watch for the greater part of six weeks, he was transferred to Hudson Correctional Facility, a medium security New York State prison for males.

---

[10] DOC Directive 4494 ("Transitional Restorative Unit and Second Chance Housing Unit"), eff. 1/26/18.

# V.   11/19/19 – 12/4/19: Third DOC Incarceration, Rikers Island, and Elmhurst Hospital

On October 30, 2019, after serving a little more than 10 months in New York State custody, Mr. Feliciano was released on parole. However, less than a month later, on November 19, 2019, he was arrested on a violation of parole and was taken back into City custody. Because he had turned 18 in May, he was treated as an adult and transported directly to Rikers Island. Upon arrival, he went to RNDC, which operates all new admissions processing for 18 to 21-year-olds as part of the Department's Young Adult Plan.[11]

### A.   11/19/19 – 11/26/19: Intake, Medication, and Fight

Upon admission to RNDC, Mr. Feliciano underwent a suicide risk screening by DOC staff and received a score of zero, indicating low risk for suicide. DOC staff also completed an arraignment and classification risk screening form for him, which included the question "Do any documents indicate Suicide Watch and/or Protective Custody?" to which the officer filling out the form checked "No."

In his medical intake screening on the same day, Mr. Feliciano reported his history of depression, anxiety, and psychiatric hospitalizations, and said that he was receiving psychiatric therapy in the community. Medical Intake staff checked his community medication fill history in the database, which showed that he had recently filled prescriptions for Buspirone, an anti-anxiety medication, and Hydroxyzine Pamoate (Vistaril), an antihistamine used short-term to treat anxiety. CHS determined that he could be housed in general population with a "[Mental Health} Follow-Up Clinician/Psychiatrist," assessed him for depression and anxiety, and prescribed him Vistaril. He was then assigned temporarily to a new admissions cell housing area at RNDC for young adults ages 18-21.

Two days later, on November 21, 2019, he called his grandmother complaining that the dosage of medication he had been given was "really low" and "not working," and said he got "so mad" that he "punched glass." He asked her what medication he had been taking at home, and after retrieving his pill bottles she informed him that he had been taking 50 mg of the anti-anxiety medication Buspirone once a day and 10 mg of the antipsychotic Risperdal twice a day.[12]

Later that afternoon, DOC staff observed him banging his head on the wall of his cell and referred him to Mental Health Services for "showing radical changes in [behavior], s[uicidal] ideation, attempting to inflict injury by banging body parts, strong feelings of guilt, being depressed, being alarmed." In the course of the psychiatric evaluation, Mr. Feliciano reported a past history of trauma and PTSD, including witnessing serious violence and being physically abused. CHS noted his history of psychiatric hospitalizations and the fact he had previously been on suicide watch in DOC custody, but also recorded that Mr. Feliciano was not found in the community fill database despite the fact that the Medical service had located him in the database during his medical intake two days earlier. Mr. Feliciano told CHS staff that he was anxious and unable to sleep through the night, and that he was not tolerating Vistaril well and preferred Buspirone for his PTSD. He admitted to banging his head

---

[11] See DOC February 2019 Update to the Young Adult Plan:
https://www1.nyc.gov/assets/boc/downloads/pdf/Meetings/2019/February/Young%20Adult%20Plan%20Update%20February%202019.pdf
[12] CHS maintains that 20 mg per day is more than three times the Maximum Daily Dose for risperidone.

against the wall to get DOC's attention so that he could have his medication addressed. Following the evaluation, CHS discontinued him on Vistaril and started him on 15 mg of Buspirone twice a day, along with a nightly antihistamine to help him sleep. CHS scheduled a follow-up appointment for early December.

Later that evening, DOC transferred Mr. Feliciano from RNDC (where the majority of Departmental services for young adults are concentrated) to the George R. Vernon Center (GRVC) on Rikers Island because of his gang affiliation. The following day, on November 22, DOC assigned him to GRVC Unit 4B, a general population housing area for young adults.

