# EXHIBIT 32

# OFFICE OF COMPLIANCE CONSULTANTS

15 WEST 5TH STREET · HIGH IMPACT COMPOUND · MERCADO TRAILER · EAST ELMHURST, NY 11370

Deputy Director
Nicole N. Austin Best
(347) 381-0728
deputydirector@compliance-consultants.us

July 27, 2022

*By Electronic Delivery*
Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

**Report on Environmental Conditions re:** *Benjamin v. Molina*
**75 Civ. 3073 (LAP)**

Dear Judge Preska:

Enclosed is OCC's report on specific environmental conditions within the NYC jails, pursuant to the late Judge Baer's 2001 Order on: Environmental Conditions. This report summarizes monitoring observations during January–April 2022 and provides an update on the Defendants' progress with respect to related orders entered by Judge Baer.

.

Respectfully submitted,

Nicole N. Austin-Best
Deputy Director
Office of Compliance Consultants

*By Electronic Copy Only*
Cc*: Law Department*
   Chlarens Orsland, Esq.
   Min Kyung (Michelle) Cho, Esq.

   *DOC Legal*
   Laura Ahern, Esq.
   Melissa Guillaume, Esq.

   *Legal Aid Society*
   Veronica Vela, Esq.
   Robert Quackenbush, Esq.
   David Billingsley, Esq.

**TABLE OF CONTENTS**

I.   INTRODUCTION………………...……………………………………..…..……………..2


II.  MONITORING OBSERVATIONS……......………………………………………….....4

    A.  Sanitation…………………………………………………………………….….....4
        1.  DOC Sanitation Reports……………………………………………......……....4
            a.  Defendants' Obligations ………………………….…..……………….4
            b.  Defendants' Performance ………………………………..……………4
            c.  Defendants' Compliance …………………………………….…………6
                i.  OCC Methodology and Analysis………….................……………9
                ii.  Benjamin Inspection Protocol……………….……..………….16
                iii.  Discussion of Findings……………….………………..…….18
        2.  DOHMH Inspection Reports ........................................................................35
        3.  OCC Recommendations ……………………………………….……………39

    B.  Ventilation………………………………………………………………….........43
        1.  Defendants' Ventilation Reports……………………………………….........43
            a.  Defendants' Obligations ………………………….………..…………43
            b.  Defendants' Performance …………………………………..…………43
                i.  Quarterly Mechanical Equipment Inspection Reports….........……43
                ii.   Monthly Airflow Reading Reports ………………….……….…..44
                iii.  Airflow Deficiency Reports……………….…………….…..44
                iv.   Monthly Intake Ventilation Reports …......................…………46
                v.   Operational Windows ………………………………..…….47
            c.  Defendants' Compliance ………………………………………………47

    C.  Lighting……………………………………………………………….......…..49
            a.  Defendants' Obligations ………………..……………………..………49
            b.  Defendants' Performance …………………………………..…………49
            c.  Defendants' Compliance …………………………………….…………50

    D.  Fire Safety…………………………………………………………...……....51


III.  COMPLAINTS…………………………………………………………..........54

OFFICE OF COMPLIANCE CONSULTANTS
15 WEST 5th ST · HIGH IMPACT COMPOUND · MERCADO TRAILER · EAST ELMHURST, NY 11370

# Report on Environmental Conditions

*Benjamin v. Molina, 75 Civ. 3073 (LAP)  Progress Report, January - April 2022*

Nicole N. Austin–Best
7/27/2022

*Benjamin v. Molina*     Environmental Conditions
75 Civ. 3073 (LAP)     January–April 2022

## I. INTRODUCTION

The Office of Compliance Consultants ("OCC") is authorized to monitor the Defendants'—the City of New York's ("NYC") and the NYC Department of Correction's ("DOC" or the "Department")—compliance with the Court's mandates contained in various orders: the Order re: Fire Safety, dated November 13, 1998; the Order on: Environmental Conditions (the "Environmental Order"), dated April 26, 2001; the Order re: Testing and Repair of Ventilation Systems (the "Ventilation Order"), dated November 14, 2003; the Amended Supplementary Order re: Repair and Renovation of Ventilation Systems (the "Am. Supp. Ventilation Order"), dated February 11, 2009; the Amended Order re: Lighting Conditions (the "Am. Lighting Order"), dated October 7, 2010; the "so ordered" Stipulation concerning withdrawal of sanitation motions and steps to improve sanitation (the "Sanitation Stipulation"), dated October 14, 2010; the Supplemental Order re: Construction Projects Required by Amended Supplementary Ventilation Order, dated October 20, 2011; the Second Supplemental Order re: Construction Projects Required by Amended Supplementary Ventilation Order, dated December 18, 2012; and the Order re: Ventilation Reports, dated November 18, 2021.

