# EXHIBIT 33

# OFFICE OF COMPLIANCE CONSULTANTS

15 WEST 5TH STREET · HIGH IMPACT COMPOUND ·  MERCADO TRAILER · EAST ELMHURST, NY 11370

Deputy Director
Nicole N. Austin Best
(347) 381-0728
deputydirector@compliance-consultants.us

June 17, 2019

*By Electronic Delivery*
Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

**Report on Environmental Conditions re: *Benjamin v. Brann***
**75 Civ. 3073 (LAP)**

Dear Chief Judge Preska:

Enclosed is OCC's report on specific environmental conditions within the NYC jails, pursuant to the late Judge Baer's 2001 Order on: Environmental Conditions.  This report summarizes monitoring observations during January–April 2019 and provides an update on the Defendants' progress with respect to related orders entered by Judge Baer.

.

Respectfully Submitted,

Nicole N. Austin-Best
Deputy Director, OCC

*By Electronic Copy Only*
Cc: Chlarens Orsland, Esq.
    Heidi Grossman, Esq.
    Laura Mello, Esq.

    Mary Lynne Werlwas, Esq.
    Dale Wilker, Esq.
    Veronica Vela, Esq.
    Robert Quackenbush, Esq.

**TABLE OF CONTENTS**

I.  INTRODUCTION…………………………………………..…………...………………1

II.  MONITORING OBSERVATIONS………...................................…………........2

   A.  Sanitation………………………………………....………......………….......2
     1.  DOC Sanitation Reports………………...………….........……........2
       i.  *Housekeeping Management Violations*..................4
       ii.  *Housekeeping Compliance Percentages*..............11
        a.  *Intake Areas*....................12
        b.  *Living Areas* ...................12

   B.  Ventilation …………………………………………..……….........18
     1.  Defendants' Ventilation Reports……………...………….…………...18
       i.  *Quarterly Mechanical Inspection Report*….......…19
       ii.  *Monthly Airflow Reading Reports* …………...……19
       iii.  *Monthly Intake Ventilation Reports* …….........….20
       iv.  *Quarterly Status Reports* ……...…………….....21
     2.  Windows ....................................................22
     3.  Cooling in Punitive Segregation Areas.........................24

   C.  Lighting…………………………………………………….........…..24

   D.  Fire Safety………………………………..……………….…..........26
     1.  OCC Fire Safety Update (provided by Mario Antonetti)...................26
       i.  *Defendants' Positiion*........................................26
       ii. *Benjamin Plaintiffs' Position* ...........................27
     2.  BKDC October 7, 2018 Report .......................................27
       i.  *BKDC visit to develop a plan of correction*....................27
     3.  February 14, 2019 Fire Safety Meeting................................31

III.  COMPLAINTS……………………………..........…………….......31

IV.  EXHIBITS

V.  APPENDIX

OFFICE OF COMPLIANCE CONSULTANTS
15 WEST 5th ST · HIGH IMPACT COMPOUND ·  MERCADO TRAILER · EAST ELMHURST, NY 11370

# Report on Environmental Conditions

Benjamin v. Brann, 75 Civ. 3073 (LAP)  Progress Report, January – April 2019

Nicole N. Austin-Best
6/17/2019

## I.  INTRODUCTION

The Office of Compliance Consultants ("OCC") is authorized to monitor the

Defendants'—the City of New York ("NYC") and the NYC Department of Correction ("DOC"

or the "Department")—compliance with the Court's mandates contained in various orders: the

Order re: Fire Safety, dated November 13, 1998; the Order on: Environmental Conditions (the

"Environmental Order"), dated April 26, 2001; the Order re: Testing and Repair of Ventilation

Systems (the "Ventilation Order"), dated November 14, 2003; the Amended Supplementary

Order re: Repair and Renovation of Ventilation Systems (the "Am. Supp. Ventilation Order"),

dated February 11, 2009; the Amended Order re: Lighting Conditions (the "Am. Lighting

Order"), dated October 7, 2010; the "so ordered" Stipulation concerning withdrawal of sanitation

motions and steps to improve sanitation (the "Sanitation Stipulation"), dated October 14, 2010;

the Supplemental Order re: Construction Projects Required by Amended Supplementary

Ventilation Order, dated October 20, 2011; and the Second Supplemental Order re: Construction

Projects Required by Amended Supplementary Ventilation Order, dated December 18, 2012.

