# EXHIBIT 44

# Fourth Report of the
# *Nunez* Independent Monitor

**Fourth Monitoring Period**
**January 1, 2017 through June 30, 2017**

**THE NUNEZ MONITORING TEAM**

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Consultant*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ..................................................................................................................... 1
  Background ........................................................................................................................... 1
  Organization of the Report .................................................................................................. 2
  Executive Summary ............................................................................................................ 4
    Policy & Training ............................................................................................................ 6
    Use of Force & Supervision of Staff ............................................................................. 7
    Investigations & Accountability .................................................................................... 11
    Procedures that Support Desired Use of Force Outcomes ............................................. 12
    Reducing Violence Among Young Inmates (16-, 17- & 18-Year-Olds) ........................ 14
  Recommendations and Next Steps ....................................................................................... 16

**Staff Use of Force and Inmate Violence Trends During the Fourth Monitoring Period** ..... 18
  Analysis of Use of Force Data ............................................................................................ 19
  Use of Force and Injuries ................................................................................................... 22
  Type of Force Used ............................................................................................................ 24
  Incident Location ............................................................................................................... 25
  Inmate Characteristics ....................................................................................................... 28
  Staff Characteristics .......................................................................................................... 32
  Reasons for the Use of Force ............................................................................................. 33
  Avoidable Use of Force ...................................................................................................... 36

**Section by Section Analysis** ................................................................................................. 39
  1.   Use of Force Policy (Consent Judgment § IV) .............................................................. 39
  2.   Use of Force Reporting and Tracking (Consent Judgment § V) ............................. 44
  3.   Training (Consent Judgment § XIII)............................................................................. 66
  4.   Anonymous Reporting System (Consent Judgment § VI)............................................ 95
  5.   Video Surveillance (Consent Judgment § IX) ............................................................. 97
  6.   Use of Force Investigations (Consent Judgment § VII)........................................... 113
  7.   Risk Management (Consent Judgment § X) ................................................................ 149
  8.   Staff Discipline and Accountability (Consent Judgment § VIII)............................. 161
  9.   Screening & Assignment of Staff (Consent Judgment § XII) ................................. 182
  10.  Staff Recruitment and Selection (Consent Judgment § XI).................................... 190
  11.  Arrests of Inmates (Consent Judgment § XIV)........................................................ 197
  12.  Implementation (Consent Judgment § XVIII) .......................................................... 198

**Current Status of Young Inmates** ........................................................................................ 203
  Raise the Age ..................................................................................................................... 203
  Facility Leadership and Support from Headquarters ........................................................... 203
  Trends in Use of Force and Violence .................................................................................. 205
  13.  Safety and Supervision of Inmates Under the Age of 19
       (Consent Judgment § XV) ...................................................................................... 209
  14.  Inmate Discipline (Consent Judgment § XVI)......................................................... 232
  15.  Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII).... 251
  **Appendix A: Definitions** ................................................................................................... i

# INTRODUCTION

This is the fourth report of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (SDNY). This report provides a summary and assessment of the work completed by the New York City Department of Correction ("the Department" or "DOC")[1] and the Monitoring Team to advance the reforms in the Consent Judgment during the Fourth Monitoring Period, which covers January 1, 2017 to June 30, 2017 ("Fourth Monitoring Period").

*Background*

The Department manages 12 inmate facilities, nine of which are located on Rikers Island ("Facility" or "Facilities"). In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding facilities in the Criminal, Supreme, and Family Courts in each borough. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and inmates, to dismantle the decades-long culture of violence in these Facilities, and to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 10,750 uniformed Staff and 1,700 civilian employees, and detains an average daily population of 9,300 inmates.[2]

The Consent Judgment was entered by the Court on October 22, 2015.[3] It includes over 300 separate provisions and requires the development, refinement, and implementation of a series of new and often complex policies, procedures, and training, all focused on reducing the

---

[1] All defined terms utilized in this report are available in *Appendix A: Definitions*.
[2] 34.1% of the inmate population are detained for four days or less, while 18.4% of the population are detained three months or more. The average length of stay for an inmate is 63.6 days. (*See* "NYC Department of Correction at a Glance," <http://www1.nyc.gov/site/doc/about/doc-statistics.page>).
[3] The Effective Date of the Consent Judgment is November 1, 2015. (Docket Entry 260)

use of excessive and unnecessary force against inmates and reducing violence among inmates, particularly Young Inmates (i.e., those under 19 years old). Although the frequent filing of routine Monitor Reports provides important information for stakeholders regarding the Department's incremental progress towards achieving compliance with the Consent Judgment, the short intervals between reports also means that the Department may not achieve major milestones during each Monitoring Period. Consequently, progress may appear to be gradual, even as the Department puts essential protocols in place.

