# EXHIBIT 50

Case 1:21-cv-09012-DLC   Document 41-50   Filed 10/24/22   Page 2 of 23

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------- x

THE CITY OF NEW YORK,

                                        Plaintiff,          **VERIFIED COMPLAINT**

            -against-                                       Index No.:

CORRECTION OFFICERS BENEVOLENT
ASSOCIATION, INC. ("COBA"), BENNY BOSCIO, JR.,
individually and as President of COBA; JOSEPH
BRACCO, individually and as the First Vice President
COBA; GLENN MORGAN, individually and as Second
Vice-President of COBA; KEISHA WILLIAMS,
individually and as Third Vice-President of COBA;
MICHAEL MAIELLO individually and as Treasurer of
COBA; ASHAKI ANTOINE, individually and as First
Citywide Trustee of COBA; LIONEL CUMBERBATCH
individually and as Financial Secretary of COBA; ANGEL
CASTRO individually and as Recording Secretary of
COBA; HERMAN JIMINIAN, individually and as
Legislative Chairperson of COBA; ANTOINETTE
ANDERSON, individually and as Corresponding Secretary
of COBA; FELIX SANCHEZ, individually and as
Sergeant-at-Arms of COBA,

                                        Defendants.
---------------------------------------------------------------------- x

        Plaintiff, by its attorney **GEORGIA M. PESTANA,** Corporation Counsel of the

City of New York, for its verified complaint alleges as follows:

### PRELIMINARY STATEMENT

        1.      This action is brought by the City of New York pursuant to §§ 210 and

211 of the New York Civil Service Law, the New York City Administrative Code, and other

applicable law to restrain the defendants from (1) causing, instigating, encouraging or condoning

a strike or other concerted action or slowdown, (2) aiding and abetting other violations of law

and (3) requiring defendants to fulfill their obligations under the Taylor Law to discourage members from engaging in the ongoing job action.

## PARTIES

2.      Plaintiff the City of New York is a municipal corporation organized and existing under the laws of the State of New York.

3.      The New York City Department of Correction ("DOC") is a mayoral agency empowered pursuant to Chapter 25 of the New York City Charter.

4.      Upon information and belief, defendant Correction Officers' Benevolent Association, Inc. ("COBA") is an unincorporated association and labor union operating in the City of New York, having its principal place of business at 77-10 21st Avenue, East Elmhurst, N.Y. 11370.

5.      In accordance with procedures established by the laws of the State and City of New York, defendant union is and has been certified to be the exclusive collective bargaining agent for its members employed by the City of New York concerning those members' salaries and conditions of employment.

6.      Upon information belief, defendant Benny Boscio, Jr. is the President of COBA.

7.  Upon information and belief, defendant Joseph Bracco is First Vice President of COBA.

8.      Upon information and belief, defendant Glenn Morgan, is Second Vice President of COBA.

9.      Upon information and belief, defendant Keisha Williams is the Third Vice President of COBA.

10.     Upon information and belief, defendant Michael Maiello is the Treasurer of COBA.

11.     Upon information and belief, defendant Ashaki Antoine is the First Citywide Trustee of COBA.

12.     Upon information and belief, defendant Lionel Cumberbatch is the Financial Secretary of COBA.

13.     Upon information and belief, defendant Angel Castro is the Recording Secretary of COBA.

14.     Upon information and belief, defendant Herman Jiminian is the Legislative Chairperson of COBA.

15.     Upon information and belief, defendant Antoinette Anderson is the Corresponding Secretary of COBA.

16.     Upon information and belief, defendant Felix Sanchez is the Sergeant-at-Arms of COBA.

17.     The above named individuals are sued in both their individual and official capacities.

### AS AND FOR A FIRST CAUSE OF ACTION

18.     The DOC is an agency of the plaintiff City of New York performing a governmental function conferred upon it by Chapter 25 of the New York City Charter. The powers and responsibilities of the Commissioner of the DOC are fully set forth in Chapter 25 § 621, *et seq.*, of the New York City Charter.

19.     The DOC employs correction officers who are represented in collective bargaining by COBA. All of the correction officers hold positions by appointment of employment pursuant to the Civil Service Law of the State of New York, and all of said

- 3 -

employees are public employees covered by the New York City Civil Service Law §§ 200, et seq., the "Taylor Law" as well as the New York City Collective Bargaining Law ("NYCCBL"). They are charged with performing the duties set forth in Chapter 25, § 623 of the New York City Charter.

