**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JERELLE DUNN, SAMUEL SEMPLE, ANDRE WASHINGTON, MATTHEW CHRISTIANSON, WILLIAM CLANTON, SAMIR SHABAN, and MICHAEL PENA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> -against- <br><br> THE CITY OF NEW YORK, <br><br> Defendant. | **Case No: 21-CV-09012 (DLC)** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**CLASS CERTIFICATION**

**Table of Contents**

PRELIMINARY STATEMENT ................................................................. 2

STATEMENT OF FACTS ...................................................................... 3

I.    INHUMANE AND ABHORRENT CONDITIONS AT RIKERS ISLAND.......................... 3

II.   THE CITY OF NEW YORK HAS LONG KNOWN OF THE CONDITIONS AT
RIKERS ISLAND AND HAS REPEATEDLY FAILED TO REMEDY THEM. ........................ 8

III.  THE CITY'S ADMISSIONS ................................................................. 12

IV.   PROPOSED CLASS, CLASS ALLEGATIONS, AND RELIEF SOUGHT .................... 14

V.    PROPOSED CLASS REPRESENTATIVES......................................................... 14
ARGUMENT........................................................................................ 16

I.    THE PROPOSED CLASS SATISFIES RULE 23(a). ......................................... 17

A.    Numerosity is Easily Satisfied. ........................................................... 17
B.    The Class Rests on Common Questions Capable of Class-Wide Resolution.................... 18
C.    Plaintiffs' Claims Are Typical of the Putative Class Members' Claims. ...................... 24
D.    Plaintiffs and Plaintiffs' Counsel Will Adequately Represent the Class....................... 25

II.   THE CLASS MEMBERS' IDENTITIES ARE READILY ASCERTAINABLE. ........... 27

III.  THE PROPOSED CLASS SATISFIES RULE 23(B)(3). ................................... 28
A.    Common Questions of Law and Fact Predominate. ..................................... 28
B.    A Class Action is Superior to Other Litigation Methods.................................... 32

CONCLUSION.................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Aichele v. City of L.A.*, 314 F.R.D. 478, 490 (C.D. Cal. 2013)..........................................21, 24, 32

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)............................................26, 33

*Augustin v. Jablonsky*, 819 F. Supp 2d 153, 158 (E.D.N.Y. Oct. 19, 2011).........................23, 32

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) ..................26

*Barnes v. Dist. of Columbia*, 278 F.R.D. 14, 20 (D.D.C. Dec. 7, 2011)......................................24

*Betances v. Fischer*, 304 F.R.D. 416, 431 (S.D.N.Y. 2015)....................................23, 30, 31, 32

*Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) ................................................................30

*Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)..............................................27

*Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010)......................................................................28

*Brown*, 609 F.3d at 468..................................................................................................................31

*Butler v. Suffolk Cty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013)................................................... passim

*Case v. Anderson*, No. 16 Civ. 983, 2017 WL 3701863, at *23 (S.D.N.Y. Aug. 25, 2017) ........30

*Catholic Health Care W. v U.S. Foodserv. (In re U.S. FoodServ. Pricing Litig.)*, 729 F.3d 108,
   130 (2d Cir. 2013). ....................................................................................................................35

*Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013) ................................................................26

*Clarkson v. Coughlin*, 145 F.R.D. 339, 346 (S.D.N.Y. 1993).....................................................17

*Cutler v. Perales*, 128 F.R.D. 39, 45 (S.D.N.Y. 1989)...............................................................25

*Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001).........................................22

Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017)...........................................................19, 29, 30

*Darnell*, 849 F.3d at 27 .................................................................................................................30

*Dunn v. City of Chicago*, 231 F.R.D. 367, 377 (N. D. Ill. 2003) ..........................................20, 21

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014)...........................................27

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 808-15 (2011) ...............................29

*Fant v. City of Ferguson*, No. 15 Civ 00253-AGF, 2022 U.S. Dist. LEXIS 102868, at *30 (E.D.
   Mo June 9, 2022)......................................................................................................................24

*Flood v. Dominguez*, 270 F.R.D. 413, 416 (N.D. Ind. 2010) ......................................................21

*Hernandez v. City of Houston*, No. 16 Civ 35772019, U.S. Dist. LEXIS 111657, at *15 (S.D.
   Tex. July 3, 2019)...............................................................................................................24, 32

*Hill v. County of Montgomery*, No. 9:14-cv-00933 (BKS), 2018 U.S. Dist. LEXIS 140305, at *23
   (N.D.N.Y. Aug. 20, 2018)........................................................................................................33

*Hoeffner v. D'Amato*, No. 09-CV-3160, 2019 WL 1428367, at *7 (E.D.N.Y. Mar. 29, 2019)....25

*In re Allergan PLC Sec. Litig.*, 18-CV-12089 (CM)(GWG), 2021 U.S. Dist. LEXIS 170310, at
   *15 (S.D.N.Y. Sep. 8, 2021) .....................................................................................................16

*In re Ashanti Goldfields Sec. Litig.*, 00-CV-0717 (DGT), 2004 U.S. Dist. LEXIS 5165, at *53
   (E.D.N.Y. Mar. 30, 2004,) ........................................................................................................34

*In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *7 (S.D.N.Y. Aug. 13, 2020)
   ....................................................................................................................................................33

*In re Drexel Burnham Lambert Group*, 960 F.2d 285, 291 (2d Cir. 1992) .................................26

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 529 (S.D.N.Y. 1996).............. 35

*In re Nassau County Strip Search Cases*, No. 99-CV-3126, 2008 U.S. Dist. LEXIS 29083, at *3–7 (E.D.N.Y Mar. 27, 2008) ....................................................................................................... passim

*In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001).............. 28, 29

*In re: Conditions at Lake County Jail*, 22-CV-127 (DMW) (D. Mont. Oct. 11, 2022) (ECF No. 49)........................................................................................................................................... 21

*Ingles v. City of New York*, 2003 U.S. Dist. LEXIS 2453, at *1 (S.D.N.Y. Feb. 18, 2003)......... 20

*Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ................................... 18, 20

*Jones v. Smith*, 784 F.2d 149, 151 (2d Cir. 1986)........................................................................ 17

*Kerman v. City Of New York*, 374 F.3d 93, 125 (2d Cir. 2004) .................................................... 32

*Langley v. Coughlin*, 715 F. Supp. 522, 555 (S.D.N.Y. 1989) ............................................... 20, 29

*Loper v. New York City Police Department*, 135 F.R.D. 81, 83 (S.D.N.Y. 1991) ....................... 17

*MacNamara v. City of N.Y.*, 275 FRD 125, 148 (S.D.N.Y. 2011)................................................. 35

*Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997) ............................................... 16, 22, 25

*Mays v. City of Middletown*, 895 N.Y.S.2d 179, 182 (2d Dep't 2010) ........................................ 30

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008) .......................................... 17

*Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978) ........................................................ 29

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) .............................................. 28

*Newkirk v. Pierre*, No. 19-CV-4283 (NGG), 2020 U.S. Dist. LEXIS 144887, at *24 (E.D.N.Y. Aug. 11, 2020), report and recommendation adopted, 2020 U.S. Dist. LEXIS 155539 (E.D.N.Y. Aug. 26, 2020) ....................................................................................................... 24

*Parker v City of N.Y.,* No. 15-CV-6733 (CLP), 2017 U.S. Dist. LEXIS 203579, at *27 (E.D.N.Y. Dec. 11, 2017) ...................................................................................................................... 33

*Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (2016) ................................... 30

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ...................................................... 34

*Pub. Emples. Retirement Sys. of Mississippi v Merrill Lynch & Co.*, 277 FRD 97, 121 (S.D.N.Y. 2011)......................................................................................................................................... 35

*R. A-G ex rel. R.B. v. Buffalo City Sch. Dist. Bd. of Educ.*, 12-CV-960, 2013 WL 3354424, at *10 (W.D.N.Y. July 3, 2013), aff'd, 569 F. App'x 41 (2d Cir. 2014)).......................................... 24

*Remick v. City of Phila.*, No. 20-1959, 2022 U.S. Dist. LEXIS 43339, at *28 (E.D. Pa. Mar. 11, 2022)...................................................................................................................................... 21

*Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993)..................................................... 17, 25, 35

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001) ............................ 25

*Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986) .......................................... 28

*Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1106 (E.D.N.Y.2006)....................... 26

*Scott v. Quay*, 338 F.R.D. 178 (E.D.N.Y. 2021)........................................................... 22, 23, 30, 31

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) .............. 16

*Shariar v. Smith & Wollensky Rest. Group,* 659 F.3d 234, 252 (2d Cir. 2011)........................... 17

*Stinson v. City of New York*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) ............................................ 29

*Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015)................................. 29, 35

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).................................................................................................................................... 17

