Case No.:  21-cv-09012 (DLC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JERELLE DUNN, SAMUEL SEMPLE, ANDRE
WASHINGTON, WILLIAM CLANTON, SAMIR
SHABAN, and MICHAEL PENA, on behalf of
themselves and all others similarly situated,

Plaintiffs,

-against-

THE CITY OF NEW YORK,

Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.

*HON. SYLVIA O. HINDS-RADIX*
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:    John Schemitsch*
*Chlarens Orsland*
*Tel:  (212) 356-3539, 2086*
*Matter No. 2021-037024*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ III

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT

           THE MOTION FOR CLASS CERTIFICATION IN THIS OVERBROAD AND OVERREACHING ACTION SHOULD BE DENIED BECAUSE PLAINTIFFS FAIL TO ESTABLISH SEVERAL KEY PRONGS OF THE FEDERAL RULE OF CIVIL PROCEDURE 23 ANALYSIS, SPECIFICALLY COMMONALITY, TYPICALITY, AND ADEQUACY; NOR CAN THEY IDENTIFY AN ASCERTAINABLE CLASS, AND THEY FINALLY CRASH DECISIVELY ON THE SHOALS OF THE RULE'S PREDOMINANCE REQUIREMENT. ........................................... 4

        A. Requirements of Rule 23(a) ......................................................................... 5

             1. Numerosity.......................................................................................... 6

             2. Commonality....................................................................................... 7

             3. Typicality ............................................................................................ 8

             4. Adequacy ........................................................................................... 10

             5. Ascertainability ................................................................................ 13

         B. Requirements of Rule 23(b): Predominance and Superiority of Method ....... 15

             1. Predominance.................................................................................... 16

Religious Services........................................................................................................ 17

"Programming" Services ............................................................................................. 17

Recreation .................................................................................................................... 18

Violence ....................................................................................................................... 18

Medical Care................................................................................................................ 19

**Page**

Overcrowding and Intake Area Conditions ............................................... 20

Food ...................................................................................................... 20

Attorney/Court Visits............................................................................ 20

An Overbroad and Amorphous Policy Claim Is Not Conducive to Class
Resolution ............................................................................................. 21

The Remaining Rule 23(b) Factors......................................................... 21

CONCLUSION....................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*Amchen Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ....................................................................................................16, 21

*Azor-El v. City of New York*,
    20-cv-03650 (KPF), Dkt. No. 73 .................................................................................19

*Bowling v. Johnson & Johnson*,
    No. 17-cv-3982, 2019 U.S. Dist. LEXIS 67795
    (S.D.N.Y. April 22, 2019) .........................................................................................5-6

*Caridad v. Metro-North Commuter R.R.*,
    191 F.3d 283 (2d Cir. 1999),
    *cert. denied sub nom Metro-North Commuter R.R. v. Norris*,
    529 U.S. 1107 ...............................................................................................................5

*Casale v. Kelly*,
    257 F.R.D. 398 (S.D.N.Y. 2009) ...............................................................................14

*Consolidated Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995) .......................................................................................6-7

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) .........................................................................................16

*Flores v. Anjost Corp.*,
    284 F.R.D. 112 (S.D.N.Y. 2012) .................................................................................5

*Garcia de León v. N.Y.U.*,
    No. 21-cv-05005, 2022 U.S. Dist. LEXIS 110787
    (S.D.N.Y., June 22, 2022) ...........................................................................................5

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*,
    903 F.2d 176 (2d Cir. 1990) .........................................................................................9

*Gen. Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982) ..................................................................................................5, 8

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017) ...............................................................................11

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
    209 F.R.D. 323 (S.D.N.Y. 2002) ..........................................................................13, 14

**Cases**      **Pages**

*Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*,
    471 F.3d 24 (2d Cir. 2006)....................................................................................6

*Mullaney v. Delta Air Lines, Inc.*,
    258 F.R.D. 274 (S.D.N.Y. 2009) ........................................................................16

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)................................................................................16

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)................................................................................21

*In re Petrobras Sec. Litig*,
    862 F.3d 250 (2d Cir. 2017)..................................................................................6

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)..............................................................................7, 9

*Schlessinger v. Reservists Comm. To Stop the War*,
    418 U.S. 208 (1974)...........................................................................................11

*Sumitomo Copper Litig. v. Credit Lyonnaise Rouse, Ltd.*,
    262 F.3d 134 (2d Cir. 2001)..................................................................................6

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)..............................................................................6, 13

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)...........................................................................................17

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) .........................................................................10

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..........................................................................................6, 7

**Statutes**

42 U.S.C. § 1983.................................................................................................1, 15

Fed. R. Civ. P. 23............................................................................................4, 5, 6

Fed. R. Civ. P. 23(a) ...................................................................1, 4, 5, 6, 15, 16, 21

Fed. R. Civ. P. 23(a)(1).........................................................................................6

