Case 1:21-cv-09012-DLC   Document 43-4   Filed 11/28/22   Page 1 of 12

# EXHIBIT A



|  | THE CITY OF NEW YORK |  |
|---|---|---|
| **ZACHARY W. CARTER**<br>*Corporation Counsel* | **LAW DEPARTMENT**<br>100 CHURCH STREET<br>NEW YORK, NY 10007 | **CHLARENS ORSLAND**<br>(212) 356-2086<br>corsland@law.nyc.gov |

June 7, 2019

**By E-Mail**

Nicole Austin-Best
Deputy Director
Office of Compliance Consultants

              Re:    Defendants' Response to Draft OCC Progress Report (January-April, 2019)

Dear Nicole:

      On behalf of The New York City Department of Correction ("DOC" or the "Department"), I write in response to the Office of Compliance Consultants' ("OCC") draft report concerning environmental conditions in the city jails, for the period January-April 2019 ("Draft Report"). The Draft Report covers sanitation, ventilation, lighting and fire safety, plus miscellaneous inmate complaints.

      As this is the first progress report issued in several years, we include basic background information where we think it would be helpful for the Court.

## Sanitation (§ II-A)

OCC acknowledged receipt of DOC inspection reports of the covered facilities. By way of background, each jail has an assigned Environmental Health Officer ("EHO"), who is a captain trained by civilian managers (who are Public Health Sanitarians) at DOC's Environmental Health Unit ("EHU"), and who conduct regular sanitation inspections. In addition, certain areas of jails are also regularly inspected by EHU Public Health Sanitarians themselves.

As to the sanitation monitoring system originally developed by each side's experts, in conjunction with the OCC expert, the DOC did in fact disengage from this system during a joint inspection, due to a unilateral change in the protocol by the experts that was not countenanced by DOC. The DOC's chief sanitarian, Patricia Feeney (currently the Deputy Commissioner for Environmental Matters), found it inappropriate to fail a housing area on a joint inspection with OCC and Plaintiffs' expert on criteria that she had not agreed to follow. However, DOC continues to adhere to all aspects of the inspection protocol as previously agreed to among OCC and the parties.

However, DOC inspectors will still fail an area if it is deficient in a single critical area in the Housekeeping Management category. The facility is expected to promptly address such failure, which is the point of the inspections. DOC's inspection forms also include a narrative section for inspections to provide any necessary context of any deficiencies. In the normal course, most deficiencies are subsequently corrected, and DOC inspectors follow up in the course of subsequent inspections.

The DOC is attempting to computerize the inspection process, so that inspectors do not have to manually compute individual scores. EHU staff attended presentations by a number of outside vendors in May, 2019, and is currently meeting with an interested vendor to

discuss purchase of such a system. We will advise OCC and counsel of any developments in this regard.

The Draft Report devotes considerable space to shortcomings affecting the use of the Diversey apparatus, a machine which dispenses certain cleaning and sanitizing fluids. See Draft Rep. at pp. 6-8. This machine was introduced to ensure that only officers with keys could access dangerous cleaning supplies; inmate work crews would thus use the substances only under proper supervision. (The previous use of soap balls has been discontinued). OCC notes that housing areas have been cited by DOC inspectors for deficiencies in the Diversey machines. As a threshold matter, it is not clear what response OCC seeks by simply listing areas where OCC subsequently surveyed Diversey machines and presumably noted deficiencies without identifying those deficiencies (Draft Rep. at p. 8). As with all violations noted by DOC staff, deficiencies are expected to be corrected by the facility in short order after the citation. DOC inspectors have their own keys and are able to access these machines to ensure they are working properly. If a work order is issued (for any deficiency), those are required to be listed in a work order log.

To date, these machines have in fact been in need of frequent repair, and EHU keeps supplies of hoses and locks in the storehouse that are distributed to the facilities as needed. While most repairs can be effectuated in-house, the manufacturer is called in on occasion to service machines, most recently on March 8, 2019 (the MDC facility) and March 20, 2019 (the AMKC facility).

The Draft Report also discusses vermin sightings as a component of the sanitation order; however, the vermin order was terminated many years ago. Inmates eat their meals in the housing areas and typically have commissary privileges, which can naturally lead to vermin

3

activity, although DOC is generally not aware of "infestations." Until recently, each facility had an assigned exterminator to ensure proper sanitary standards. Within the last two months, two exterminators retired and two transferred to the New York City Housing Authority, resulting in some exterminators now covering two facilities. However, the job openings have been posted and DOC anticipates filling the four vacant slots. In addition, the EHU has its own supervising exterminator, who reviews monthly exterminator reports, assists in compliance, and will respond to any apparent infestation.

As to Intake Areas/Receiving Rooms (Draft Rep. § *ii(a)*), these are holding areas where inmates are temporarily held pending transfer to a housing area, or for transport to an area outside of the inmates' home facility (e.g., court appearance, off-island medical specialty clinic). DOC strives to keep these areas clean and orderly, but acknowledges that the constant daily turnover of inmates makes that task challenging. Facility exterminators are also available to address issues in the intake areas of each facility.