On November 26, CHS generated a record indicating Mr. Feliciano had a medication compliance rate of 30%. On the same day, he was involved in a fight with another person in his housing unit. DOC's current practice is to bring people to the Main Intake directly following an incident or fight, so that the person can calm down in a pen, be decontaminated (if they have been sprayed), visit the adjacent clinic, and where necessary, receive a new housing area assignment.[13] Despite having no visible injuries, Mr. Feliciano was brought to the intake/clinic, where he refused medical treatment. He reported later to his grandmother that he spent about 3-4 hours in a holding pen in the Main Intake "going crazy" that evening after the incident, until being returned to his cell after midnight.

### B.  11/27/19 – 11/28/19: Second Fight, Attempted Suicide, and Transfer to Elmhurst

On November 27, 2019, the day before Thanksgiving, Mr. Feliciano came out of his cell at 8:32 a.m., sat down at one of the tables in the day room, and ate breakfast while watching TV.  After breakfast, he took a shower.

At approximately 10:28 a.m., Mr. Feliciano made the first of three phone calls that day to his ex-girlfriend.  He told her that while in prison he "broke down both mentally and physically" but believed he "still [had] an opportunity to change." In those calls, he largely appeared to be in good spirits, laughing with her and asking to meet with her when he got out of jail, saying he "couldn't do this alone."

At 11:27 a.m., after eating lunch, Mr. Feliciano called his grandmother. He apologized for not having wished her a happy birthday the day before, and explained that he had not been able to call because he had gotten into a fight and was in the Main Intake most of the night. He asked her multiple times when she was coming to visit him, and she replied that she would visit once her NY State I.D. came in the mail.

After speaking with his grandmother, Mr. Feliciano played a video game and cards with other people in the housing area and briefly interacted with two non-uniformed staff. At 1:33 p.m., he listened to music and danced alone in the stairwell area. At 3:04 p.m., he locked into his cell for institutional count. He locked out about one hour later, and was observed socializing in the stairwell with two other people at 5:16 p.m.

At 5:24 p.m., Mr. Feliciano's friend, Mr. Martinez appeared to start arguing in the day room area with another person in custody, who then struck him. Mr. Martinez began to fight with six of them and Mr.

---

[13] The Board's new restrictive housing rule, effective July 9, 2021, will no longer permit the Department to use intake areas for this purpose after January 9, 2022. *See* RCNY § 6-05(k), https://www1.nyc.gov/assets/boc/downloads/pdf/RULE-AND-SBP-6-4-21-Legal-11833206.pdf

Feliciano intervened when he saw that his friend was outnumbered. Officers physically separated the two groups and used chemical spray to end the fighting. According to jail records, Mr. Feliciano suffered lacerations to his face, abrasions to his torso, and contusions on his back, while Mr. Martinez sustained a hematoma to his face and ribs.  Thereafter, Officers escorted Mr. Feliciano and Mr. Martinez out of the housing area to the clinic.

Mr. Feliciano went to a treatment cubicle in the clinic area from 5:35 p.m. to 6:04 p.m. The treating physician diagnosed him with "lacerations requiring sutures, staple or glue" and ordered an X-ray to be taken at the Urgi-Care Clinic at West Facility on Rikers Island.

At approximately 6:23 p.m., Officers brought Mr. Feliciano to the Main Intake area. The Main Intake is a series of temporary holding areas ("pens") each containing benches, a sink, and a toilet blocked by a waist-high privacy partition. The front "wall" of each of these pens consists of iron bars at about five-inch intervals that allow people to see directly inside. Mr. Feliciano joined Mr. Martinez in Pen 8, whereupon Mr. Martinez embraced him. They spent the next four hours alone together in Pen 8 waiting to be transported to Urgi-Care at West Facility. Mr. Martinez recalled later to *The New York Times* that Mr. Feliciano said, "If they separate us, I'm going to kill myself."

After four hours, A. was taken out of Pen 8 to go to Urgi-Care, after which Mr. Feliciano was moved to Pen 11 by himself. Pen 11 is one of the larger pens in the middle of the Main Intake. The front of the pen directly faces the officer's station, which sits nine feet away with an unobstructed view. A side wall of iron bars lines another corridor running next to Pen 11, which provides additional views inside.