This report summarizes the status of sanitation, ventilation, lighting, and fire safety within various New York City jails as reviewed by OCC during January–April 2022 (the "monitoring period"). A summary of complaints reported to OCC by The Legal Aid Society's Prisoners' Rights Project ("LAS" or "Plaintiffs," sometimes "Plaintiffs' counsel") conclude this report. As required by the Revised Order re: Timetable for Submission of OCC Progress Reports, dated January 14, 2021, a draft of this report was circulated to the parties on May 20, 2022 for review and comment. The Court granted the parties two extensions to provide their comments to the draft report. The first was granted to the Defendants due to a scheduled

vacation, which changed the deadline from June 13, 2022 to June 27, 2022 and the second to the Plaintiffs due to illness, which extended the deadline to July 5, 2022. In accordance with longstanding practice, the parties' July 5, 2022 comments to the draft report ("Defs.' res." and Pltfs.' res.") incorporated into and appended to this final version of the report.

## II. MONITORING OBSERVATIONS

### A. Sanitation

1. DOC Sanitation Reports

#### a. Defendants' Obligations

The Department's Environmental Health Officers and Public Health Sanitarians are required to inspect and report on the sanitation conditions within the jails. An Environmental Health Officer is a captain who conducts regular sanitation inspections of common areas at a designated facility and is required to "submit . . . reports of all such inspections, including a description of any ameliorative actions taken, planned[,] or recommended." *Id*. at ¶ 3c. The Environmental Order requires Environmental Health Officers to "make a thorough inspection of the entire institution in the course of the week and [to] make more frequent inspections when necessary to respond to particular problems—e.g., inmate complaints." ¶ 3b. The Environmental Health Officers are trained by the Department's Environmental Health Unit, which is staffed by Public Health Sanitarians who are themselves required to complete "weekly inspections of all facilities as well as weekly reports of deficiencies" and "provide reports on a regular basis to [OCC] with respect to environmental conditions that are the subject of this Order." *Id.* ¶ 4. Generally, an Environmental Health Officer inspects the assigned facility over the course of one week and a Public Health Sanitarian inspects the facility over one month.

#### b. Defendants' Performance

During this monitoring period, OCC received redacted Public Health Sanitarian ("PHS") reports and Environmental Health Officer ("EHO") reports from the Environmental Health Unit ("EHU") intermittently from January 6–April 29, 2022. The PHS reports consisted of inspections conducted December 13, 2021–April 15, 2022 and the EHO reports consisted of

inspections conducted October 11, 2021–March 18, 2022.  Each PHS report is comprised of individual inspections of several intake and living areas carried out on a specific date.  The EHO reports, in comparison, are not comprised of individual inspections, but include several areas on each inspection report, dated for a specific day or several days depending on the facility.  The PHS and EHO reports are provided to OCC as individual pages from larger reports instead of full reports since certain of the inspections involve matters or locations that are not currently subject to *Benjamin* monitoring.  For example, OCC does not monitor staff areas, clinics and medical locations, and pantries; accordingly, some of the report pages provided to OCC are redacted or omitted for the same reason.

    The PHS and EHO reports, collectively, should provide a snapshot of the conditions observed by the Sanitarians and Officers at a given time and aid in the ongoing assessment of the sanitation conditions within the jails; however, not all facilities are included in the EHO reports and given the different formatting of these reports as well as the reporting differences among the individual facilities, it is difficult to discern violation locations and dates with the reporting covering multiple areas in a day in some facilities versus one week in others.  To illustrate, attached is a table of the inspection details of the intake areas and the randomly selected living areas that were reviewed for this report along with a sample of the source reports.[1]  Att. 1.