This report summarizes the status of sanitation, ventilation, lighting, and fire safety

within various New York City jails as monitored by OCC during January–April 2019 (the

"monitoring period").  Summaries of complaints filed with OCC by The Legal Aid Society's

Prisoners' Rights Project ("LAS" or "Plaintiffs," sometimes "Plaintiffs' counsel") during this

monitoring period conclude this report.  As required by the Order re: Timetable for Submission

of OCC Progress Reports, dated January 19, 2007, a draft of this report was circulated to the

parties for review and comment.  In accordance with longstanding practice, the parties'

comments to the draft report are incorporated into this final version and attached as an Appendix

to this report.

The Defendants obtained Court approval for the parties to submit their responses to the

draft report after the May 24, 2019 deadline that would have allowed OCC to submit this final

report by the last day of May, pursuant to this Court's endorsed letter-order, entered September

22, 2015.  The new submission deadline for the parties' comments was June 7, 2019, which was

met, and OCC was required to submit the final report to the Court by June 17, 2019.  Throughout

this report, the parties' comments to the draft report are identified as *Benjamin* Plaintiffs'

Response (abbreviated as *Benjamin* Pls.' Resp.) and Defendants' Response (abbreviated as

Defs.' Resp.), respectively.  Within their respective responses, the parties provided background

information (some of which was previously unknown to this writer) that has been added to this

final report.  The background information is greatly appreciated because it helps to contextualize

the progress of this litigation.

## II.   MONITORING OBSERVATIONS

### A.  Sanitation

1.  DOC Sanitation Reports

During this monitoring period, OCC received redacted Public Health Sanitarian ("PHS")

reports and Environmental Health Officer ("EHO") weekly reports from the Environmental

Health Unit ("EHU") on a regular basis.[1]  The reports submitted by the EHU included 306 PHS

reports for inspections conducted January–April 2019 and 13 batched EHO weekly reports for

the same period.  Each PHS report was comprised of individual inspections of several intake and

---

[1] By way of background, each jail has an assigned Environmental Health Officer ("EHO"), who is a captain trained by civilian managers (who are Public Health Sanitarians) at DOC's Environmental Health Unit ("EHU"), and who conduct regular sanitation inspections.  In addition, certain areas of jails are also regularly inspected by EHU Public Health Sanitarians themselves.

Defs.'  Resp. to Draft Report at 3.

living areas carried out on a specific date, e.g. the three January 2, 2019 PHS reports were

comprised of inspections in the following ten locations:

| Facility | Locations Inspected |
|----------|---------------------|
| **BKDC** | 6A, 6B, 6C, 6D, 7A, 7B, 7C, 7D |
| **OBCC** | Main Intake |
| **RNDC** | Intake |

The EHO reports, by contrast, are not comprised of individual inspections, but include several

locations on each inspection report, dated for a specific day or several days depending on the

facility.  The PHS and EHO reports are provided to OCC as individual pages of larger reports

instead of full reports since certain of the inspections involve matters or locations that are not

currently subject to *Benjamin* monitoring; accordingly, some of the report pages provided to

OCC are redacted for the same reason.  These reports provide a snapshot of the conditions

observed by the sanitarians and officers at a given time and aid in the ongoing assessment of the

sanitation conditions within the jails.

     The PHS reports are completed using a system developed by the *Benjamin* sanitation

experts including Eugene Pepper, OCC's consultant, and agreed to by the parties in which a total

score of 80% or greater is considered a satisfactory outcome, except when there exists one or

more of certain "management/sanitation" conditions.  However, the reporting tool was later

modified by the Defendants, as previously reported.  The Department's modifications removed

all compliance indicators:  the "management/sanitation compliance score," which indicates that

an area "meets accepted standards or requirements" with a score of "0" and, conversely, does not

meet those standards or requirements with a score of "1"; the automatic "housekeeping

compliance" and "total unit compliance" indicators, which individually report compliance as

"yes" because the area "met standards or requirements" or "no" because it did not.  (In response

to the draft of this report, Plaintiffs' requested additional information on who modified the

reporting tool and where it was previously reported.  *Benjamin* Pls.' Resp. to Draft Report at 5.