The use of force-related procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of **sound correctional practice**: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. Whether the policies and procedures prescribed in the Consent Judgment will ultimately have the intended effect on Staff conduct depends, to a significant degree, on strong leadership throughout the Department, the quality of training for Staff, and consistent messaging to Staff through supervision, incentives, and disincentives.

*Organization of the Report*

The following sections of this report summarize the Department's efforts to achieve Substantial Compliance with the provisions in each section of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of use of force ("UOF") trends and then assesses compliance with the specific provisions related to Staff's use of force (e.g. policy,

reporting, investigations, Staff discipline, video surveillance, recruiting, training, etc.). Next, the report examines violence and UOF among Young Inmates and then assesses compliance with the provisions applicable to Young Inmates (e.g., classification, programming, protective custody, staffing, incentives and discipline, etc.). The Monitoring Team's strategy for assessing compliance is consistent with supporting the advancement of reforms in that provisions must be considered, addressed, and evaluated in a sequential and logical manner to achieve sustainable reform. The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[4] (b) Partial Compliance,[5] and (c) Non-Compliance.[6] During this Monitoring Period, the Monitoring Team also elected to withhold a compliance rating ("Compliance Rating Withheld") for certain provisions where the Department made initial efforts to achieve compliance, but additional work or assessment was both necessary and forthcoming in order for the Monitoring Team to be in a position to apply a rating. The Monitoring Team did not assess compliance ("Not Yet Rated") for every provision in the Consent Judgment in this report, but with each Monitoring Period, the Monitoring Team has increased the proportion of provisions for which the compliance level has been assessed.[7] Finally, the Monitoring Team did not assess compliance for any provision with a deadline for

---

[4] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

[5] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains.

[6] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment.

[7] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress. This report also provides compliance ratings for several provisions that were not evaluated in the prior three Monitor's Report. Subsequent Monitor's Reports will do the same, continually increasing the total number of provisions assessed.

completion falling after June 30, 2017, though a summary of the Department's progress to date is provided.

The Monitor's Report addresses all 15 substantive sections of the Consent Judgment. For each substantive section, an introduction includes a high-level summary of the section's requirements as well as contextual information that is important for understanding the detailed discussion about the various provisions. The rest of each section provides the Monitoring Team's compliance assessment for a set of provisions, which includes a summary of the specific steps the Department has taken to achieve compliance, the Monitoring Team's analysis of those efforts, recommendations for the Department's next steps, if applicable, and the Monitoring Team's compliance rating, if applicable. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward. The language of the Consent Judgment provisions is embedded in the compliance assessments for ease of reference.

_Executive Summary_

The Consent Judgment provisions are intended to resolve the issues considered in _Nunez_ and the SDNY investigation, and generally aim to: (1) reduce unnecessary or excessive force, by providing Staff with new tools and training for responding to inmate behaviors and by ensuring accountability for Staff's improper use of force and (2) reduce violence in the Facilities that house Young Inmates by implementing procedures and protocols likely to address the underlying causes of violence (e.g., Staffing levels, responses to misconduct, programming, incentives for positive behavior, etc.). Other stakeholders have recently called for the closing of Rikers Island. While that decision is beyond the scope of _Nunez,_ the Monitoring Team strongly encourages the

City and the Department to remain focused on addressing the existing conditions of confinement. Improvements and compliance with the *Nunez* Consent Decree cannot be deferred.

At the end of the Monitoring Period, the Commissioner and the Chief of Department resigned. Commissioner Ponte guided the Department through the initial implementation of the *Nunez* reforms by modeling a new approach for managing the New York City Jails. He set a tone for the Department that reform is necessary, committed essential resources, and established some key strategies for the Department to evaluate its use of force more rigorously.  The Monitoring Team is encouraged that the Mayor appointed competent, committed, and reform-minded individuals in the roles of Acting Commissioner[8] and Acting Chief of Department. The Monitoring Team is confident that these individuals will maintain—if not accelerate—the pace of reform and will ensure that disruption is minimized during the leadership transition. A more fulsome discussion of the impact of these leadership changes will be discussed in the next Monitor's Report.