20.     This action is brought pursuant to §§ 201(9), 210 and 211 of the Civil Service Law, § 12-312(e) of the New York City Collective Bargaining Law and other applicable law to restrain the defendants from (1) engaging in a strike, "sick out," mass absenteeism or other stoppage or slowdown of work; (2) causing, instigating, encouraging or condoning a strike or other concerted action or slowdown; and (3) aiding or abetting other violations of law. Plaintiff also seeks damages for defendants' illegal conduct.

21.     Section 210 of the Civil Service Law prohibits strikes by public employees and Section 201(9) of the Civil Service Law defines a strike to include a "concerted stoppage of work or slowdown by public employees."

22.     Both Civil Service Law §210 and Administrative Code § 12-312(e) prohibit public employees and public employee organizations from engaging in, causing, instigating, encouraging, or condoning any strike, mass absenteeism, concerted stoppage of work, or slowdown.

23.     Specifically, § 210(1) of the Civil Service Law provides:

> No public employee or employee organization shall engage in a strike, and no public employee or employee organization shall cause, instigate, encourage, or condone a strike.

Section 201(9) of the Civil Service Law defines "strike" as "any strike or other concerted stoppage of work or slowdown by public employees." Section 12-312(e) of the NYCCBL specifically identifies mass absenteeism as a form of unlawful job action.

24.     Section 211 of the Civil Service Law provides in relevant part that:

> where it appears that public employees or an
> employee organization threaten or are about to do, or
> are doing an act in violation of section two hundred
> and ten of this article [the no-strike provision quoted
> above], . . . the chief legal officer of the government
> involved shall forthwith apply to the supreme court
> for an injunction against such violation.

25.     Defendants are working under a collective bargaining agreement, which

was effective from March 1, 2019, through February 28, 2022.  Article XXV of the agreement

specifically prohibits strikes and provides:

### ARTICLE XXV - NO STRIKES

> In accord with applicable law, neither the Union nor any employee
> shall induce or engage in any strikes, slowdowns, work stoppages,
> or mass absenteeism, or induce any mass resignations during the
> term of this Agreement.

26.     The New York City Charter § 621 vests control of the DOC in the

Commissioner of Correction.  Section 623 of the City Charter provides that the responsibilities

of the DOC include:

> (1) Charge and management of all institutions of the city, including
> all hospital wards therein for the care and custody of felons,
> misdemeanants, all prisoners under arrest awaiting arraignment
> who require hospital care, including those requiring psychiatric
> observation or treatment and violators of ordinances or local
> laws and for the detention of witnesses who are unable to
> furnish security for their appearance in criminal proceedings,
> except such places for the detention of prisoners or persons
> charged with crime as are by law placed under the charge of
> some other agency.
>
> (2) Sole power and authority concerning the care, custody and
> control of all court pens for the detention of prisoners while in
> the criminal courts of the city of New York, the family court of
> the state of New York within the city of New York, the
> supreme court in the counties of New York, Bronx, Kings,
> Queens and Richmond and of all vehicles employed in the
> transportation of prisoners who have been sentenced, are

- 5 -

awaiting trial or are held for any other cause.

(3) Charge and management of persons or any other institution of the city placed under his jurisdiction by law.

(4) All authority, except as otherwise provided by law, concerning the care and custody of felons, misdemeanants and violators of local laws held in the institutions under his charge.

(5) All authority in relation to the custody and transportation of persons held for any cause in criminal proceedings and all prisoners under arrest awaiting arraignment who require hospital care, including those requiring psychiatric observation or treatment, in any county within the city.

(6) General supervision and responsibility for the planning and implementation of re-training, counseling and rehabilitative programs for felons, misdemeanants and violators of local laws who have been sentenced and are held in institutions under his charge.

## THE ILLEGAL JOB ACTION

27.     Correction officers are engaged in a campaign of mass absenteeism that constitutes an illegal strike and/or work slowdown.

28.     The concerted nature of this conduct is evident when comparing the number of correction officers who have been Absent Without Leave ("AWOL") this year with prior years.