*Torres v. City of New York*, No. 09-CV-9357, 2017 WL 2191601, at *2 (S.D.N.Y. May 17, 2017) ........................................................................................................................................ 30

*Tsereteli v. Residential*, 283 FRD 199, 218 (S.D.N.Y. 2012) ...................................... 34

*Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989) ... 22, 25

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................. 18

**Statutes**

42 U.S.C. § 1983 .......................................................................................................... 19

**Rules**

Fed. R. Civ. P. 23(a) ............................................................................................. passim

Fed. R. Civ. P. 23(b) ............................................................................................. passim

## PRELIMINARY STATEMENT

Rikers Island is, and has long been, a humanitarian disaster. In 2017, former Chief Judge of the New York Court of Appeals Jonathan Lippman and then City Council Speaker Melissa Mark-Viverito called Rikers Island "an affront to the civic values of New York City," adding that "closing Rikers Island is not simply good public policy—it is a moral imperative." Declaration of Jonathan C. Moore ("Moore Decl.") ¶ 3, Ex. 1. In 2021, Ross MacDonald, Chief Medical Officer for the City of New York's Correctional Health Services begged for assistance, writing publicly that "we have witnessed a collapse in basic jail operations, such that today I do not believe the City is capable of safely managing the custody of those it is charged with incarcerating." Moore Decl. ¶ 5, Ex. 3. More recently, the State of New York declared Rikers Island a disaster emergency in Governor Hochul's Fifth Executive Order, and New York City declared a state of emergency on the Island in Executive Order No. 241, which was recently extended on October 12, 2022. Moore Decl. ¶ 6, Ex. 4. Last month, recent former DOC Commissioner Vincent Schiraldi referred to Rikers as "a house on fire." Moore Decl. ¶ 7, Ex. 5. While this motion was being drafted, Erick Tavira was found dead in his cell of suspected suicide. Moore Decl. ¶ 35, Ex. 27.

Plaintiffs Jerelle Dunn, Samuel Semple, Andre Washington, William Clanton, Samir Shaban, and Michael Pena were subjected to abhorrent and inhumane conditions while detained at Rikers Island. Defendant, through its mismanagement and neglect of Rikers Island, created the unconstitutional conditions. Despite having long known that the conditions at Rikers were and are unconstitutional, Defendant has failed to intervene meaningfully or adequately to rectify these conditions. Defendant instead allowed them to persist and worsen. Through creating the inhumane conditions at Rikers Island and acting with deliberate indifference to the violations of incarcerated people's constitutional rights and human dignity, the City is liable to each of the class members.

On behalf of themselves and all others similarly situated, Plaintiffs submit this memorandum of law in support of their motion to certify a class of all people who entered or were housed on Rikers Island on or after November 2, 2018 to the present and going forward until resolution of this case (hereinafter the "Class Period"),

In not correcting the long known constitutional deficiencies at Rikers Island, the City of New York has treated the proposed class in a uniform way. Because this inhumane treatment was the result of Defendant's practices and policies of turning allowing the humanitarian disaster in its jails to persist, and because the proposed class seeks damages for injuries suffered from a single cause or set of causes, a Rule 23(b)(3) class action is the standard and appropriate mechanism for adjudication. The alternative—requiring the independent litigation of each class member's claims in potentially thousands of largely *pro se* complaints—would tax the resources of this Court. Additionally, given the financial and practical barriers to class members' abilities to bring individual suits, it is likely that many class members would never have an opportunity to present their claims. Thus, the only reasonable means by which to proceed is on a class basis.

## STATEMENT OF FACTS

## I.     INHUMANE AND ABHORRENT CONDITIONS AT RIKERS ISLAND

People held at Rikers Island during the Class Period were subjected to a collection of egregious and dehumanizing conditions of confinement. The detained population is subjected to overcrowded, unsanitary, unhabitable, decaying, and dilapidated buildings that lack adequate heating and cooling systems. ECF No. 1, First Amended Complaint ("FAC") ¶¶ 103–36; Moore Decl. ¶¶ 8–21, Exs. 6–13. They are served nutritionally inadequate, spoiled meals at irregular times, and are not even given enough clean water to drink. FAC ¶¶ 137–43; Moore Decl. ⁋ 8–21, Exs. 6–13. They are denied outdoor time, recreational programming, religious services, court

appearances, and legal calls. FAC ¶¶ 200–19; Moore Decl. ¶¶ 8–21, Exs. 6–13. These constitutional violations are further compounded by the constant threat and fear of rampant violence against the detained populations, which is exacerbated by knowledge that, if they are injured or need medical treatment, that treatment is unlikely to come. FAC ¶¶ 144–99.

All who come through Rikers Island experience the horror of intake, where newly detained people are processed. *Id.* at ¶ 104; Moore Decl. ¶¶ 10-15, Ex. 7. The small intake cells at Rikers Island do not have beds and are only meant to hold people for a few hours. Moore Decl. ¶¶ 10-15, Ex. 7. Yet dozens of people are stuffed into these small cages for days and weeks at a time, forced to choose between sleeping on the floor or sleeping sitting up on a bench. *Id.* Toilets often overflow with feces in these overcrowded intake cells, and individuals are expected to defecate and urinate in plastic bags within inches of one another. FAC ¶¶ 104–05; Moore Decl. ¶¶ 10-15, Ex. 7. People trapped in intake cells are often surrounded by others vomiting from untreated drug withdrawal or coughing from COVID-19. FAC ¶¶ 107, 135, 193.

People in custody are also subjected to the filthy and unsanitary conditions at intake every time they are transferred between facilities and before and after they appear in court. Moore Decl. ¶¶ 10-15, Ex. 7. Staffing shortages and the steadily increasing jail population also result in delays moving people out of intake. FAC ¶ 206; Moore Decl. ¶ 61, Ex. 53. As a result, detained people can spend two to four weeks trapped in the appalling conditions of intake, often without a shower or clean clothing, forced to sleep shoulder to shoulder next to others, either on the ground or sitting on a bench. FAC ¶ 110; Moore Decl. ¶ 38, Ex. 30. These sanitation issues are abundant throughout Rikers and extend far beyond intake. Rats, mice, maggots, roaches, and other vermin are widespread throughout the facility. FAC ¶¶ 111–12, 116–20; Moore Decl. ¶¶¶ 25, 26, and 41 Exs. 17, 18, and 33. Shower stalls double as cells at times, and the halls are strewn with garbage, fecal

matter, and urine. FAC ¶ 112; Moore Decl. ℙ 25, Ex. 17. People at Rikers Island are subjected to extreme and dangerous heat conditions, and many facilities lack air conditioning, fans, or access to cool showers, even during dangerously hot periods, and experience similar issues with a lack of adequate heat or blankets during the cold winter months. FAC ¶¶ 122–25; Moore Decl. ℙ 42, 8, and 17, Ex. 34, 6, and 9. The smell is "[w]orse than a sewer." Moore Decl. ¶ 45, Ex. 37.

Meals at Rikers Island are irregular, nutritionally inadequate, and unsanitary. The lack of adequate, fresh, and regular meals is experienced by all regardless of housing placement, as staff absenteeism has prevented regular preparation and distribution of meals. FAC ¶ 137. Food arrives hours late and is often cold and unsubstantial. *Id*. at ¶ 138; Moore Decl. ℙ 10, Ex. 7. In crowded intake areas, officers have thrown loaves of bread into the overcrowded intake cells for people in them to fight over a limited amount of available food. FAC ¶ 139. As DOC prepares meals based on maximum capacity of a housing area, frequent overcrowding beyond dormitory capacity means not enough available food in housing areas. *Id*. at ¶ 140. Without cups, many people in intake cells can only access drinking water by scooping it up in their unwashed hands. *Id*. at ¶ 141; Moore Decl. ℙ 10, Ex. 7.

Southern District Court Judge Swain, who oversees the court-ordered monitorship at Rikers Island, has described "extremely dangerous" conditions of confinement there in which rampant violence means that "every single day people are in danger." FAC ¶ 149; Moore Decl. ℙ 22, Ex. 14. Fear of injury or death from violence is a constant and universal condition at Rikers Island. Many housing and intake areas have no staff present for prolonged periods of time, and DOC frequently places detained persons in the same housing areas, or even the same cells, as members of rival gangs, in violation of the DOC classification system. FAC ¶ 145. Correction officers condone and watch "fight nights," in which detained people are pitted against each other

without staff intervention. FAC ¶ 146; Moore Decl. ⁋ 30, Ex. 22. Correction officers themselves instigate violence by providing makeshift weapons, and by failing to confiscate the same. FAC ¶ 147; Moore Decl. ⁋ 30, Ex. 22. When intervention does occur, officers respond indiscriminately by pepper spraying entire units or areas, subjecting many uninvolved individuals to these chemicals, further agitating disorder. FAC ¶¶ 146–47; Moore Decl. ⁋ 30, Ex. 22. These conditions have led to a reasonable, universal fear among the incarcerated population that they are under a real and constant threat of violence, whether it be excessive force by guards, or violence at the hands of their fellow detained persons. FAC ¶ 148.