**Statutes**                                                                                   **Pages**

Fed. R. Civ. P. 23(a)(2) ...................................................................................................7

Fed. R. Civ. P. 23(a)(3) ...................................................................................................8

Fed. R. Civ. P. 23(a)(4) .................................................................................................10

Fed. R. Civ. P. 23(b) ................................................................................................15, 21

Fed. R. Civ. P. 23(b)(3) ...........................................................................1, 4, 6, 15, 16, 21

**Other Authorities**

1 *McLaughlin on Class Actions*, § 4:27 (17th ed.) ........................................................13

7A Wright, Miller & Kane, § 1764 (2d ed. 1986) ........................................................9

1 Herbert B. Newberg, *Newberg on Class Actions: A Manual for Group Litigation*
   *at Federal and State Levels,* § 3.13 (2d ed. 1985) ....................................................9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

JERELLE DUNN, SAMUEL SEMPLE, ANDRE
WASHINGTON, WILLIAM CLANTON, SAMIR
SHABAN, and MICHAEL PENA, on behalf of themselves
and all others similarly situated,                                  Case No.:  21-cv-09012 (DLC)

                                                Plaintiffs,

                        -against-

THE CITY OF NEW YORK,

                                                Defendant.

------------------------------------------------------------------------ x

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.

#### Preliminary Statement

  The plaintiffs in this Section 1983 action were formerly detained on Rikers Island during the COVID-19 pandemic, and claim that their conditions of confinement were unconstitutional and inhumane, largely due to relatively recent staff shortages in the New York City Department of Correction ("DOC" or the "Department"), which itself largely arose out of the pandemic.  They seek to represent *every person* incarcerated in the DOC's correctional facilities from November 2, 2018 to the present--claiming they all experienced the same purportedly deplorable conditions even years *prior* to the pandemic--and now move for class certification under Rule 23(a) and (b)(3).

  Defendant submits this memorandum of law in opposition to the motion, as Plaintiffs fail to meet their burden of establishing several prongs of the class certification

analysis. The proposed class is extraordinarily overbroad, and consequently suffers from two fatal flaws:

> (1) their theory of the case is predicated on required services not being provided due to pandemic-related staff shortages, which cannot be extrapolated to support earlier pre-pandemic alleged service deficiencies; and

> (2) not every person in custody ever has the same experience, especially as it relates to violence, medical care, access to courts, and other offered services. A person's circumstances will naturally vary depending on various factors, such as their housing area, length of stay, and personal circumstances, such as their age or health condition, or need or desire for particular services.

Consequently, Plaintiffs cannot establish the elements of commonality, typicality, and adequacy, or an ascertainable class and predominance. As discussed below, there are simply too many people and too many needs and too many services and too many individual circumstances to justify a judicial 'one size fits all' remedy. The motion for class certification should be denied.

## STATEMENT OF FACTS

The six plaintiffs, formerly incarcerated on Rikers Island during the period of the pandemic, seek to represent a class of current, former, and future detainees who were allegedly subjected to unconstitutional conditions of confinement, ranging from unsanitary conditions to denial of recreation to having to purportedly witness acts of violence and disorder around them. Although seeking to certify a class beginning on November 28, 2018, the six plaintiffs were all incarcerated during the 2020-2021 pandemic period, and the amended complaint and sole supporting declaration of counsel focus on well-publicized staffing shortages during this period. Relying heavily on Monitor reports in a case primarily focused on systemic use of force issues,

*Nunez v. City of New York*, Plaintiffs assert that staff shortages and purported mismanagement of DOC resources has resulted in a breakdown of order on Rikers Island, and that the provision of virtually all services came to a halt, and continues to this day. However, they also assert that comparable inhumane conditions existed in November of 2018, several years before the DOC began feeling the effects of the pandemic, with its resultant staff shortages; therefore, their theory of the case is inconsistent.

In conjunction with this Memorandum of Law, Defendant is submitting declarations of DOC employees and their counsel, to establish certain facts relevant to the motion, and to contextualize certain of Plaintiffs' assertions. *See* Declarations of Sherrie Rembert ("Rembert Decl."), Antonin Gajtani ("Gajtani Decl.") and Chlarens Orsland ("Orsland Decl."). Plaintiffs have not submitted *any* declarations of the proposed class representatives, rather relying on a declaration of counsel attaching 55 exhibits. Of these, 25 are media accounts of purported current conditions on Rikers Island, while the rest are excerpts of reports from court monitors and oversight agencies, executive orders and judicial orders from other cases. *See* Declaration of Jonathan C. Moore, dated October 24, 2022 ("Moore Decl.") (Dkt. No. 40).