## (ii) Housekeeping Scoring Percentages

OCC states that it "believes that the Department's scoring practices results in artificially inflated compliance percentage scores and illusory compliance, in certain cases." See Draft Rep. at p. at 12. While DOC disagrees with this contention, if OCC believes the current protocol should be changed, DOC is willing to hear its suggestions and discuss the matter.

### A.   Lighting

While OCC generally agreed with the DOC sanitation findings related to light levels, it criticized the DOC purported "practiced of determining lighting to be adequate when the lighting was not measured." Id. at p. 14. As discussed further below in the 'lighting' section, there is a separate order on measuring light levels. In the course of routine sanitation inspections, DOC had previously agreed to provide a 10 foot candle standard in the showers and

4

janitor closets only, and does measure these. Measuring other areas can be discussed in conjunction with a meeting on the light order, but as discussed further below, the DOC does not believe that it can take any additional steps to improve light levels in the jails.

OCC's recommendation that DOC provide 10 foot candles of light in dayroom and sleeping areas (as opposed to showers and janitor closets)--to better detect "soil or soap residues"--is noted. However, Judge Baer's light order, which is still in effect, requires a minimum 20 fc in these areas (for reading purposes); therefore, this recommendation is unnecessary and in conflict with Judge Baer's order.

**B.   Ventilation**

As a threshold matter, Defendants have engaged an outside consultant, Dagher Engineering (which had previously provided services to DOC), to review DOC's compliance with the current ventilation standards. We anticipate organizing a meeting in the near future with OCC, its ventilation expert, and Plaintiffs' counsel to discuss the order, DOC compliance, and next steps. We are happy to discuss any concerns of OCC or Plaintiffs at this meeting.

*i/ii/iii Quarterly and Monthly Reports*

On May 25, 2019, Defendants circulated the following reports to OCC and counsel: monthly mechanical equipment for period December 2018-February 2019, and yearly ventilation mechanical equipment inspection report for period March-April 2019.

*iv. DOC Monthly Ventilation Status Reports to the Court*

As noted above, Defendants plan on meeting with OCC and counsel to review DOC's compliance with the ventilation order, including air-balancing.

### 2. Windows

When inoperable windows are reported in the normal course, work orders are generated to make the necessary repair. If the window is inoperable and cannot be immediately repaired, the cell will be taken out of service and the inmate relocated.

### C. Lighting

Neither the parties nor OCC have discussed lighting in recent years. The last major event was the agreed-upon implementation of the recommendations of an outside consultant. As OCC and counsel are aware, DOC had implemented *all* recommendations and thus had replaced light bulbs and light fixtures, and also painted the cell walls white. Short of tearing down the building and constructing new jails,[1] the DOC cannot take further steps to increase light levels. DOC is currently reviewing light levels in certain areas of the jails and will provide an update to OCC and counsel in the near future.

### Fire Safety

As a threshold matter, the Court should be aware that there is no system-wide Order concerning fire safety, as there are for the other areas of the litigation. For many years, fire safety has been the subject of meetings and discussions with Plaintiffs' counsel, OCC, and OCC's fire safety consultant, Mario Antonetti, as well as DOC's consultant (currently Chris Heaton). In the past, the group would occasionally meet with Judge Baer to provide updates when requested. The DOC had previously advised the late Judge Baer that it would embark on a plan to improve fire safety, that would at its core, ensure that all facilities have, at a minimum, operational fire alarms and smoke detectors.

This DOC position was, and has been, a philosophical point of contention between DOC and OCC/plaintiffs' counsel. The OCC expert, Mr. Antonetti, has consistently opined that the facilities must adhere to the current national fire code to maximize fire protection (e.g., sprinklers, smoke barriers). While the DOC is not adverse to this additional higher level of protection--and has stated its intentions of doing so in the future--it does not believe that this is *constitutionally* required. Therefore, as the DOC's core fire safety plan now draws to a close, it seems evident that ultimately this Court should be presented with a fully briefed motion to resolve the question of what constitutes reasonable fire protection sufficient to meet constitutional standards. As is the parties' practice, there will be a meeting with DOC, Plaintiffs' counsel, and OCC (and the respective experts) to meet and discuss this issue in more detail, prior to agreeing to any briefing schedule.

However, prior to that time, as noted in the Draft Report, the parties are currently discussing specific safety issues at the Brooklyn facility. Following the parties' meeting with Mr. Antonetti, the Department has engaged in discussions and review with the Department's expert regarding the facility. We will meet again with Plaintiffs' counsel and OCC to see if we can agree on a resolution of this specific dispute. After the Brooklyn matter is resolved, we intend to review the DOC's implementation of its original plan with OCC and counsel, and discuss how to best proceed prior to seeking Court intervention.

---

[1] The Court may be aware of an announced proposal to close Rikers Island and move all inmates off the island; this proposal does in fact contemplate the construction of new jails, as well as upgrades to current borough facilities.