Within an hour of Mr. Martinez's departure, Mr. Feliciano began displaying troubling behavior such as throwing food, kicking the pen gate, screaming, and keening over a bench. Another person in custody in the Main Intake later gave a written statement saying that at this time, Mr. Feliciano was "going crazy, stating he wanted to be with his friend." Shortly thereafter, Mr. Feliciano stood on a bench and appeared to search for an object close to the ceiling. At 11:32 p.m. — with Officer 1 standing immediately outside the pen watching him — Mr. Feliciano stood with one foot on the sink and the other foot on the toilet partition and tied his shirt to an object near the ceiling. He tested his weight against the ligature (i.e., the tied-up shirt), placed both feet on the partition, and wrapped the ligature around his neck, while Officer 1 stood pen-side, watching. Mr. Feliciano then removed the ligature from his neck, sat down on a bench, and began eating. Officer 1 returned to his desk to finish paperwork.

A few minutes later, at 11:35 p.m. the Intake Captain approached Mr. Feliciano's pen and the two had a verbal exchange. As the Intake Captain walked away, Mr. Feliciano reached through the bars and threw a plate of food in the Captain's direction. One minute later, Mr. Feliciano resumed work on the ligature. Standing again on the toilet partition, he began tying a second shirt/sweatshirt to the bars on the left side of the pen and connected the two clothing items. He looped the ligature around his neck while standing on the partition and then dropped his body from the partition. Hanging from his neck, the tips of his toes appeared to barely touch the ground. Immediately after dropping from the ligature, Mr. Feliciano appeared to change his mind and could be seen struggling to lift himself to safety using the partition as support. The tips of his toes made slight contact with the ground as he attempted unsuccessfully to lift himself back onto the partition. For one minute and 51 seconds, surveillance footage shows him hanging with his arms and legs flailing before losing consciousness at 11:43:04 p.m. During this one-minute-and-51-second period, Officer 2 was standing several feet

away in the Officer's station directly facing Pen 11. At the same time, two people in custody across the corridor in Pen 7 appeared to watch what was happening.

At approximately 11:43 p.m., Officer 3 approached Mr. Feliciano's pen. He opened the pen door and looked inside for 14 seconds at Mr. Feliciano, who was hanging motionless with his toes grazing the ground. Officer 3 then closed the door without entering the pen and walked away. At 11:44 p.m., Officer 1 passed directly in front of Pen 11 without looking at Mr. Feliciano. At the same time, two people in custody who appeared to be disposing of garbage bags in the Main Intake took notice of Mr. Feliciano hanging and moved around to the front of the pen to get a closer look.

Meanwhile, Urgi-Care had reportedly determined to send Mr. Feliciano's friend Mr. Martinez to the hospital for further evaluation. The sally port exit where ambulances arrive is behind the Officer's station in the Main Intake, and so at 11:44 p.m. two FDNY EMTs wheeled Mr. Martinez through the Main Intake on a gurney, escorted by three Officers (Officers 4, 5 and 6). From their path through the Main Intake to the sally port exit, Mr. Martinez the three escort officers, and the two EMTs had a direct line of vision to Pen 11 and looked over at Mr. Feliciano while he was hanging motionless.

Mr. Martinez and the two EMTs spent more than three minutes at the exit behind the Officer's station waiting for the sally port to open, during which time the two EMTs stared intently across the Main Intake at Mr. Feliciano's pen, appearing concerned but not moving from Mr. Martinez's gurney. Mr. Martinez later told Board staff that during this time, Officers asked him to tell Mr. Feliciano to stop "fronting" (i.e., faking a suicide attempt); Mr. Martinez reported that he yelled out to Mr. Feliciano, and then when Mr. Feliciano failed to respond, Mr. Martinez began crying and yelling at Officers to help. The Genetec video reviewed by Board staff (which does not contain audio) confirms that Mr. Martinez appeared distraught and shouted several times towards Pen 11. During this three-minute delay waiting for the sally port to open, Officers 1, 2, 3, and 7 each made an appearance at the Officer's station. At 11:47 p.m., the FDNY EMTs wheeled Mr. Martinez out of the Main Intake sally port and transferred him to Bellevue Hospital by ambulance.