    In addition to the differences mentioned above, information such as why a work order was submitted could not be gleaned from the reports.  For example, starting with January 3, 2022 and *every* week thereafter, RNDC 2 Lower South noted a ventilation deficiency that affected cells #3, #5, #7, #21, #25, #27, #29, and #30, but did not specify the issue that required the

---

[1] The table is comprised of EHO inspection details from the January 3-7, 2022, January 10-14, 2022, January 17-21, 2022, January 24-28, 2022, and January 31-February 4, 2022 redacted reports as submitted to OCC on March 22, 24, and 31, 2022.

submission of work orders. OCC contacted the EHU, which then contacted the facility, and found out that the windows in the cells were closed, but a draft was coming through. OCC followed-up with the EHU, which contacted the facility again to ascertain that the windows were otherwise operational. (The work orders submitted for these and other issues remained opened as of the final EHO report submitted to OCC on April 29, 2022, despite the drafty conditions which were known since the winter months.) As noted earlier, all facilities are not included in the EHO reports, which makes it difficult to undertake a comprehensive review, but moreover, the EHO reports are not formatted for *Benjamin* compliance rating and it would take an inordinate amount of time for OCC to reformat and calculate compliance based on these reports. Nonetheless, OCC reviews and makes notes of the EHO findings; however, given the foregoing, these reports have not been formally reviewed in this report.

### c. Defendants' Compliance

The Defendants are not in substantial compliance with the Court's sanitation mandates but there has been some improvement with regard to the numbers of individual instances. Eighty percent with zero housekeeping management observations is the agreed upon minimum compliance percentage for the Department to meet accepted sanitation standards in individual intake and living areas.[2] OCC's analysis of the PHS findings indicates that during 145 inspections of intake and living areas conducted January–April 2022, the EHU determined 54% indicated compliance, which is an improvement from 47% during the last monitoring period. In

---

[2] [[T]he parties' experts and OCC's expert] adopted the 80% score with no sanitation management citations as the scoring criteria to determine a units (sic) pass or failure. The Department felt that a housekeeping score of 80% was easily achievable. The group felt that no sanitation management issues should exist, as these constitute the highest threat to human health.

2013 ENVIRONMENTAL HEALTH INSPECTIONS FOR NEW YORK CITY JAIL FACILITIES AT RIKERS ISLAND at 3.

the report for that monitoring period (at 6) OCC clarified its position regarding the Defendants' reported compliance:

> As noted in OCC's current and previous reports, there must be zero housekeeping management observations within the eighty percent compliance rate, which is not the case with the reported compliance rates because the Department's reported compliance does not incorporate the triggering of management violations based on the frequency of Unclean to Sight, Surfaces (not) Smooth and Easily Cleanable, and Organic Soil Accumulations in a unit.

OCC also expressed hope of a change in the Department's practices (at 31) because the Defendants' noted in their response to the draft of that report that with regard to this matter "the Department is open to discussion when the respective experts are able to assemble for a sanitarian inspection." As the parties prepared for the commencement of the sanitation inspection on May 23, 2022, OCC still encouraged by the Defendants' representation, recalculated the Department's compliance to fully align with the inspection protocols and twenty-one inspections yielded scores of at least eighty percent with zero housekeeping management observations; therefore, the Department's compliance is only 14%. Attached is a table of the compliant and noncompliant areas after OCC's recalculations. Att. 2. (This matter is elaborated on in the applicable section of this report.) Throughout this report, the Defendants' compliance will be discussed within the contexts of their application of the sanitation protocols as well as how the sanitation protocols are designed to be implemented.

In some cases, the Department can achieve actual compliance by following its own policies such as repairing structural surfaces that are in poor repair.[3] "There are maintenance conditions that must be reported and repaired to ensure that all surfaces are cleanable. Missing

---

[3] The Department's uniform sanitation policies and procedures are mostly codified in Department of Correction Directives 3900R *Environmental Health Program*, 3901R-B *Housekeeping Procedures,* and 3906R-A *Sanitation Supply Protocol and Storage,* and supplemental documents, such as the *Cleaning and Sanitizing Manual*, the *Inmate Rule Book*, and various Teletypes, e.g., "Distribution of the Revised 'Cleaning and Sanitizing Manual.'"