Those matters were addressed at length by OCC during previous progress reports, including the

May–August 2015 report of which the sanitation monitoring section is appended as Exh. 1

should there be a need for further reminders or clarification.)

      According to the sanitation inspection training material that preceded the implementation

of the current sanitation inspection protocol, "Because these criteria are administrative and

managerial, and because they are deemed as absolutely essential to any housekeeping and

sanitation operation, if any single item fails to meet the compliance standards, the total unit

compliance is deemed unsatisfactory until that deficiency is corrected."  "Housekeeping and

Sanitation Inspection Strategy and Evaluation Matrix" at 5.  Despite the removal of the

compliance indicators, the Department reportedly "fails" areas that receive a score at or above

80% when at least one housekeeping management violation is cited although there are no indicia

on the form that the area did not meet standards.

*i.   Housekeeping Management Violations*

      During the monitoring period, DOC identified twenty-nine housing areas deemed to have

failed inspection by the Department, notwithstanding a "housekeeping compliance percentage"

of 80%, for the following violations.  As indicated in the chart below, certain areas failed

inspection with more than one violation.

**Housekeeping Management Violations**



Of the twenty-nine housing areas:

➢ Twenty-five failed the inspection due to "inadequate cleaning equipment & equipment

sanitation."  The assessment criteria for this violation include:

    a)  Cleaning equipment in poor repair or worn;
    b)  Cleaning equipment is visibly dirty and possibly malodorous;
    c)  Inadequate storage of housekeeping equipment;
    d)  Cleaning equipment storage appurtenances not available for the sanitary and safe
        storage of mops, brooms and brushes; [and]
    e)  Par levels inappropriate to the facility or not established to meet cleaning needs.

➢ Three additional and one of the above-mentioned twenty-five housing areas failed the

inspection due to inadequate water facilities, which is determined as follows:

    a)  Utility sink not readily available and/or accessible.
    b)  Hot and cold water of adequate flow and pressure not provided.
    c)  Absence of a free-flowing drain.

➢ One additional and one of the above-mentioned twenty-five housing areas failed because

the cleaning and sanitizing procedures were not followed as outlined immediately below:

    a) Uniform sanitary procedures as detailed in policies and procedures not followed.
    b) Cleaning frequency inadequate to maintain proper sanitation.
    c) Policy is inadequate to address soiling of the unit.
    d) No evidence of training of inmates to housekeeping policy.
    e) Disposable gloves and other personal protective equipment not available, provided, or used as per manufacturer's label requirements and/or institutional policy.

Verification of these criteria is by indicating <u>two</u> or more of the following:

- Lack of adherence to established policies and procedures;
- No notation in unit log (schedule or frequency);
- Absence of training materials or instructional postings in critical housekeeping areas;
- Direct chemical test of finished disinfectant solution;
- Negative responses to inmate and/or staff interviews.

➢ One of the above-mentioned twenty-five housing areas additionally failed due to a lack of cleaning chemicals, which is determined as follows:

    a) Cleaning chemicals not provided at the unit.
    b) Par levels not appropriate to the unit.  Verification of the deficiency is by any <u>one</u> of the following:

- Boundary markers in inventory levels that signal replenishment is necessary not established, or,
- Amount or level considered to be adequate, not maintained, or,
- Absence of a standard quantity as established by policy.