The conditions that merited the reforms required by the Consent Judgment were the result of a long period of mismanagement, limited resources, and antiquated and bureaucratic processes at the Department.  Once the Consent Judgment was imposed, the Department was immediately tasked with overhauling policies and procedures, modernizing processes for tracking information, and starting the long road toward evolving its approach to managing inmates and changing the mindsets of leaders and uniformed Staff. There is no lack of effort by the Department to develop and implement new policies, procedures, and training, many which go well beyond the requirements of the Consent Judgment. As described throughout this report, the Department committed significant resources and conducted a considerable amount of work in

---

[8] On October 3, 2017, the Mayor appointed the Acting Commissioner to the Commissioner of the Department of Correction.

this Monitoring Period to implement the requirements of the Consent Judgment. For an agency with over 10,000 Staff, fully resolving the complex issues surrounding the improper use of force, and inmate violence simply cannot be achieved during the 20 months that have elapsed since the Effective Date of the Consent Judgment, and significant work remains.

Whether the policies and procedures prescribed in the Consent Judgment will ultimately have the intended effect on Staff conduct depends, to a significant degree, on strong leadership throughout the Department, the quality of training for Staff, and consistent messaging to Staff through supervision, incentives, and disincentives. Culture change requires a multi-faceted approach: (1) developing and implementing adequate policies that devise and describe appropriate and necessary procedures; (2) designing and implementing training programs that provide Staff with the skills required to carry out the expected practices; (3) supervising Staff in a manner that encourages and rewards those who implement the new practices and that guides and influences those who are slower to adapt to the new ways of managing inmates; (4) applying scrutiny to situations in which policies and procedures were not followed to determine what went wrong and how it could be corrected; and (5) imposing corrective action and discipline when Staff's behavior is not aligned with policy.

- *Policy & Training*

The Department has made significant progress with the first two steps—policy and training.

- **Policy**: The Department has developed a comprehensive directive regarding the Use of Force that comports with best practices and the requirements of the Consent Judgment. The Policy went into effect on September 27, 2017, after this Monitoring Period, but prior to the filing of this Report.

- **Training**: DOC completed the Herculean task of providing S.T.A.R.T. training to all Staff as part of the implementation of the new Use of Force Directive. As of the filing of this Report, the Department has provided training on the new Use of Force Directive and Defensive Tactics to over 9,000 In-Service Staff and Recruits (over 99% of all active Department Staff). The Department has also deployed several relevant trainings to Staff working with Young Adults. Furthermore, the Department has made significant strides in developing and deploying high quality trainings required under *Nunez*. The training programs are delivered by effective and dedicated instructors, and Staff actively participate and engage in the lessons.

- *Use of Force & Supervision of Staff*

While the Department has made significant gains in safely managing the Young Inmate population, described in more detail below, serious and problematic issues involving Staff use of force continue in an unabated fashion. The Department has a deeply entrenched culture of managing troublesome and/or potentially dangerous inmates with an iron fist. This ingrained propensity of Staff to immediately default to force to manage any level of inmate threat or resistance continues to produce high monthly incident numbers, especially in the absence of timely accountability for such misconduct. The cultural dynamic that permeates so many encounters between Staff and inmates in DOC is quite simply a consequence of Staff actions and behaviors that too often engender, nurture, and encourage confrontation. For example,[9] in an

---

[9] Eight incidents are described throughout the Executive Summary. In six of the eight incidents, the Department took some sort of immediate administrative response after the incident occurred including re-training for some Staff, re-assigning one Staff Member to a new post, placing one Staff member on a non-inmate contact post, and demoting one Supervisor. The investigation into two of these incidents are complete, while six are still pending. Of the two closed cases, the Department imposed Command Discipline on two Staff Members in one case, and the Staff member in the other closed case was reassigned. Formal discipline may be imposed in the six other cases that are pending once those investigations are completed.

April incident, an Officer precipitated a use of force and after the inmate had been restrained, a Captain was heard on tape exhorting Officers in a crude and profane manner to use further force if necessary, notwithstanding that the inmate was no longer exhibiting any resistance to Staff. The circumstances related to particular incidents suggest that some Staff relish confrontation rather than act to avoid it. Confrontation avoidance appears to be anathema to many supervisors and line Staff, and is far too often not even put into play.