29.     AWOL is a designation that is given when an officer fails to show up for their shift and does not have any sort of authorization to take leave.  AWOL is a type of insubordination in that it represents a refusal to report as ordered, and thus being AWOL, alone, is grounds for disciplinary action. While any individual instance of AWOL is improper, here, it is clear that correction officers are committing this misconduct in a broad and coordinated manner (along with many officers calling out sick) in order to slowdown and/or stop the DOC from performing its functions, thus rendering it an illegal job action.  Beginning on or about

- 6 -

September 15, 2021, the DOC began suspending correction officers for 30 days pending hearing and determination if they go AWOL. However, action against the COBA and its leadership for continuing to condone the job action requires this Court's intervention.

30.     There has been a dramatic rise in AWOL rates since the beginning of this calendar year. In 2019, DOC recorded average of 645 instances of AWOL per month, and no more than 818 in any given month. In 2020, DOC recorded an average of 773 instances of AWOL amongst correction officers per month, a 20% increase over the prior year and DOC reached a high for the year of 1,285 in December, 2020. In the 8 months of 2021, DOC has a staggering **2304** instances of AWOL each month amongst correction officers. This represents a staggering **198% increase from 2020** and a 215% increase from 2019.

31.     There is no plausible explanation for this dramatic increase across the board other than a concerted effort by correction officers to engage in an unlawful job slowdown through mass absenteeism (the "illegal job action").

32. In public statements, COBA officials tend to justify the mass absenteeism as a reflection on working conditions without discouraging such conduct – despite the fact that AWOL is plainly misconduct and not justified under collective bargaining principles. In so doing, COBA officials are condoning the ongoing job action.

33. For example, in an interview with PIX 11 News, when asked about mass absenteeism in connection with worsening conditions, defendant Boscio stated, "the reality is the people who have been AWOL for the last 8 years are the [DOC] leadership and [the elected officials]…they are not being asked…to act on everything we've [been asking them] to do." By connecting mass absenteeism to a supposed failure by the City to meet COBA's demands (and a failure of elected officials to pressure the City to do so), defendant Boscio has conceded the mass

- 7 -

absenteeism is, in fact, an unlawful job action by members of the union he leads.

34.    There is also no doubt that defendants, while excusing and implicitly condoning the job action, are well aware they can – and should – do more to stop it. For example, on September 2, 2021, COBA delegate Donna Schnirring wrote a memorandum to DOC Commissioner Vincent Schiraldi in response to Commissioner Schiraldi's request for suggestions about how to improve conditions at DOC. Schnirring stated to Commissioner Schiraldi that if he were to consider some of her suggestions, "I can promise to have officers . . . that are out sick and Medically Monitored to return to work."

35. This statement by a duly elected COBA delegate is an admission that COBA is aware that officers are purposefully absenting themselves from work as leverage for policy change and that COBA could, if it chose, end or at least mitigate that job action if various policies are changed to their satisfaction.

36. Even under ordinary circumstances, this unlawful job action by correction officers would severely impair the ability of the DOC to perform the duties mandated by the City Charter and would endangered the health and safety of individuals housed in DOC facilities, employees who work in DOC facilities, and other members of the general public.

37. But, at this critical juncture, the unlawful campaign of mass absenteeism by correction officers is one of the primary contributors to an emergency circumstance in which the health and well being of plaintiff's employees, as well as the detainees in DOC facilities, are at risk.

38.    On September 2, 2021, Steven J. Martin, the federal Monitor appointed by the United States District Court for the Southern District of New York to monitor ongoing compliance with federal constitutional standards found that "Department's high rate of Staff

- 8 -

absenteeism must be addressed immediately because the abuse of sick leave and AWOL contributes to overall mismanagement of the Facilities."

39.     In order to curb the pervasiveness of what he termed a "troubling practice," the Monitor recommended, amongst other things, that that the City and Department evaluate "all available data and information regarding the significant increase of tours with AWOL Staff or Staff on sick leave during Spring 2021 to ascertain the viability of all legal remedies, including whether a job action has occurred, and then taking appropriate remedial action."

40. The deterioration of conditions for individuals incarcerated in Department facilities as a result of the mass absenteeism of staff has been extensively covered by press and has been observed by experts across the criminal justice community.  Much like the federal monitor, press accounts have noted the difficulties faced at Rikers are exacerbated by "an unofficial work action."  One media outlet, for example, noted "Thousands of officers have stopped reporting for duty. Many of them are calling in sick and some are simply absent without official leave."