Rates of use of force and violent incidents, such as stabbings and slashings—have skyrocketed during the Class Period. *Id*. at ¶¶ 155–64. In 2018, the New York City Comptroller's Office found that, despite a declining detainee population, rates of violent incidents and uses of force continued to increase. FAC ¶ 155; Moore Decl. ⁋ 31, Ex. 23. By 2019, use of force by DOC officers had jumped nearly 30 percent from 2018. FAC ¶ 157; Moore Decl. ⁋ 32, Ex. 24. In 2020, uses of force by guards against detained persons rose 183 percent from 2016. FAC ¶ 158; Moore Decl. ⁋ 34, Ex. 26. In 2021, the rate at which guards used force against detained persons was 200 percent higher than the rate in 2016 that gave rise to the *Nunez* consent decree. FAC ⁋ 161, Moore Decl. ⁋⁋ 22 and 29, Ex. 14 and 21.

By the end of April 2022, 191 stabbings were recorded for the year. *Id*. at ¶ 166; Moore Decl. ⁋ 29, Ex. 21. The *Nunez* Monitor emphasizes that these violent incidents are "*not* typical, they are *not* expected, they are *not* normal" in comparison to "generally accepted practices in the [corrections] field." FAC ¶¶ 167, 179; Moore Decl. ⁋ 22 and 53, Ex. 14 and 45. The Monitor noted that "on a daily basis, there is a manifest risk of serious harm to both detainees and staff, which in turn generates high levels of fear among both groups." *Id*.

This widespread fear violence is exacerbated by the lack of accessible and timely medical care. There are significant delays in transporting those in need of care to clinics, mental health units, or to the hospital, even if 911 has been activated. FAC ¶ 181; Moore Decl. ⁋ 5, Ex. 3. Limitations on accessing mental and medical healthcare begin at intake: When a detained person is brought to Rikers Island, days may pass until they are given a preliminary medical screening, which should occur promptly upon their arrival, and individuals are deprived of access to medications they require for ongoing conditions. FAC ¶ 182. Access to mental health services are similarly dismal. Between November 2018 and November 2021, 19 to 35 percent of mental health appointments were missed because staff failed to produce detained persons to their mental health services. FAC ¶ 194; Moore Decl. ⁋ 33, Ex. 25. A collapse in basic jail operations and the delays in medical and mental health care have been deadly, and all detained at Rikers are at risk of serious injury and death from this lack of adequate and prompt care. *Id*. In 2021, there were a record 16 deaths—the deadliest year since 2013, when nearly twice as many people were detained at Rikers Island. Moore Decl. ⁋ 36, Ex. 28. In the past four months, the death toll for 2022 has risen to 17. *Id.* at ⁋ 35, Ex. 27. There is insufficient staff to escort those in need of medical care to the medical unit, and people in custody have had to personally carry individuals to the clinic to obtain emergency care. *Id.* at ⁋ 15.

People detained at Rikers are locked in cells or housing units for days without access to the outdoors or other forms of recreation. FAC ¶ 200; Moore Decl. ⁋ 18, Ex. 10. When entire housing units have been shut down, people in custody spend weeks without leaving their unit. Essential services, including religious observance, have all but come to a standstill. FAC ¶ 200. These stretches of time without recreation and sunlight create a "torturous experience" for every detained person. *Id*. at ¶ 201; Moore Decl. ⁋ 18, Ex. 10. The inhumane and chaotic conditions have led to

staff and other contracted parties—who once lead skills, art, and education classes—to cease coming to the Island altogether. FAC ¶ 208.

Limited access to the courts and counsel is yet another unconstitutional condition of confinement at Rikers Island. The DOC is not reliably transporting persons in their custody to their scheduled court appearances, in violation of their right to access the courts. FAC ¶ 210. Over the last year and a half, detained persons who have already been held for extensive periods of time due to COVID-related court closures are subjected to even longer waiting periods because DOC staff is failing to escort them to their virtual and in person court appearances. *Id.* Legal calls and visits are also not guaranteed. *Id.* at ¶ 216. Attorneys cannot get ahold of staff to set up visits or calls, or when they do call at a scheduled time, attorneys are met with unanswered phones, or told that their client was not brought down to the legal call area. *Id.* A criminal defendant must attend court to advance their criminal case and leave pretrial detention at Rikers Island, and the limited access to counsel and the court keeps people in the abhorrent conditions of Rikers for longer periods of time. *Id.* at ¶ 219.

## II.   THE CITY OF NEW YORK HAS LONG KNOWN OF THE CONDITIONS AT RIKERS ISLAND AND HAS REPEATEDLY FAILED TO REMEDY THEM.

The City has long been aware of the appalling conditions at Rikers but has consistently failed to remedy them, allowing them to further decline. In 1975, a group of people in custody at New York City jails brought Section 1983 conditions of confinement claims against the City in *Benjamin v. Brann*, 75-CV-03073 (S.D.N.Y.), resulting in years of court-ordered reform and mandatory reporting on conditions at Rikers Island. The *Benjamin* monitor repeatedly found, including in 2019, 2020, and 2021, that the City still has not substantially complied with a September 2001 Environmental Order mandating that it provide clean jail cells, proper ventilation, adequate lighting, and other basic living necessities—violating this Order for more than 20 years.

8

FAC ¶¶ 116-121. Quarterly reports from the *Benjamin* monitor reveal that, during the Class Period, the City continued to subject people in custody at Rikers to unsanitary conditions decades after court-ordered reform. *Id.*; Moore Decl. ¶¶ 26, 40–42, Ex. 18, 32–34. Because the DOC knew of these worsening sanitation conditions, the *Benjamin* monitor found it "unconscionable that the Department would not only neglect to inspect the intake areas more frequently as required by the Environmental Order, but inspect them less often." Moore Decl. ¶ 26, Ex. 18. Conditions include ailing infrastructure, fire-singed trash and doors, stagnant water, rotten food, and "makeshift laundry." Moore Decl. ¶¶ 9–15.

The City is also aware of the longstanding violence at Rikers, but has failed to adequately remedy it. In 2013, an injunctive class action was brought in the Southern District of New York on behalf of all present and future persons incarcerated on Rikers Island alleging the City had a pattern and practice of excessive force. *See, generally*, *Nunez et al. v. City of New York et al.*, Case No. 11-CV-5845 (LTS)(JCF); FAC ¶ 260. In 2014, the United States Department of Justice issued a report on the conditions of confinement finding that "there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates" and the "investigation suggests that the systemic deficiencies identified in [the] report may exist in equal measure" for adult detained persons housed in separate facilities on the Island. FAC ¶ 262; Moore Decl. ¶ 43 X, Ex. 35. Then-Mayor Bill de Blasio publicly declared the multi-jail complex a "dehumanizing environment" which creates a "dynamic of conflict and violence" which was "decades in the making." FAC ¶ 261; Moore Decl. ¶ 44, Ex. 36. The following year, in 2015, a Consent Judgment was entered in *Nunez* providing for a federal monitor to report on the DOC's compliance with court-ordered reforms. The mayor then announced a plan to close Rikers Island, replacing it with borough-based jails, but recognized that the City needed to take "immediate steps" to ensure "safe,

humane conditions as quickly as possible." FAC ¶ 267; Moore Decl. ¶¶ 44, 46, Ex. 36, 38. The years following this announcement to Close Rikers—during the Class Period of November 1, 2018—Rikers Island has only fallen into further dysfunction and disrepair, while the City's plan to close Rikers (originally set for 2026) remains years away. FAC ¶¶ 267–68; Moore Decl. ¶ 46, Ex. 38. Since that announcement, the City has *again* failed to fulfill its duty to provide humane conditions of confinement at Rikers Island. Numerous advocates have recognized that the conditions on Rikers Island are "inhumane." Moore Decl. ¶¶ 3, 19, Ex. 1, 11.

Since the *Nunez* Consent Judgment was entered nearly seven years ago, federal monitor Steve J. Martin has produced at least twelve reports covering the period between October 22, 2015 (beginning the first monitoring period) and June 30, 2021 (ending the twelfth monitoring period); at least four Remedial Reports; and at least seventeen supplementary status reports, recommendations, and action plans associated with conditions on the Island, all of which make clear that the City has not only failed to comply with the terms of the Consent Judgment, but that conditions on Rikers have worsened significantly since the Consent Judgment was entered. FAC ¶ 264; Moore Decl. ¶¶ 22, 34–36 Ex. 14, 26–28. The Eleventh *Nunez* Monitor's Report warned that a "pervasive level of disorder and chaos in the Facilities is alarming" that extends far beyond the staff violence against adolescent males, for which the monitor was first required. Moore Decl. ¶ 34, Ex. 26.