For brief pertinent background, Rikers Island currently consists of eight facilities, whose population generally ranges from approximately 329 to approximately 2,076. *See* Rembert Decl. ¶ 5. In addition, DOC operates a prison hospital ward at Bellevue Hospital (and a prior ward, now closed, at Elmhurst Hospital). *Id.* There are currently about 5,892 individuals in custody. The population turns over frequently, and as of October 2022, DOC has had over 16,000 new admissions. The average length of stay of an individual in 2022 is 118.7 days. Prior to the pandemic, in 2018, there were over 43,000 new admissions. *Id.*

**ARGUMENT**

**THE MOTION FOR CLASS CERTIFICATION IN THIS OVERBROAD AND OVERREACHING ACTION SHOULD BE DENIED BECAUSE PLAINTIFFS FAIL TO ESTABLISH SEVERAL KEY PRONGS OF THE FEDERAL RULE OF CIVIL PROCEDURE 23 ANALYSIS, SPECIFICALLY COMMONALITY, TYPICALITY, AND ADEQUACY; NOR CAN THEY IDENTIFY AN ASCERTAINABLE CLASS, AND THEY FINALLY CRASH DECISIVELY ON THE SHOALS OF THE RULE'S PREDOMINANCE REQUIREMENT.**

Rikers Island is an easy target.  It is the subject of a long-standing plan to be closed and replaced with modern borough-based jails.   In more recent years, it has been burdened by the demands of the COVID-19 pandemic, as have all societal institutions.  Many advocates, elected officials, and court monitors have criticized its operations and are demanding change.

Riding this crest of criticism, and pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a class of plaintiffs consisting of individuals who were in DOC custody on Rikers Island from November 2, 2018 until the present, and going forward into the future, and seek monetary damages for allegedly being subjected to what they describe as unconstitutional conditions of confinement, as follows:

    a.  are held in overcrowded, unsanitary, and uninhabitable conditions while the jail structures crumble around them;

    b.  are denied access to adequate, sanitary, and regular meals;

    c.  suffer from violence and/or live in near-constant fear of violence from guards or other incarcerated people;

    d.  are denied access to preventative and emergency medical and mental health care;

4

    e.   are denied access to programming, recreation, and religious services; or

    f.   are denied timely access to the courts or their lawyers while in custody.

<u>See</u> Amend. Comp. ¶ 279.  As discussed below, *by virtue of their inconsistent theory of the case based on pandemic staff shortages, and the undeniably individual nature of a purported lack of service to so many thousands of individuals, Plaintiffs cannot meet several key prongs of Rule 23, and so class certification should be denied.*

## A.   <u>Requirements of Rule 23(a)</u>

Federal Rule of Civil Procedure 23(a) sets forth certain prerequisites to a class action lawsuit:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Before certifying a class, a district court must be persuaded, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999), *cert. denied sub nom Metro-North Commuter R.R. v. Norris*, 529 U.S. 1107 (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)).  The class proponent bears the burden of showing that each of the above four requirements has been satisfied.  *Flores v. Anjost Corp.*, 284 F.R.D. 112, 121 (S.D.N.Y. 2012).  "The test is conjunctive; if one element is not met, then the claim cannot be certified for class treatment." *Garcia de León v. N.Y.U.*, No. 21-cv-05005, 2022 U.S. Dist. LEXIS 110787 at *22 (S.D.N.Y., June 22, 2022).  "These four requirements...effectively limit the class claims to those fairly encompassed by the named plaintiff[s]' claims." *Id.* at *22-23, quoting *Bowling v.*

5

*Johnson & Johnson*, No. 17-cv-3982, 2019 U.S. Dist. LEXIS 67795 (S.D.N.Y. April 22, 2019) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)).

Although not expressly required by Rule 23, the Second Circuit has also recognized an implied requirement of ascertainability, which requires that the description of the proposed class be sufficiently definite using objective criteria. *In re Petrobras Sec. Litig,* 862 F.3d 250, 260 (2d Cir. 2017). In addition to the Rule 23(a) requirements, the named plaintiffs must also demonstrate that class certification is warranted under Rule 23(b)(3), which is available when the Court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3).

A party seeking class certification must establish by a preponderance of the evidence that each of the requirements set forth in Rule 23 has been met. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 546 F.3d 196, 201-03 (2d Cir. 2008). In addition, the Court must "resolve[] factual disputes relevant to each Rule 23 requirement" and find that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *Miles v. Merrill Lynch & Co., (In re Initial Pub. Offering Sec. Litig.),* 471 F.3d 24, 41 (2d Cir. 2006). The district court is afforded broad discretion in class certification questions because it is often in the best position to assess the propriety of the class action. *Sumitomo Copper Litig. v. Credit Lyonnaise Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).

## 1. **Numerosity**

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This prerequisite is satisfied by a class consisting of at least 40 members. *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.

1995). Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement. *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir. 1993). Here, Defendant does not dispute the prong of numerosity.