7

## III Complaints

OCC occasionally receives environmental complaints from Plaintiffs' counsel (or directly from inmates or others), although most complaints are typically sent directly to DOC's Office of Constituent and Grievance Services ("OCGS"). OCGS is the DOC ombudsman for complaints and inquiries from inmates and their families, and when complaints are sent by Legal Aid, responses are made to them directly. DOC will discuss a protocol to have OCC directly copied on responses to individual complaints.

In this quarter, OCC has identified 13 specific complaints.

### Comp. No. 1 (Hot Water)

This complaint is no longer within the purview of Court monitoring since the underlying Benjamin order(s) have been terminated.

### Comp. No. 2 (Sanitation)

The Department was notified of this complaint on January 3, 2019, and EHU addressed the complaint. On January 7, 2019, it was noted that the house detail was in the process of cleaning and sanitizing the area. EHU was advised that an inmate had been smearing and throwing feces, and affected areas were cell 20, common areas, and the clinician's office. All areas were observed clean except for the area outside of cell 11, where cereal boxes, wrappers, and other food debris were noted. Supplies used to clean and sanitize the area had been discarded after use. Sufficient cleaning supplies (general purpose cleaner and Virex II 256 disinfectant) were provided.

### Comp. No. 3 (Sanitation)

The Department was notified of this complaint on January 9, 2019. The investigator interviewed the inmate, and asked him if he was afforded a broom, mop, and cleaning solution. The inmate replied, "yes, but I want bleach to clean my cell, they do not give

8

me bleach." The Department does not provide bleach to inmates for safety reasons, but instead provides a cleaning solution from the Diversey machine, which had been offered to the inmate. The investigation confirmed that sanitation detail comes to the housing area daily to clean the housing area.

**Comp. No. 4 (Heat)**

This complaint is no longer within the purview of OCC and Court monitoring since the underlying Benjamin order(s) have been terminated, with the exception of the provision of Judge Baer's Heat Order concerning punitive segregation. Complaints outside this litigation should be forwarded by OCC to the DOC Office of Constituent and Grievance Services, which investigates and responds to all complaints.

**Comp. No. 5 (Brown Drinking Water)**

This complaint is no longer within the purview of Court monitoring since the underlying Benjamin order(s) have been terminated.

**Comp. No. 6 (Temperature)**

This complaint is no longer within the purview of Court monitoring since the underlying Benjamin order(s) have been terminated. See response to Comp. No. 4 above.

**Comp. No. 7 (Temperature)**

This complaint is no longer within the purview of Court monitoring since the underlying Benjamin order(s) have been terminated. See response to Comp. No. 4 above.

**Comp. No. 8 (Temperature)**

This complaint is no longer within the purview of Court monitoring since the underlying Benjamin order(s) have been terminated. See response to Comp. No. 4 above.

### Comp. No. 9 (Cell flooding)

The Department was notified of this complaint on February 26, 2019. The facility investigated and confirmed no flooding or hazardous conditions existed in or around the cell of the inmate who filed the complaint. The inmate refused to submit a written or verbal statement. The inmate who filed the complaint has been known to file multiple (at least four documented) complaints alleging the same or similar issues, all of which were deemed unsubstantiated.

### Comp. No. 10 (Sanitation)

The Department was notified of this complaint on February 26, 2019. The facility investigation revealed that an inmate had been throwing urine and feces on the floor in front of his cell. An inmate work crew removed the feces, and cleaned and sanitized the area. The remainder of this complaint is not within the purview of Benjamin Court monitoring.

### Comp. No. 11 (Cell Fires)

The Department was notified of this complaint on March 18, 2019. On March 16th, the DOC Fire Safety Unit ("FSU") responded to GRVC as a result of a fire alarm activation. It determined that an inmate had attempted to set ablaze various paper materials. The FSU officers inspected the area and confirmed that no smoke or fire conditions were present. Upon a search, the inmate's cell was found to not contain any possible ignition sources. Photographs were taken of the area and the alarm panel was reset by the officers.

### Comp. No. 12 (Sanitation)

The Department does not appear to have a record of this complaint when it was lodged (apparently in March). In the progress report, it is evident that the complaint language requests action of OCC, not of the Department. It was not until April 16, 2019 that OCC

forwarded the complaint to the EHU. In order to ensure prompt action on the part of the Department, OCC should immediately forward environmental complaints to DOC in the future.

**Comp. No. 13 (Broken Soap Dispenser)**

The Department was notified of this complaint on March 6, 2019. The facility investigated and confirmed that the soap dispenser was broken. Work orders to repair and replace parts as needed were placed.[2]

**Conclusion**

We appreciate the opportunity to respond to the Draft Report, and to update the Court on the status of the remaining open areas in the Benjamin litigation.

Sincerely yours,

Chlarens Orsland
Assistant Corporation Counsel

cc:   Mary Lynn Werliwas
      Veronica Vela
      Robert Quackenbush
      Dale A. Wilker
      Counsel for Plaintiffs

---

[2] Due to employee absences, DOC cannot presently confirm the completion of the work.

11