At 11:46 p.m., Officer 7 walked past Pen 11. One minute later, Officers 1 and 7 walked together around the perimeter of Mr. Feliciano's pen looking at him, motionless with a ligature around his neck. They both then proceeded to a back room off the Main Intake Floor.

At 11:47, Officer 2 gestured to Officer 3 to indicate he was leaving the area. One minute later, Officer 2 returned with the Intake Captain and unlocked the door of Pen 11. The Officers stood outside the open door for seven seconds before entering, at which time Officer 7 followed them inside. The Captain placed handcuffs on one of Mr. Feliciano's wrists, and then the Captain and Officer 2 untwisted Mr. Feliciano's body to release his neck from the ligature. At that point, 11:49 p.m., Mr. Feliciano fell to the ground in a slump on his knees after hanging for seven minutes and 51 seconds.

Right after Mr. Feliciano fell, the Intake Captain removed the handcuffs from Mr. Feliciano's wrist and felt for a pulse. He issued a radio transmission call for medical assistance, and then he and Officer 7 laid Mr. Feliciano's body out on the floor in a supine position. The Officers continued searching for a pulse, and at 11:50 p.m., Officer 7 began chest compressions. Officer 2 retrieved a defibrillator and at 11:51 p.m., Officer 7 placed defibrillator pads on Mr. Feliciano's chest. Three clinic staff arrived at the scene and took over chest compressions at 11:52 p.m. Three more medical staff came within two minutes, one with a gurney and another with a bag valve mask. Clinic staff then inserted an oropharyngeal airway and started an IV of Narcan (a drug generally used in an emergency to treat overdoses). Records show that a request for an ambulance was placed with FDNY at 11:54 p.m. At

12:05 a.m. on November 28, a seventh clinic staff person entered the pen and performed a tracheal intubation on Mr. Feliciano.

A CHS Referral Form recorded on November 28, 2019 described the medical treatment Mr. Feliciano underwent while lying on the floor of the intake pen as follows: "Emergency called into the intake area. Found on the floor, no pulse, no breathing. CPR started, 2 doses of Narcan given. Ambu bagged. Pulse restored about 2 minutes [later] and rescue breathing continued. As per DOC [patient] attempted suicide by hanging."

EMS arrived at the GRVC sally port at 12:28 a.m. and the ambulance left with Mr. Feliciano at 12:46 a.m. According to an Elmhurst Hospital Run Tracking/Monitoring Report, the ambulance arrived at the Emergency Room 34 minutes later, at 1:20 a.m. The Report further indicated that between 2:05 a.m. and 2:30 a.m., Mr. Feliciano underwent a CAT scan.

GRVC officers reported the incident to the Central Operations Desk ("COD") at 12:35 a.m. on January 28. That report said the following:

> ATPO, AT 2341 HOURS, IN THE INTAKE PEN #11, INMATE FELICIANO WAS
> AWAITING TRANSPORTATION TO URGI-CARE WHEN HE PERFORMED A MANIPULATIVE
> GESTURE BY TYING HIS INSTITUTIONAL UNIFORM SHIRT AROUND HIS NECK AND THE
> OTHER END TO THE PEN'S PARTITION. THE CAPTAIN OBSERVED THE INMATE AND
> ENTERED THE PEN. WHEN THE CAPTAIN WENT TO REMOVE THE SHIRT THE INMATE
> FELL. OFFICER [7] PERFORMED CPR. MEDICAL STAFF WAS SUMMONED AND ARRIVED AT
> 2345 HOURS TO THE INTAKE. AT 0025 HOURS, MEDICAL STAFF DEEMED THE INMATE
> UNRESPONSIVE. THE INMATE WAS REFERRED TO ELMHURST HOSPITAL VIA EMS FOR
> TREATMENT. THE INMATE WAS BREATHING UPON DEPARTURE TO THE HOSPITAL.

At 2:35 a.m., the COD was updated to say that Mr. Feliciano was "critical but stable and placed in a medical induced coma."