tiles, plumbing leaks, missing/loose cove base, and trip/fall hazards must be reported expeditiously through the work order system." DOC *Cleaning and Sanitizing Manual* at 11. OCC's review of the inspection reports indicates that although such deficiencies were observed repeatedly throughout the monitoring period, work orders were rarely submitted, which may be because work orders were previously submitted and remained open. There were 194 documented instances of missing (not cracked) tiles, missing/loose cove bases, and trip/fall hazards such as broken and uneven flooring in the survey sample during this monitoring period; however, only nine work orders were mentioned—all by the same PHS; indeed, that one PHS noted the submission of twenty-one of the twenty-two work orders documented by the Sanitarians during the monitoring period. Of course, the facilities also submitted work orders but as with the Sanitarians, when the work orders were submitted, the conditions remained for months resulting in the submission of an additional work order even though the Department prohibits more than one open work order for the same deficiency. For example, the PHS reported missing floor tiles in the janitor's closet of RNDC 6 Central North on January 5, 2022 and noted that a work order was submitted. On February 28, 2022, a different PHS noted the same condition during a follow-up inspection. During a subsequent inspection on March 25, 2022, the PHS that conducted the first inspection again mentioned the missing floor tiles and noted the submission of an additional work order. The Defendants report that the entering of work orders into the Department's electronic system "has been negatively impacted" by "staffing shortages" but "paperwork order forms have been utilized to identify and abate deficiencies." Defs.' resp. at 3. If the deficiencies are being abated it is unclear why the PHS observed the same deficiency repeatedly over the course of months and found it necessary to generate additional work orders.

### i. OCC Methodology and Analysis

For this monitoring period, OCC chose all intakes and the following randomly-selected living areas for review:

1. AMKC Main Intake
2. AMKC C-71 Intake
3. AMKC Dorm 2 Main
4. AMKC Quad Lower 14
5. AMKC Quad Lower 19
6. AMKC Quad Upper 8
7. AMKC West 17 Lower A
8. EMTC Main Intake
9. EMTC 3 Upper
10. EMTC 5 Upper
11. EMTC 8 Upper
12. EMTC 10 Main
13. GRVC Main Intake
14. GRVC Segregation Intake
15. GRVC 7A
16. GRVC 19A
17. NIC Main Intake
18. NIC Annex Intake
19. NIC Dorm 3
20. NIC 5 South
21. OBCC Main Intake
22. OBCC Tower Intake
23. OBCC 1 North
24. OBCC 3 West
25. RMSC Intake
26. RMSC Building 9
27. RMSC Infirmary
28. RMSC South 2B
29. RMSC South 3B
30. RMSC South 5B
31. RNDC Intake
32. RNDC 1 Upper South
33. RNDC 2 Lower South
34. RNDC 2 Upper South
35. RNDC 5 Central North
36. RNDC 6 Central North
37. RNDC Mod 1South
38. VCBC Intake
39. VCBC 3A/B
40. VCBC 3C/A
41. WF Main Intake
42. WF CDU Intake (Sprung 5)
43. WF Sprung 8
44. WF Sprung 10

Note: Some locations were closed during some or all of the monitoring period. There was no B-Post Officer in AMKC Quad Upper 8 on February 3, 2022, so that inspection did not proceed.

The Court requires that "[s]hower facilities, janitor's' closets, laundry areas, and toilets, washbasins, sinks and other personal hygiene and sanitation facilities . . . be thoroughly cleaned and sanitized at least once daily and more often if necessary." Environmental Order, ¶ 11a.[4] The Department has removed most laundry areas, but the other types of sanitation facilities remain and are present in intake and living areas.

<u>Intake Areas</u>

OCC reviewed sixty-five inspection reports of the intake areas in AMKC, EMTC, GRVC, NIC, OBCC, RMSC, RNDC, VCBC, and WF during January–April 2022. Compliance ratings ranged from 65.38 (AMKC Main Intake on March 16, 2022) to 93.02 (RMSC Intake on

---

[4] This provision of the Environmental Order also requires that showers be power washed with a bleach solution on a quarterly basis. By Order re: Power Washing, dated December 14, 2010, the Court suspended this mandate and permitted the Department to steam clean or use less-damaging measures in an effort to preserve tile work.