OCC reviewed the inspection reports for the housing areas identified by DOC as failing inspection and found that twenty-seven of the twenty-nine housing areas—93%—did not meet standards due to matters with Diversey apparatuses (example pictured below), which dispense Diversey General Cleaner (general cleaner), Diversey Virex (sanitizing solution), and Diversey Stride (neutral floor cleaner).  Per the Defendants, "[t]his machine was introduced to ensure that only officers with keys could access dangerous cleaning supplies; inmate work crews would thus

*Benjamin v. Brann*                                                     **Progress Report**
**75 Civ. 3073 (LAP)**                                          **January–August 2019**

use the substances only under proper supervision.  (The previous use of soap balls has been

discontinued)." [2]  Defs.' Resp. to Draft Report at 3.



---

[2] In August 2012, Jason Echevarria, an inmate at Rikers Island, died after ingesting a "soap ball."

In addition to the violations that caused housing areas to fail the PHS inspections, as reported by DOC, OCC noted that there were similar violations cited by EHOs during their inspections, several of which, if not all, were related to Diversey dispensers:

1. AMKC Quad 11 U (2/12/19)
2. AMKC West 17 L B (1/18/19)
3. AMKC West 17 LB (1/4/19)
4. AMKC West 17 LB (2/19/19)
5. AMKC West 17 LB (2/29/19)
6. AMKC West 17 LB (3/29/19)
7. AMKC West 18 L A (1/18/19)
8. AMKC West 18 LA (1/4/19)
9. AMKC West 18 LA (2/19/19)
10. AMKC West 18 LA (2/29/19)
11. AMKC West 18 LA (3/29/19)
12. AMKC West 18 Upper (1/17/19)
13. GRVC 10A (2/17/19- 2/23/19)
14. GRVC 8B (2/17/19- 2/23/19)
15. MDC 10 West (2/18/19 - 2/22/19)
16. MDC 11 East (2/18/19 - 2/22/19)
17. MDC 11 West (2/18/19 - 2/22/19)
18. MDC 4 West (2/11/19 -2/15/19)
19. MDC 7 West (2/11/19 -2/15/19)

Further, Plaintiffs' counsel reported a complaint, on March 6, 2019, from AMKC Quad 11 Upper "that the utility sink soap dispenser for mopping the floors has been broken for a year. As a result, officers must pour out soap from a container that is kept in the A station." OCC staff investigated the complaint and confirmed it was broken "for a long while" as reported by facility staff, who also reported it was repaired shortly after the complaint. There were no log entries found regarding this matter.

The foregoing set of circumstances prompted OCC to survey facilities for additional instances of housekeeping management violations involving Diversey dispensers that were not reported to OCC by the Defendants. OCC compiled a non-exhaustive list of 110 additional instances and provided same to the parties. The Defendants acknowledged these issues, stating, "To date, these machines have in fact been in need of frequent repair, and EHU keeps supplies of hoses and locks in the storehouse that are distributed to the facilities as needed. While most repairs can be effectuated in-house, the manufacturer is called in on occasion to service machines . . . ." Defs.' Resp. to Draft Report at 3. Plaintiffs emphasize that OOC's findings were not exhaustive as OCC did not review every area and affected areas could not be properly cleaned

when the machines were broken unless the Department implemented some other measure.

*Benjamin* Pls.' Resp. to Draft Report at 6.

The Defendants have not reported implementing additional measures and, as stated, in their abovementioned response to the draft of this report, the Department's only solution is to repair the broken machine. This is illustrated by the March 6, 2019 complaint referenced above that was investigated by OCC and for which the machine remained broken for an inordinate period with no remedy provided to the housing area other than to file a complaint. On June 7, 2019, the Defendants confirmed that the machine was broken and parts needed to be replaced, but was unable to confirm the completion of the work. Defs.' Resp. to Draft Report at 11.

    o   Presence of Vermin or Indicator Organisms

An additional component of the Housekeeping Management assessment is the Presence of Vermin or Indicator Organisms, which unlike the other components, does not cause the Department to fail an inspection.

> This criterion is listed under the management section because the presence of vermin or indicator organisms requires subsequent action by the correctional staff in reporting the observable condition. However, no further action on their part is necessary unless so directed. If an observation is made, that observation is informational only and does not factor into the overall unit compliance unless it remains unreported or uncorrected.

"Housekeeping Inspection Matrix" at 12.