To a large extent, Staff's tendency to engage in this pattern of hyper-confrontation falls under the rubric of unprofessional conduct and, to a lesser extent, the inexperience of Staff. For example, when Staff routinely use improper and needlessly painful escort techniques, confrontation is inevitable and any inmate resistance to the painful escort technique is viewed as resistance which in turn generates use of additional force. When Staff immediately resort to force rather than summoning a supervisor in an anticipated force situation, non-force alternatives are, of course, foreclosed. When Staff use hard takedown techniques on restrained inmates, the risk of injury increases exponentially. When OC is disbursed arbitrarily among a group of inmates, some of whom are not resisting but are merely present, confrontation is inevitable. When an aggressive officer uses profanity and needlessly shoves and threatens an inmate, confrontation is unavoidable.

At the end of each Monitoring Period, the Subject Matter Experts (SMEs) submit to the Monitor summaries of their observations and impressions of the Preliminary Reviews, investigations, and other documentation they have reviewed. The following excerpts from these summaries illustrate these very real operational issues:

- o Staff resort too quickly to aggressively taking inmates to the floor.

- o Cell extraction teams appear to frequently enter cells/holding areas at full speed

and forcibly apply the shield when inmate resistance is passive or minimal and
did not require a full speed extraction.

- o Staff frequently fail to recognize that a situation is escalating and continue to
  verbally engage inmates with provocative language.

- o Staff reports often detail inmate resistance in heightened clarity but rarely note
  inappropriate actions by Staff that escalated the incident.

- o Staff lack effective listening skills.

- o Staff fail to maintain safe distances when interacting with inmates.

In addition to these problematic behaviors from line Staff, supervision by certain
Captains often fosters unprofessional conduct by line Staff. The number of Captains who are
frequently and repeatedly involved in problematic UOF incidents is disturbing. That these
Captains are often left in a position to engage in subsequent misconduct is one of the clearest
examples of the lack of accountability in the DOC. In order to facilitate the culture shift the
Department needs in order to be successful, those who embody the goals of the Consent
Judgement through their words and actions should be publicly recognized, rewarded and
incentivized. Conversely, those who continue to engage in problematic and confrontational
behavior with inmates should not be rewarded nor incentivized to continue behaving in this
manner. The choices the Department makes about tangible rewards, verbal accolades,
assignments and promotions speak volumes to the line Staff about the leadership's values and the
culture they intend to promote.

During the first month of the Fourth Reporting Period there were 412 UOF incidents,
which included at least 50 possible head strikes, at least 95 instances of force on restrained
inmates, the use of at least 10 prohibited holds and at least 20 instances involving the use of

institutional equipment.[10]  The January 2017 incidents included one Captain who was involved in

no fewer than four problematic applications of force and one in which the Captain used a racial

epithet when ordering Staff to place the inmate on the wall. During an incident in late December

2016, a Deputy Warden ordered a Captain to use chemical agents ("OC") on a restrained inmate

standing passively with his face to the wall.  Yet another Captain, who has an extensive recent

history of involvement in problematic uses of force, used a crowd-control canister of OC on an

inmate who was restrained and lying prone on the ground.  In yet another incident, one Officer

needlessly precipitated what became a potentially dangerous major disturbance.  During that

incident, another Officer was virtually out of control and engaged in a shoving match with a

Captain, and thereafter used OC on a restrained inmate who was acting in compliance with the

other Officers' orders.

    During June 2017, there were 423 use of force incidents which included at least 35

possible head strikes, at least 100 instances of uses of force on restrained inmates, the use of at

least 15 prohibited holds and at least 25 instances involving the use of institutional equipment.[11]

Just as in the beginning of the Monitoring Period, the end of the Monitoring Period also included

a number of troubling incidents involving Captains.  A Captain with an extensive recent history

of involvement in problematic uses of force was involved in an incident during which the

Captain kicked/stomped an inmate.  In February, this same Captain had unnecessarily used OC

on an inmate and thereafter slammed the inmate into a wall, causing a head injury requiring five

sutures.  Another UOF incident in May involved an unnecessary application of OC and the

supervising Captain failed to report that the incident even occurred.

---

[10] This data is based on the Department's reporting of Staff reported uses of force. It is important to acknowledge that the Department has not completed the investigations into the majority of these incidents.
[11] Refer to footnote 10.

Vigilant supervision by all levels of the uniformed Staff will be the necessary lynchpin of compliance. Techniques, strategies, and attitudes that support the S.T.A.R.T. training must be reinforced on a daily basis by both non-disciplinary and disciplinary means—and this reinforcement must be timely, appropriately, and consistently applied.