41. The Chief Medical Officer for Correctional Health Services, which provides medical care to incarcerated persons in New York City, wrote to the New York City Council about the deterioration of conditions and the enormous impact that staffing shortages was having on the jail population.

42. Attorneys advocating for the detainees at Rikers likewise have been observing that conditions in the jails are deteriorating "because correction officers simply won't do their jobs."  These poor conditions include medication not being delivered to detainees, emergent conditions simply being ignored or not addressed and meals significantly delayed or not

provided altogether.

43. On September 15, 2021, Mayor Bill DeBlasio issued a declaration of emergency "to address the conditions in the New York City jails." In issuing that order, the Mayor observed that "excessive staff absenteeism among correction officers and supervising officers has contributed to a rise in unrest and disorder, and creates a serious risk to the necessary maintenance and delivery of sanitary conditions; access to basic services including showers, meals, visitation, religious services, commissary, and recreation; and prompt processing at intake . . ."

44. Paragraph 2 of Mayor's emergency Executive Order addresses the unlawful AWOL by correction officers by providing "any DOC correction officer or supervising officer who is absent without leave (AWOL) shall be suspended for up to thirty days without pay pending hearing and determination of disciplinary charges to address the AWOL issue."

45. While City is doing its part to mitigate this problematic and unlawful job action to help resolve this ongoing emergency, the defendants have not fulfilled their legal obligations to help mitigate and apparently will not without emergency judicial intervention.

46. Despite agreeing that immediate action is needed to address these concerns, defendants oppose any remedial effort short of hiring many more correction officers, a response the federal monitor has noted does not appear to be the issue given that, in his roughly four decades of working in correctional institutions, the DOC has one of the "richest staffing ratios."

47. Defendants have vowed to oppose and even block the City providing other resources, including security to help support the correction officers in an apparent attempt to coerce the City to increase the union's ranks.

Case 1:21-cv-09012-DLC   Document 41-50   Filed 10/24/22   Page 12 of 23

48.     In short, the dramatic increase in mass absenteeism by correction officers is clearly coordinated and an outright abdication of correction officers' basic responsibilities to protect the health and safety of the individuals housed in their facilities, other DOC employees, and the visiting public.

49.     Defendants are clearly aware of this campaign of mass absenteeism, and are either unable or unwilling to fulfill their obligations under law and contract to mitigate it, putting the population of Riker's Island – employees and detainees alike – in greater danger.

50.     The illegal job action being encouraged and condoned by defendants violates the Civil Service Law, New York City Collective Bargaining Law, and their own collective bargaining agreement in an apparent attempt to leverage this emergency to coerce the City into meeting defendants' demands.

51.     The illegal job action now being conducted is only the most recent instance in a decades-long history of illegal job actions either instigated or condoned by defendant COBA, its officials and members.

52.     In April 1987, one hundred and eleven (111) Correction Officers at the Brooklyn Correctional facility engaged in an illegal job action by leaving their posts or refusing to report for duty.  This violation of the Taylor Law was seemingly motivated by a misguided desire to protest disciplinary action being taken against nine other Correction Officers.

53.     Ultimately, the striking Correction Officers returned to duty but thereafter were subject to disciplinary proceedings and penalties which included the loss of twice the amount of the pay they would have received during the time they engaged in the illegal job actions.

54.     In August 13, 1990 large numbers of Correction Officers entered upon and

- 11 -

completely blocked the flow of traffic across the Buono Memorial Bridge which links Rikers Island to the mainland. Many of the Correction Officers stopped their cars on the Bridge, claiming that their vehicles had broken down. As these vehicles were removed, additional Correction Officers drove onto the Bridge, again claiming that their cars had broken down.

55. Other Correction Officers gathered nearby on the street leading to the Bridge, and either sat down or otherwise blocked traffic to and from Rikers Island. Within a short period of time all access to or from Rikers Island was completely blocked. It must be noted that under New York law correction officers are authorized to carry firearms and that many officers carry off-duty pistols.