One of the causes of the abhorrent conditions at Rikers Island is that, since at least 2018, the City has continued to fail to properly manage its DOC staff, leading to a staffing crisis that exacerbated deplorable conditions of confinement. Staff absenteeism has reached alarming levels, even though the DOC employs more than enough staff in proportion to the number of people in custody. FAC ¶¶ 222, 230, 246; Moore Decl. ¶¶ 56, 58 Ex. 48, 50. Even when current employees

*do* show up for their shifts, the City and DOC do not effectively manage them. FAC ¶¶ 223-226, 231, 241-242, 247. For example, during the Class Period, the City was aware that its needed to implement a modern system for deploying staff to various areas of the Island, rather than maintaining its current, handwritten shift schedules and rosters, but it failed to do so. *Id.* at ¶ 223. Accordingly, the City cannot effectively track where staff are assigned. *Id.* at ¶¶ 224, 231. Correction officers are assigned to posts where they are not needed, while entire housing areas are un- or understaffed, leaving people in custody without anyone to assist in medical emergencies or intrapersonal disputes, risking significant danger to their wellbeing. *Id.* at ¶ 246.

Additionally, because of high rates of absenteeism and mismanagement, officers are forced to work multiple shifts in a row, decreasing their ability to perform their duties correctly to ensure the safety of people in their custody, while simultaneously increasing the chance of violence against the detained population. *Id.* at ¶ 249. Since May 2021, there have been over 11 lockdowns on the Island due to staff absenteeism, leaving people in custody locked in their cells without recreation or services. *Id.* at ¶ 253. Nearly one-third of correction officers were not showing up to work or are unavailable. *Id.* at ¶ 255; Moore Decl. ¶ 49, Ex. 41. The City also refuses to enact a functional system for disciplining correction officers for misconduct, allowing a backlog of disciplinary actions to accumulate against officers when they use excessive force or fail to show up for work. FAC ¶ 175–78; Moore Decl. ¶¶ 34, 53, Ex. 26, 45.

The City simply refuses to remedy the deplorable conditions at Rikers. The City has not only failed to comply with the Environmental Order in *Benjamin* and the Consent Judgment in *Nunez* but also violated a September 2021 injunctive order that required the DOC to provide basic standards of living—including access to showers and personal care items, blankets, access to the courts, and hot meals—for the 115 people detained in just the Enhanced Supervision Housing unit.

FAC ¶ 274–75. On May 13, 2022, a separate court found the DOC in contempt of an order to provide access to sick call and not delay access to health services, as thousands of medical appointments were missed due to lack of officer escorts. *Id.* at ¶ 191; Moore Decl. ¶ 55, Ex. 47. Following that order, the City still had not ensured people at Rikers Island were escorted to medical appointments, and on August 9, 2022, the court ordered the DOC to pay $100 for each missed escort to the infirmary. Moore Decl. ¶ 60, Ex. 52.

## III.   THE CITY'S ADMISSIONS

Throughout the Class Period, the City has made numerous, public admissions of the deplorable conditions at Rikers Island and acknowledged its failures to act to remedy those conditions. In 2021, then-DOC Commissioner Vincent Schiraldi called Rikers Island a "humanitarian crisis." FAC ¶ 3. Last month, DOC Commissioner Molina called conditions at Rikers "disturbing" but noted, "Our infrastructure and staffing challenges, which are the result of years of mismanagement and neglect, are no secret." Moore Decl. ¶ 59, Ex. 51. Mayor Eric Adams has admitted that DOC's staffing "create[s] a serious risk to the necessary maintenance and delivery of sanitary conditions; access to basic services including showers, meals, visitation, religious services, commissary, and recreation; and prompt processing at intake." Moore Decl. ¶ 6, 46, Ex. 6, 48. Mayor Adams reports that only 7.2 percent of people in custody receive programming, services, recreation, education, or counseling. Moore Decl. ¶ 57, Ex. 49.

The City also admits that it has failed to ensure people in custody have access to medical care. The City's Board of Correction found that at Rikers Island, there is no "acceptably functioning system for providing emergency care to persons in life-threatening situations." FAC ¶ 185; Moore Decl. ¶ 37, Ex. 29. The Chief Medical Officer of Correctional Health Services, a City agency that provides medical care on Rikers Island, has stated that the City's staffing has

caused delays in transferring patients to clinics for care, to mental health units, or to the hospital, "even when 911 has been activated and EMS has arrived to transport them." Moore Decl. ¶ 5, Ex. 3. "[The] Department is aware of a large number of missed appointments due to lack of escort officers." Answer at ¶ 28.

The City acknowledged the "poor conditions" at Rikers Island, including "medication not being delivered to detainees, emergent conditions simply being ignored or not addressed and meals significantly delayed or not provided altogether" in a lawsuit the City filed against Corrections Officers Benevolent Association ("COBA")—the union—accusing COBA of orchestrating an "unlawful campaign of mass absenteeism" that caused "the deterioration of conditions." *City of N.Y. v. COBA*, Dkt. No. 1, at *6, 9 (Sup. Ct. N.Y. Co. Sept. 20, 2021); Moore Decl. ¶ 58, Ex. 50. The Board of Correction found that the City's staffing practices cause people to spend "significant lengths of time in intake" and affects "access to medical and mental health, time out of cell, recreation, visiting, televisiting, phone calls, showers, and more." Moore Decl. ¶ 23, Ex. 15.

DOC Commissioner Molina admits that his agency's security practices "are deeply flawed . . . and illogical even to those with no law enforcement experience," and that "inadequate supervision at the facility level" has created dysfunction throughout the system. FAC ¶ 220; Moore Decl. ¶ 27, Ex. 19. Commissioner Molina acknowledged that a "timely and meaningful discipline process . . . quite frankly has never existed in this department." FAC ¶ 178; Moore Decl. ¶ 27, Ex. 19. Commissioner Molina has criticized his agency's policies directly, stating, "Staffing practices and procedures do not allow [the DOC] to be effective operationally." FAC ¶ 225; Moore Decl. ¶ 27, Ex. 19. Molina observed that there is "no accountability in a number of areas" pertaining to staff misconduct, and that the City and DOC leadership have "created an environment where the discipline needed to operate a law enforcement agency [i]s absent." *Id.*

## IV.     PROPOSED CLASS, CLASS ALLEGATIONS, AND RELIEF SOUGHT

Plaintiffs move to certify a class of all individuals who were in DOC custody on Rikers Island from November 2, 2018, until the present and going forward until resolution of the case, and thus were subjected to unconstitutional and/or negligently administered conditions of confinement as described in the First Amended Complaint. FAC ¶¶ 99-219, 279.

Plaintiffs and the putative class members were all confined in the Rikers Island jail complex during the Class Period. On behalf of themselves and the Class, Plaintiffs bring claims against Defendant for violating (1) their constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; (2) their constitutional rights under the New York State Constitution including, but not limited to, Article 1, §§ 1 and 6; and (3) negligently subjecting incarcerated individuals from unreasonable risks of damage to their health and physical and mental soundness. Plaintiffs seek damages for the unconstitutional confinement conditions the Class endured while incarcerated on Rikers Island.

## V.     PROPOSED CLASS REPRESENTATIVES

Jerelle Dunn was detained pretrial at Rikers Island for one month. FAC ¶ 10. Upon arrival, Mr. Dunn was crammed in an intake cell shoulder to shoulder with 30 to 40 other people for almost one week. *Id.* at ¶ 21, 25. People urinated and defecated on the floor and walls, as they had no working toilet. *Id.* Mr. Dunn slept on a dirty floor when there was room on the floor or otherwise on a hard metal bench. *Id.* Mr. Dunn received small amounts of cold, inedible, and/or rotten food. *Id.* at ¶ 24. After being transferred to a housing unit, Mr. Dunn slept on a filthy floor for two days with no mattress. *Id.* at ¶ 25. Mr. Dunn could only clean himself in a dirty and bug-infested shower. *Id.* at ¶ 26–27. He was subjected to the threat of violence. *Id.* at ¶ 30. Mr. Dunn did not have

14

recreational time and only stepped foot outside when he went to court. *Id.* at ¶ 31. He was not produced for court appearances and did not receive legal mail. *Id.* at ¶ 32.

Samuel Semple was in pretrial confinement on Rikers Island for approximately six weeks. *Id.* at ¶ 11. He experienced overcrowding and unsanitary conditions including placement in a cell with approximately 40 men with an overflowing and leaking toilet, *id.* at ¶ 36, lack of medical and psychiatric care, *id.* at ¶¶ 35, 43, lack of adequate meals, *id.* at ¶ 37, threat of violence, *id.* at ¶¶ 38, 40, and lack of access to his court date, *id.* at ¶ 39.