### 2. **Commonality**

Rule 23(a)(2) requires there to be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart,* 564 U.S. at 349-50 (internal quotation marks omitted). "This doesn't mean merely that they have all suffered a violation of the same provision of law." *Id.* at 349. The common injury "must be of such a nature that it is capable of class wide resolution--which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id. at 350.* Thus, it "is not the raising of common 'questions'--even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation" that renders a class certifiable on commonality grounds. *Wal-Mart Stores, Inc.,* 564 U.S. at 350 (emphasis in original) (internal citations omitted).

Here, Plaintiffs allege that all putative class members have suffered injuries from common issues of fact: *i.e.,* the contention that Defendant's policies and practices are violating the substantive rights of the putative class (whether by deliberate indifference or negligence). *See* Pl. Mem. at 18-19. More precisely, and fairly read, the amended complaint alleges that the DOC did not adequately respond to the COVID-19 staffing crisis and has been generally deficient in its managerial responsibilities in recent years. Plaintiffs thus boldly conclude that everyone who is or has been in DOC custody for the last four years--even prior to the pandemic-- has been injured by these policies, and they seek monetary damages as a remedy.

However, it is readily apparent that the many thousands of individuals implicated by this contention--who have all had varying experiences in different facilities and housing area and Intake areas--would not necessarily have a common injury, even if DOC's policies were found to have led to deficient conditions in the jails generally. *The glaring infirmity of this action is the multiplicity of outcomes that may have resulted from any system-wide deficiency, often itself dependent on the individual circumstances of the affected detainee.* For example, there are currently eight operating jails, each with their own warden and supervisory staff. *See* Rembert Decl. at ¶ 4. Housing areas themselves have their own populations and characteristics, such as a particular security threshold or other condition, such as a mental health classification. *Id.* Thus, lack of staff in one facility may impact detainees differently--depending on what service they wanted that day and whether it could be rescheduled. Moreover, each warden uses their discretion in addressing operational issues of this sort, thus resulting in varying outcomes from one facility to another. A mental health unit will perforce have different needs from a restricted housing unit or a General Population unit. Different Intake areas for new admissions were in use at various times. This deficiency in Plaintiffs' contention also implicates a number of other prongs in the analysis, including 'typicality,' 'adequacy,' and 'predominance,' and is discussed in continuing detail below.

### 3. <u>Typicality</u>

The typicality requirement of Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Like the commonality requirement, typicality "serve[s] as [a] guidespost[] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co.*, 457 U.S. at 158 n.13.

The "typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux,* 987 F.2d at 936. Where the same conduct is alleged to have been "directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 936-37. (citing 1 Herbert B. Newberg, *Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels* § 3.13, at 167 (2d ed. 1985); 7A Wright, Miller & Kane § 1764, at 235-36 (2d ed. 1986)).

Plaintiffs cannot satisfy the typicality prong. As an initial matter, while seeking to represent over 100,000 current and former detainees, from November 2, 2018 to the present (*see* Rembert Decl. ¶8), *the named Plaintiffs are only representative of recent conditions, not coincidentally coinciding with staffing issues that occurred in the wake of the pandemic.* All six plaintiffs were admitted during this period, five in March 2021-September 2021, and one in September of 2020 (Mr. Clanton). *See* Amend. Comp. ¶¶ 10-15. They were not present during the earlier proposed class period beginning in November 2018--a year in which DOC had over 43,000 admissions (*see* Rembert Decl. ¶ 8--and so cannot make claims regarding lack of services in that period. Consequently, they lack the wherewithal to represent those individuals, and thus their claims are not typical of any earlier-in-time claims. And even in a more circumscribed recent time period, as discussed throughout this memorandum of law, the multiplicity of personal characteristics, circumstances and outcomes also renders them atypical.

Class certification is also inappropriate "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 903 F.2d 176, 180 (2d Cir. 1990).

For those who claim they were denied services during the COVID-19 period--*i.e.*, all *named* plaintiffs*--the DOC will contend that necessary public health measures were required to prevent the spread of COVID-19 and to protect the health of the detainees and staff--all of which unfolded during momentous and uncertain times.  These measures restricted movement in the jails and suspended certain services (*e.g.,* in-person visits, communal activities such as religious services), in favor of various accommodations (*e.g.*, video visits, individual religious counselling).  These wide-spread protective measures will demonstrate that DOC officials in fact were not deliberately indifferent to the safety of persons in their charge, and these responsive actions specifically addressed to an unprecedented pandemic will be a defense in this action.

As to those held in the pre-COVID period, DOC will contend that any interruptions to mandated services were not common, especially since there was no similar Department-wide staffing emergency as occurred in the latter stage of the pandemic.  When interruptions or denials occurred, that would typically be due to legitimate security issues, such as a facility lock-down or institutional search operation, or other unforeseen event.  And even when a service could not be provided, say due to an absent staff member, the Department will show that often a missed service could be provided later in the day or on another shift, or could simply be rescheduled.  *See* Rembert Decl., ¶ 5.  A delayed recreation session or rescheduled tele-visit or routine sick call visit and the like would only be of constitutional import under exceptional circumstances.