### C.  11/28/19 – 12/4/19: Discharge from Custody and Officer Suspensions

Upon admission to Elmhurst Hospital, Mr. Feliciano was treated for anoxic brain injury (brain injury due to sustained oxygen deprivation) and potential respiratory impairment. He was unable to speak, ambulate, or feed himself. Doctors attempted to extubate him on November 29, but reintubated him shortly thereafter following concerns about his ability to breathe on his own. On December 4, the New York State Board of Parole lifted his parole warrant on account of his being ventilator dependent, effectively discharging him from DOC custody. On December 5, he underwent a tracheostomy and feeding tube insertion, and on December 9, he was treated for pneumonia after a MRSA infection. A brain scan on December 17 showed severe brain damage. On January 10, 2020, Mr. Feliciano was transferred to Bellevue Hospital's Acute Traumatic Brain Injury Rehabilitation Facility, where he still remains with no change in prognosis as of June 2021.[14] On December 1, 2020, Mr. Feliciano's family reported to *NY1* that Mr. Feliciano "can no longer stand on his own, has limited vocal function and can't feed himself."[15]

---

[14] As per David Rankin, attorney for the Feliciano family.
[15] https://www.ny1.com/nyc/all-boroughs/news/2020/12/01/relatives-say-city-responsible-for-inmate-s-injury-during-failed-suicide-attempt-at-rikers-island

Within days of the incident, Officer 1, Officer 2, Officer 7, and the Intake Captain were suspended for 30 days without pay, which is the maximum amount of time DOC may suspend staff pending the formal resolution of charges against them, pursuant to collective bargaining agreements. If warranted, DOC is precluded from proceeding with any further disciplinary action against staff in this case until after the resolution of other law enforcement agency investigations. According to DOC, these personnel are currently employed at DOC in modified-duty posts that do not involve contact with the incarcerated population.

As of the date of this report, the New York City Department of Investigation and the Bronx District's Attorney's Offices are still investigating this case and have yet to issue their findings.

# VI.    Post-Incident Policy Changes

Upon reviewing this incident, Board staff discovered that another suicide attempt had taken place in the same intake pen (GRVC Intake Pen 11) six days before. On the evening of November 21, 2019, a 26-year-old man with bipolar disorder who had been in mental observation housing attempted to hang himself. The COD for this incident stated, in part, that he "performed a manipulative gesture by tying his coat around his neck and that a captain and five officers utilized upper body controls and took him to the floor." On December 12, 2019, a *New York Times* article about Mr. Feliciano's suicide attempt reported that this individual "stated in an interview that it took about three minutes before two guards entered the pen and cut him down. 'Nobody stopped me until I did it.'"[16]

On February 13, 2020, the Chief of the Department issued a teletype on "Self-Injurious Behavior" to all commanding officers, reminding staff of suicide prevention protocols and proper notifications. Among other things, the teletype instructed that the terminology "manipulative gesture" or any similar variation would be prohibited from now on. It noted "regardless [sic] of an individual known to have mental health issues, the individual may choose a lethal method to self-harm (ex. hanging) even in the absence of a true intent to die, an individual may miscalculate or mistakenly self-injure causing serious, life threatening circumstances. For these reasons, all individuals shall be monitored closely and all self-injurious behavior shall be considered a serious event." The teletype also reemphasized current policy in Directive No. 5000R-A ("Reporting Unusual Incidents") that all reports of unresponsive individuals must be made to the Central Operations Desk within fifteen (15) minutes, and reminded all staff of Departmental Rules and Regulations 6.15.010, which requires that staff immediately cut or remove ligatures from people's necks without first waiting for assistance to arrive.

In June 2021, the Board passed a new chapter of local regulations governing restrictive housing. Prompted in part by Mr. Feliciano' attempted suicide, Section 6-05 of the new rules prohibit the Department from placing people in intake areas after a fight or staff use of force (known as "de-escalation confinement") and will instead require the Department to place people in individual cells with beds and toilets for no more than six hours. This provision of the new rules will take effect on January 9, 2022.