January 11 and 21, 2022 and March 25, 2022).  Of the eleven intake areas inspected during this monitoring period, the EHU found that two demonstrated compliance during each inspection[5]—a decrease from six during the last monitoring period—and the remaining nine were noncompliant during one or more inspections with the OBCC Tower Intake failing each of four inspections. When the sanitation protocols are applied as designed, none of the intake areas demonstrated compliance during every inspection.  The Defendants believe they will be able to achieve compliance because "[a] cleaning schedule has been identified for every Intake which divides the Intake into 21 distinct modules to be thoroughly cleaned each tour.  This process ensures that the entire Intake is thoroughly cleaned every week as Intakes are too large to thoroughly clean during Sunday [General Inspection]."  Defs.' resp. at 3.

<u>Living Areas</u>

"Every living area (cells, dormitory, and modular sleeping areas, and showers/bathrooms and dayrooms in each of these units) shall be thoroughly cleaned and sanitized each week." Environmental Order, ¶ 11c.  Further:

> Each housing area shall have an adequately ventilated [janitor's] closet equipped with a sink, or accessible to a sink, and shall have an adequate supply of cleaning implements and supplies, accessible to all detainees, so that each detainee can clean his cell daily and so that common areas of the housing blocks can also be cleaned.  All cleaning implements shall be cleaned thoroughly after each use and stored in a clean, adequately ventilated place.

*Id*. ¶ 11f–g.

OCC reviewed eighty inspection reports of living areas in AMKC, EMTC, GRVC, NIC, OBCC, RMSC, RNDC, VCBC, and WF during January–April 2022.  Compliance ratings ranged from 53.33 (AMKC West 17 Lower A on February 8, 2022) to 96.43 (RNDC 2 Upper South on

---

[5] NIC Annex Intake and RMSC Intake

February 28, 2022). Of the thirty housing areas reviewed for compliance, the EHU found eight were compliant during each of at least two inspections[6]—a slight increase from seven during the last monitoring period. An additional three living areas were inspected only once during the monitoring period and the EHU assessed those areas as compliant during their individual inspections.[7] The EHU assessed the remaining nineteen as noncompliant during one or more inspections and six of those living areas were noncompliant during every inspection this monitoring period.[8] When the sanitation protocols are applied as designed, NIC 5 South (inspected February 25, 2022 and March 16, 2022) is the only living area to pass every inspection during the monitoring period.

## Vacant Cells

The Defendants, additionally, remain noncompliant in cleaning and maintaining vacant cells in accordance with the Court's mandate that '[e]very cell shall be thoroughly cleaned and sanitized upon becoming vacant, shall be kept clean of garbage and debris while vacant, and shall be inspected prior to re-occupancy to ensure that it is cleaned and sanitized." Environmental Order at ¶ 11c. In the sample reviewed by OCC, the Sanitarians visited fifty-one vacant cells, four of which were inspected twice during the monitoring period, resulting in fifty-five inspections. None of the vacant cells were clean and the Sanitarians recorded a combined 185 violations. The Defendants acknowledge this deficiency and report "the cleanliness of vacant cells has been stressed at several Warden's Meetings held by the former Chief of Department and attended by Deputy Commissioner Patricia Feeney." Defs.' resp. at 3-4. It is

---

[6] AMKC Quad Lower 19; GRVC 19A; NIC 5 South and Dorm 3; RMSC South 2B and South 5B; and RNDC 1 Upper South and 2 Upper South
[7] EMTC 10 Main; RMSC Infirmary and South 3B
[8] AMKC Quad Lower 14, Quad Upper 8, and West 17 Lower A; RMSC Building 9; VCBC 3C/A; and WF Sprung 8

unclear if such discussions will continue with the restructuring of the Department and the replacement of the uniformed Chief position with a civilian manager.

DOC's Practices and Plans to Improve Sanitation

On February 14, 2022, the Defendants reported a series of previously undisclosed practices and plans to improve sanitation in response to OCC's draft version of the *September—December 2021 Report on Environmental Conditions*.  Plaintiffs' counsel, likewise unaware of the Department's efforts and plans, requested additional information and data in support of the Defendants' claims of increased sanitation worker applications from incarcerated individuals and records of the weekly sanitation meetings chaired by the EHU among other things.  Att. 3.  In response, the Defendants provided several documents and a letter explaining the documents and their relevance to the discovery request.  Att. 4.  Foremost, the Defendants' response to Plaintiffs' discovery request indicates that documentation to support the Department's claims of increased participation after notifying incarcerated individuals of wage increases does not exist.  Nor are there records indicating how they were notified of the wage increases since these were all anecdotal reports or through oral communication and, for similar reasons, there are no documents showing an increase in incarcerated individuals reporting to work or the effectiveness of incentive programs.