The Defendants complied with the reporting requirements and requested an exterminator for each of the reported vermin indicators. During an inspection, the indicators in this category include "[v]ermin whose presence in the environment indicates conditions of filth, chronic wetness or the presence of contaminating substance(s); primarily organic matter. Examples include fruit flies, sewer flies, pill bugs, silverfish and houseflies, among others (Arthropods)." *Id.* at 8. The

Defendants' reported such vermin in housing areas that failed due to other housekeeping

management violations:

- MDC 8 East (2/13/2019): "several filth flies noted"
- MDC 11 East (4/3/2019): "several maggots and filth flies noted"
- MDC 11 West (4/3/2019): "several filth flies noted"
- OBCC 2 Southwest (4/12/2019): "more than ten live roaches noted crawling on wall/floor"

Additionally, DOC staff reported indicator vermin in more than an additional 250 instances

during the monitoring period, including:

- AMKC Dorm 2 Upper (4/11/2019)   ants
- AMKC Dorm 3 Top (4/15/2019)   maggots
- AMKC Mod 1 Upper A (4/15/2019) excess flies
- AMKC West 18 Upper A (4/15/2019) drain flies
- BKDC 7 Lower D (4/10/2019)  mice
- BKDC5 Lower A (4/14/2019)   mice
- BKDC 5 Lower B (4/14/2019)   mice
- BKDC5 Lower C (4/14/2019)   mice
- BKDC 5 Lower D (4/14/2019)   mice
- GRVC 5A (4/15/2019)   ants
- OBCC 2 Upper (4/14/2019)   flies
- RMSC 1 East B (4/8/2019)   ants
- MDC 4 South (2/26/2019)   filth flies

DOC facility staff further reported infestations in certain facilities:

| Facility | Housing Area | Date | Reported Infestation | Location |
|---|---|---|---|---|
| AMKC | Quad 3 Upper | 1/25/2019 | "ant infestation" | cell# 6 |
| AMKC | Quad Upper 6 | 1/16/2019 | "mice infestation" | dayroom, cell, and common area |
| AMKC | Quad 10 Lower | 1/2/2019 | "mice infestation" | both sides entire area |
| AMKC | Quad 10 Upper | 2/1/2019 | "rodent / mice infestation" | dayroom |
| AMKC | Quad 11 Lower | 1/3/2019 | "mice infestation" | entire area |
| AMKC | Quad 12 Upper | 2/2/2019 | "rodent infestation" | entire area |
| AMKC | Quad 13 Upper | 1/3/2019 | "rodent infestation" | whole housing area |
| AMKC | Quad 18 Upper | 3/29/2019 | "ants and flies infestation" | tier, janitor's closet, and dayroom |
| AMKC | West 17 Lower A | 3/27/2019 | "bug infestation" | shower area |
| AMKC | West 17 Lower A | 3/24/2019 | "bug infestation" | shower area |
| AMKC | West 17 Lower A | 4/3/2019 | "insect infestation" | shower area |
| BKDC | 3 Lower B | 4/11/2019 | "rodent infestation" | common area |
| BKDC | 7 Lower D | 4/10/2019 | "rodent infestation" | common area |
| NIC | 1st floor | 3/11/2019 | "water bug infestation" | 1st floor bathroom |
| RMSC | 5A | 3/31/2019 | "bed bugs infestation" | living area |
| RMSC | Bldg. 3 | 2/28/2019 | "ant infestation" | cell #5 |
| RMSC | Bldg. 3 | 2/6/2019 | "ant infested" | cell #5 |
| RMSC | Bldg. 6 | 3/23/2019 | "ant infestation" | showers |

An infestation is when vermin are observed in numbers or quantities large enough to be harmful, threatening, or obnoxious.  Determination of an infestation is also through the observation of multiple signs such as the presence of feces, rub marks and/or gnawing damage; detection of multiple instars (stages of development) of arthropods is considered an infestation.  *Id.*