- ***Investigations & Accountability***

In order for the Department to achieve the intended outcome of using force safely, proportionally and only when necessary, it must provide not only adequate supervision, but must conduct timely and appropriate investigations and impose adequate and timely accountability. As set forth below, Full ID and Facility investigations are all too often not completed in a timely fashion and are plainly deficient in quality, resulting in no remedial actions being taken when they are clearly warranted. The misuses of force that regularly occur in the Department simply cannot continue to go on unabated. While the traditional investigation and discipline strategies— if timely and of high-quality—are one way to hold Staff accountable, the Monitoring Team has recommended and is working closely with the Department to implement an array of fast-acting accountability measures that can deliver the zero-tolerance message swiftly, *if* implemented with vigor.

- **Use of Force Investigations**: The Department's Investigation Division conducts a Preliminary Review of all use of force incidents. These reviews provide sound and reasonable assessments of the incident and identify potential next steps for a continued investigation (to the extent one is warranted). However, the Department's use of force investigations, by the Facilities and the Investigations Division ("ID"), remain inconsistent, of low quality, and untimely. Investigation delays have been compounded by ID's increased caseload (for which new

efficiencies are currently underway) and a backlog of Facility Investigations which challenges the Facilities' ability to keep up with new investigations. Allegations of sexual assault and harassment of Young Inmates suffer from many of these same investigative issues and very few are completed timely.

- **Staff Accountability and Risk Management**: The Department's Trials division has recently improved its ability to serve and file charges timely.  However, the Department as a whole continues to struggle to impose meaningful and appropriate accountability and discipline to Staff who engage in misconduct. Untimely and poor-quality investigations inhibit the delivery of a streamlined and consistent message to Staff regarding appropriate versus inappropriate force.  The Department is striving to develop and hone new processes to identify opportunities to provide contemporaneous guidance and/or ensure timely corrective action through the Wardens' reviews of Use of Force incidents as part of the Rapid Reviews and the "Avoidables" process; the Immediate Action Review Committee's review of incidents; identifying Staff who require counseling as part of the 5003 process; and developing an interim Early Warning System designed to identify Staff Members with problematic conduct who may need additional support, mentorship, and/or corrective action. These tools may contribute to more timely corrective action.

- *Procedures that Support Desired Use of Force Outcomes*

In order to achieve the desired use of force outcomes—safe, proportional and only when necessary—the Department must implement various practices that support the elements of

culture change described above. Many of these are required by the Consent Judgment and key issues are highlighted below:

- **Use of Force Reporting**: The Department has continued to develop, refine, and utilize data to better understand and address the ways in which Staff use force in the jails.  The Department also dedicated significant resources to continuing to build a Case Management System.  However, the Department has not been able to demonstrate that Use of Force Reports are consistently or timely completed. The Department's antiquated system for generating and maintaining reports contributes to the issue. During this Monitoring Period, the Department began to develop strategies to collect the use of force reports more systematically so they are readily available to use of force investigators to support investigations.

- **Video Surveillance**: The Department has nearly completed installing a sufficient number of stationary, wall-mounted surveillance cameras to achieve complete camera coverage.  However, the Department continues to struggle with capturing use of force incidents on handheld cameras, though the process for uploading handheld video footage has begun to improve.

- **Screening Staff for Promotion**: The Department screened and promoted 85 Staff to Supervisory positions in this Monitoring Period. Although, to date, the Monitoring Team has found the Department's screening process generally meets the requirements of *Nunez*, the delays in conducting investigations and limited discipline imposed by the Department inhibits the Department's ability to thoroughly assess a candidate's qualifications for any given position. The importance of Supervisors, discussed above, and the vast amount of work

required to achieve the goals of the Consent Judgment heightens the importance of the Department utilizing reasonable judgment in promoting Staff. All promotions should facilitate the culture shift the Department needs in order to be successful.

- **Hiring New Staff**: The Department's Recruitment Unit and Applicant Investigation Unit continue to work together to attract and process unprecedented numbers of qualified candidates to fill increasingly larger recruit classes, resulting in 2,821 graduates from the Training Academy since the Effective Date, and matriculating another 1,203 during this Monitoring Period.

- *Reducing Violence Among Young Inmates (16-, 17- & 18-Year-Olds)*

Young inmates (those under age 19) contribute a disproportionate share of the Department's use of force and inmate-on-inmate violence. Use of Force rates at RNDC and GMDC have decreased, however, rates of violence during the current monitoring period were largely comparable to those witnessed in January-June 2016. Some of this violence is very serious, involving stabbing or slashing Staff or other inmates. Some inmates, particularly at RNDC, exhibit chronically violent behavior. The Department has established some of the component parts necessary to reduce violence and to develop new responses to Young Inmate misconduct.