56. Once a large number of armed correction officers have blocked the Bridge a potentially volatile and violent situation was created. This blockage of the bridge persisted throughout the day on August 13, 1990, and continued until 6 p.m. on August 14, 1990 after an agreement concerning COBA's demands was reached by the City and the COBA leadership. Upon reaching an agreement the blockage of the Bridge ended and the Correction Officers returned to work.

57. Because access to and from Rikers Island was blocked DOC was unable to transport prisoners to the courts for scheduled proceedings, including bail hearings and trials and to medical facilities. Inmates scheduled to be transferred to state prison facilities could not be transferred, and scheduled parole hearings could not be conducted.

58. In early September, 1993, the City and COBA were in the midst of negotiating a new contract when the COBA leadership threatened that a job action would occur and referred specifically to the illegal job action of August 1990, in which the Bridge was blocked by COBA's membership, thereby preventing access to and from Rikers Island.

- 12 -

59.     Immediately after such threats were made at a bargaining meeting, a flyer was widely circulated to COBA's membership on Rikers Island. The flyer stated that if there was no contract there would be no work and called on COBA members to assemble on the Bridge on September 13, 1993. This constituted an illegal threat to strike and this threat, in and of itself, was a violation of the Taylor Law.

60.     On September 10, 1993, on application of the City and the Commissioner of the Department of Correction, the Honorable Jane Solomon, Justice of the Supreme Court, County of New York, issued an injunction prohibiting illegal strikes including, among other things, the blocking of the Bridge. *See City of New York v. COBA, et al.*, Index No. 405403/93 (Sup. Ct. N.Y. Co., Sept. 10, 1993).

61.     In addition, on Monday, September 13, 1993, a massive police presence secured the Bridge in preparation for possible illegal job actions by defendant union and its members. The combination of this Court's injunction and the police presence to enforce that injunction help to prevent any job action on the Bridge and the Bridge remained open to traffic in September, 1993.

62.     It should be noted that 1993 was not the first time that COBA was restrained from engaging in an illegal job action. In October of 1972 COBA's leadership was also restrained from violations of the Taylor Law.

63.     Unfortunately, neither the preliminary injunctions issued in 1972 nor in 1993 provided sufficient deterrent effect from continued unlawful conduct by the union, its leadership or its members.

64.     In 2013, a former COBA president arrived at a Rikers Island shift change meeting, and led correction officers out of the shift change and into the commissary. Officers

- 13 -

thereafter refused to comply with orders to get in formation for uniform inspection and to facilitate a shift change. Officers were reportedly protesting the fact that some inmates received pizza from the facility's mental health staff after the inmates completed a lengthy therapy program.

65.     The former COBA president condoned the work stoppage, stating "You want to eat pizza, stay home…You want to have Carvel, stay home. You want to do a timeout, stay home. Corrections officers are not babysitters," and "You push me, I push back." *See* "De Blasio Setting Up a Test: Prison Reformer vs. Rikers Island," New York Times, April 4, 2014, accessible at https://www.nytimes.com/2014/04/05/nyregion/joseph-ponte-new-yorks-new-corrections-commissioner-faces-challenge-at-rikers.html (last accessed March 30, 2021), annexed to the Shaffer Aff. as Exhibit "F."

66.     On November 18, 2013, correction officers assigned to the DOC's Transportation Division, after speaking with members of COBA's Executive Board, including a former COBA president, suspiciously noted deficiencies in all 33 transportation buses at the Rikers Island Transportation Unit during mandated "pre-trip inspections" at the beginning of their tours. *See* Summons and Complaint, *City of New York v. Correction Officers' Benevolent Association, et al.*, Index # 452134/13, NYSCEF Doc. No. 1, annexed to the Shaffer Aff. as Exhibit "G," at ¶ 35.

67.     By prior DOC practice, the rejection of these buses by their drivers caused the vehicles to be taken out of service until such time as they could be inspected by mechanics and confirmed to be safe for further use. *Id.*

68.     As a result of this unusual adherence to rules regarding operation of vehicles by those correction officers, all 33 available buses at the Rikers Island Transportation

- 14 -

Unit which had been appropriately fitted for secure transfer of inmates to the courts and to medical appointments were deemed to be inoperable, despite the fact that no driver had reported any similar deficiency with regard to these vehicles during their previous use on the Friday before. *Id.*

69.     Further, after speaking to the COBA president, correction officers refused to attend a roll call meeting by a superior officer to address the shortage of available buses and its impact on producing inmates for court appearances. *Id.* at ¶ 36.