Andre Washington was confined at Rikers for approximately six weeks, *id.* at ¶ 12. He experienced the inhumane conditions on the Island including an overcrowded cell of approximately 30 people who slept on an unsanitary and dirty floor, *id.* at ¶ 46, the dilapidated structural conditions including flooding floods and rats, *id.* at ¶ 48, threat of violence including witnessing a suicide attempt and other violence in the intake area, *id.* at ¶¶ 49, 50, lack of medical and mental health care, *id.* at ¶ 50, lack of access to several court dates to determine bail, *id.* at ¶ 51, lack of recreation and law library, *id.* at ¶ 52, and improper meals, *id.* at ¶ 53.

William Clanton was in pretrial confinement on Rikers Island for approximately fourteen months. *Id.* at ¶ 54. He experienced overcrowding and unsanitary conditions including placement in a cell with approximately 40 to 50 people, *id*. at ¶ 55, placement in housing where urine and feces were present throughout, *id*. at ¶ 65, overflowing and leaking toilet, *id*. at ¶ 36, threat of violence, *id*. at ¶¶ 57, 67, lack of adequate meals, *id.* at ¶¶ 61–64, and lack of recreation time, *id*. at ¶ 66.

Samir Shaban was in pretrial confinement on Rikers Island for approximately six months. *Id.* at ¶¶ 69, 76. He experienced overcrowding and unsanitary conditions including placement in an intake cell with at least 30 people, who lacked access to restrooms and were forced to urinate

and defecate on themselves, while others were vomiting from withdrawal or from the disgusting conditions. *Id*. at ¶¶ 70, 71, 74. Mr. Shaban was subjected to threat of violence, *id*. at ¶ 72, and lack of medical care, *id*. at ¶ 75. Staff did not take him to his virtual court date and forced him to miss a legal visit from his defense attorney, as they did not properly process the visit. *Id*. at ¶ 73.

Michael Pena was in confined for almost three full months in the inhumane conditions on Rikers Island. *Id.* at ¶ 15. He was deprived of medical care and prescription medication despite serious medical need, such that his wounds turned green and purple and discharge blood and pus. *Id.* at ¶¶ 80, 92, 94. Mr. Pena was placed in a cell with dried feces and human waste caked onto the toilet seat, walls, and floor of the cell. *Id.* at ¶ 83. He was subjected to verbal and physical violence and constant fear of violence. *Id.* at ¶¶ 84, 86-87, 95. Mr. Pena even witnessed multiple people attempt suicide. *Id.* at ¶¶ 88-89. He was also denied access to his parole revocation hearing, *id.* at ¶ 97, did not have access to recreation except approximately three times during the three months he was incarcerated, and was denied access to the law library, *id.* at ¶ 98.

## ARGUMENT

The Court should certify the Proposed Class, as it satisfies the requirements of Federal Rule of Civil Procedure 23(a), is ascertainable, and meets the requirements of Rule 23(b)(3). *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). The Second Circuit's "general preference is for granting rather than denying class certification, meaning that the requirements of Rule 23 must be construed liberally." *In re Allergan PLC Sec. Litig.*, 18-CV-12089 (CM)(GWG), 2021 U.S. Dist. LEXIS 170310, at *15 (S.D.N.Y. Sep. 8, 2021) (internal quotation marks omitted); *Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997).

Plaintiffs seeking to certify a damages class must satisfy the four requisites of Rule 23(a) and the requirements of Rule 23(b)(3): "that the questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008). "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

Courts in this Circuit have recognized that the "class action device is particularly well-suited in actions brought by prisoners due to the fluid composition of the prison population." *Clarkson v. Coughlin*, 145 F.R.D. 339, 346 (S.D.N.Y. 1993) (citing *Jones v. Smith*, 784 F.2d 149, 151 (2d Cir. 1986); *Loper v. New York City Police Department*, 135 F.R.D. 81, 83 (S.D.N.Y. 1991)). Class actions "tend to be the norm" in prison cases, as prisoners frequently arrive and leave an institution, but the underlying claims (here, deliberate indifference to unconstitutional conditions of confinement) remain. *Id.*

## I.     THE PROPOSED CLASS SATISFIES RULE 23(a).

### A.     Numerosity is Easily Satisfied.

Plaintiffs meet the numerosity requirement as they seek to certify a class of thousands of people incarcerated at Rikers Island from November 2, 2018, to the present. FAC ⁋⁋ 4, 6, 258. The Class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Where a putative class has more than forty members, numerosity is presumed. *See Shariar v. Smith & Wollensky Rest. Group,* 659 F.3d 234, 252 (2d Cir. 2011) (internal citations omitted). Plaintiffs are not required on a class certification motion to provide "evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). Though the exact number of individuals in custody will be determined through preliminary discovery, it will be in the thousands. Moore Decl. ⁋ 57, Ex. 49.

**B.      The Class Rests on Common Questions Capable of Class-Wide Resolution.**

Commonality is met if the plaintiffs' grievances share a single common question of law or fact. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("[F]or purposes of Rule 23(a)(2) even a single common question will do.") (internal quotations omitted). The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Courts examine "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* Common "issues whose resolution will affect all or a significant number of the putative class members" are sufficient to satisfy Rule 23(a)(2). *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (internal quotations and citations omitted).

Here, questions of fact common to Plaintiffs and class members include:

1.  Whether inactions and actions by Defendant has caused the unconstitutional conditions of confinement described in the First Amended Complaint;

2.   Whether Defendant failed to correct, or implemented, applied, or acquiesced to the unconstitutional and dangerous conditions of confinement described in the First Amended Complaint; and

3.  Whether Defendant's improper management of budget, resources, and staff has caused risks to the health, safety, general welfare, and dignity of people in custody on Rikers Island.

Common questions of law include, *inter alia*:

1.  Whether the omissions, practices, policies, and resulting confinement conditions alleged in the First Amended Complaint violate the Eighth and Fourteenth Amendments to the United States Constitution, in that they deprive the Plaintiffs and class members of their rights to be free from deprivations of liberty or punishment without due process of law, and to be free from cruel and unusual punishment;

2.  Whether Defendant's knowledge of the deplorable confinement conditions on Rikers Island, and its implementation of policies and practices that do not properly remedy

such conditions, amounts to deliberate indifference to the unconstitutional treatment of incarcerated people on the Island;

3. Whether Defendant's failure to exercise proper oversight of Rikers facilities to ensure safety and humane conditions amounts to a breach of Defendant's duty of care to people in its custody and whether such violation caused injury to those incarcerated on Rikers Island, constituting negligence and/or gross negligence;

4. Whether the conditions of confinement on Rikers Island, taken together, create an unconstitutional jail environment that violates the rights and human dignity of every person incarcerated on the Island; and

5. Whether Defendant's constitutional violations and misconduct, especially violations to human dignity, entitles the class members to general damages.

Determination of these common questions, which pertain to the constitutionality of confinement conditions on Rikers Island and Defendant's deliberate indifference and/or negligence to such conditions, will resolve issues central to the class-wide claims through 42 U.S.C. § 1983 (*Monell*) and New York State law. FAC ¶¶ 280–95.

The First Amended Complaint alleges numerous deplorable confinement conditions at Rikers Island—filthy and unsanitary living conditions; overcrowding; constant threat of violence, fear of not having access to medical and mental healthcare when needed; lack of programming, recreation; and religious services; and lack of access to courts and legal counsel. FAC ¶¶ 99–219. These conditions overall create an inhumane jail environment that poses an excessive risk to health and safety in violation of the Eighth and Fourteenth Amendments. FAC ¶¶ 3–5, 99–102, 136, 143, 150, 180, 198, 200, 219; 283–84, 288-289; *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation.") ("[C]onditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another.") (finding that for Eighth and Fourteenth Amendment conditions of confinement claims, a plaintiff must show that "conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of

19

serious damage to physical and mental soundness.") (internal quotations omitted). Every person held at Rikers Island during the Class Period has been subjected to the unconstitutional, unhealthy, unsafe, and inhumane environment at Rikers Island. Resolving common questions of the constitutionality of the conditions at Rikers Island will therefore affect "all or a significant number of the putative class members." *Johnson*, 780 F.3d at 137.