### 4.  <u>Adequacy</u>

Rule 23(a)(4) requires plaintiffs to "demonstrate that the proposed action will fairly and adequately protect the interests of the class."  To satisfy this requirement, class representatives must demonstrate that they are members of the class they purport to represent. *In re Vitamin C Antitrust Litig.,* 279 F.R.D. 90, 100 (E.D.N.Y. 2012).  "To have standing to sue as a

class representative it is essential that a plaintiff…be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlessinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 216 (1974) (citations omitted). Once that threshold has been met, courts apply a three-part test.

> First, Plaintiff must demonstrate that class counsel is qualified, experienced…[and] generally able to conduct the litigation, and that no conflicts exist that might impair its representation. Second, the named plaintiff must show that there is no conflict of interest between the named plaintiffs and other members of the plaintiff class. Third, a named plaintiff must exhibit enough integrity and credibility to convince the court that the named plaintiff will diligently perform its fiduciary duties to the class.

*Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 536 (E.D.N.Y. 2017) (citations and internal quotation marks omitted).

Here, the named Plaintiffs are not representative of the detainees who were held prior to the pandemic period, and in addition, are not fairly representative of the class they seek to represent even during the pandemic period.[1]   The following analysis discusses and also reflects the infirmities of Plaintiffs' theory that were identified above in the 'commonality' and 'typicality' analyses.   Again, the consistent infirmity is the vast number of individuals sought to be represented and financially redressed for a vast number of alleged constitutional deficiencies.

The most glaring deficiency afflicts perhaps the most consequential subject matter category in this action: violence in the jails.  Here, none of the named Plaintiffs claim they were assaulted by DOC staff, although Mr. Clanton *suggests* he was, in a vague statement lacking any detail; but fairly read, it appears to place him as an observer only.  *See* Amend. Comp. ¶ 67: "[Clanton] also *experienced and witnessed* violence from guards, including security teams picking up the men by their pants and necks and literally throwing them into their cells."

---

[1] Defendant does not challenge the adequacy of present counsel to litigate a class action.

(emphasis added).  Only one plaintiff, Mr. Semple, claims he was assaulted by a fellow detainee-
-not an officer-- who took his cane and hit him with it.  *See id.* at ¶ 40.  Mr. Semple also claims
he was "indirectly sprayed" when officers attempted to subdue others with a chemical spray.  *Id.*
at ¶ 38.

   In addition, alleged victims of violence will likely have a particularly distinct and
compelling interest in prosecuting their own cases, rather than being part of a class of thousands,
especially one in which none of the named representatives was similarly situated with them as
fellow victims of direct violence.  An individual with a more serious injury or more egregious
circumstances will likely pursue their case with great vehemence, while someone who was
pushed and perhaps handcuffed too tightly may be less motivated.  Some may have counsel or
wish to retain private counsel.  Family members and dependents will undoubtedly have an
exceptional interest in the prosecution of the case, especially in death or permanent injury cases.
Under these circumstances, what similarity or interest would a family member or estate
administrator have with Mr. Semple or Mr. Clanton, such that they would be comfortable having
their interests represented by them in a class context?

   Plaintiffs demonstrate similar infirmities in their claims to speak for others
regarding purported lack of medical care.  These are similar to those infirmities identified above
in the 'commonality' and 'typicality' analyses.  For example, of the six plaintiffs, Mr. Clanton
does not allege lack of medical care, and Mr. Shaban alleges his requests for care were denied,
buts offers no details about what condition needed care (Amend. Comp. ¶ 75).  The claims of the
remaining four are disparate and show just how starkly claims can differ, making them
inappropriate for class resolution on liability, let alone damages.  Mr. Semple alleges in
conclusory fashion that he suffers from medical and psychiatric issues and needs medication and

doesn't get it (Amend. Comp. ¶¶ 35, 43).  Mr. Dunn alleges he waited three weeks before being able to see a doctor (*id.* ¶ 29).  Mr. Washington claims he has blood pressure issues and "heart complications," but makes no further allegation about not receiving medical care; rather, he alleges that his condition makes him "vulnerable to severe COVID-19" (*id.* ¶ 47).  He also alleges that being in jail affects his mental health and he has never received treatment (*id.* ¶ 50).  Mr. Pena claims he did in fact see a doctor on his first day (May 10, 2021), and once again on June 4, 2021, a day after an incident; he received a prescription but was denied medication for a week, leading to an infection, and later he was not treated for a spider bite (*id.* ¶¶ 78-80, 84, 92).

In the context of a proposed class consisting of over 100,000 individuals, in which close to a thousand individuals file their own lawsuit every year challenging various conditions of confinement unique to their circumstances (*see* Gajtani Decl. at ¶ 6), these named Plaintiffs cannot be adequate representatives.  Their proffered claims are disparate and distinct, and thus are not representative of others.