On September 27, 2021, following the recent rash in completed suicides and suicide attempts—including an attempted hanging in view of elected officials touring an intake area[17] and an attempted

---

[16] Fn. 1, supra.
[17] https://nypost.com/2021/09/13/inmate-tries-to-hang-himself-during-politician-tour-of-hellish-rikers-island/

hanging in a young adult area reviewed by a federal oversight monitor[18]--the Department issued another teletype titled "Suicide Prevention and Intervention" to "reiterate [staff's] professional responsibilities" when observing someone engaged in self-harm.[19] The new teletype added language to the effect that staff may never make any assumptions about why a person is engaging in such behavior (i.e., the person is faking, or seeking attention) in lieu of immediately intervening. The teletype also clarifies that staff must physically intervene (as opposed to just issuing verbal commands) and specifies that such physical intervention may include use of force.

## D. KEY FINDINGS

- Long delays (more than five hours) in an Intake pen awaiting transport to Urgi-Care resulted in dangerously tense conditions leading up to Mr. Feliciano's suicide attempt.

- Mr. Feliciano hung with a ligature around his neck for seven minutes and 51 seconds before DOC staff cut him down. During that time he was observed hanging motionless on several occasions by at least seven Officers, one Captain, two FDNY EMTs, and three other people in custody.

- DOC touring assignment records indicate that Officers 1, 2, and 7 were specially trained in mental health and CPR.

- Staff involved in the incident subsequently reported that Mr. Feliciano had made a "manipulative gesture" and they believed him to be faking his suicide attempt.

- The Intake Captain and Officer 2—the two who first entered Mr. Feliciano's pen and cut him down—each had received command-level disciplines involving failure to supervise. The Intake Captain had two pending Memorandums of Complaint (MOCs—higher level charges eligible for departmental discipline) for failure to supervise, as well as one MOC for failure to provide medical assistance for which the Department took 13 vacation days.

- The ambulance did not arrive until more than 33 minutes after the emergency call was placed. Once the ambulance arrived, EMS stayed on the scene for 18 minutes. It took another 34 minutes from when the ambulance left the facility until Mr. Feliciano arrived at the hospital emergency room.

- Mr. Feliciano had a lengthy and significant history of suicidal behavior while in City custody, including 20 days of suicide watch at RNDC in 2018 and almost six weeks of suicide watch at Horizon Juvenile Center in 2018-2019. Nevertheless, when he entered DOC custody for the third time in late 2019, DOC's suicide risk screening measures did not detect him to be at any risk of suicide, which would otherwise have prompted an immediate evaluation by Mental

---

"We were in the intake area, which is completely overrun and completely crowded, stepping over pools of piss," [Assembly member Jessica Gonzalez-Rojas (D-Queens] recalled after the visit. "A man called me over and pointed to someone who jumped up on the bars and tried to use a bedsheet to kill themselves ... I called a guard over. I think [the inmate] was OK."

[18] https://www.nydailynews.com/new-york/nyc-crime/ny-jails-oversight-violence-conditions-failure-20210924-ynujlhq5pvc25lojb3b7mj33su-story.html ""There were officers literally within six feet of a hanging inmate in their direct line of sight and they did not detect that," [the Federal Monitor Steve Martin] said of the incident, which occurred Monday in the Rikers jail that houses younger detainees."

Health. Instead, he didn't see Mental Health for two more days, only after he began self-injuring and complaining about his psychiatric medication doses being ineffective.

- Mr. Feliciano's time as an adolescent in DOC custody was marked by frequent violence, fights, self-harm, and uses of staff force, including staff spraying him with chemical agents seven times in a six-week period at RNDC.

- The medication histories run by CHS in the community fill database for Mr. Feliciano during his third and final DOC intake appear to have yielded different results when run by the Medical side and by the Mental Health side. It also appears that CHS did not access or review Mr. Feliciano's medical records from his recent time in New York State DOCCS, which presumably would have provided additional information about his medication needs.

- Two days after arriving at RNDC, the jail where young adult services are largely concentrated, DOC moved Mr. Feliciano to GRVC.

- CHS recorded that Mr. Feliciano has a 30% medication compliance rate as of November 26, the day before his fight and subsequent suicide attempt.   In this case, as in others, CHS records do not make clear whether or not this low compliance rate is attributable to Mr. Feliciano's failure to accept medication, a failure by the agencies to consistently provide him access to medication, or a combination of both.