OCC was very interested in the production of the requested documents especially because the Defendants represented that "Commanding Officers will be required to submit written plans of action to improve sanitation in any area that fails more than one inspection." Defs.' February 14, 2022 resp. at 6.  The Defendants further reported, the DOC supervisory staff responsible for sanitation compliance will "conduct compliance inspections and review the implementation of these plans of action."  *Id.*  The Defendants did not provide copies of the individual written plans

as characterized in the above response and were unable to produce any records of the related compliance inspections undertaken by management and facility administrators.  Nonetheless, they provided their overall plan (also mentioned in their February 14 response)—a document titled, *Plans to Improve Sanitation*, which includes outlines of the generalized "causes of sanitation issues" and "suggestions to correct sanitation issues."  Att. 5.

Among the causes are: "[s]upervisors do not know the proper cleaning and sanitizing procedures" with the corresponding suggestion to "[r]equest training for supervisors and inmate work details."  But while it is heartening to see the Department acknowledge its training and management deficiencies in this document, the Environmental Health Unit's "PHS Sanitation Stats," which tallies management violations among other things, gives an artificial sense of achievement by calculating and disseminating compliance scores that omit the clear management violation—"Cleaning and Sanitizing Procedures (not) Followed."  It appears that the EHU is focused on the obvious automatic failures caused by the enumerated management violations and the compliance scores without consideration of the several conditions that also contribute to administrative and managerial failures.  On a pragmatic level, there is a discernable flaw in a system that would accept, for example, that the conditions noted in the table immediately below, as observed in RNDC 1 Upper South are as satisfactory as those in 2 Upper South and that they both indicate adherence to sanitation policies and procedures.

*Benjamin v. Molina*  
75 Civ. 3073 (LAP)

Environmental Conditions  
January–April 2022

| RNDC 1 Upper South (1-Apr) | |
|---|---|
| cell #1 (occupied) | dirty ceiling |
| | dirty floor |
| | dirty wall(s) |
| | dirty window ledge(s) |
| cell #19 (occupied) | dirty corners |
| | dirty floor |
| cell #20 (occupied) | dirty floor |
| | toothpaste on wall(s) |
| cell #3 (occupied) | dirty ceiling |
| | dirty floor |
| | dirty light shield(s) |
| | dirty sink(s) |
| | dirty toilet(s) |
| | dirty wall(s) |
| common area | dirty wall(s) |
| dayroom | vent(s) dirty - wall |
| dayroom furnishings | dusty table frame(s) |
| dayroom toilet | broken window sill |
| | dirty light shield(s) |
| | dirty window screen(s) |
| | floor paint missing part(s) |
| | rusted window sill |
| janitor's closet | missing floor tile(s) |
| | vent(s) dirty - ceiling |

| RNDC 2 Upper South (28-Feb) | |
|---|---|
| dayroom | peeling paint on ceiling |
| showers | soap scum on floor |
| | soap scum on wall(s) |

The Department's policies and procedures are adequate to prevent and address soiling and unsanitary conditions within the jails; however, such conditions clearly exist on a widespread level. This is largely because the cleaning and sanitizing policies and procedures are not being followed. OCC calls on the Defendants to explain why so many instances of clear failures to follow the Department's policies and procedures, as regularly documented on the inspection reports, do not result in a management violation and automatically failed inspection. This is especially relevant when it is known that the "supervisors are not providing adequate instructions/training," which is noted as one of the "causes of sanitation issues." The sanitation protocols, when applied as designed, simplify the detection of such management violations.

"[T]he Department rejects this contention [arguing] it would effectively result in the double citation of a single deficiency." Defs.' resp. at 4. This is a misleading argument; for, the ongoing failure of a living area or intake to achieve minimum standards in sanitation is indeed a management issue and until these management violations are reliably identified they cannot be adequately addressed and the Department will have difficulty achieving actual compliance.