The Defendants claim that the vermin sightings discussed herein are done so "as a component of the sanitation order; however, the vermin order was terminated many years ago." Defs.' Resp. to Draft Report at 3.  OCC reminds the Defendants of their obligations pursuant to the Sanitation Stipulation, dated October 14, 2010, at ¶ 5 (A), which lists "vermin exclusion" as one of the "training and supervision concerns to be addressed" by the Department.  Moreover, as noted in the beginning of this discussion on the presence of vermin, it is one of the assessment areas on the sanitation inspection form that was designed by the experts and agreed to by the parties in this litigation.  Ultimately, the Defendants have acknowledged the ongoing issues with the presence of vermin:

> Until recently, each facility had an assigned exterminator to ensure proper sanitary standards.  Within the last two months, two exterminators retired and two transferred to the New York City Housing Authority, resulting in some exterminators now covering two facilities.  However, the job openings have been posted and DOC anticipates filling the four vacant slots.  In addition, the EHU has its own supervising exterminator, who reviews monthly exterminator reports, assists in compliance, and will respond to any apparent infestation.

### ii. *Housekeeping Compliance Percentages*

The foregoing discussion focused on housing areas that received a housekeeping compliance percentage of at least 80% after inspection by a Department sanitarian yet failed inspection due to certain violations.  As noted earlier, 80% is the agreed upon minimum compliance percentage for the Department to meet accepted sanitation standards.  OCC reviewed 166 randomly selected PHS reports: 159 inspections were conducted in housing and intake areas,

5 housing areas were closed during the PHS visits, and 2 intake areas were not inspected due to security related incidents.  Per the Department's compliance percentage scoring, 31 (19%) of the areas inspected did not meet standards and 128[3](81%) met standards.

      *a.   Intake Areas*

This consultant reviewed fourteen inspections that the EHU's sanitarians conducted in intake areas.  The compliance percentages for those areas ranged from 71.2% in MDC Intake (1/24/19) to 97.1% in NIC Annex Intake (1/18/19).  In the intake areas, two (or 14.3%) PHS inspections yielded a compliance percentage less than 80.0%.  The remaining twelve (or 85.7%) PHS inspections yielded at least 80.0% (nine (or 64.3%) ranged from 83.0% to 89.8% and three (or 21.4%) ranged from 91.5% to 97.1%).

The cleanliness of the intake areas are assessed similarly to the living areas, as described below:

      *b.   Living Areas*

Every living area (cells, dormitory, and modular sleeping areas, and showers/bathrooms and dayrooms in each of these units) shall be thoroughly cleaned and sanitized each week . . . .  Every cell shall be thoroughly cleaned and sanitized upon becoming vacant, shall be kept clean of garbage and debris while vacant, and shall be inspected prior to reoccupancy to ensure that it is cleaned and sanitized . . . .  Each housing area shall have an adequately ventilated janitor [sic] closet equipped with a sink, or accessible to a sink, and shall have an adequate supply of cleaning implements and supplies, accessible to all detainees, so that each detainee can clean his cell daily and so that common areas of the housing blocks can also be cleaned.  All cleaning implements shall be cleaned thoroughly after each use and stored in a clean, adequately ventilated place.

Environmental Order ¶ 11(c)–(g).

The range of compliance percentages for the 145 PHS inspections of living areas reviewed by this consultant were from 70.0% in BKDC 9D on 1/15/19 to 96.8% in MDC 4West on 4/10/19.  In the living areas, 26 (or 17.9%) PHS inspections yielded a compliance percentage

---

[3] An additional three housing areas scored above 80%; however, they did not meet standards due to housekeeping management violations.

less than 80.0%.  The remaining 119 (or 82.1%)  PHS inspections yielded at least 80.0% (92 (or

63.4%) ranged from 80.0% to 89.7% and 27 (or 18.6%) ranged from 90.0% to 96.8%).