- The Department has made a clear and significant commitment to providing programs to Young Inmates to enhance skill development and reduce idle time, both of which will reduce violence and enhance positive youth development. The combination of education services, mandated recreation, Program Counselor-led programming, and programming delivered by community-based partners means

14

that, if an inmate chooses to be involved, a large portion of out-of-cell time is consumed by structured programming led by an adult. The Department is developing strategies to demonstrate proof of practice in this area.

- A group incentive program, "the Levels," is now operational at both RNDC and GMDC. This program rates each housing unit on a variety of factors (i.e., incidents, respect for Staff, sanitation, compliance with rules, lock-ins, etc.) and inmates receive rewards and privileges commensurate with their unit's performance level. A rich array of activities is available to incentivize positive behavior. This program may help the Department to identify options for providing accountability for inmates who violate institutional rules, by either suspending privileges or transferring poorly-behaved inmates to housing units with fewer privileges. Currently, the options for imposing effective inmate discipline are limited.

- Several alternatives to Punitive Segregation are now operational. They include Second Chance Housing Unit ("SCHU"; least restrictive), Transitional Housing Unit ("TRU"), the Secure Unit, and Young Adult-Enhanced Supervision Housing ("YA-ESH"; most restrictive). These programs house inmates who commit violent infractions in a restrictive setting, and offer several programs to address their behavior. By design, these programs should provide discipline that begins to address the underlying causes of violent behavior, therefore making it unlikely to reoccur. However, in order to do so, the quality of behavior supporting planning must be improved, criteria for progressing through the programs must be clarified, and basic program monitoring and quality assurance protocols must be enacted.

15

- The Department improved its immediate response to disruptive and violent misconduct by identifying a location at RNDC and GMDC, away from Main Intake, where inmates can be transported to regain control of their behavior and await re-housing. [12] This tool will allow the Department to separate inmates who pose an immediate threat from others on the housing unit, while protecting the processing function of Main Intake. Once policy is finalized and fully implemented, the effectiveness of this tool can be assessed.

_Recommendations and Next Steps_

The work completed to date confirms that the road to sustainable reform will be neither swift nor painless; it must be traversed in an incremental, well-reasoned, and methodical manner. Furthermore, the pace of progress will also be uneven. Certain issues may be easy to resolve or may benefit from a synergy that comes along at just the right time. Others may seem intractable for a time, and progress toward compliance with them may sometimes feel out of reach. For these reasons, while the Monitoring Team continues to push the Department to achieve incremental progress during each Monitoring Period, the Monitoring Team also urges patience and an open-mindedness to let new ideas emerge and be tested rather than to rush forward with a set idea of how or when things should be done.

Given the concerns listed above and discussed in far more depth in the subsequent sections of this report, the Monitoring Team will focus on supporting the Department's efforts in certain key areas during the next Monitoring Period: (1) implementing the New Use of Force Directive and disciplinary guidelines; (2) developing strategies to better manage and reduce the use of force; (3) improving the timeliness of Staff accountability and discipline; (4) improving

---

[12] The Department began to utilize this model in other Facilities beginning in the Fifth Monitoring Period.

the timeliness and quality of UOF investigations; and (5) expanding the array of disciplinary options for Young Inmates and ensuring the viability of the existing alternatives to Punitive Segregation.

Finally, the Monitoring Team strongly urges the Department to dedicate adequate resources to support the pursuit of reform and to sustain it once it is achieved. As evidenced throughout this report, developing and implementing the reforms in the Consent Judgment is a massive undertaking and the necessary resources to maintain these efforts continue to expand as the Department works to achieve and sustain compliance in more and more areas. The Monitoring Team therefore strongly recommends that the Department maintain adequate staffing resources in areas directly related to achieving and/or maintaining compliance with *Nunez*, including for: (1) the Nunez Compliance Unit ("NCU"), which is starting to develop an internal capacity to monitor performance, and manages the flow of information to the Monitoring Team; (2) the UOF Auditor who must analyze and interpret UOF data and then use it to drive improved practice; (3) the Deputy Risk Manager to support the Early Warning System; and (4) the Facilities that must respond to requests for information and support Staff as they implement new practices.