70.     As a result of this job action, 33 out of 44 inmates who were scheduled to appear at their own trials, or testify at other trials, could not be produced to testify on November 18, 2013. *Id.* at ¶¶ 37, 39-40. An additional 702 inmates who had other scheduled court appearances could not be transported by DOC to court on November 18, 2013. *Id.* at 40. Finally, inmates missed 49 specialty appointments at Bellevue Hospital and 35 specialty appointments on Rikers Island due to this job action. *Id.* at ¶ 41.

71.     This long history of illegal concerted job actions by the COBA, its officials and its members, indicates a pattern of illegal conduct and flagrant disregard for the law, of which the current mass absenteeism is but the most recent manifestation. These past actions provide the context for defendants' present system-wide challenge and indicate the inherently severe threat to public order and safety which is posed by the defendants' conduct.

72.     The likelihood of irreparable harm to the City of New York and its millions of residents, as well as to those who work and visit here, due to this and any other illegal job action by correction officers is indisputable.

- 15 -

73.     The observations of the federal monitor and all across the criminal justice community, along with the Mayor's declaration of emergency establish, beyond argument, that immediate, irreparable injury to plaintiff is ongoing.

74.     Correction officers are responsible for safeguarding and securing DOC facilities; protecting individuals in custody, employees who work in DOC facilities, and visitors from the general public; enforcing the laws of the City and State of New York; and otherwise fulfilling the duties set forth in Chapter 25, Section 623 of the New York City Charter.

75.     It should not require legal action to ensure COBA fulfills its obligations under the law and under its CBA to discourage the illegal job action and mitigate the emergency that has arisen from it.  The risk to health and safety of individuals housed in DOC facilities, employees who work in DOC facilities, and other members of the general public has already increased dramatically.  COBA must, at the very least, do the minimum the law requires to mitigate this emergency.

76.     In view of the irreparable harm, including the danger to public safety and health, and the unnecessary expenditure of municipal funds for overtime resulting directly from this slowdown, Plaintiff respectfully urges this Court to grant the injunctive relief requested in this application.

## AS AND FOR A SECOND CAUSE OF ACTION

77.     Plaintiff repeats and realleges each of the allegations set forth in paragraphs "1" through "76", as if fully set forth herein.

78.     Defendants have willfully and maliciously condoned, encouraged and/or engaged in an illegal job action by correction officers with the intent that such action will cause the plaintiff to suffer significant injury and damages.

- 16 -

79. As a result of the illegal job actions encouraged and/or condoned by defendants herein, plaintiff has suffered, and will continue to suffer immediate and irreparable injuries, including significantly increased overtime, and may suffer conditions which will endanger the public safety and welfare in the City of New York and other damages as yet specifically unknown, but all of which are known to, foreseeable by, and fully intended by defendants.

80. Plaintiff has no adequate remedy at law.

81. No prior application for this or any other provisional remedy or similar relief has been made to this or any other Court.

**WHEREFORE,** plaintiff demands preliminary and permanent relief enjoining and restraining the defendant union its officers, directors, agents, members, representatives, servants, and all other persons, whomsoever known or unknown acting in their behalf or in concert with them, or any of them in any manner or by any means from:

        (a) voting to engage in, or otherwise in favor of, engaging in, or causing, instigating, encouraging or condoning, or lending support or assistance of any nature to any strike, concerted stoppage of work or slowdown, including, but not limited to, a concerted work stoppage or slowdown which takes the form of failing to issue summonses, claiming illness, failing to or refusing to report to work stations, failing or refusing to carry out lawful orders or to perform duties in a normal manner, or conducting a rule book slowdown against plaintiff, the purpose or effect of which is to delay, or otherwise hinder the proper performance of New York City Department of Correction duties;

        (b) interfering in any manner directly or indirectly with plaintiff, its officers, agents, representatives or employees, or preventing them or any of them from engaging in the

- 17 -

performance of any duties in behalf of plaintiff, or, in any manner, interfering with or affecting the orderly continuance of the functions of plaintiff, its officers or employees, or refusing to carry out lawful orders:

(c)  committing, attempting or directing the taking of any action which is likely to cause any employee of plaintiff to decline or discontinue to work for said plaintiff, or to slow down in the performance of duties of employment for said plaintiff, or to fail or refuse to report to or to leave his or her work assignment, or fail to perform his or her duties in a normal manner;

(d)  committing, attempting or directing the taking of any action to induce, persuade or intimidate any person, association, firm or corporation, or their employees, to initiate or continue any agreement to fail or refuse to make deliveries to or for plaintiff, or to fail or refuse to perform services for plaintiff, or interfere in any manner with the operations or functions of plaintiff;

(e)  for any of the purposes or with any of the effects set forth in subparagraphs (a), (b), (c) or (d) above: picketing, patrolling, congregating, or walking back and forth within 100 feet of the entrance to any office, facility or other premises operated or administered by the New York City Department of Correction, or calling meetings and causing crowds to collect in front of said premises, or causing any officers, agents, members, representatives, servants or employees of the New York City Department of Correction, or any other person, to do, perform or engage in, or participate in any or all such acts, which has or have the effect of disrupting, impeding or interfering with the normal functioning and operation of the New York City Department of Correction;

(f)  engaging in any action or attempted action, either written or oral, which has the intent,

- 18 -

purpose or effect to encourage or support employees of plaintiff to engage in a concerted work stoppage which takes the form of reporting sick, or failing to or refusing to report to their work assignments, or to follow lawful commands, or to perform duties in a normal manner, and where such act or attempted act, either written or oral, has the further intent or purpose, expressed or implied, to impede the operations of plaintiff, or to accede to the unsatisfied demands of any one or more defendants or any representative of defendants;

(g) agreeing, conspiring or combining to perform any of the foregoing, or any other unlawful act tending to injure, damage, destroy or interfere in any manner with the operations or functions of plaintiff or doing any act in furtherance of any such agreement, conspiracy or combination;

**AND WHEREFORE,** plaintiff further demands judgment against the defendant COBA and its defendant officers, each of them, jointly and severally for the sum of One Million Dollars ($1,000,000.00) for the first day, or portion thereof, the defendant COBA, or any officer of the defendant COBA, engages in, causes, instigates, encourages, or condones any strike, mass absenteeism, concerted stoppage of work, or slowdown, and for double that amount for the following day the defendant COBA, or any officer of the defendant COBA, engages in, causes, instigates, encourages, or condones any strike, mass absenteeism, concerted stoppage of work, or slowdown, and thereafter for double the amount of the preceding day's damages, whether it is a consecutive day or not, for each day the defendant COBA, or any officer of the defendant COBA, continues to engage in, cause, instigate, encourage, or condone any strike, mass absenteeism, concerted stoppage of work, or slowdown, as compensatory damages and One Million Dollars ($1,000,000.00) in punitive damages for each day, or portion thereof that the defendant COBA, or any officer of the defendant COBA, engages in, causes, instigates,

- 19 -

Case 1:21-cv-09012-DLC   Document 41-50   Filed 10/24/22   Page 21 of 23

encourages, or condones any strike, mass absenteeism, concerted stoppage of work, or

slowdown.

Dated:      New York, New York
             September 20, 2021

                     GEORGIA M. PESTANA
                     Corporation Counsel of the
                       City of New York
                     Attorney for Defendants
                     100 Church Street, Room 2-100
                     New York, New York 10007
                     (212) 356-2430
                     eeichenh@law.nyc.gov

              By:                                     
                     Eric Eichenholtz
                     Assistant Corporation Counsel

- 21 -

## VERIFICATION

STATE OF NEW YORK     )
                              : SS.:
COUNTY OF NEW YORK   )

         GEORGIA M. PESTANA, being duly sworn, deposes and says that I am the

Corporation Counsel of the City of New York and the Chief Legal Officer of the City of the New

York City, that I have read the foregoing complaint and know the contents thereof to be true

except as to the matters herein alleged upon information and belief and as to those matters I

believe them to be true, that the source of my information and the basis for my belief are

personal knowledge, information supplied by employees of New York City and the books and

records of the New York City Department of Correction.

_____
GEORGIA M. PESTANA

Sworn before me this
__20__ day of September, 2021

_____
NOTARY PUBLIC

MARY A. SCHNEIDER
Notary Public, State of New York
Registration No. 01SC6280761
County of Queens
My Commission Expires May 13, 20_25_