Courts in the Second Circuit have repeatedly held that questions pertaining to the nature and constitutionality of confinement conditions are capable of class-wide resolution. *See, e.g., Ingles v. City of New York*, 2003 U.S. Dist. LEXIS 2453, at *1 (S.D.N.Y. Feb. 18, 2003) (commonality requirement met where plaintiffs in New York City Department of Correction facilities alleged a "pattern and practice of excessive force"); *Langley v. Coughlin*, 715 F. Supp. 522, 555 (S.D.N.Y. 1989*)* (commonality requirement satisfied for a proposed class of inmates asserting conditions-of-confinement claims arising out of their confinement at the Special Housing Unit of the Bedford Hills Correctional Facility where "common issues include[d] whether the alleged conditions on SHU—including noise, smell, lack of hygiene, smoke and fire, and potentially traumatic unusual incidents—can amount to a violation of constitutional standards; the actual nature of conditions on SHU throughout the time period in question; and the effect that such conditions are likely to have on a person confined in SHU"); *Butler v. Suffolk Cty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) (commonality found where proposed class asserted conditions of confinement including chronic exposure to human waste, rusty showers smelling of sewage, inadequate ventilation, prolonged exposure to mold, rust, vermin, freezing temperatures, leaking water, and contaminated drinking water and food); *see also Dunn v. City of Chicago*, 231 F.R.D. 367, 377 (N. D. Ill. 2003) (certifying class of detainees under Rule 23(b)(3) noting that "[c]ourts routinely address conditions of confinement claims in class actions").

Courts nationally "routinely address conditions of confinement claims in class actions." *Dunn*, 231 F.R.D. at 377 (certifying class of detainees under Rule 23(b)(3)). "[C]onditions of confinement claims are amenable to class actions because the actions or inactions of defendants regarding [the jail] are applicable to all." *In re: Conditions at Lake County Jail*, 22-CV-127 (DMW) (D. Mont. Oct. 11, 2022) (ECF No. 49) (certifying a "Conditions Class" of "[a]ll person incarcerated at Lake County Jail as of September 3, 2021 to the present" as "the context is different in a jail—whether it is mold, or overcrowding, or poor food" as jail conditions apply to all, even if each person in custody "might have a slightly different concern on a different day"); *Aichele v. City of L.A.*, 314 F.R.D. 478, 490 (C.D. Cal. 2013) ("Because the class members were held with other class members in one of several locations, the conditions of their detention are shared and satisfy the commonality requirement."); *Flood v. Dominguez*, 270 F.R.D. 413, 416 (N.D. Ind. 2010) (certifying a class of detainees kept in overcrowded, filthy holding cells and forced to sleep on concrete benches and floors due to the jail's practices of keeping detainees in holding cells for prolonged periods of time); *Remick v. City of Phila.*, No. 20-1959, 2022 U.S. Dist. LEXIS 43339, at *28 (E.D. Pa. Mar. 11, 2022) (certifying a class of all people detained in Philadelphia Department of Prisons subject to unconstitutional conditions of confinement as a result of COVID-19 restrictions and staffing shortage).

Plaintiffs also allege that the City's policies and practices of incarcerating people in unconstitutional conditions, mismanaging Rikers Island, and failing to correct the deplorable conditions there amount to deliberate indifference to the constitutional rights of people incarcerated at Rikers Island. FAC ¶¶ 280–89. Courts have expressly held that the question of whether a municipality was deliberately indifferent to jail conditions is a "common question subject to class-wide resolution." *Butler*, 289 F.R.D. at 98. When an unconstitutional practice or

policy is alleged, commonality exists even if there are differences in the circumstances and claims for relief of individual class members. In a Southern District case challenging a policy and practice of suspicionless stops conducted by a unit of New York City Police Department, the Court held that the commonality requirement was satisfied where the "injuries complained of by the named plaintiffs allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will injure the proposed class members." *Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001). The Court held that even though "individual circumstances of class members may differ," the class claim is "that the [class members'] injuries derive from a unitary course of conduct by a single system." *Id.* at 417 (citing *Marisol A.*, 126 F.3d at 377); *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989) ("[T]he existence of individualized factors or variations does not preclude finding of existence of common questions where pattern, practice or policy exists."). Class Members' claims also stem from the same "unitary course of conduct" by the City, including deliberate indifference and/or negligence to the unconstitutional conditions on Rikers Island despite longstanding knowledge of those conditions.

Courts have also certified classes bringing negligence claims for unlawful conditions-of-confinement. *See, e.g.*, *Scott v. Quay*, 338 F.R.D. 178 (E.D.N.Y. 2021) (certifying a class bringing a Federal Tort Claims Act negligence claim for time incarcerated in at the Metropolitan Detention Center during "a series of inhumane and potentially dangerous conditions" including freezing cells, irregular and cold food, disrupted access to medical care, and cold showers). The *Scott* Court explained that the question at the class certification stage is not whether the "[negligence] elements can be assumed or established, but rather whether a class-wide proceeding can resolve them in a way that generates common answers bearing on each of the claims raised by class members." *Id.* at 187. As the answer to the question of whether Defendant's failure to ensure its jail met minimal

constitutional standards breached the duty of care would resolve the negligence claims of all class members in "one stroke," commonality is apparent. *Scott*, 338 F.R.D. at 187–88.

Every person detained on Rikers Island during the Class Period experienced violations of their rights and basic human dignity. FAC ¶¶ 99–102, 136, 143, 150, 180, 198, 200, 219. Thus, all the putative class members are entitled to at least general damages, which can be calculated on a class-wide basis. In *Betances v. Fischer*, 304 F.R.D. 416, 431 (S.D.N.Y. 2015), the district court found that general damages were available to the entire class for "loss of liberty," even where certain class members may also be entitled to individualized special damages for particularly egregious harms. Such general damages "need not be specifically proved . . . [but] may be inferred from the circumstances" experienced by the class. *Id.* Similarly, in a case challenging the blanket strip search policy of Nassau County Sheriff's Department, the Eastern District awarded general damages of $500 per strip search for each class member based on the inherent loss of human dignity associated with an unconstitutional strip search. *See Augustin v. Jablonsky*, 819 F. Supp 2d 153, 158 (E.D.N.Y. Oct. 19, 2011) (reserving ruling on all other damages for later determination); *In re Nassau County Strip Search Cases*, No. 99-CV-3126, 2008 U.S. Dist. LEXIS 29083, at *3–7 (E.D.N.Y Mar. 27, 2008) (finding that the class was entitled to compensatory, not merely nominal, damages for harm to human dignity).

Courts outside of this District have also certified classes with claims for general damages. *See, e.g.*, *Fant v. City of Ferguson*, No. 15 Civ 00253-AGF, 2022 U.S. Dist. LEXIS 102868, at *30 (E.D. Mo June 9, 2022) (certifying general damages class for loss of liberty where plaintiffs alleged that class was held in detention for unreasonable time periods); *Barnes v. Dist. of Columbia*, 278 F.R.D. 14, 20 (D.D.C. Dec. 7, 2011) (class-wide general damages based on affront to human dignity were appropriate in class action strip search and overdetention case). In 2019,

the Southern District of Texas allowed a general damages class of over-detained persons to proceed where "dominant issues. .. hinge[d] on liability derived from the same course of conduct and premised on the same legal theory," overshadowing any individualized damages that may be available to specific plaintiffs. *Hernandez v. City of Houston*, No. 16 Civ 35772019, U.S. Dist. LEXIS 111657, at *15 (S.D. Tex. July 3, 2019). The Central District of California certified a class of plaintiffs seeking general damages for pain, suffering, and a loss of dignity for all protestors arrested at a specific event based on a theory that "the claims ar[o]se out of a blanket, uniformly applied policy of arrest and detention without probable cause and under unconstitutional conditions." *Aichele*, 314 F.R.D. at 478. As plaintiffs seek general damages for injury to human dignity caused by the inhumane conditions at Rikers Island, certification is appropriate.

As common questions of fact and law exist that are capable of class-wide resolution, and the allegations in the amended complaint are of a systemic nature, commonality is satisfied. *See Newkirk v. Pierre*, No. 19-CV-4283 (NGG), 2020 U.S. Dist. LEXIS 144887, at *24 (E.D.N.Y. Aug. 11, 2020), report and recommendation adopted, 2020 U.S. Dist. LEXIS 155539 (E.D.N.Y. Aug. 26, 2020) (commonality satisfied because "the claims at issue. .. are systemic, not individual") (citing *R. A-G ex rel. R.B. v. Buffalo City Sch. Dist. Bd. of Educ.*, 12-CV-960, 2013 WL 3354424, at *10 (W.D.N.Y. July 3, 2013), *aff'd*, 569 F. App'x 41 (2d Cir. 2014)). *See also Aichele*, 314 F.R.D. at 490 (commonality requirement satisfied where plaintiffs "challenge[d] the overall conditions in which they were detained" and "need not prove that every single class member was subjected to every single adverse condition to establish a custom or practice of unconstitutional conditions").