Finally, the proposed class representatives have not submitted declarations in support of this motion.  Plaintiffs must demonstrate adequacy by a preponderance of the evidence, *see Teamsters Local 445*, 546 F.3d at 202, and proposed class representatives thus typically submit declarations or affidavits "demonstrating their willingness and ability to take an active role in pursuing the case."  1 McLaughlin on Class Actions, §4:27 (17th ed.).  Here, the individuals at issue have not taken the most basic step in proving this aspect of their case.

### 5. Ascertainability

As to the implied requirement of ascertainability, plaintiffs typically must demonstrate that there is an 'identifiable class.'  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 209 F.R.D. 323, 336 (S.D.N.Y. 2002)).  A class is identifiable when, as stated above, its membership may be ascertained by reference to objective criteria.  *Id.* at 337.

Here, Plaintiffs essentially allege that every individual who ever entered a New York City jail--even if for a single day--experienced deplorable conditions of constitutional import. This includes a period of time even prior to the pandemic, when there would be no apparent reason for the unusual staffing shortages that affected the DOC in the latter stage of the pandemic. However, it is not enough for Plaintiffs to assert that the class is ascertainable simply because DOC can identify every detainee it held in recent years (Pl. Mem. at 27); what must be ascertained are those individuals *subject to the described alleged constitutional deprivations*.

By contrast, in *Casale v. Kelly*, the loitering case, the Court suggested that it might not certify a class that comprised every individual arrested by the NYPD who had a valid claim against it; what allowed a class of arrestees to be certified was that it was limited to those arrested for a violation of two specific sections of the Penal Law that had been declared unconstitutional--*i.e.*, those arrested for loitering. *See Casale v. Kelly*, 257 F.R.D. 398, 413 (S.D.N.Y. 2009).

Here, several aspects of the class definition itself are also vague and imprecise, rather than "specific" and "objective," as required by the standard, and so the individuals in the class are not in fact ascertainable. Specifically, "uninhabitable conditions" and "crumbling" structures are rhetorical terms and vague. Equally rhetorical and subjective is "fear" of violence, as opposed to actually being a victim of violence, either by staff or fellow detainees. How does one identify individuals who fear violence? Presumably everyone in New York City fears violence. This is vague and overbroad and does not lend itself to constitutional analysis. "Where any criterion is subjective, *e.g.*, state of mind, the class is not ascertainable." *In re Methyl Tertiary Butyl Ether Prods.*, 209 F.R.D. at 337. "Programming" is also vague and

ambiguous, as it could refer to school classes or counselling or an AA meeting or any number of other jail activities.

While "overcrowding" itself is a recognized condition actionable under Section 1983 under certain circumstances, in this case, that allegation appears to be limited to those held in overcrowded Intake areas upon their admission; there is no general allegation that regular housing areas anywhere else in the jails are overcrowded, and this portion of the proposed class definition must fail. Moreover, DOC has utilized various Intake facilities over the years. *See* Rembert Decl. In addition, the named Plaintiffs were all admitted in 2021, but for Mr. Clanton, who was admitted on September 25, 2020. *See* Amend. Comp,. ¶ 54. They have no apparent experience in the jails in November of 2018 or the years preceding the pandemic. Therefore, contrary to Plaintiffs' assertion, the ability to simply list every detainee on Rikers Island over the last four years does not make this category capable of being ascertained.

**B.**    **Requirements of Rule 23(b): Predominance and Superiority of Method**

In addition to satisfying the prerequisites of Rule 23(a), a party seeking certification of a class must also demonstrate that the action satisfies one of the conditions set forth in Rule 23(b). Plaintiffs here seek to certify a class pursuant to Rule 23(b)(3), which applies to matters in which:

> (3)    the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)   the likely difficulties in managing a class action.

*See* Fed. R. Civ. P. 23(b)(3).  As discussed below, this requirement decidedly dooms Plaintiffs' attempt to gather up the almost unimaginably diverse individual claims implicated by this motion, and present them to the Court as capable of efficient and fair resolution in one fell judicial stroke.

### 1.  Predominance

The Rule 23(b)(3) predominance requirement is designed to ensure that the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quoting *Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  A class should be certified "only when it would achieve economies of time, effort, and expenses, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (internal quotations immitted).  This requirement is "far more demanding than the Rule 23(a) requirement that common questions of law or fact exist." *Mullaney v. Delta Air Lines, Inc.*, 258 F.R.D. 274, 278 (S.D.N.Y. 2009); *Amchen Prods.*, 521 U.S. at 623-24.