# E. RECOMMENDATIONS

**TO CHS**

1. CHS should develop an action plan to ensure that medical information from prior City incarcerations is quickly integrated upon subsequent intakes, including known histories of suicidal behavior and psychiatric medication regimens.

2. CHS should work with NY State DOCCS to ensure timely and effective medical information-sharing about people in the City jails who were recently released from state custody.

3. CHS should immediately move to implement the following recommendations regarding the provision and tracking of medications, which the Board also made in its June 2020 Report on the Death of Layleen Polanco:

   a. Institute controls to ensure that a new patient's current medications — including all recent prescriptions captured in the community fill database, in collateral records accompanying a person into custody, or self-reported — are continued in custody, and that all such medications are bridged immediately at Intake, as required by CHS's Intake Evaluation Policy (Policy#: MED 1). If there is a clinical determination that continuing a community medication is not appropriate, the reasons for that decision and any consultations with community providers or the patient should be recorded;

   b. Act on SCOC's December 17, 2019 Final Report on the Death of Wayne Henderson, which directed CHS to "commence a comprehensive review and revision of the medication delivery and reconciliation process for inmates within NYC DOC. Proper

health records must also contain a record of medications prescribed by the physician and administered;"

   c. Develop a process for flagging and tracking patients with serious conditions (including mental health) who have low rates of medication compliance. This process should include a written analysis of the reasons why a patient has low compliance (e.g. patient refusal) and any operational barriers to compliance, (e.g. CHS staff could not locate the patient), and should also include an individualized medication compliance plan to address such issues.

**TO DOC**

1. Given the current intake crisis and a rise in self-harm incidents, the Department should ensure that intake areas are not staffed by people with disciplinary histories for failure to supervise or failure to render medical assistance.

2. DOC should reevaluate its mental health and CPR trainings for staff in light of the fact that several officers with such training failed to intervene in this attempted suicide.

3. The Department should develop an action plan to not only respond to self-harm in intake areas but also to prevent it through tension-reduction measures. This might include enhanced sanitation/hygiene, distribution of programming tablets, physical modifications to make intake more comfortable, the use of television, and improved beverage and snack distribution.

4. The Department should employ trained suicide prevention aides (SPAs) in custody through the Observation Aide Program in every jail intake area during every tour. The Department should revisit the Observation Aide Directive to allow SPAs in these areas to distribute water and other necessities to people inside intake pens, to the extent the Department finds that doing so would alleviate area tension.

5. The Department should develop internal policies to reduce its overreliance on chemical agents on young adults and people with mental health issues. The Department's September 27, 2021 teletype on Suicide Prevention should be immediately modified to prohibit staff from using chemical agents as a means of stopping a suicide attempt (i.e. spraying someone who has a ligature around their neck.)

**TO CHS/DOC, Jointly**

1. The agencies should work together to develop a system to flag people with prior self-harm incidents in custody at intake for immediate Mental Health evaluation and appropriate housing determinations.

2. The agencies should present to the Board a joint action plan to ensure that people are transported from the clinic to Urgi-Care in less than an hour, and that all transfers of people in intake awaiting medical treatment are tracked in a manner that can be evaluated for quality assurance.

## F. CONCLUSION

The attempted suicide of Nicholas Feliciano in November 2019 highlights many troubling aspects of New York City's jail system relating to young adults, mental health treatment, self-harm, dangerous intake conditions, and poor supervision. These conditions persist today. It is the Board's hope that the public, DOC, and CHS can learn from our findings and the agencies can implement our recommendations to prevent future tragedies.