OCC, however, believes that the Department's scoring practice results in artificially

inflated compliance percentage scores and illusory compliance, in certain cases.  For example,

the following housing areas that the EHU identified as compliant, did not meet standards:

- AMKC  Quad 15 Lower* (3/6/2019) **78.26%**
- AMKC  West 18 Upper A (3/19/2019) **78.26%**
- BKDC  5D (2/14/2019) **77.27%**
- BKDC  6A (2/5/2019) **78.33%**
- BKDC  6C (2/5/2019) **77.27%**
- BKDC  6C (4/3/2019) **77.27%**
- BKDC   7B (2/5/2019) **77.27%**
- BKDC   7B (4/3/2019) **77.27%**
- GRVC  19A (2/28/2019) **78.00%**
- MDC  6 West  (3/12/2019) **78.18%**
- RMSC  5 South B (1/30/2019) **79.55%**
- VCBC  1BB (3/20/2019) **79.55%**

*The EHU identified this area as not passing inspection due to one of the aforementioned housekeeping management violations; however, the area actually has a compliance score of less than 80%.

The Defendants acknowledge that their current method of scoring inspections needs to be

rectified and reported "[t]he DOC is attempting to computerize the inspection process, so that

inspectors do not have to manually compute individual scores."  Defs.' Resp. to Draft Report at

2.  OCC clarifies for the Court that the scores do not have to be calculated manually and that

initially, the DOC bought computer tablets to use while conducting the inspections.  Before the

Defendants' modifications, the tool was designed to compute the percentages and automatically

identify compliant from noncompliant areas.  In the original design, the compliance percentages

are automatically calculated when the inspection reporting form is used because the formula is

embedded in the tool, an Excel spreadsheet.

Manually, the compliance percentages can be calculated as follows:

$$\frac{the\ sum\ of\ the\ component\ trend\ scores}{the\ count\ of\ scores} - 1$$

For example, in AMKC West 18 Upper A (3/19/2019), the sum of the component scores is 10

and the count of scores is 53; thus, the equation: $10 \div 53 = .18867925$.  1 is then subtracted

from the result, which is .8113207 or 81.13% (when the EHU's ratings are left in place).  The EHU's compliance percentages are artificially inflated primarily due to its practice of adding compliant sanitation lighting scores for areas that were not assessed for sanitation lighting. When the sanitation lighting scores are removed for the locations not inspected for sanitation lighting, the equation is $10 \div 46 = .2173913$, and when 1 is subtracted, the score is .7826087 or 78.26%.  Clearly, it was the EHU's scoring practice that made the area seem to meet standards, when, in fact, it did not.

To be clear, the compliance percentages calculated by OCC in the foregoing examples do not include an assumption of inadequate sanitation lighting.  The calculated percentages only remove lighting from the equation where it was not assessed objectively, i.e. measured to produce a foot-candle reading.  If the sanitation lighting conditions in the foregoing examples were deemed inadequate, the calculated percentages would be lower, but since there are no light readings to refer to in certain inspected areas, the locations were treated as if they were not inspected for sanitation lighting.  This is integral to the integrity of the system because the sanitation inspection protocol uses a Boolean system for calculation, meaning there are only two possible outcomes; therefore, values—"1" for inadequate or "0" for adequate—must be noted for inspected items only.  There is no allowance for an uninspected item to be scored under this system.  Items not inspected during the inspection must be left blank, or the entry will be calculated in the overall result.

> o   Sanitation Lighting

Generally, this writer agreed with the characterization of deficiencies cited by the sanitarians; however, as stated above, one exception is the practice of determining lighting to be adequate when the lighting was not measured, i.e. light readings were not recorded, and in

certain cases, in spite of several inoperable lights.  Such practices not only undermine the objectivity of the sanitation protocol, but also hinder the progress of this litigation.

Light readings were not recorded in the cells or at the dormitory beds during any of the inspections, yet the lighting conditions were deemed adequate in every instance.  Certainly, measuring the light levels in all areas where the adequacy of sanitation lighting is being determined is reasonable and not beyond the scope of a sanitarian's duty.  Further, the sanitarians' individual inspection practices undermine the EHU's compliance determinations. Keeping with the example of AMKC West 18 Upper A (3/19/2019), the sanitarian did not record light readings in any of the seven locations rated as compliant with lighting standards; yet, by comparison, in VCBC 1BB (3/20/2019), the sanitarian recorded light readings in three of the seven locations rated as compliant.