**C.    Plaintiffs' Claims Are Typical of the Putative Class Members' Claims.**

Plaintiffs' claims are typical of those of the class they seek to represent, as their claims arise out of the same general "course of events" and rely on "similar legal arguments to prove the defendant[s'] liability." *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001) (quoting *Marisol A.*, 126 F.3d at 376); *see Robidoux*, 987 F.2d at 936–37 (typicality usually satisfied "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented"); Fed. R. Civ. P. 23(a)(3). The injuries sustained by Plaintiffs and class members arise from the same well-documented practices and policies of Defendant—supported, in part, by prior findings of liability and the City's own admissions—have caused the conditions to persist.

Given the pervasive nature of these inhumane conditions, Plaintiffs' and class members' claims arise out of "a unitary course of conduct by a single system" sufficient to satisfy Rule 23(a)(3). *Marisol A.*, 126 F.3d at 377. Plaintiffs and class members must prove the same elements of deliberate indifference and negligence. Accordingly, "by advancing their own interests," Plaintiffs "will advance the interests of the class." *Ventura*, 125 F.R.D. at 600 (citations omitted); *Cutler v. Perales*, 128 F.R.D. 39, 45 (S.D.N.Y. 1989) (typicality satisfied where "all members of the putative class would benefit by the success of the named plaintiff[s]"); *Hoeffner v. D'Amato*, No. 09-CV-3160, 2019 WL 1428367, at *7 (E.D.N.Y. Mar. 29, 2019).

### D.      Plaintiffs and Plaintiffs' Counsel Will Adequately Represent the Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." In evaluating whether a proposed class representative has met this requirement, courts consider "whether: (1) plaintiff's interests are antagonistic to those of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *Amchem Prods., Inc.*

*v. Windsor*, 521 U.S. 591, 625–26 (1997). The purpose of Rule 23(a)(4) is to weed out potential lead plaintiffs with "fundamental" conflicts of interest that "go to the very heart of the litigation." *Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013) (citation omitted).

The adequacy requirements are satisfied here. Proposed Class Representatives Dunn, Semple, Washington, Clanton, Shaban, and Pena have the same interests as, and no conflict of interest with, the Class. All were subjected to the same unconstitutional confinement conditions on Rikers Island and suffered the same general injuries as class members—violations of their constitutional rights and basic human dignity. FAC ¶¶ at 17–98. As Plaintiffs seek the same forms of relief—general damages—as class members, and do not stand to benefit from a unique resolution of the case, they are adequate Class Representatives.

Proposed Class Counsel have the requisite experience, qualifications, and ability to litigate on behalf of the Class. *See In re Drexel Burnham Lambert Group*, 960 F.2d 285, 291 (2d Cir. 1992). The Court considers the following: (1) "the work counsel has done in identifying or investigating potential claims in the action," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) counsel's knowledge of the applicable law, and "the resources that counsel will commit to representing the class." Rule 23(g)(1)(A). Adequacy is satisfied "where the class attorneys are experienced in the field or have demonstrated professional competence in other ways, such as by the quality of the briefs and the arguments during the early stages of the case." *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1106 (E.D.N.Y.2006). As enumerated in the accompanying declaration of Jonathan C. Moore, Proposed Class Counsel is highly experienced in complex class actions and have prosecuted numerous class actions. Moore Decl. ¶ 61–68. The Court has had the opportunity to judge the competence of counsel in asserting the claims in this case by reviewing the Complaint

and Amended Complaint, this motion, and other filings. Counsel have demonstrated that they have the resources and expertise to prosecute this action.

## II.    THE CLASS MEMBERS' IDENTITIES ARE READILY ASCERTAINABLE.

Courts in this Circuit recognize an "implied requirement of ascertainability in Rule 23." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). "[T]he touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.* at 24–25. Ascertainability is required "only to prevent the certification of a class whose membership is truly indeterminable." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

The identities of the class members are readily ascertainable. The Class is defined solely by objective criteria—any individual incarcerated and subjected to the conditions on Rikers Island during the Class Period. This information is in Defendant City's possession and is easily accessible. Some of this data is already published on New York City's Open Data website. Moore Decl. ⁋ 62, Ex. 54. Though the class members' names are currently not listed in the public spreadsheets, one of DOC's primary activities is recording the name of every person in its custody. Such information is in Defendant City's possession and can easily be produced to Plaintiffs. Additionally, Defendant has already agreed to provide preliminary discovery including a list of people incarcerated on Rikers Island and the length of their stay. Accordingly, obtaining the identities of the putative class members will be straightforward.

## III.   THE PROPOSED CLASS SATISFIES RULE 23(B)(3).

### A.   Common Questions of Law and Fact Predominate.

Class certification is appropriate if the questions of law or fact common to class members predominate over any questions affecting only individual members. Rule 23(b)(3). Generally, "the Rule 23(b)(3) predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010). Satisfying the typicality requirement is a strong indicator of predominance. *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986). If Plaintiffs can establish that the "issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole" will "predominate over those issues that are subject to individualized proof," predominance is satisfied. *Id.* at 483; *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001).

Class-wide issues predominate where "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). "The Second Circuit has emphasized individual liability issues need not be "*de minimus*" to certify a class; instead, predominance is "much broader." *Brown*, 609 F.3d at 485. The Court may "certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *In re Nassau Cty. Strip Search Cases*, 461 F.3d at 227. "[C]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." Each element of plaintiffs' claims need not be subject to class-wide proof. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 139).

Common to the Class are the following questions, *inter alia*: whether the confinement conditions at Rikers Island are cruel or inhumane, and/or violate due process and whether the City was deliberately indifferent and/or negligent to the unconstitutional conditions. Like the classes certified in *Butler* and *Langley*, class members in the instant case allege violations of their rights based on multiple, concurrent conditions of confinement that "may have a more acute effect . . . than would any one in isolation." *Langley*, 715 F. Supp. at 543; *Butler*, 289 F.R.D. 80. The predominance factor requires the Court to examine the elements of the underlying causes of action. *Stinson v. City of New York*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) (predominance was met where the Court found that answering questions that are common to the class members resolved the elements of the plaintiffs' 42 U.S.C. § 1983 *Monell* claim); *see Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 808-15 (2011). However, each element of plaintiffs' claims need not be subject to class-wide proof. *Sykes*, 780 F.3d at 81 (2d Cir. 2015).

To establish a Section 1983 claim against the City for unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments, Plaintiffs must show (1) that the City had an unconstitutional policy, custom or practice; (2) a causal connection between the municipal policy and constitutional deprivation; and (3) deliberate indifference to unconstitutional conditions of confinement. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978); *Darnell*, 849 F.3d at 32–33. Deliberate indifference under both the Eighth and Fourteenth Amendments requires a showing that people held at Rikers suffered an objective deprivation of "the minimal civilized measure of life's necessities" and "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to health, which includes the risk of serious damage to physical and mental soundness." *Darnell*, 849 F.3d at 27. The "conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (citing *Blissett v. Coughlin*, 66 F.3d

531, 537 (2d Cir. 1995)). The straightforward question common to all class members is: "Did the City know, or should it have known, that the conditions at Rikers Island posed an unreasonable risk to the health and/or safety of people detained there?" *See Darnell*, 849 F.3d at 40. Predominance is met, as at issue is the uniform policy—the City's longstanding pattern or practice of creating and maintaining inhumane conditions of confinement at Rikers Island, and the City's failure to remedy those conditions. *See Betances*, 304 F.R.D. at 101 (predominance met where plaintiffs alleged harm to the class by "a single, uniform policy").

For negligence, Plaintiffs must show that Defendant owed a duty of care, breached that duty, and that such breach was the proximate cause of the resulting injury. *Scott*, 338 F.R.D. at 190 (citing *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (2016)). "[I]t is well-established in New York that when the State assumes physical custody of inmates or detainees, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard those individuals from harm." *Case v. Anderson*, No. 16 Civ. 983, 2017 WL 3701863, at *23 (S.D.N.Y. Aug. 25, 2017); *Torres v. City of New York*, No. 09-CV-9357, 2017 WL 2191601, at *2 (S.D.N.Y. May 17, 2017) ("It is well established that the government undertakes a duty of care to prisoners in its custody with regard to foreseeable risks of harm."); *Mays v. City of Middletown*, 895 N.Y.S.2d 179, 182 (2d Dep't 2010) ("Here, because the plaintiff was in their custody, the police had a duty to safeguard him against foreseeable dangers.").

The overarching questions relevant to all class members pertaining to the negligence claim include those pertaining to Defendant's duty of care to people in its custody, whether Defendant breached that duty, and whether Defendant's breach caused the injuries. Answers to those questions "all involve allegations of negligence against the same actors, arising from the same

conduct" and "affecting claimants in the same or similar ways." *Scott*, 338 F.R.D. at 190 (damages class certified in case of negligence to conditions of confinement).