The predominance requirement "is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (internal quotation marks and citation omitted,)  Moreover, "[a]n individual question is one where 'members of a proposed class will need to present evidence that varies from member to

member,'" while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

As discussed above, in a case involving thousands of individuals over a four year period--each purportedly subjected to some combination of several differing unconstitutional conditions of confinement--*their claims will necessarily vary individually in character, and thus will require individualized proof, not generalized proof.* The fact that Plaintiffs may be able to show that on a particular day or week or month that a certain percentage of staff was absent, would not perforce lead to the conclusion that every individual in that facility was denied a service or missed an appointment during that time. Any number of reasons could delay or deny a service other than purported managerial ineptness or lack of staff. A security situation could halt movement and delay services. A clinician may be out sick. There may be a technical problem with the tele-visit equipment. Or individuals may simply prefer not to leave the housing area at that time because they are tired or preoccupied. These contingencies affect all the subject services at issue here:

### *Religious Services*

Only those individuals who intended to attend a religious service, and purportedly could not be escorted to the chapel, would be affected in this particular category. Or those of religious bent may not be regular attendees or may prefer an individual visit by a DOC faith leader, rather than attend a congregate service--especially during the COVID period, when movement had to be restricted.

### *"Programming" Services*

Similarly, only those actually scheduled for particular "programming" (Amend. Comp., ¶ 279(e)) would be affected by an inability to attend a class or counseling session.

Moreover, if the class or activity was simply rescheduled, as is common (*see* Rembert Decl., ¶ 5), there would be no purported denial of services, just a delay that would not necessarily offend the Constitution.

### *Recreation*

Not all detainees will choose to attend outdoor recreation every day, especially if housed in a General Population housing unit with free movement in that unit. Sometimes inclement weather conditions will disincentivize outdoor recreation. Sometimes a conflicting family or counsel visit will be more appealing. Or a court appearance will trump a recreation slot. Or an individual prefers to finish a card game or watch a ball game on the day-room television or finish a phone call or just lounge around the housing area that day.

### *Violence*

Perhaps most significant is the category of violence. As the district courts are well aware, there are any number of lawsuits alleging that incarcerated persons have been subjected to unlawful force, or that staff failed to intervene to protect them from other detainees. These allegations can range from being too tightly hand-cuffed to being shoved against a wall to being punched to being subjected to a chemical spray to being relentlessly beaten or thrown down a flight of stairs. In these cases, alleged injuries could vary wildly, from soft-tissue injuries to permanent disabilities to simple loss of dignity. Therefore, generalized proof of lack of staffing will not prove these highly individualistic claims.

Similarly, cases that result in tragic deaths will vary wildly, especially as some are self-harm cases and some are drug overdose cases, and not necessarily the result of an assault by staff. Some may allege excessive force by staff, while some may allege deliberate indifference, especially in circumstances where a detainee is found unresponsive in their cell.

### *Medical Care*

Similarly, claims of access to medical care or denial of medical care raise particular issues unique to each individual. Some will be young and healthy and have less need for care, and some will be older and perhaps less healthy and in greater need of care. Some will have underlying medical conditions and some may not. Some may have a mental health condition and some may not. Some may have allergies or high blood pressure or anxiety or a disability; the list goes on. Proof of staffing shortages or general mismanagement will not lead to a conclusion that thousands of detainees were all denied medical care in some uniform manner. (Moreover, those housed in a medical dormitory or at a hospital prison ward are not similarly situated, as they have direct access to clinical staff.)

Plaintiffs cite the mandamus order in the current state court Article 78 proceeding, *Agnew*, involving a lack of escort officers to take detainees to regular sick call. But missing a sick call may be entirely non-consequential, if the purpose is to address a minor ailment or seek information or advice; the visit can be rescheduled by the clinic or the individual can make another appointment. Even someone with a scheduled procedure or even a surgical appointment may not be particularly prejudiced if that appointment has to be rescheduled. Outside the jail context, scheduling issues of this sort happen with some regularity. By contrast, an individual found unresponsive in their cell requires immediate emergency care. Again, there is little commonality in a world of over 100,000 prospective plaintiffs, all of whom would not necessarily have similar concerns or experiences.[2]

---

[2] As the Court may be aware, in the early stages of the pandemic, as reported in the media, many detainees were released to reduce the population to lower the risk of spreading the virus. *See e.g.*, Decl. of DOC Deputy Commissioner Patricia Feeney, submitted in *Azor-El v. City of New York*, 20-cv-03650 (KPF), Dkt. No. 73 (at ¶ 64) (discussing release of approximately 1,500 detainees). This group is also dissimilar to the named Plaintiffs and others in custody.