# **Appendix**

Response of Correctional Health Services to the Board of Correction's

Report and Recommendations

**Correctional Health Services (CHS) Response to the Board of Correction Investigation of the November 2019 Attempted Suicide of Nicholas Feliciano**

**NYC Health + Hospitals/Correctional Health Services (CHS) has robust systems in place to ensure the quality of care provided to its patients.  Those systems, and the care provided to Mr. Feliciano by CHS, did not contribute to the tragic event and outcome that is the focus of this report. We regret that the Board appears to have missed an opportunity to gain a better understanding of the phenomenon of Non-Suicidal Self-Injury in jails and the dangers associated with this phenomenon, which is a product of the environment rather than an outcome of clinical care.  Following are CHS' specific responses to the Board's recommendations as they pertain to CHS.**

**RECOMMENDATIONS TO CHS**

1. CHS should develop an action plan to ensure that medical information from prior City incarcerations is quickly integrated upon subsequent intakes, including known histories of suicidal behavior and psychiatric medication regimens.

   RESPONSE: CHS already has a process to integrate information from prior incarcerations into subsequent intakes. All templates for initial evaluations (initial MH Assessment and Treatment Plan and Initial Psychiatric Assessment) in CHS' electronic health system include a chart review section where clinicians are directed to review the medical intake and include any relevant information, to review clinical information from the PSYCKES database, and to review any prior admissions, including whether the patient has ever been on PACE/CAPS, whether the patient has ever been on psychiatric medications, and so on.

2. CHS should work with NY State DOCCS to ensure timely and effective medical information-sharing about people in the City jails who were recently released from state custody.

   RESPONSE: CHS already has a policy that requires all mental health staff who provide direct care to know how and when to obtain collateral information, how to document it, and how to incorporate it into the treatment and reentry plan. NY State DOCCS information is considered collateral information. In situations in which mental health records/information from NY State DOCCS for specific patients, typically those who have a Serious Mental Illness, are considered necessary to inform treatment, the Social Work department contacts NY State DOCCS to obtain that information, which is then related to the treatment team and included in the chart. This communication process is efficient and records are typically obtained quickly.

3. CHS should immediately move to implement the following recommendations regarding the provision and tracking of medications, which the Board also made in its June 2020 Report on the Death of Layleen Polanco:

   a. Institute controls to ensure that a new patient's current medications — including all recent prescriptions captured in the community fill database, in collateral records accompanying a person into custody, or self-reported — are continued in custody, and that all such medications are bridged immediately at Intake, as required by CHS's Intake Evaluation Policy (Policy#: MED 1). If there is a clinical determination that continuing a

community medication is not appropriate, the reasons for that decision and any consultations with community providers or the patient should be recorded;

RESPONSE:  CHS has already instituted a system by which psychiatric providers are instructed to check community prescription databases and, if the patient is in fact taking those medications and if clinically indicated, to continue those prescriptions. The Initial Psychiatric Assessment directs psychiatric providers to copy and paste community medication full history and to check whether medications where ordered at medical intake. Psychiatric providers include their justification for the medications they prescribe in their formulation and plan.

b. Act on SCOC's December 17, 2019 Final Report on the Death of Wayne Henderson, which directed CHS to "commence a comprehensive review and revision of the medication delivery and reconciliation process for inmates within NYC DOC. Proper health records must also contain a record of medications prescribed by the physician and administered;"

RESPONSE: This information is contained in CHS pharmacy system and is available to clinical staff through a link in the electronic health record. CHS has begun providing printouts of this information as part of medical records provided to SCOC.

c. Develop a process for flagging and tracking patients with serious conditions (including mental health) who have low rates of medication compliance. This process should include a written analysis of the reasons why a patient has low compliance (e.g. patient refusal) and any operational barriers to compliance, (e.g. CHS staff could not locate the patient), and should also include an individualized medication compliance plan to address such issues.

RESPONSE: CHS already has such systems in place.  As discussed, CHS does not consider the critical contributing factors to this event to be medication responsive.

**TO CHS/DOC, Jointly**

1. The agencies should work together to develop a system to flag people with prior self-harm incidents in custody at intake for immediate Mental Health evaluation and appropriate housing determinations.

RESPONSE: Such a system already exists, and is initiated by DOC, which is the first point of contact with persons in custody.

2. The agencies should present to the Board a joint action plan to ensure that people are transported from the clinic to Urgi-Care in less than an hour, and that all transfers of people in intake awaiting medical treatment are tracked in a manner that can be evaluated for quality assurance.

RESPONSE: Transportation of persons in custody is the responsibility of DOC.