In contrast to the PHS practice of rating lighting as adequate in areas where lighting levels were not recorded, the EHOs report lighting as inadequate in areas where lighting levels were not recorded.  For example, during the week of 2/18/2019–2/22/2019, MDC reported "inadequate lighting" in the following locations:

- 7 West "janitor's closet"
- 9 East "janitor's closet"
- 9 West "shower stall #2U"
- 10 West "upper and lower tier showers"; "janitor's room"
- 11 East "lower tier stall 2"
- 11 West "lower tier stalls"; "storage and storage corridor"

The existence of a standard should necessitate its application in all instances that may benefit from its use, particularly in this litigation, which has seen the sanitation compliance assessment process reach a level of objectivity that has taken years to achieve.  Certainly, it has already been determined that sanitation compliance uses a standard of 10 foot-candles in specific areas: "With regard to the provision of sufficient lighting for cleaning purposes in all toilets and shower areas and janitor [sic] closets that lack it, [D]efendants shall in the course of performing

the Construction Plan or otherwise provide no less than 10 foot/candles [sic] of lighting in each

such area." *Benjamin* Sanitation Maintenance Plan at 3.  In most cases, the sanitarians recorded

lighting levels in toilet and shower areas and in janitors' closets, but, as stated above, the lighting

was determined adequate even when foot-candles were not recorded.  It is OCC's position that

the existing standards should be applied consistently in all cases so that years of progress do not

come to a halt; what is more, the EHU should require light readings to be taken in every instance

where lighting is being assessed.

As a reminder, the matter of the EHU assessing a location as compliant without obtaining

light readings is not a new topic and is inconsistent with the training and practice of the expert

sanitarians.  During the 2011 expert sanitation inspection, Mr. Pepper (OCC), Dr. Powitz (LAS),

and Mr. Balsamo (DOC) each assessed lighting as adequate or inadequate only after measuring

the light levels.  This applied to sleeping areas, dayrooms, and common areas, as well as to the

showers, bathrooms, and janitors' closets.  After the 2011 inspection, the experts raised this issue

with the Defendants, who replied:

> The Department believes that once again the bar is being raised.  Although not required
> by the Lighting Order, the Department agreed to provide 10 foot candles of light in the
> janitor closet, bathroom, and showers.  However, the Department did not agree to provide
> 10 foot candles of light in the dayroom and sleeping areas; yet, during the inspection, the
> consultants held the Department accountable for providing 10 foot candles in the
> dayroom and in the dormitory sleeping areas.

"Response to Environmental Inspection Reports for New York City Jail Facilities on Rikers

Island Conduced on November 28–December 1, 2011," Att. D at 4.  Notwithstanding the

Defendants' protestations, Mr. Pepper opined:

> Lighting should be adequate enough for cleaning personnel to see soil or soap residues on
> surfaces.  The American Public Health Association Standards for Health Services in
> Correctional Institutions recommends minimum light intensities for toilets and
> washrooms be 20 foot candles, and for corridors and exit ways 10 foot candles.  This
> consultant continues to recommend that the utility/janitor closets should have a minimum
> of 20 foot candles of lighting as well to better facilitate proper cleaning of these closets.

"2013 Environmental Health Inspections for New York City Jail Facilities at Rikers Island," at

16.  Puzzlingly, referring to this quote by Mr. Pepper, the Defendants claim that OCC

recommends for DOC to provide 10 foot-candles of light in dayroom and sleeping areas.  No

such assertion is evident in Mr. Pepper's language.  The Defendants' confusion may stem from

their own response quoted here immediately above Mr. Pepper's quote.  Nevertheless, it appears

the Defendants do not intend to measure the light levels in sleeping areas, dayrooms, and

common areas during EHU's sanitation inspections.  Regardless of whether the Defendants

implement lighting monitoring in all areas during the EHU's sanitation inspections, the

sanitarians should, at least, refrain from assessing lighting as adequate in locations, including

bathrooms, showers, and janitors' closets, when light levels are not recorded since this practice

artificially inflates the sanitation compliance percentages.