In sum, the questions at the core of each class member's causes of action pertain to whether the City's inactions and actions during the Class Period amounted to a violation of the Constitution and/or negligence. These questions of law are the same for each of the people housed at jails on Rikers Island. Determinations of unconstitutionality and/or negligence predominate over any factual variations among class members, including the question of individualized damages. *See Betances*, 304 F.R.D. at 429 (finding that questions of the defendant correction officers' liability predominated over the individualized circumstances of class members where common proof could be used to assess the plaintiff's claim of a constitutional violation); *Butler*, 289 F.R.D. at 102 (finding that questions of unconstitutionality of conditions of confinement and defendants' deliberate indifference predominated over "the extent of each class members' [sic] damages").

The predominance standard is met here because the overarching common question is whether Defendant's conduct, policies, and practices in creating and responding to the dangerous and inhumane conditions at Rikers Island constituted deliberate indifference in violation of the Constitution and/or if defendants breached the duty of care owed to those in their custody by failing to remedy these conditions. These fundamental questions do not vary among class members, and every class member would be forced to litigate these issues in the absence of class certification. Rule 23(b)(3) certification is thus well-suited for this case because all Plaintiffs challenge the City's uniform practices, which creates a "strong commonality of the violation and the harm." *Brown*, 609 F.3d at 468. Class certification would allow these questions to be resolved at once.

As Plaintiffs seek general damages for loss of human dignity, predominance is further satisfied. *See In re Nassau Cty. Strip Search Cases*, 2008 U.S. Dist. LEXIS 29083, at *19. General

damages require generalized proof, "need not be specifically proved," and "may be inferred from the circumstances of the . . . imprisonment." *Betances*, 2022 U.S. Dist. LEXIS 45082, at \*29 (citing *Kerman v. City Of New York*, 374 F.3d 93, 125 (2d Cir. 2004)). In *Betances*, where plaintiffs succeeded in certifying a class alleging Fourteenth Amendment Due Process violations, the court found plaintiffs could put forth evidence of general damages using a "daily rate" to compensate for loss of liberty from unlawfully imposed post-release supervision over the course of days, months, or years. *Id.* at \*34; *Augustin*, 819 F. Supp. 2d 153 (denying decertification with respect to liability and general damages and permitting class members to proceed individually on unique emotional distress damages).[1] While the length of class members' detentions vary, and thus the duration of the unconstitutional conditions of confinement varies, a matrix could be used, as well as a "daily rate" for loss of human dignity. *See Hernandez*, 2019 U.S. Dist. LEXIS 111657, at \*15 (predominance requirement satisfied and damages class certified where plaintiffs sought only general damages on a class-wide basis); *Aichele*, 314 F.R.D. at 496 ("Plaintiffs here specifically do not seek special damages for out-of-pocket losses such as lost earnings or medical expenses, which likely would require individualized inquiries. Thus, at this stage, it appears that the likelihood that individual damages questions will ultimately predominate over common ones is slim.").

### B.    A Class Action is Superior to Other Litigation Methods.

A class action is the superior method of adjudicating this case. Fed. R. Civ. P. 23(b)(3) identifies four nonexclusive factors for the court's consideration: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the

---

[1] Should the Court find it appropriate to follow a similar approach as in *Augustin*, it may certify a liability and general damages class and permit class members to proceed individually on all other damages.

particular forum; (D) the difficulties likely to be encountered in the management of a class action." *Id.* Each of these factors weighs in favor of certifying the Class.

First, it is unlikely that the class members are individually interested in controlling the prosecution of separate actions. *See In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *7 (S.D.N.Y. Aug. 13, 2020) (finding superiority where "there is no overwhelming interest by class members to proceed individually"). Counsel for Plaintiffs have received hundreds of calls from putative class members expressing interest in being part of the Class and inquiring on the procedural posture of the instant case. A large portion of the putative class members are still incarcerated and/or indigent, which makes a class action the best mechanism to obtain relief. The putative class members likely lack the resources and means to bring individual actions, which is indicative of the superiority of class-wide litigation. *Parker v City of N.Y.,* No. 15-CV-6733 (CLP), 2017 U.S. Dist. LEXIS 203579, at *27 (E.D.N.Y. Dec. 11, 2017) (certifying a class of detainees who were placed in segregated confinement upon re-arrest); *Hill v. County of Montgomery*, No. 9:14-cv-00933 (BKS), 2018 U.S. Dist. LEXIS 140305, at *23 (N.D.N.Y. Aug. 20, 2018) (certifying class for claims of inadequate nutrition in a county jail as detainees and former detainees, "are unlikely to have the financial resources to sue separately, judicial economy favors certification over joinder.").

Individual suits would require expending substantial litigation costs that would likely outweigh each class member's ultimate recovery. *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (internal quotation omitted); *see also In re Ashanti Goldfields Sec. Litig.*, 00-CV-0717 (DGT), 2004 U.S. Dist. LEXIS 5165, at *53 (E.D.N.Y. Mar. 30, 2004,) (finding that when cost of bringing

individual suits would "far exceed any individual recoveries," class members had "minimal" interest in individually controlling the prosecution); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually."). Finally, any class members who do retain an interest in individual suits will have the opportunity to opt out of the class. *See* Fed. R. Civ. P. 23(c)(2)(B)(v).

Second, Plaintiffs are unaware of other class members pursuing similar individual claims in separate cases. And this lawsuit has sufficiently progressed such that certification is proper. *See In re Nassau Cty. Strip Search Cases*, 461 F.3d at 230 (for purposes of the extent of litigation factor, progress in the action favors certification). The parties have already discussed discovery pertaining to the putative class members, Defendant has answered the First Amended Complaint, and the parties are engaging in mediation discussions.

Third, the desirability of concentrating the litigation in the present forum is apparent given that Defendant is located in this District, the events giving rise to the class-wide claims arose in this District, and many of the putative class members are still incarcerated within this District. Furthermore, concentrating this litigation in a single forum "avoids the risk of inconsistent adjudication, and encourages the fair and efficient use of the judicial system." *Tsereteli v. Residential*, 283 FRD 199, 218 (S.D.N.Y. 2012).

Finally, no great difficulties will arise in managing this case as a class action. On the contrary, "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'" *Catholic Health Care W. v U.S. Foodserv. (In re U.S. FoodServ. Pricing Litig.)*, 729 F.3d 108, 130 (2d Cir. 2013). Common legal and factual questions in this case will rely on the same generalized proof. *See*

Section II.A., *supra*. In considering manageability, courts have also considered how "geographically convenient" a district is for the parties. *Sykes*, 780 F.3d at 82. This District is the most convenient forum for litigating this action.

Even were management difficulties to arise, they are "certainly no greater than the management difficulties that would inevitably result from hundreds of separate trials." *See MacNamara v. City of N.Y.*, 275 FRD 125, 148 (S.D.N.Y. 2011) (*citing In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 529 (S.D.N.Y. 1996)). In the case of any management difficulties, there are numerous methods available for effectively managing any individual determinations of damages once the common issues have been decided. *See, e.g.*, *In re Nassau County Strip Search Cases*, 461 F.2d at 231 (instructing district court to bear in mind that "[t]here are a number of management tools available... to address any individualized damages issues," including, *inter alia*, creating subclasses).

Certifying the proposed Class as opposed to thousands of potential individual actions "cannot help but result in a huge savings of judicial resources." *Pub. Emples. Retirement Sys. of Mississippi v Merrill Lynch & Co.*, 277 FRD 97, 121 (S.D.N.Y. 2011) (citing *Robidoux*, 987 F.2d 931). Accordingly, this action satisfies the superiority requirement.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the Class as set forth above, pursuant to Rule 23(a) and (b)(3).

Dated: New York, New York
        October 24, 2022

**BELDOCK LEVINE & HOFFMAN LLP**          **RICKNER PLLC**

By: _____             By: _____/s/_____
    Jonathan C. Moore                          Rob Rickner
    David B. Rankin                            Masai I. Lord (of counsel)
    Deema Azizi                                Stephanie Panousieris
    Regina Powers

    14 Wall Street, Suite 1603
    New York, NY 10005
99 Park Avenue, PH/26th Floor       t: 212-300-6506
New York, NY 10016                             e: rob@ricknerpllc.com
t: 212-490-0400                                mlord@lordlawgroup.com
  212-277-5825                             stephanie@ricknerpllc.com
e: jmoore@blhny.com
  drankin@blhny.com
  dazizi@blhny.com
  rpowers@blhny.com                    **THE LAW OFFICE OF**
                               **CHRISTOPHER H. FITZGERALD**

    By**:**_____/s/_____
    Christopher H. Fitzgerald

    14 Wall Street, Suite 1603
    New York, NY 10005
    t: 212-266-2275
    e: CFitzgerald@CHFLegal.com

    *Attorneys for Plaintiffs*