### *Overcrowding and Intake Area Conditions*

Plaintiffs also allege, with some rhetorical flourish, that all proposed class members "are held in overcrowded, unsanitary, and uninhabitable condition while the jail structures crumble around them." (Amend. Comp. ¶ 279).  However, upon closer review of the amended complaint, Plaintiffs appear to be referring to those individuals held in crowded Intake pens while awaiting processing and transfer to a housing unit--a recent purported development attendant to the staffing issues affecting DOC in the wake of the pandemic.  *See e.g.,* Moore Decl. ¶¶ 9-16.  As discussed above, the named individual plaintiffs were admitted primarily after March 2021, with one entering in September 2020.  The dates of the cited media reports discussed in the Moore declaration supporting the allegations of over-crowding and mismanagement are post- October 21, 2021, with most accounts reporting the summer and fall of 2022.  *Id.*  Thus, there is a clear line of demarcation between the current plaintiffs and prior detainees, as well a distinction with Intake and General Population housing areas.

### *Food*

There is no general allegation that detainees are not being fed while in custody.  Rather, Plaintiffs allege that food--often in the context of the Intake area while awaiting transfer to a housing area--is delayed or served cold or is not otherwise "adequate." *See e.g.,* Amend. Comp. ¶¶  20, 32, 61, 64.  Under the "demanding" standard of predominance, these allegations are simply insufficient.

### *Attorney/Court Visits*

Similarly, occasional allegations of missed attorney visits or in-person court appearances do not appear to predominate.  Tele-visits and in-person visits by counsel (or family) can be rescheduled, and it is not unusual for court appearances to be adjourned or rescheduled as necessary.

### *An Overbroad and Amorphous Policy Claim Is Not Conducive to Class Resolution*

This case can be contrasted with another case demonstrating a clear example of circumstances where every individual in a detention system would perforce be aggrieved by a defined and unambiguous policy, thus warranting class certification as to liability, *see In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) ("*In re Nassau I*"). In that case, the detention system had a blanket policy of strip-searching everyone arrested on misdemeanor charges unrelated to weapons or drugs; the Second Circuit found that this "simple policy" affecting all does indeed warrant class certification. *Id.* at 226-28, 231. When one compares this policy to the purported policy at issue in the instant action--deliberate indifference (or negligence) to staffing shortages and general mismanagement of the jails--it is clear that one cannot characterize a somewhat amorphous policy challenge relating to general management deficiencies as having the same or even similar effect on every individual who ever stepped foot on Rikers Island. As discussed above, *there are too many people and too many needs and too many services and too many individual circumstances.* So even if Plaintiffs could meet all the requirements of Rule 23(a), this motion would fail squarely and emphatically on the predominance requirement of Rule 23(b)(3).

### *The Remaining Rule 23(b) Factors*

Turning to the other factors of Rule 23(b), this analysis also dooms Plaintiffs' motion for class certification. Rule 23(b) is intended "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote...uniformity of decision as to *persons similarly situated*, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchen Prods.*, 521 U.S. at 615 (quoting Advisory Committee's Notes on Rule 23(b)(3)) (emphasis added). The non-exclusive list of factors, as discussed below, supports

the City's contention that a class action is inappropriate due to the differing nature of the individual claims of thousands of detainees, either past or present.

First, there is already a great deal of current litigation concerning the controversies identified in this action. As set forth in the accompanying declaration of Antonin Gajtani, the DOC Legal Division is currently defending approximately 846 lawsuits filed in 2022 alone. *See* Gajtani Decl. at ¶ 8. In the prior four-year period, almost 3,000 cases were filed. *Id.* Therefore, the courts in the Southern and Eastern districts are already enmeshed in cases seeking monetary damages for alleged constitutional deprivations of the kind at issue here. And while there would likely be an 'opt out' period in the event of class certification, the many *pro se* litigants in our districts may not be in a position where they could reasonably assess the benefits and risks of doing so.

Nor would there be any great benefit to having a single district judge oversee these cases in a class action, as the local district judges (specifically in the S.D.N.Y. and E.D.N.Y.) are routinely handling these cases as they come across the transom. The number of cases has not increased appreciably in relation to the pre-pandemic number of lawsuits; in fact it has been slightly decreasing. *See* Gajtani Decl., ¶ 8. Therefore, it does not appear that any particular economy will be achieved by assembling all claims before this individual Court.

Indeed, even if Plaintiffs were correct that they could establish common liability, it would be even more problematic to determine damages, due to the differing impact a particular constitutional violation would have on an individual detainee. Therefore, individual damages issues would still have to be tried and resolved, and so no economy or convenience would be achieved in any event. For these reasons, the predominance standard cannot be established.

## **Conclusion**

For the above reasons, Plaintiffs cannot meet their burden of proving all the prongs of the class certification analysis, and because there is no judicial 'one size fits all' remedy, Plaintiffs' motion for class certification must be denied.

Dated:      New York, New York
            November 28, 2022

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the
  City of New York
Attorney for Defendant
100 Church Street
New York, New York 10007
(212) 356-3539, 2086
jschemit@law.nyc.gov
corsland@law.nyc.gov

By:      _____

John Schemitsch
Chlarens Orsland
Assistant Corporation Counsel

23